**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD COLLURA, Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>          v.<br><br>WARNER BROS. DISCOVERY, INC., DAVID M. ZASLAV, and GUNNAR WIEDENFELS,<br><br>                   Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Richard Collura ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Warner Bros. Discovery, Inc. ("WBD" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired WBD securities between

February 23, 2024 and August 7, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     WBD is a global media and entertainment company that provides a portfolio of content, brands, and franchises across television, film, streaming, and gaming outlets.  The Company operates through several reportable segments including, *inter alia*, its Networks segment, which primarily consists of its domestic and international television networks.

3.     WBD's television networks include, *inter alia*, TNT, which has relied on basketball programming to drive ratings and revenue since 1988, particularly through its U.S. sports rights agreements with the National Basketball Association ("NBA").  Under its existing 2014 deal with the NBA, TNT paid an annual average fee of $1.2 billion.

4.     In 2024, the NBA entered advanced discussions with its various partners for a new round of media-rights deals that would last approximately a decade.  WBD was unable to reach a new deal with the NBA before its exclusive negotiating window expired in April 2024, allowing the NBA to negotiate with other companies for its sports rights content, including, *inter alia*, NBC, which offered to pay an annual average fee of $2.5 billion, and Amazon, which offered to pay an annual average fee of $1.8 billion.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill; (ii) WBD's goodwill in its Networks segment had

significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) the foregoing significantly increased the likelihood of WBD incurring billions of dollars in goodwill impairment charges; (iv) accordingly, Defendants had overstated WBD's overall business and financial prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.      On August 7, 2024, WBD issued a press release announcing its second quarter 2024 financial results.  Among other items, WBD reported disappointing revenue of $9.71 billion, representing a 6.3% year-over-year ("Y/Y") decrease and missing consensus estimates by $360 million; as well as a net loss of approximately ***$10 billion*** because of a $9.1 billion non-cash goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects.  WBD disclosed that the goodwill impairment charge was "triggered in response to the difference between market capitalization and book value, continued softness in the U.S. linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA."

7.      On this news, WBD's stock price fell $0.69 per share, or 8.95%, to close at $7.02 per share on August 8, 2024.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  WBD is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

12.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

13.      Plaintiff, as set forth in the attached Certification, acquired WBD securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.      Defendant WBD is a Delaware corporation with principal executive offices located at 230 Park Avenue South, New York, New York 10003.  WBD's Series A common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "WBD".

15.     Defendant David M. Zaslav ("Zaslav") has served as WBD's President and Chief Executive Officer at all relevant times.

16.     Defendant Gunnar Wiedenfels ("Wiedenfels") has served as WBD's Chief Financial Officer at all relevant times.

17.     Defendants Zaslav and Wiedenfels are sometimes referred to herein as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of WBD's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of WBD's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with WBD, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

19.     WBD and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     WBD is a global media and entertainment company that provides a portfolio of content, brands, and franchises across television, film, streaming, and gaming outlets.  The Company operates through three reportable segments: Studios, Networks, and Direct-to-Consumer

("DTC").  The Networks segment primarily consists of its domestic and international television networks.

21.    WBD's television networks include, *inter alia*, TNT, which has relied on basketball programming to drive ratings and revenue since 1988, particularly through its U.S. sports rights agreements with the NBA.  Under its existing 2014 deal with the NBA, TNT paid an annual average fee of $1.2 billion.

22.    In 2024, the NBA entered advanced discussions with its various partners for a new round of media-rights deals that would last approximately a decade.

## Materially False and Misleading Statements Issued During the Class Period

23.    The Class Period begins on February 23, 2024, when WBD issued a press release during pre-market hours announcing its fourth quarter and full year 2023 financial results (the "4Q/FY23 Earnings Release").  The 4Q/FY23 Earnings Release quoted Defendant Zaslav as stating, in relevant part, that Defendants had purportedly "execut[ed] against [their] strategic plan to reposition the company," were "now on solid footing with a clear pathway to growth", and "ha[d] an attack plan for 2024 that includes . . . further progress against [their] long-range financial goals" such that Defendants "[we]re confident in [their] ability to drive sustained operating momentum and enhanced shareholder value."

24.    With respect to WBD's Networks segment, the 4Q/FY23 Earnings Release stated, *inter alia*:

- Networks operating expenses decreased 7% ex-FX[1] to $2,829 million compared to the prior year quarter. The AT&T SportsNet business exit favorably impacted the year-over-year growth rate by approximately 300 bps[.]
  - Costs of revenues decreased 7% ex-FX, primarily driven by lower international sports rights fees, including the transfer of TNT Sports Chile, exiting the AT&T SportsNet business, as well as lower domestic general entertainment content expense, partially offset by the impact of inflation in Argentina.

---

[1] WBD's references to "ex-FX" in its financial statements refer to the exclusion foreign exchange rate effects.

- SG&A [selling, general, and administrative] expenses decreased 4% ex-FX, primarily driven by lower personnel expenses.

25.     The same day, WBD hosted a conference call with investors and analysts to discuss the Company's fourth quarter and full year 2023 results (the "4Q/FY23 Earnings Call").  During his prepared remarks on the 4Q/FY23 Earnings Call, Defendant Zaslav asserted, *inter alia*, that "[o]ur top priority this year was to get this company on solid footing and on a pathway to growth, and we've done that"; that "[w]e've significantly enhanced the efficiency of the organization with a long runway still to go"; that "[w]e are optimistic that the efforts we've undertaken on digital and advanced advertising solutions . . . will enable us to achieve a more competitive profile"; and that, "[b]ottom line, we're a far healthier company now," "we're building real momentum", "[a]nd we expect 2024 will be a year to drive that momentum forward even further" notwithstanding "the impacts of ongoing disruption in the pay-TV ecosystem and a dislocated linear advertising ecosystem."

26.     With respect to the NBA and its content, Defendant Zaslav stated, in relevant part:

Last weekend we saw great coverage and strong ratings at the NBA All-Star Game and All-Star Weekend. We have a strong positive 40-year relationship with the NBA. And in terms of our NBA rights, we are now fully engaged in renewal discussions, and they are constructive and productive. Our global sports portfolio continues to provide real meaningful value to all of our platforms. We're proud to be the home of one of the most coveted collections of premium sports content in the industry, along with a best-in-class talent roster and exceptional production values.

27.     During the question-and-answer ("Q&A") phase of the 4Q/FY23 Earnings Call, an analyst noted that it was "great news to hear [the positive news regarding] the NBA conversations", which "[c]learly . . . would be a big positive to retain those rights", and asked "[h]ow do you think about making that work financially for the company" given "that linear TV is under pressure on the revenue side, and I think it's probably safe to say the NBA costs are going to go up", and "how

do you guys approach this from a kind of a P&L [profit and loss] point of view when you think about exploiting the NBA for what I imagine will be another long-term deal?"  Defendant Wiedenfels responded, in relevant part:

> [O]n the NBA, as you know, we're in the middle of exclusive discussions here, so I want to lift it up maybe one level to a general statement on how we look at sports rights. We're spending close to $20 billion sort of, on content and programming in the broadest sense, and every dollar we spend plays a different role across the portfolio. We generally like to own our content. That's not the case with sports, but we obviously acknowledge the enormous value, reach value, emotional value of these deals. And we have been able to strike profitable deals and we're always going to be disciplined. It's very easy to lose control over sports rights investments. That's not what we do. We're going -- we know exactly what value we assign and we stay disciplined during our discussions.
>
> And if you take that into account, I think we have enormous opportunity to be much more efficient with our content spend overall across the entire company, and that will include certain areas in which, you're right, you probably have to assume that there is inflation going forward. On the NBA specifically, we've had a very, very strong partnership for 40 years, and I certainly hope that we're going to be able to continue that in the most positive way.

28.     Also on February 23, 2024, WBD filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K").  With respect to the Company's 2023 goodwill impairment analysis, the 2023 10-K stated, in relevant part:

> *2023 Impairment Analysis*
>
> As of October 1, 2023, the Company performed a quantitative goodwill impairment assessment for all reporting units. The estimated fair value of each reporting unit exceeded its carrying value and, therefore, no impairment was recorded . . . . [T]he Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%. The fair values of the reporting units were determined using a combination of DCF [discounted cash flow] and market valuation methodologies. Due to [*inter alia*] declining levels of global GDP growth, [and] soft advertising markets in the U.S. associated with the Company's Networks reporting unit . . . the Company will continue to monitor its reporting units for changes that could impact recoverability.

8

29.     In addition, the 2023 10-K contained generic, boilerplate representations regarding WBD's "invest[ment of] significant resources to acquire and maintain licenses to produce sports programming" and that "there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed", stating, in relevant part:

> We face significant competition to acquire and maintain licenses to sports programming, which leads to significant expenditure of funds and resources. As a result of an increasing number of market entrants in the programming space, we have seen upward pressure on programming costs in recent years, particularly in connection with the licensing and acquisition of sports content from third parties. We may also be impacted by such upward pressures driven by increasing investment in programming by competitors . . . . There can be no assurance that we will be able to compete successfully in the future against existing or new competitors to obtain and/or maintain licenses to recurring sports events, or that increasing competition for programming licenses . . . will not have a material adverse effect on our business, financial condition or results of operations.
>
> There can also be no assurance that we will recoup our investment in sports programming, including realizing any anticipated benefits of our joint ventures. The impact of these contracts on our results of operations over the term of the contracts depends on a number of factors, including the strength of advertising markets and subscription levels and rates for programming. Our success with sports programming is highly dependent on consumer acceptance of this content and the size of our viewing audience.

Plainly, the foregoing risk warning was a generic, catch-all provision that was not tailored to WBD's actual known risks regarding its sports rights negotiations with the NBA, much less that these negotiations were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill.

30.     The 2023 10-K also contained generic, boilerplate representations regarding WBD's potential future "recogni[ition of] . . . impairment charges related to goodwill and other intangible assets", while simultaneously downplaying the likelihood of the same, stating, in relevant part:

> We have a significant amount of goodwill and other intangible assets on our consolidated balance sheet. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired. Significant negative industry or economic trends, including the continued decline of traditional linear television viewership and linear ad[vertising] revenues, disruptions to our business, inability to effectively integrate acquired businesses, underperformance of our content, unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and market capitalization declines ***may*** impair goodwill and other intangible assets. Any charges relating to such impairments ***could*** materially adversely affect our results of operations in the periods recognized.

(Emphases added.)  Plainly, this risk warning, too, was a generic, catch-all provision that was not tailored to WBD's actual known risks regarding impairments to its Networks segment's goodwill, much less that the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA, were likely to lead to billions of dollars in goodwill impairment charges.

31.    Appended as exhibits to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

32.    On April 22, 2024, WBD's exclusive sports rights negotiating window with the NBA expired without a deal, allowing the NBA to negotiate with other companies for its sports rights content, including, *inter alia*, NBC, which offered to pay an annual average fee of $2.5 billion, and Amazon, which offered to pay an annual average fee of $1.8 billion.

33.    On May 9, 2024, WBD issued a press release announcing its first quarter 2024 financial results (the "1Q24 Earnings Release").  The 1Q24 Earnings Release quoted Defendant Zaslav as stating, in relevant part, that "[w]e are pleased with our progress in the first quarter as evidenced by strong results in important [key performance indicators]" and that "[w]e continue to make bold moves to transform our company for the future as we position ourselves to take full advantage of the opportunities ahead."

34.    With respect to WBD's Networks segment, the 1Q24 Earnings Release stated, in*ter alia*:

- Networks operating expenses decreased 8% ex-FX to $3,006 million compared to the prior year quarter. The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps[.]
  - Costs of revenues decreased 8% ex-FX, primarily driven by the AT&T SportsNet exit, the allocation of U.S. sports costs to DTC, as well as lower general entertainment content expense. These benefits were partially offset by the timing of domestic sports rights expense, unfavorable inflationary impacts in Argentina, and higher election expenses. The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps.
  - SG&A decreased 8% ex-FX, primarily driven by lower overhead expenses.

35.    The same day, WBD hosted a conference call with investors and analysts to discuss the Company's first quarter 2024 results (the "1Q24 Earnings Call").  During his prepared remarks on the 1Q24 Earnings Call, Defendant Zaslav repeatedly touted Defendants' purported "confiden[ce]" in their assets, stating that "we're very confident in the strength of our assets and believe we will see both strategic and financial progress in the quarters ahead"; and that "we're more confident than ever in our assets and our playbook."

36.    With respect to WBD's negotiations with the NBA, Defendant Zaslav stated, in relevant part:

> We've enjoyed a strong partnership with the NBA for almost four decades. We're in continuing conversations with them now, and we're hopeful that we'll be able to reach an agreement that makes sense for both sides.

We've had a lot of time to prepare for this negotiation, and we have strategies in place for the various potential outcomes. However, now is not the time to discuss any of this. Since we are in active negotiations with the league and under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them. With that in mind, please understand that this is as much as we're prepared to say about this topic today.

37.    Defendant Wiedenfels, during his prepared remarks on the 1Q24 Earnings Call, highlighted that WBD "continued [to] benefit from [*inter alia*] the [Company's] many initiatives to improve working capital, which we are still in the early innings of realizing", a "more disciplined and analytical approach to content investment and allocation", and "meaningfully lower cash restructuring costs."

38.    With respect to advertising trends, Defendant Wiedenfels stated, in relevant part, that "we did see sequential improvement [in] linear [markets] . . . in the first quarter" and "[t]otal company advertising in Q1 was down 7%, a sequential improvement of 300 basis points," as well as asserted that Defendants "expect another record quarter in Q2", which, "in part, reflects an increasingly more holistic portfolio approach to monetizing viewership on [*inter alia*] linear . . ., supporting our ability to offer our partners incremental reach and more customized ad[vertising] solutions spanning all platforms, particularly in the US."

39.    During the Q&A phase of the 1Q24 Earnings Call, in response to an analyst's inquiries regarding WBD's "restructuring while navigating through the massive industry changes" and,  "from a WBD point of view, what do you think the biggest surprises will be", as well as whether Defendants "can . . . give us your outlook for both sides, both [DTC] and linear", Defendant Zaslav stated, in relevant part:

[F]or us, it's really two tiers. One is we got rid of a lot of content we didn't think was going to help us. But at the same time, we brought in a lot of great creatives and invested a lot of content. So it's, how do we run these businesses efficiently for

real free cash flow and drive for growth? But two, creative excellence. How do we have the best content?

In this past year, HBO had maybe its best year ever, and in addition to that, Warner Brothers Television has some of the best, highest quality TV production, and we're looking at our motion picture business now, which we're feeling really good about. It's number one to start the year, but we have a lot of great content. So I think it's that combination.

Great content, great creatives, fighting to tell the best stories on every platform, and then running it like a real business. Real free cash flow and real EBIT [earnings before interest and taxes], and I think those two will drive us for the future.

40.     In response to these same inquiries, Defendant Wiedenfels stated, in relevant part:

I would . . . say that we're operating in a much more constructive environment this year than we did last year. So hopefully, that'll be supportive.

To your point . . . about the differentiation between D2C and linear, well really one of the things that's working very well right now is that convergence. The way . . . the team take our inventory to the market is fully harmonized now. It's across platforms, incremental reach. We're leaning in further.

* * *

Longer term, there is definitely more opportunity here. We have been very transparent about the significant monetization difference between linear and digital advertising. [Defendant Zaslav] talked about AI a couple of minutes ago. Certainly that should be a helper longer term as we think about our go-to-market here, so definitely some upside.

* * *

We're seeing how we're running the company fundamentally differently that's not reflected in our current and near-term financials, and I think that's going to be the surprises.

41.     Also on May 9, 2024, WBD filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2024 (the "1Q24 10-Q"). With respect to the Company's goodwill and intangible assets impairment analysis for the quarter, the 1Q24 10-Q stated, in relevant part:

> During the three months ended March 31, 2024, the Company performed goodwill and intangible assets impairment monitoring procedures for all of its reporting units and identified no indicators of impairment or triggering events. As of October 1, 2023 . . . the Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%. The Company will continue to monitor its reporting units for triggers that could impact recoverability of goodwill. These triggers include, but are not limited to, continued decline in the Company's market capitalization; affiliate and sports rights renewals, including the NBA, associated with the Company's Networks and DTC reporting units; [and] declining levels of global GDP growth and soft advertising markets in the U.S. associated with the Company's Networks reporting unit[.]

42.    In addition, the 1Q24 10-Q contained substantively the same boilerplate risk warnings as referenced in ¶ 29, *supra*, regarding WBD's "invest[ment of] significant resources to acquire and maintain licenses to produce sports programming" and that "there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed", while acknowledging that "our license for NBA programming is currently subject to renewal, and our exclusivity period with the NBA has expired" and, "[a]s a result, we face increased competition to license content from the NBA, which ***could*** result in significantly higher programming costs to us or a failure to maintain our license for NBA programming."  (Emphasis added.)  Plainly, this risk warning was a generic, catch-all provision that was not tailored to WBD's actual known risk that its negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill.

43.    Likewise, the 1Q24 10-Q continued to provide boilerplate risk warnings regarding WBD's potential future "recogni[ition of] . . . impairment charges related to goodwill and other intangible assets", while simultaneously downplaying the same, stating, in relevant part:

> We have a significant amount of goodwill and other intangible assets on our consolidated balance sheets. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired . . . . The occurrence of certain events or circumstances ***could*** result in a downward revision

14

in the estimated fair value of a reporting unit or intangible assets. For example, continued negative industry or economic trends, including the decline of traditional linear television viewership and linear ad[vertising] revenues, declining levels of global GDP growth and soft advertising markets in the U.S., disruptions to our business, inability to effectively integrate acquired businesses, execution risk associated with anticipated growth in our DTC products, underperformance of our content, failure to renew content licenses and distribution agreements, including affiliate and sports rights renewals (including the NBA), unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and continued decline in our market capitalization ***could*** negatively affect our estimates of the fair value of our reporting units. When events or changes in circumstances such as this occur, we have needed to, and ***may*** in the future need to, write-down the value of our goodwill and other intangible assets. ***If*** we determine that our estimate of the fair value of a reporting unit is below the recorded value of that unit on our balance sheet, we ***may*** record a non-cash impairment loss for the goodwill. Any charges relating to the impairment of our goodwill and other intangible assets ***could*** materially adversely affect our results of operations in the periods recognized.

We consider all current information when determining the need for, or calculating, any impairment loss. However, future changes in events or circumstances, such as a continuation or worsening of the current negative industry and economic trends and the other events and circumstances described above, ***could*** result in decreases in the fair value of our goodwill and other intangible assets and require us to record additional impairment losses that ***could*** materially adversely affect our results of operations in the periods recognized.

(Emphases added.) Plainly, this risk warning, too, was a generic, catch-all provision that was not tailored to WBD's actual known risks regarding impairments to its Networks segment's goodwill, much less that the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA, had significantly deteriorated the Networks segment's goodwill to such an extent that the Company was likely to record billions of dollars in goodwill impairment charges in a matter of months.

44.     Appended as exhibits to the 1Q24 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by the Individual Defendants.

45.    The statements referenced in ¶¶ 23-31 and 33-44 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill; (ii) WBD's goodwill in its Networks segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) the foregoing significantly increased the likelihood of WBD incurring billions of dollars in goodwill impairment charges; (iv) accordingly, Defendants had overstated WBD's overall business and financial prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

46.    In addition, throughout the Class Period, WBD's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required WBD to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." Defendants' failures to disclose, *inter alia*, that WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill, as well as that WBD's goodwill in its Networks segment had significantly deteriorated to such an extent that the Company was likely to record billions of dollars in goodwill impairment charges, violated Item

105 because this issue represented a material factor that made an investment in the Company speculative or risky.

47.    For similar reasons, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Sage to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failures to disclose, *inter alia*, that WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill, as well as that WBD's goodwill in its Networks segment had significantly deteriorated to such an extent that the Company was likely to record billions of dollars in goodwill impairment charges, violated Item 303 because this issue represented a known trend or uncertainty that was likely to have a material unfavorable impact on the Company's business and financial results.

## The Truth Emerges

48.    On August 7, 2024, during after-market hours, WBD issued a press release announcing its second quarter 2024 financial results (the "2Q24 Earnings Release").  Among other items, WBD reported disappointing revenue of $9.71 billion, representing a 6.3% Y/Y decrease and missing consensus estimates by $360 million; as well as a net loss of approximately ***$10 billion*** resulting from a $9.1 billion non-cash goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects.  With respect to WBD's reported net loss during the quarter, the 2Q24 Earnings Release stated, in relevant part:

> Net loss available to [WBD] was $(10.0) billion, which includes a $9.1 billion non-cash goodwill impairment charge from the Networks segment, as well as $2.1 billion of pre-tax acquisition-related amortization of intangibles, content fair value step-up, and restructuring expenses.

- The goodwill impairment was triggered in response to the difference between market capitalization and book value, continued softness in the U.S. linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA.

49.    That same day, during after-market hours, WBD hosted a conference call with investors and analysts to discuss the Company's second quarter 2024 results (the "2Q24 Earnings Call").  On the 2Q24 Earnings Call, Defendant Wiedenfels stated, in relevant part:

> Little more color on the Goodwill impairment. And to get straight to the point here, there is no one factor that is driving this impairment. So the way this works is obviously with the amount of goodwill that we have, there's a systematic process that we go through every quarter and we're monitoring for so-called triggering events.
>
> ***And this is clearly where a sports right discussion like the one with the NBA comes into play as a triggering event, which then compels us to re-evaluate our business case*** in a strategic planning process with the latest assumptions, the best view of where the industry is and how we play in that field. ***And that's what then leads to evaluation, which in the second quarter happened to be $9.1 billion below what was on the books for the network segment.*** So it's really a full re-evaluation, not a response to one individual factor.

(Emphases added.)

50.    Following the 2Q24 Earnings Release and the 2Q24 Earnings Call, WBD's stock price fell $0.69 per share, or 8.95%, to close at $7.02 per share on August 8, 2024.

51.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

52.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in

a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired WBD securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, WBD securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by WBD or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of WBD;

- whether the Individual Defendants caused WBD to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of WBD securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

59.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- WBD securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold WBD securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

60.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

61.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

62.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

64.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of WBD securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire WBD securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

65.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for WBD securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about WBD's finances and business prospects.

66.     By virtue of their positions at WBD, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

67.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of WBD, the Individual Defendants had knowledge of the details of WBD's internal affairs.

68.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of WBD As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to WBD's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of WBD securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning WBD's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired WBD securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

69.    During the Class Period, WBD securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading

statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of WBD securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of WBD securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of WBD securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

70.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

72.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.     During the Class Period, the Individual Defendants participated in the operation and management of WBD, and conducted and participated, directly and indirectly, in the conduct

of WBD's business affairs. Because of their senior positions, they knew the adverse non-public information about WBD's misstatement of income and expenses and false financial statements.

74.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to WBD's financial condition and results of operations, and to correct promptly any public statements issued by WBD which had become materially false or misleading.

75.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which WBD disseminated in the marketplace during the Class Period concerning WBD's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause WBD to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of WBD within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of WBD securities.

76.    Each of the Individual Defendants, therefore, acted as a controlling person of WBD By reason of their senior management positions and/or being directors of WBD, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, WBD to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of WBD and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

77.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by WBD.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 25, 2024

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*