**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD COLLURA, Individually and on Behalf of All Others Similarly Situated,<br><br>*Plaintiff*,<br><br>v.<br><br>WARNER BROS. DISCOVERY, INC., DAVID M. ZASLAV, and GUNNAR WIEDENFELS,<br><br>*Defendants*, | **Case No. 1:24-cv-09027-KPF**<br><br>**CLASS ACTION**<br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Honorable Katherine Polk Failla<br><br>JURY TRIAL DEMANDED |

Co-Lead Plaintiffs Anthony Yuson ("Yuson") and Michael Steinberg ("Steinberg"), and Additional Named Plaintiff Richard Collura ("Collura," and collectively with Yuson and Steinberg, the "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for their First Amended Complaint (the "Complaint") against Warner Bros. Discovery, Inc. ("WBD" or the "Company"), David Zaslav ("Zaslav"), and Gunnar Wiedenfels ("Wiedenfels"), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, interviews with former employees, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired WBD common stock between February 23, 2024, and August 7, 2024, both dates inclusive (the "Class Period"), and were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 ("Exchange Act"). The action charges that Defendants named herein Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission.

2. WBD is a global media and entertainment company that provides several marquee linear television channels to cable and satellite providers, including TNT, HGTV, and Discovery Channel. WBD also has interests in film studios, Internet streaming media, and gaming. Though it has gone through many different iterations, the current entity was created through a merger between WarnerMedia and Discovery, Inc. in 2022. This merger left WBD with debt of $49.3 billion, causing WBD to incur $1.777 billion in interest in 2022, $2.221 billion in 2023, and $2.017 billion in 2024, placing the Company under significant financial strain. This case involves misrepresentations regarding the most important transaction facing WBD in 2024, and perhaps since its merger: the renewal of a decade-long contract to broadcast a large chunk of National Basketball Association ("NBA") games.

3. WBD operates in three main business segments: Studios, Networks, and Direct-to-Consumer. Of the three, the Networks segment has been the primary driver of revenue for WBD, and the only consistently profitable division. The Networks segment chiefly consists of WBD's domestic and international television networks, including TNT. The Networks segment primarily generates revenue through advertising and distribution via linear (*i.e.,* traditional broadcast rather

than Internet streaming format) television channels, for which it is paid a carriage fee for each customer of a cable or satellite provider.

4. A main driver for the Networks segment is live sports, and nothing has been a bigger draw for the Networks segment than the NBA. For WBD, the NBA generated hundreds of millions of dollars annually in advertising revenue, supported WBD's other sports-related shows, and allowed WBD to charge high carriage rates to cable and satellite providers. Further, the NBA provided WBD with a "halo effect" that boosted all of WBD's other properties, as well as contributed towards WBD's non-tangible assets like goodwill.

5. The tangible and intangible benefits of the NBA to WBD was confirmed both by former WBD employees and Defendants in a lawsuit filed against the NBA at the end of the Class Period.

6. In 2014, the NBA entered into media agreements with WBD's predecessor (which were then assigned to WBD) and Disney to broadcast NBA games through the end of the 2024-2025 NBA season. WBD's 2014 media agreement stipulated that, beginning in March 2024, WBD would have an exclusive negotiating period with the NBA to renew its deal, and that if a new agreement could not be reached, the NBA could receive offers from third party bidders. The 2014 media agreement also contained a "Matching Clause" that allowed WBD to match any third party offer, but critically, only if it matched all relevant terms. The 2014 media agreement expressly provided that linear television programming could not be used to match an offer for internet broadcasting.

7. This case involves misrepresentations and omissions that Defendants made to investors throughout the Class Period concerning WBD's reliance on retaining NBA rights to support other media business, renewal negotiations, and WBD's ability to match competing offers.

Specifically, Defendants concealed: (i) the importance of WBD's media agreement with the NBA in justifying high carriage rates that WBD was commanding, producing significant advertising dollars for WBD, providing a "halo effect" that boosted all of WBD's other properties, and negotiating more favorable terms with other sports leagues; (ii) that WBD lacked the means to exercise its Matching Clause to force renewal of the 2014 media agreement with the NBA because it could not meet terms offered by certain third party bidders including cross-promotion with the NFL and a large Internet streaming presence; (iii) that as a result, the Matching Clause in WBD's 2014 media agreement with the NBA did not provide the protection Defendants conveyed to investors and did not allow WBD to ensure renewal of NBA rights for another decade; and (iv) that losing the NBA rights would significantly compromise WBD's revenue and goodwill, particularly in its Networks segment.

8. At the beginning of 2024, as the 2014 media agreement neared expiration, WBD and its senior executives began to downplay the importance of retaining NBA rights. While this may have been intended to send a message to the NBA that WBD would drive a hard bargain, it also misled investors.

9. On March 9, 2024 through April 22, 2024, WBD and the NBA entered into an exclusive renewal negotiating period, which lapsed without the parties reaching any renewal agreement. Almost immediately, third party bidders made substantial offers to the NBA. It was then reported that the NBA was advancing toward a series of deals with Disney for a separate block of games, NBCUniversal for a block of games similar to that previously broadcast by WBD, and either Amazon or Google for a newly-created block of Internet streaming rights. In response to the increased risk that WBD could lose the NBA, WBD's stock dropped dramatically.

10. In an effort to stem the decline, Defendants falsely reassured investors that WBD

could nevertheless choose to keep the NBA rights under the Matching Clause in the 2014 media agreement. In truth, it was impossible for WBD to exercise that Matching Clause because it could not meet the terms offered in the competing bids. WBD lacked NFL games so could not cross-promote with NFL, as NBCUniversal and Amazon offered, and did not have the Internet streaming audience or infrastructure needed to match Amazon's other terms. And, WBD was also not in a financial position to match NBCUniversal's offer of $2.45 billion per year, even if it could match the cross-promotion term. Consequently, Defendants had no viable chance of retaining the NBA rights through the Matching Clause. Further, Defendants continued to downplay the significant financial impact that failing to renew would have on WBD.

11. In late April 2024, *Sports Business Journal* reported that WBD's Chief Executive Officer ("CEO") David Zaslav refused to pay above $2.1 billion per year for the rights, when at a minimum it would take $2.45 billion to match NBCUniversal's offer (even if WBD could match the NFL cross-promotion, which it could not).

12. Still, despite knowing that WBD was technically unable and financially unwilling to match the NBCUniversal offer, and technically unable to match the Amazon Internet streaming offer, Defendants continued to mislead investors into thinking that WBD could still employ the Matching Clause to renew its media agreement with the NBA, while omitting the significant financial impact WBD would face if it lost NBA rights.

13. In July 2024, the NBA informed WBD that it planned to accept the offers from NBCUniversal and Amazon, and gave WBD five days to match the offers. In response, WBD chose not to match NBCUniversal's $2.45 billion per year offer, but said it would match Amazon's $1.8 billion per year Internet streaming-only offer. However, WBD lacked the Internet streaming distribution and infrastructure, and therefore submitted a purportedly "matching" bid that offered

the same amount of money but without matching the actual terms. Instead, WBD heavily rewrote core terms of Amazon's offer in the bid it called "matching," in violation of the Matching Clause's requirement that a matching bid meet all material terms. For example, instead of matching Amazon's agreement to distribute the games in that package only via Internet streaming, WBD attempted to grant itself the option to distribute the games on a linear cable network, its Internet streaming service, or both.

14. On July 24, 2024, in response, the NBA informed WBD that it had rejected WBD's offer because it did not constitute a proper offer under the Matching Clause of the 2014 media agreement, and WBD lost its opportunity to renew its NBA deal.

15. On this news, WBD's stock price fell from a July 24, 2024 closing price of $8.47 per share by $0.76, or 8.97%, before rebounding to close at $7.99 per share on July 25, 2024. Despite this significant price decline, the full impact of WBD's failure to renew the media agreement with the NBA remained concealed from investors, and had yet to fully materialize.

16. On August 7, 2024, after market hours, WBD issued a press release announcing that it would take a $9.1 billion non-cash goodwill impairment charge from its Networks segment, triggered by its failure to renew the media agreement with the NBA. That same day, during a conference call with investors and analysts, Chief Financial Officer ("CFO") Gunnar Wiedenfels confirmed that the failure to renew the media agreement with the NBA had triggered the $9.1 billion goodwill impairment.

17. On this news, WBD's stock price fell from an August 7, 2024 closing price of $7.71 per share by $0.98, or 12.71%, before rebounding to close at $7.02 per share on August 8, 2024.

18. As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiffs and other Class

members have suffered significant losses and damages.

## JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

21. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). WBD's principal office is located in this District at 230 Park Avenue South, New York, New York 10003. Moreover, pursuant to WBD's most recently filed quarterly and yearly report, as of February 13, 2025, the Company had 2,454,764,337 shares of common stock outstanding. WBD's securities trade on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands of investors in WBD securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

22. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

23. Co-Lead Plaintiff Anthony Yuson purchased WBD common stock at artificially inflated prices during the Class Period as set forth in his previously-filed certification, ECF No. 22-2, and was damaged as a result of the federal securities laws violations alleged herein.

24. Co-Lead Plaintiff Michael Steinberg purchased WBD common stock at artificially

inflated prices during the Class Period as set forth in his previously-filed certification, ECF No. 23-3, and was damaged as a result of the federal securities laws violations alleged herein.

25. Additional Named Plaintiff Richard Collura purchased WBD common stock at artificially inflated prices during the Class Period as set forth in his previously-filed certification, ECF No. 1-2, and was damaged as a result of the federal securities laws violations alleged herein.

26. Defendant WBD is a Delaware corporation with principal executive offices located at 230 Park Avenue South, New York, New York 10003. WBD's common stock trades in an efficient market on the NASDAQ under the ticker symbol "WBD".

27. Defendant David Zaslav was at all relevant times WBD's CEO. As CEO, Zaslav had responsibility for and ultimate authority over WBD's business. Moreover, Zaslav had access to information outlining the importance of the NBA to WBD's business, the advertising dollars that the NBA brings in, the "halo effect" that the NBA had on the rest of WBD's business, the status of negotiations with the NBA about the renewal of the rights to broadcast the NBA on WBD's networks, and the Matching Clause contained in WBD's 2014 media agreement with the NBA. Zaslav was also the point person and primary decision maker in WBD's negotiations with the NBA to renew the rights to broadcast the NBA on WBD's networks. Further, Zaslav spoke to WBD investors in earnings calls and through other public forums, press releases about the Company's operations, including about the status of WBD's negotiations with the NBA, the impact losing those rights would have on WBD, and WBD's ability to use the Matching Clause contained in WBD's 2014 media agreement with the NBA to keep the rights to broadcast the NBA.

28. Defendant Gunnar Wiedenfels has served as WBD's CFO at all relevant times. As CFO, Wiedenfels had access to, and authority and oversight over WBD's business. Moreover, Wiedenfels had access to access to information outlining the importance of the NBA to WBD's

business, the advertising dollars that the NBA brings in, the "halo effect" that the NBA had on the rest of WBD's business, the status of negotiations with the NBA about the renewal of the rights to broadcast the NBA on WBD's networks, and the Matching Clause contained in WBD's 2014 media agreement with the NBA. Wiedenfels also spoke to WBD investors in earnings calls and through other public forums, press releases about the Company's operations, including about the status of WBD's negotiations with the NBA, the impact losing those rights would have on WBD, and WBD's ability to use the Matching Clause contained in WBD's 2014 media agreement with the NBA to keep the rights to broadcast the NBA.

29. Defendants Zaslav and Wiedenfels are sometimes referred to herein collectively as the "Individual Defendants."

30. The Individual Defendants, by virtue of their responsibilities and day-to-day activities at WBD, possessed the power and authority to control the contents of WBD's SEC filings, press releases, and other market communications. Because of their positions with WBD, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

31. WBD and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I. The Creation of Warner Bros. Discovery

32. WBD is a global media and entertainment company that provides a portfolio of content, brands, and franchises across television, film, Internet streaming, and gaming outlets. Warner Bros. has existed since 1923 in various iterations, and the latest, Warner Bros. Discovery was formed in early 2022.

33. On May 16, 2021, *Bloomberg* reported that AT&T was considering an offer to divest its interest in WarnerMedia and merge it with Discovery, Inc. *See* Ed Hammond, *AT&T Is Preparing to Merge Media Assets With Discovery*, BLOOMBERG, May 16, 2021, https://www.bloomberg.com/news/articles/2021-05-16/at-t-is-said-in-talks-to-combine-content-assets-with-discovery-kor6r2uj. The two companies confirmed the agreement the following day.

34. On April 8, 2022, Discovery, Inc. completed the merger (the "Merger") with WarnerMedia business of AT&T and changed its name to Warner Bros. Discovery, Inc. On April 11, 2022, WBD's shares started trading on the NASDAQ under the "WBD" symbol.

35. As part of the Merger, Zaslav was appointed as CEO, and Wiedenfels was appointed as CFO.

36. In connection with the Merger, AT&T received $40.5 billion in a combination of cash, debt securities, and WarnerMedia's retention of certain debt. AT&T shareholders also received $42.4 billion in WBD equity, representing 71% of the combined company. Prior Discovery shareholders continued to own 29% of the combined company.

37. As a result of the Merger, WBD was heavily saddled with debt. As of December 31, 2022, WBD had consolidated indebtedness of $49.3 billion, which caused WBD to incur a net interest expense of $1.777 billion in 2022, $2.221 billion in 2023, and $2.017 billion in 2024.

Consequently, WBD was constrained financially and also heavily dependent on consistent revenue from its existing properties to service its significant debt obligations.

## II. WBD's Revenue Streams

38. The merged Company classified its operations into three reportable segments—Studios, Networks, and Direct-to-Consumer ("DTC"):

> **Studios** – primarily consisting of the production and release of feature films for initial exhibition in theaters, production and initial licensing of television programs to third parties and networks/DTC services, distribution of films and television programs to various third party and internal television and streaming services, distribution through the home entertainment market (physical and digital), related consumer products and themed experience licensing, and interactive gaming.
>
> **Networks** – primarily consisting of WBD's domestic and international television networks, including TNT, the NBA rights holder.
>
> **DTC** – (direct-to-consumer) primarily consisting of WBD's premium pay-TV and streaming services.

39. Since the Merger, WBD's Networks segment has been its sole reliable profit generator. The chart below illustrates the profitability of each segment:

| Segment | 2022 | 2023 | 2024 |
|---|---|---|---|
| **Studios** | **$1.194 billion loss** | **$211 million profit** | **$529 million profit** |
| **Networks** | **$2.919 billion profit** | **$3.322 billion profit** | **$3.395 billion profit**[1] |
| **DTC** | **$5.293 billion loss** | **$2.565 billion loss** | **$1.485 billion loss** |

40. The Networks segment was the sole reason WBD was able to keep afloat after the Merger, as the DTC segment posted three straight years of multi-billion-dollar losses, and the Studios segment was unprofitable overall during the three-year period.

41. The Networks segment's profitability was driven by live sports offerings via TNT Sports, and especially the NBA. WBD describes TNT Sports as follows:

[1] WBD's Networks segment profit for Fiscal Year 2024 was calculated by taking its reported revenue for Fiscal Year 2024, a $5.759 billion loss, and adding the $9.154 billion impairment triggered by the loss of the NBA rights, resulting in a profit of $3.395 billion.

**TNT Sports** is a global leader in the delivery of premium sports content. The TNT Sports U.S. portfolio includes expansive, multi-platform partnerships with the National Basketball Association ("NBA"), Major League Baseball, the National Collegiate Athletic Association ("NCAA") Division I Men's Basketball Championship, National Hockey League, United States Soccer Federation, Unrivaled, National Association for Stock Car Auto Racing, Roland-Garros, NCAA Big 12 Football and Men's Basketball, and NCAA Big East Men's and Women's Basketball. Additionally, TNT Sports co-manages NCAA.com and NCAA March Madness Live, along with NBA Digital, including NBA TV, the NBA App, and NBA.com. Bleacher Report and House of Highlights, digital destinations for young adult sports fans, are owned and operated by TNT Sports.

42. Each segment reports its financial results in terms of four categories:

- **Distribution** revenues generated from fees charged to network distributors, which include cable, DTH [direct-to-home] satellite, telecommunications and digital service providers, and DTC subscribers. ***The largest component of distribution revenue is comprised of linear distribution rights to our networks from cable, DTH satellite, and telecommunication service providers. Distribution revenues are largely dependent on the rates negotiated in the agreements, the number of subscribers that receive our networks, the number of platforms covered in the distribution agreement, and the market demand for the content that we provide.***[2]

- **Advertising** revenues are ***principally generated from the sale of commercial time on linear (television networks and authenticated TVE*** **[cable and satellite TV everywhere]** ***applications)*** and digital platforms (DTC subscription services and websites), and sold primarily on a national basis in the U.S. and on a pan-regional or local-language feed basis outside the U.S. Advertising contracts generally have a term of one year or less. Advertising revenue is dependent upon a number of factors, including the number of subscribers to our channels, viewership demographics, the popularity of our content, our ability to sell commercial time over a group of channels, the stage of development of television markets, and the popularity of free-to-air television.

- **Content** revenues are generated from the release of feature films for initial exhibition in theaters, production of programs licensed for initial television/SVOD [subscription video on demand] exhibition, the additional licensing of feature films and television programs to various television, SVOD and other digital markets, distribution of feature films and television programs in the physical and digital home entertainment market, sales of console games and mobile in-game content,

[2] Unless noted otherwise, all emphasis is supplied.

sublicensing of sports rights, and licensing of intellectual property such as characters and brands.

- **Other** revenue primarily consists of studio production services and tours.

43. The Networks segment, including WBD's live sports offerings, primarily generates revenue through advertising and distribution on linear TV channels such as TNT.

44. According to Wells Fargo analysts, in 2022, "linear revenue still account[ed] for a big percentage of the overall revenue profile." *See* Steven Cahall, Wojtek Majerczak, Omar Mejias, and Daniel Osley, *WBD: The Opportunities, the Risks & the Model*, WELLS FARGO, June 1, 2022, at 15. Analysts expected "linear revenue to account for 47% of total revenues [that] year."

45. Because WBD was heavily saddled with debt and underperforming Studios and DTC segments, the Company profoundly depended on its Networks segment, especially its live sports offerings, to bring in revenue.

## III. The Importance of Live Sports

46. When an American consumer turns on a television service to watch live sports, a web of companies behind the scenes interact to create, package, and distribute that event to the screen. That process is commonly referred to as the "pay TV ecosystem."

47. With respect to live sports in particular, the pay TV ecosystem has three basic levels:

a. Sports leagues: At the top level, sports leagues such as the NFL and the NBA organize live sporting events and own the copyright to those events. The sports leagues sell the media rights to their events to programmers, via long-term license agreements.

b. Programmers: Programmers are companies that own basic and premium broadcast and cable networks, such as WBD, Disney, Fox. Programmers acquire the media rights to popular programming—such as NBA games—and then broadcast those games on their linear channels. Programmers then license the rights to distribute those linear channels to video distributors, via carriage agreements.

c. Video Distributors: Video distributors includes cable television companies such as Comcast and satellite television companies such as DISH and DirecTV, virtual distributors like Hulu Live, and subscription video on demand ("SVOD") such as Amazon Prime Videos.

**Figure 1**




48. In the increasingly fractured media environment, live sports have significantly grown in importance. Unlike most other programming, sports fans demand to watch their events in real time. Consequently, viewers are likely to watch both the sports programs and advertisements, instead of watching on a delayed basis and fast-forwarding through the advertisements.

49. Twenty-seven of the thirty most-watched broadcasts of all time have been live sporting events. And in 2023, "97 of the top 100 most watched broadcasts were sports events." TV Timeout: Understanding Sports Media Rights, Hearing Before the Subcomm. On Commc'ns and Tech., 118th Cong. at 15:15 (2024) (statement of Rep. Doris Matsui), available at https://energycommerce.house.gov/events/communications-and-technology-subcommitteehearing-tv-timeout-understanding-sports-media-rights. Indeed, "[s]ports, more than any other form of entertainment, are . . . the principal driver of TV viewership." *Id.*

50. While viewers' appetite for live sports is endless, the supply of live sports is limited. Leagues, such as the NBA, have limited numbers of games, each game only occurs once, and the mystery of the game's outcome lasts only while the game is live.

51. Therefore, live sports programming is "non-replicable" TV for large numbers of consumers, who will pay a premium and sit through advertisements to watch their teams play in real time. Accordingly, cable and satellite providers consider live sports a "must-have," and pay high carriage fees for the channels that air them.

52. According to research from Nielsen Sports, despite the fact that only 8% of total U.S. linear TV viewing time was spent on watching live sports between Q2 2020 and Q2 2021, 31% of U.S. linear TV ad revenues depended on live sports programming. *See* Ahmed Elkady, *31% of U.S. linear TV ad revenues depend on live sports*, VIDEONET, July 11, 2022.



53. Further, in the U.S. market, 13% of sports viewing time comes from fans aged 18-34, generally considered to be one of the most important demographics that advertisers target. *Id.* This is almost double the figure (7%) for viewers aged 55 and above. *Id.*

54. Indeed, notoriously fickle younger viewers have flocked to live sports. In 2021, younger fans constituted 61% of the total number of sports fans. *Id.* This is important for advertisers because the ubiquity of smartphones and Internet streaming services has made linear television – and the advertisements shown on linear television – increasingly irrelevant to younger audiences. Yet live sports remain a constant avenue through which advertisers can reach younger audiences.

55. Advertisers recognize the importance of live sports. In 2022, advertisers spent approximately $17.7 billion on national U.S. linear TV sports programming, up from $14.9 billion in 2021. *See* John Consoli, *In Challenged Ad Climate, Sports Advertising Continues Growth*, TV NEWS CHECK, Feb. 8, 2023, https://tvnewscheck.com/business/article/in-challenged-ad-climate-sports-advertising-continues-growth/.

56. As Jon Diament, who oversees sales revenue for WBD's TNT Sports portfolio, noted, "[i]t's good to be in sports sales right now. Everything else is pretty challenged." *Id.*

## IV. The Importance of the NBA to WBD

57. The NBA was particularly important to WBD and its Networks segment. WBD's television networks include, *inter alia*, TNT (acquired through a merger with Turner Broadcasting System, Inc. in 1996), which has relied on basketball programming since the 1980's to drive ratings and revenue, particularly through its U.S. sports rights agreements with the NBA (the "NBA Rights").

58. The NBA Rights allowed WBD (and its previous iterations) to have exclusive rights

to broadcast certain regular season and playoff games, pregame and postgame content, and other NBA-related content on its networks.

59. WBD employed Confidential Witness 1 ("CW1") from May 2016 until October 2023. CW1, based out of WBD's Atlanta office, served as a Finance Manager and reported to WBD's Vice President for Finance, Nikia Clarke. CW1 worked in linear finance operations, focusing on balance sheets, profit and loss statements, and cable distribution rates, and CW1's job responsibilities included analyzing financial performance and assisting in revenue forecasting for WBD's television networks.

60. According to CW1, WBD's ability to negotiate cable carriage fees depended heavily on the NBA Rights, because live sports like the NBA were one of the few remaining "must watch events" on traditional television, where consumers prefer to watch the event in real time rather than on delay or on-demand. This made the NBA Rights increasingly valuable to cable providers. Consequently, CW1 confirmed that WBD relied heavily on the NBA Rights to justify high subscriber rates in its carriage agreements with cable providers. CW1 estimated that 80% of WBD's ability to negotiate carriage fees depended on live sports like the NBA, and without the NBA Rights, WBD would command much lower carriage fees.

61. The significance of the NBA Rights to WBD sustaining its high carriage fees was also noted by analysts covering WBD, who viewed the renewal of the NBA Rights as "critical." *See* Alexandra Canal, *Why losing NBA media rights would be a 'big negative' for Warner Bros. Discovery*, YAHOO, May 6, 2024, https://finance.yahoo.com/news/why-losing-nba-media-rights-would-be-a-big-negative-for-warner-bros-discovery-103401175.html. The *Yahoo* article also cited one analyst who specifically noted that live "sports content is key both for linear TV ad sales and carriage fees, and for the Max streaming service's prospects in a competitive direct-to-

consumer landscape." *Id*. Importantly, "[s]ports rights have become increasingly important for legacy media giants" and live sports garner "loyal audiences [that] are more willing to fork over their monthly cable package or streaming service fee to access sports over other types of content." The *Yahoo* article also quoted Bank of America analyst Jessica Reif Ehrlich, who concluded the NBA Rights were "critical" to WBD's future because they allowed TNT to capture "the highest carriage fees … out of all of the company's cable networks at an estimated $3 per subscriber." *Id.*

62. Wells Fargo analysts estimated that in 2022 TNT's carriage rate was then $2.75 per subscriber per month, with the NBA Rights accounting for ***at least*** $1.15 of that portion, or $1.1 billion in affiliate revenue. *See* Steven Cahall, Wojtek Majerczak, Omar Mejias, and Daniel Osley, *WBD: NBA Rights—Go Hard in the Paint*, WELLS FARGO, Nov. 23, 2022, at 1.

63. CW1 confirmed that advertisers paid WBD significantly more for commercial placement in live sports programming like the NBA because viewers, watching in real time, end up watching these commercials. As a result, according to CW1, WBD knew that losing the NBA Rights would also lead to advertisers abandoning WBD for its competitors who broadcast live sports.

64. WBD employed Confidential Witness 2 ("CW2") from January 2020 until October 2023. CW2, based out of WBD's Atlanta office, served as a Team Lead and Manager in Sales Operations at WBD. CW2 handled commercial advertisement sales revenue across WBD's entertainment, sports, and animation divisions. CW2 was responsible for adjusting backlogs and managing commercial placements, and in this role, worked directly with NBA-related advertisement sales.

65. CW2 confirmed the importance of the NBA Rights to WBD's advertising revenue, stating that the NBA Rights were a cornerstone of WBD's financial operations. CW2 estimated

that live sports accounted for approximately 30-40% of the Company's total advertising revenue. For example, CW2 stated that the NBA All-Star Weekend alone generally netted WBD $20 to $40 million in advertising revenue, while NBA playoff games significantly boosted advertising revenue.

66. Indeed, in 2022, analysts calculated that advertising revenue for WBD's NBA content garnered WBD approximately $750 million. *See* Steven Cahall, Wojtek Majerczak, Omar Mejias, and Daniel Osley, *WBD: NBA Rights—Go Hard in the Paint*, WELLS FARGO, Nov. 23, 2022, at 1.

67. The importance of the NBA Rights to WBD has grown since 2022. A recent report projects that WBD will lose $1.1 billion in television advertising revenue in 2026 due to its failure to renew the NBA Rights – a figure that would account for approximately 23% of its total advertising revenue. *See* Drew Lerner, *Warner Bros. Discovery to lose $1.1 billion in advertising without NBA*, AWFUL ANNOUNCING, March 31, 2025, https://awfulannouncing.com/warner-bros-discovery/one-billion-nba-revenue-lost-tnt.html.

68. Analysts consistently determined that the tangible impact of the NBA Rights to WBD's advertising and carriage rates revenue for WBD's Networks segment approximated $1.8 billion per year. *See* Steven Cahall, Wojtek Majerczak, Omar Mejias, and Daniel Osley, *WBD: NBA Rights—Go Hard in the Paint*, WELLS FARGO, Nov. 23, 2022, at 1; Steven Cahall, Wojtek Majerczak, Omar Mejias, Daniel Osley, and Deborah Yeboah, *MEDIA: NBA Rights—WBD Boxed Out by CMCSA/NBC*, WELLS FARGO, Apr. 30, 2024, at 1.

69. The NBA Rights also served as a tentpole for other WBD content. Its commentary show, *Inside the NBA* – made possible through the NBA Rights – became a cultural touchstone in sports culture that has become "the most consistently entertaining and zeitgeist-y of any sports

studio show[.]" Dade Hayes, *Charles Barkley And Fellow 'Inside The NBA' Hosts Re-Up With Warner Bros Discovery Sports On Eve Of Season Tipoff*, DEADLINE, Oct. 17, 2022, https://deadline.com/2022/10/charles-barkley-inside-the-nba-tnt-reup-with-warner-bros-discovery-sports-1235147408/. Observers described *Inside the NBA* as a sports "Leviathan" and noted that by attracting countless sports fans it had a "halo effect" for other WBD content, especially linear programming. David Aldridge, *My front row seat on 'Inside the NBA,' the greatest studio show in sports TV history*, N.Y. TIMES, July 19, 2024, https://www.nytimes.com/athletic/5531128/2024/07/19/inside-the-nba-tv-show-tnt-praises/.

70. The NBA Rights were also vital to WBD's burgeoning Internet streaming service, Max. According to CW2, NBA advertising sales were critical to financing the unprofitable Max. Moreover, in October 2023, WBD introduced live sports on Max for an additional fee of $9.99 a month. The NBA (along with MLB in the summer) was the primary driver for customers to purchase this add-on service. Consequently, WBD depended on the NBA Rights not just for high TNT carriage fees and linear advertising, but also for its new drivers of revenue. *See* Joe Flint, *Max Streaming Service Unveils $9.99-a-Month Sports Tier with NBA and MLB Games*, WALL ST. J., Sept. 19, 2023, https://www.wsj.com/business/media/max-streaming-sports-tier-nba-mlb-1c845ba.

71. Live sports also helped WBD prevent "churn." Churn is the rate at which current customers cancel over a given period. Because sports attract loyal fans who stay with a service at least through the season, which is often long, live sports are a powerful tool to prevent churn. *See* Eddie Yoon, Christopher Lochhead, Katrina Kirsch, and Jonathan Carson, *Tackling the Problem of Subscribers Who Binge…Then Bail*, HARVARD BUSINESS REVIEW, July 17, 2023, https://hbr.org/2023/07/tackling-the-problem-of-subscribers-who-bingethen-bail.

72. In addition to the tangible assets that the NBA Rights provided to WBD, they also contributed towards the Company's goodwill. Goodwill is an intangible asset that is the difference between the sum of the net fair value of all of the assets of a company, minus the liabilities, and the book value of a company. The goodwill difference represents the value of a company's name, brand reputation, loyal customer base, solid customer service, good employee relations, and proprietary technology. Companies are required to review the value of their goodwill on their financial statements at least once a year and record any impairments.

73. At the end of the Class Period, Defendants confirmed in a lawsuit against the NBA that the NBA Rights were a "unique asset that cannot be replaced[,]" that the NBA Rights provided "a halo effect that is used to promote other content and drive attention and viewership to other TBS and WBD channels, networks, and properties[,]" and that the NBA Rights provided WBD with an edge when negotiating the "rights to telecast other sports leagues' events and to obtain more favorable terms with [WBD's] own downstream distributors."

74. Nevertheless, despite the vital role the NBA Rights played to WBD's business, during the Class Period, Defendants failed to inform investors how important the NBA Rights were to WBD, how imperative it was for WBD to renew the NBA Rights, or convey the risk to WBD's business if the Company failed to renew the NBA Rights.

## V. The History of the NBA on WBD

75. The NBA Rights have been vital to WBD and its predecessors since the mid-1980's. Beginning with the 1984-85 NBA season, Turner Broadcasting's TBS channel became the national cable partner of the NBA under a four-year deal, gaining rights (along with broadcast channel CBS) to air blocks of NBA regular season and playoff games. This began a nearly four-decade relationship between the NBA and Turner Broadcasting.

76. In the summer of 1987, Turner Broadcasting signed a joint broadcast contract effective for the 1988–89 season, splitting NBA Rights between TBS and TNT. TNT took the lead, securing rights to the NBA Draft, most regular-season games (about 50 per season), and the majority of playoff games (approximately 25) allocated to Turner Broadcasting. By the late 1990's, TBS's role diminished to airing only single games or doubleheaders once a week, typically on Wednesdays.

77. During the 1989-90 NBA season, TNT launched its marquee NBA studio show, *Inside the NBA*, featuring the host Ernie Johnson, Jr. He was later joined by marquee hosts like Charles Barkley, and Shaquille O'Neal, and Kenny Smith. The show won nineteen Sports Emmy Awards and drove millions of views.

78. From 1990 to 2002, the NBA Rights were divided between three networks – Turner Broadcasting, Disney, and NBC – and their combined five distribution channels – TNT, TBS, NBC, ESPN, and ABC.

79. When the NBA Rights were renegotiated, Turner Broadcasting was able to retain its rights for TNT only. Disney was able to grab the largest share of the NBA Rights.

80. Turner Broadcasting signed a six-year deal to broadcast games on TNT. The six-year deal was worth approximately $2.2 billion or $366,666,666 per year.

81. In 2007, Turner Broadcasting signed an amended agreement with the NBA. According to the 2007 NBA agreement, Turner Broadcasting retained the NBA Rights for nine additional NBA seasons in exchange for $3,253,000,000, payable as follows:

- 2007-08: $329,406,265
- 2008-09: $372,900,000
- 2009-10: $382,000,000

- 2010-11: $391,500,000
- 2011-12: $401,000,000
- 2012-13: $411,000,000
- 2013-14: $421,200,000
- 2014-15: $431,400,000
- 2015-16: $442,000,000

## VI. The 2014 WBD-NBA agreement

82. In 2014, Turner Broadcasting's previous NBA Rights agreement neared its end, and the NBA again marketed the NBA Rights to media companies. On October 3, 2014, the NBA and Turner Broadcasting entered into a new licensing agreement where Turner Broadcasting agreed to pay the NBA $10.26 billion to distribute at least 64 regular season games and 30 playoff games, and other game and non-game content for 9 seasons, through the end of the 2024-2025 NBA season. Disney entered into a similar arrangement for a separate block of the NBA Rights. Under the 2014 media agreement, Turner Broadcasting paid the NBA as follows for its block of the NBA Rights:

- 2016-17: $930,480,221
- 2017-18: $977,004,232
- 2018-19: $1,025,854,443
- 2019-20: $1,077,147,165
- 2020-21: $1,131,004,524
- 2021-22: $1,187,554,750
- 2022-23: $1,246,932,487
- 2023-24: $1,309,279,112

- 2024-25: $1,374,743,067

83. The 2014 media agreement gave Turner Broadcasting the right to exclusively negotiate renewal during a short period commencing March 9, 2024 (the "Exclusive Negotiating Period"). Both Turner Broadcasting and the NBA agreed to negotiate in good faith during the Exclusive Negotiating Period.

84. If the NBA and Turner Broadcasting were unable to reach a renewal agreement within the Exclusive Negotiating Period, the 2014 media agreement permitted the NBA to negotiate with third party bidders. However, the 2014 media agreement required the NBA to notify Turner Broadcasting and provide a five (5) day "Matching Period" for Turner Broadcasting to match the third party offer (the "Matching Clause"). Through the Matching Clause, Turner Broadcasting would be able to retain the NBA Rights so long as it matched not just the monetary amount but also "***each term***" of a third party offer:

> After the Exclusive Negotiating Period, the NBA may negotiate with any party or parties (including an Incumbent) with regard to OTA Rights and/or Cable Rights, but, except as specifically provided in Paragraph B.2. below, shall not enter into an agreement or agreements with any third party or parties (including another Incumbent) relating to OTA Rights and/or Cable Rights (or any subset of such rights) without first giving (subject to Paragraph B.1(c) below) the Incumbents a five (5) day opportunity ("Match Window") to enter into a license agreement or license agreements with NBA ***on the terms and conditions offered to such third party*** or parties (each, a "Third Party Offer"). Any Third Party Offer presented to an Incumbent must provide for a term of at least three (3) years and, if it includes provisions relating both to OTA Rights and Cable Rights, must specifically allocate the total rights fee and other consideration payable to and by the NBA (e.g., advertising inventory provided to NBA, tickets provided by the NBA) between the OTA Rights and Cable Rights provided for in the Third Party Offer. ***Each Incumbent may, at its discretion, accept or reject any one or more or all of the Third Party Offers, in any combination, but, if it does accept a Third Party Offer, it must accept each term of the Third Party Offer that relates to OTA Rights (if the Third Party Offer relates solely to OTA Rights), Cable Rights (if the Third Party Offer relates solely to Cable Rights) or OTA Rights and Cable Rights (if the Third Party Offer relates both to OTA Rights and Cable Rights) (as the case may be)*** in accordance with the terms of this Exhibit.

85. Moreover, the 2014 media agreement specified that to match a third party offer, Turner Broadcasting as the incumbent would need to offer the same type of distribution offered by the third party. This was intended to prevent the incumbent from abusing the Matching Clause to renew a more lucrative form of distribution, like cable, by matching the monetary amount bid for a less lucrative form of distribution, like Internet streaming:

> Each Incumbent shall have the right, subject to the terms of this Paragraph (applied mutatis mutandis as necessary), to Match a Third Party Offer that provides for the exercise of rights to distribute NBA regular season and/or Playoff games ("Game Rights") via any form of combined audio and video distribution (e.g., Internet distribution). ***In the event that an Incumbent Matches a Third Party Offer that provides for the exercise of Game Rights via any specific form of combined audio and video distribution, such Incumbent shall have the right and obligation to exercise such Game Rights only via the specified form of combined audio and video distribution (e.g., if the specified form of combined audio and video distribution is Internet distribution, a Matching Incumbent may not exercise such Game Rights via television distribution) through a distributor reasonably acceptable to the NBA***.

86. All the terms, rights, and obligations of the 2014 media agreement were transferred to WBD after the Merger.

87. Accordingly, as the NBA Rights came up for renewal in 2024, WBD knew that it could only exercise the Matching Clause by meeting the monetary amount, distribution means, and terms of a third party offer.

## VII. The Lead-Up to WBD's Exclusive Negotiating Period

88. Pursuant to the terms of the 2014 media agreement, the NBA Rights were coming up for renewal or third party bidding in 2024. Before the Exclusive Negotiating Period and Matching Period, the NBA announced that the NBA Rights would be split into three packages. "Package A" would include the NBA Finals, primetime games, and the WNBA. "Package B" would include some primetime games, some playoff games, and an in-studio show. Package A approximated the package Disney held under the 2014 media agreement, while Package B

approximated the package WBD held under the 2014 media agreement. The third package was to be Internet streaming-only and marketed separately from Packages A and B.

89. Analysts and commentators covering the NBA and the bidding for the NBA Rights determined that a host of factors would allow the NBA to command a substantial premium for the NBA Rights and possibly triple the fees it commanded in the 2014 media agreement. *See* Amol Sharma and Isabella Simonetti, *How the NBA Plans to Remake TV Deals and Net Billions of Dollars for Its Stars*, WALL ST. J., Oct. 18, 2023, https://www.wsj.com/business/media/how-the-nba-plans-to-remake-its-tv-deals-and-score-billions-for-its-stars-32678182. Specifically, analysts noted that the popularity of the NBA with younger audiences and the fact that NBA regular season games averaged 1.6 million viewers, while the NBA Playoffs averaged more than 5 million viewers, contributed greatly towards the NBA's value. *Id.* This, viewed in conjunction with the fact that the other sports leagues commanded high fees, that in a challenged ad climate, live sports is the only consistent draw for viewers, and that the NBA was going to be the last major sports-media property to come up for bidding in next decade, it was all but a certainty that the cost for the NBA Rights would be steep. *Id.*

90. Because of the high value of NBA games to media companies and the NBA's decision to split rights into the three packages, it was understood within the industry that the NBA Rights would see aggressive bids from both traditional media companies and Internet streaming companies like Amazon and Apple. *Id.*

91. WBD employed Confidential Witness 3 ("CW3") from February 2019 until December 2022. CW3 served as a Senior Vice President of Business Improvement, and was familiar with WBD's internal structure and industry context surrounding the 2014 media agreement and WBD's subsequent attempt to renew the NBA Rights.

92. WBD employed Confidential Witness 4 ("CW4") from January 2020 until October 2023. CW4 served as a Supervisor of Data, and CW4's job responsibilities included managing ad sales and marketing budgets.

93. According to CW3, there was a general understanding inside WBD that the NBA would be asking for significantly more money to renew the NBA Rights deal than was paid under the 2014 media agreement. This was amplified, according to CW3 and CW4, by knowledge that other companies like Amazon would compete with WBD for the lucrative NBA Rights.

94. Nevertheless, despite the knowledge of the NBA's importance to WBD and its increasing value to the broader market, leading up to the Exclusive Negotiating Period, Zaslav downplayed the NBA's importance to investors. Specifically, at an RBC investor conference in November 2022, Zaslav told the press that "we don't have to have the NBA." Andrew Marchand, *TNT Sports' boss said they didn't need the NBA – we're about to find out*, THE ATHLETIC, May 8, 2024, https://www.nytimes.com/athletic/5478528/2024/05/08/nba-tnt-nbc-tv-deal-david-zaslav/. This was particularly important, as Zaslav was not only the CEO of WBD, but also the head of WBD's negotiating team for the NBA Rights.

95. WBD employed Confidential Witness 5 ("CW5") from October 2018 until January 2025. CW5 served as the Director of Content Finance, whose job responsibilities included managing finances related to content assets.

96. CW5 and CW2 confirmed that WBD's negotiations with the NBA for a renewal of the NBA Rights were a closed-door affair limited to a few select individuals at WBD, and Zaslav was a key figure in the negotiations on behalf of WBD.

## VIII. Defendants Make Materially False and Misleading Statements During the Class Period

### A. WBD misleads investors as it enters into the Exclusive Negotiating Period

97. The Class Period begins on February 23, 2024, when WBD announced its Q4FY23 and Fiscal Year 2023 results and held an earnings call with investors. In that earnings call, Zaslav discussed the upcoming Exclusive Negotiating Period, which was slated to begin on March 9, 2024. Specifically, Zaslav misleadingly reassured investors about the renewal rights discussions and omitted the significant impact that WBD's failure to retain the NBA Rights would have on the Company, stating:

> ***We have a strong positive 40-year relationship with the NBA, and in terms of our NBA rights, we are now fully engaged in renewal discussions and they are constructive and productive.***
>
> Our global sports portfolio continues to provide real, meaningful value to all of our platforms. We're proud to be the home of one of the most coveted collections of premium sports content in the industry, along with a best-in-class talent roster and exceptional production values. We're excited for our expansive coverage of the Paris Summer Olympics throughout all of Europe as well.
>
> ***The hard work we've done over the last nearly two years has positioned us well financially and creatively, and as we look towards the future, we will continue to make the tough calls and do that is necessary to get this business on a clear pathway to growth and to drive increased shareholder value.***

98. The above statements identified in Paragraph 97 were materially false and misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (1) that the NBA Rights were crucial to support the high carriage rates that WBD was able to command, produce significant advertising dollars, provide a "halo effect" that boosted all of WBD's other properties, and negotiate more favorable terms with other sports leagues; (2) that WBD internally viewed the NBA Rights as a unique, irreplaceable asset; and consequently, (3) losing the NBA Rights would

significantly compromise WBD's revenue and goodwill, particularly in its Networks segment.

99. When asked directly about the renewal of the NBA Rights, Wiedenfels stated:

> **Benjamin Swinburne** – And then for JB and maybe Gunnar, however you want to address it, great news to hear on the NBA conversations. Clearly, that would be a big positive to retain those rights. How do you think about making that work financially for the company? It's not a big debate that linear TV is under pressure on the revenue side, and I think it's probably safe to say the NBA costs are going to go up. So how do you guys approach this from a kind of a P&L point of view when you think about exploiting the NBA for what I imagine will be another long-term deal? Thanks so much.
>
> **Gunnar Wiedenfels** – ***And then Ben, on the NBA, as you know, we're in the middle of exclusive discussions here, so I want to lift it up maybe one level to a general statement on how we look at sports rights. We're spending close to $20 billion sort of, on content and programming in the broadest sense, and every dollar we spend plays a different role across the portfolio. We generally like to own our content. That's not the case with sports, but we obviously acknowledge the enormous value, reach value, emotional value of these deals. And we have been able to strike profitable deals and we're always going to be disciplined. It's very easy to lose control over sports rights investments. That's not what we do. We're going -- we know exactly what value we assign and we stay disciplined during our discussions.***
>
> ***And if you take that into account, I think we have enormous opportunity to be much more efficient with our content spend overall across the entire company, and that will include certain areas in which, you're right, you probably have to assume that there is inflation going forward. On the NBA specifically, we've had a very, very strong partnership for 40 years, and I certainly hope that we're going to be able to continue that in the most positive way.***

100. The above statements identified in Paragraph 99 were materially false and misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (1) that the NBA Rights were crucial to support the high carriage rates that WBD was able to command, produce significant advertising dollars, provide a "halo effect" that boosted all of WBD's other properties, and negotiate more favorable terms with other sports leagues; (2) that WBD internally viewed the NBA Rights as a unique, irreplaceable asset; and consequently, (3) losing the NBA Rights would

significantly compromise WBD's revenue and goodwill, particularly in its Networks segment.

101. After that earnings call, on March 9, 2024, WBD and the NBA entered into the Exclusive Negotiating Period. However, WBD failed to secure a renewal of the NBA Rights during that time.

**B. Defendants mislead investors about WBD's ability to exercise its Matching Clause as the Exclusive Negotiating Period expires without a deal, and competition for the NBA Rights increases**

102. On April 22, 2024, WBD's exclusive negotiating window expired. Almost immediately, third party bidders emerged seeking to obtain the NBA Rights.

103. On April 25, 2024, the *Wall Street Journal* reported that the NBA was advancing toward a series of deals, with Amazon and Google vying for a new, smaller Internet streaming package separate from Packages A and B of the NBA Rights, and NBCUniversal vying for either Package A or Package B of the NBA Rights. *See* Joe Flint and Isabella Simonetti, *Amazon, YouTube Vie for NBA Streaming Rights as League's Media Talks Heat Up*, WALL ST. J., Apr. 25, 2024, https://www.wsj.com/business/media/nba-tv-rights-talks-heat-up-with-amazon-youtube-vying-to-air-games-6741e60a?mod=article_inline. Additionally, the *Wall Street Journal* noted that despite the Matching Clause, the deals offered by Amazon or NBCUniversal could contain terms that were difficult or impossible to match. *Id.*

104. A follow-up article by the *Wall Street Journal* on April 29, 2024 reported that NBCUniversal was preparing to offer around $2.5 billion per year (later confirmed to be $2.45 billion per year), which included playoff and regular season games that would appear on the NBC cable network, as well as its Peacock Internet streaming service. *See* Joe Flint, Amol Sharma, and Isabella Simonetti, *NBC Prepares $2.5-Billion-a-Year Bid to Pluck NBA Rights From TNT*, WALL ST. J., Apr. 29, 2024, https://www.wsj.com/business/media/nbc-prepares-roughly-2-5-billion-a-

year-offer-to-steal-nba-rights-away-from-tnt-e6e14eeb. That *Wall Street Journal* article noted that the loss of the NBA "would be a blow to the strength of [WBD's] TNT cable network at the same time it is being hurt by cord-cutting and a shrinking advertising marketplace." *Id.*

105. The same day, other news outlets reported that Amazon had reached a framework for a deal with the NBA for an Internet streaming-only deal. *See* Dade Hayes, *NBA Rights Chase Will Reportedly Draw Hefty NBCUniversal Bid, With Amazon Looking To Lock League's First National Streaming Deal*, DEADLINE, Apr. 29, 2024, https://deadline.com/2024/04/nba-rights-nbcuniversal-amazon-warner-bros-discovery-1235899201/. Consequently, both the NBCUniversal and Amazon offers and their terms—including the $2.45 billion price tag of NBCUniversal's offer and the Internet streaming-only quality of Amazon's offer—were widely reported at the time.

106. On this news, WBD's stock price fell from an April 29, 2024 closing price of $8.15 per share by $0.80, or 9.81%, before rebounding to close at $7.36 per share on April 30, 2024, a decline of nearly 10%.

107. The market attributed the precipitous price decline to "concerns [WBD] could lose its NBA rights." Oliver Darcy, *Warner Bros. Discovery's stock plummets to new low amid concerns the media giant could lose its NBA rights*, CNN, May 1, 2024, https://www.cnn.com/2024/05/01/media/warner-bros-discovery-could-lose-nba-rights/index.html. CNN emphasized that "[i]ndustry insiders have repeatedly underscored how important it is for the network and WBD to retain the NBA broadcast rights. 'It's a must have,' a media executive stressed to CNN on Tuesday." *Id.* CNN went on to outline how the NBCUniversal offer eclipsed what WBD was paying under the 2014 media agreement. Further, if the NBA accepted NBCUniversal's offer, it would be a huge blow to not only WBD's linear cable business,

but also to "WBD's flagship streaming service, Max, [which had] been advertising live sports to consumers as a key differentiator from other platforms." *Id*.

108. In response, despite the increasing threat to WBD's ability to retain the NBA Rights, Defendants misleadingly assured investors about WBD's ability to retain the NBA Rights, specifically through the Matching Clause, while downplaying and omitting the disastrous risk that losing the NBA Rights would have on WBD.

109. On May 6, 2024, Zaslav appeared at the Milken Institute Global Conference and spoke directly about the NBA Rights and WBD's continuing negotiations, stating "[w]e continue to be in constructive negotiations with the NBA[.]"

110. The above statement identified in Paragraph 109 was materially false and misleading when made because (1) WBD was not then in "constructive negotiations" with the NBA because it was neither able nor willing to match the existing third party offers; and (2) the statement omitted that losing the NBA Rights would significantly compromise WBD's revenue and goodwill, particularly in its Networks segment.

111. Despite the rising competition for the NBA Rights, analysts and investors remained assured by Defendants' misleading statements that the Matching Clause protected WBD from losing the NBA Rights:

> Much has changed, however, since then. An exclusive negotiation period for both WBD and fellow incumbent rights holder ESPN has now expired, and recent reports point to Comcast's NBC Sports making an aggressive effort to acquire an NBA rights package, along with separate efforts by ESPN as well as online retail and streaming giant Amazon. ***WBD does have matching rights within its current NBA deal, providing a level of protection in these negotiations***.

Eric Fisher, *Warner Bros. Discovery CEO's About-Face on Rights: 'We Love the NBA'*, FRONT OFFICE SPORTS, May 7, 2024, https://frontofficesports.com/warner-bros-discovery-ceos-about-face-on-rights-we-love-the-nba/.

112. On May 9, 2024, WBD announced its Q1FY24 results and held an earnings call with investors. In that earnings call, Zaslav directly addressed the negotiations with the NBA and misleadingly reassured investors of WBD's ability to utilize the Matching Clause, while at the same time omitting the increasing risk to WBD's business of losing the NBA Rights and the consequences thereof, stating:

> ***Before I close, I want to mention a topic I know is top of mind for everyone and that's the NBA. We've enjoyed a strong partnership with the NBA for almost four decades. We're in continuing conversations with them now and we're hopeful that we'll be able to reach an agreement that makes sense for both sides. We've had a lot of time to prepare for this negotiation and we have strategies in place for the various potential outcomes. However, now is not the time to discuss any of this. Since we are in active negotiations with the league and under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them.***

113. The above statements identified in Paragraph 112 were materially false and misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (1) the "matching rights" referenced provided WBD no protection because WBD could not match the terms offered by NBCUniversal and Amazon, such as cross-promotion with the NFL and a high minimum Internet streaming presence; (2) WBD was not in a financial position to match NBCUniversal's $2.45 billion per year offer; (3) that WBD internally viewed the NBA Rights as a unique, irreplaceable asset; and (4) losing the NBA Rights would significantly compromise WBD's revenue and goodwill, particularly in its Networks segment.

114. In that same earnings call, an analyst directly questioned Zaslav about the NBA Rights, WBD's ability to exercise its Matching Clause, and the NBA Rights' connection to preventing churn. In response, Zaslav attempted to evade addressing the Matching Clause and, when discussing churn, omitted mention of the greatest risk to WBD's ability to combat churn –

the NBA Rights he knew were lost, stating:

> **Steven Cahall –** Thank you. So David and Gunnar, with a continuous improvement mindset, it seems like you have some tools that could help reaccelerate EBITDA. ***And then I think there's some concern about what you might be willing to do to match on the NBA rights. So I'm just wondering if we can think about these things being tied together. Do you think you can find enough cost improvement that strengthens your hand as you think about a more aggressive matching offer to retain some of those rights?***
>
> **David Zaslav –** ***Thanks. Look churn is the, you need to have a great, great product, you need to have great content. But the churn is just a killer in this business. And so we have been hyper-focused on it and it's not one simple answer but the churn is down dramatically. And we measure it daily, weekly from when we launched this business. It's not at our target because our target is that it should be extremely low in the -- with a two handle, that would be, you know, that's when your business starts to be really healthy, when you're below three.***
>
> ***And so, JB, why don't you talk? We have very specific initiatives on churn. Certainly, bundling is a big helper. A lot of these deals that we're talking about with players in Latin America and in Europe, where you're working with an existing distributor that you have a relationship with that's hard bundling in many cases with users have different characteristics that are quite attractive but we need to go at this as like an attack mode.***

115. The above statements identified in Paragraph 114 were materially false and misleading when made because the statements omitted to disclose the direct information requested by the analyst: the fact that the best defense the Company had against churn, the NBA Rights, were already lost because WBD lacked the ability to match the terms of the NBCUniversal and Amazon offers.

116. Less than two weeks later, the *Sports Business Journal* reported that the NBA was formalizing deals with Disney, Amazon, and NBCUniversal. The Disney deal, which was negotiated during and after Disney's own exclusive negotiation period under its 2014 media agreement with the NBA, was for Package A of the NBA Rights, and was later confirmed to be $2.6 billion per year. According to the article, NBCUniversal agreed to pay $2.45 billion per year for a block approximating what the NBA had described as Package B of the NBA Rights, and

Amazon would pay between $1.8 billion and $2 billion per year for the package of separate streaming-only rights. *See* Tom Friend, *NBA formalizing deals with Disney, Amazon, NBC*, SPORTS BUSINESS JOURNAL, May 22, 2024, https://www.sportsbusinessjournal.com/Articles/2024/05/22/nba-formalizing-media-rights-deals-disney-amazon-nbc/. The article noted that the deals could be finalized within a few weeks, at which point WBD could attempt to under its Matching Clause to match the NBCUniversal offer. *Id*. Critically, the article noted that because WBD was $40 billion in debt and did not have the same level of over-the-air infrastructure as NBCUniversal, WBD would likely need to exceed the $2.45 billion per year offered by NBCUniversal to retain the NBA Rights. *Id*. The article also reported that Zaslav "believed he would only have to pay between $1.8B and $2.1B to retain the 'B' package this time around and refused to [raise] to $2.4B." *Id*.

117. Consequently, while Defendants publicly represented to investors that they were having productive conversations with the NBA about renewing WBD's NBA Rights, they were, in fact, refusing to match the monetary value, let alone the actual terms of the competing offer(s).

118. That same day, on May 22, 2024, Wiedenfels attended the J.P. Morgan 52nd Annual Global Technology, Media and Communications Conference and again was asked about the NBA Rights. Attempting to evade discussing anything specific about WBD's negotiations, Wiedenfels again reassured investors that WBD had the Matching Clause that it could exercise, stating:

> **David Karnovsky –** Got it. With the NBA, I think many people in this room probably want me to ask you for an update. I wouldn't expect you to break news, but maybe I can give you a follow-up to what you said on the earnings call around matching rights. Would be interested to understand better how those work? Is this entirely financial. Are there considerations around packaging? What can you say?
>
> **Gunnar Wiedenfels –** Well you wouldn't be surprised that I'm not going to be breaking news here. ***And look, this is still very much an ongoing negotiation.***

> We've had a great partnership with the NBA. We value the product, and were very hopeful that we're going to be able to find a solution here that's mutually beneficial to both sides. ***We do have a contractual matching, right?***
>
> ***And that's an important part of our ongoing contractual relationship, but that's about as much as I want to say about the NBA.***

119. The above statements identified in Paragraph 118 were materially false and misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (1) the "contractual matching" referenced provided WBD no protection because WBD could not match the terms offered by NBCUniversal and Amazon, such as cross-promotion with the NFL and a high minimum Internet streaming presence; (2) WBD was not in a financial position to match NBCUniversal's $2.45 billion per year offer; (3) that WBD internally viewed the NBA Rights as a unique, irreplaceable asset; and (4) losing the NBA Rights would significantly compromise WBD's revenue and goodwill, particularly in its Networks segment.

120. Eight days later, on May 30, 2024, at the Bernstein 40th Annual Strategic Decisions Conference, analysts again asked about WBD and the future of WBD without the NBA. Zaslav again misleadingly reassured investors about WBD's ongoing negotiations with the NBA and the impact of losing the NBA on WBD, stating:

> **Laurent Yoon** – All right. So I would like to address one elephant in the room and turn to sports. And just to kind of clear the table, no specific questions on the negotiation with the MDA *[sic]*, none of that.
>
> But I'd like to kind of have a -- take a slightly different angle to that. So generally, the general view in the market, a lot of the questions I get or commentary I gets is that is WBD today, when it comes to NBA, is left with to auction. And it's not a WBD issue, basically, all the players want the right. You can pay up what seems to be an exorbitant amount, or you may -- or give it up. Those are sort of the -- and both options don't see that appealing, right?
>
> The question I have is around what would WBD, or maybe (technical difficulty) specifically, what would it look like without the NBA rights? Because -- and I don't

> mean that in a negative way because at the end of the day, it's a capital allocation issue, right? So if you can make the case that you could spend up money to generate return on something else, maybe that is compelling as well right? So what would that look like? What would be WBD and TNT look like without the NBA?
>
> **David Zaslav** – Well first, we're -- ***we continue to talk to the NBA. And our team does an extraordinary job on the NBA, inside the NBA with Barclay and Shack it's maybe the best sports television show. I was just down in Atlanta. We've got a great team down there, and we love our experience with the NBA. But in general, we're a leader in sports around the world. And if -- we have the Olympics in Europe. With leading -- we have most of the football in the U.K. where TNT Sport, with a full buffet of content around the world. . . .***
>
> **Laurent Yoon** – Okay. So to summarize, even without -- ***whatever happens with the NBA, the value proposition of (technical difficulty) is a good destination for a (technical difficulty) content in each of the relevant of markets you play in?***
>
> **David Zaslav** – ***We feel very comfortable and we've been very strategically focused on making sure that we have a robust offering of sports for each our sports channels in the U.S. and around the world.***

121. The above statements identified in Paragraph 120 were materially false and misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (1) "continu[ing] to talk" to the NBA provided WBD investors no hope because WBD could not match the terms offered by NBCUniversal and Amazon, such as cross-promotion with the NFL and a high minimum Internet streaming presence; (2) WBD was not in a financial position to match NBCUniversal's $2.45 billion per year offer; (3) that WBD internally viewed the NBA Rights as a unique, irreplaceable asset; and (4) losing the NBA Rights would significantly compromise WBD's revenue and goodwill, particularly in its Networks segment.

### C. Amazon and NBCUniversal successfully bid on the NBA Rights, Disney renews its deal, and WBD is left without NBA Rights

122. In July 2024, the NBA formally accepted the renewal offer from Disney to secure Package A of the NBA Rights, and accepted the third-party offer from NBCUniversal of $2.45

billion per year to secure Package B of the NBA Rights. The NBA also accepted Amazon's offer for the third Internet streaming-only package at $1.8 billion per year to stream 66 regular-season NBA games and certain playoff games. All of these offers far exceeded the amount that WBD paid under the 2014 media agreement.

123. On July 17, 2024, the NBA sent WBD a letter informing WBD of its formal acceptance, marking the start of the five-day Matching Period applicable to the NBCUniversal and Amazon offers. WBD had no Matching Period applicable to Disney's offer because that offer was a renewal of Disney's own 2014 deal.

124. On July 22, 2024, WBD informed the NBA that it did not seek to match NBCUniversal's offer and would not match the terms of Amazon's offer but would meet the financial obligation if the NBA would renegotiate virtually all of the material terms of the Amazon offer.

125. With the letter, WBD returned a markup of the Amazon offer that demanded substantive revisions to 8 of 27 sections of the Amazon offer (including revisions to 22 different subsections), changed 11 defined terms that are collectively used roughly 100 separate times, struck nearly 300 words, and added over 270 new words, substantially altering the parties' rights and obligations in the process.

126. These changes were significant. Most notably, because WBD lacked the Internet streaming audience and infrastructure necessary for an Internet streaming-only package, WBD sought to rewrite that most essential term. Instead of matching Amazon's agreement to distribute the games in that package only via Internet streaming, WBD attempted to grant itself the option to distribute the games on a linear cable network, its Internet streaming service, or both. In other words, WBD wanted to pay the lower Internet streaming-only price but still have flexibility to

broadcast or stream.

127. This revision directly contradicted the Matching Clause in the 2014 media agreement, which stated that a matching offer has to include the exact same type of distribution, and cannot substitute an offer for Internet distribution with an offer for linear cable distribution:

> In the event that an Incumbent Matches a Third Party Offer that provides for the exercise of Game Rights via any specific form of combined audio and video distribution, such Incumbent shall have the right and obligation to exercise such Game Rights only via the specified form of combined audio and video distribution (e.g., ***if the specified form of combined audio and video distribution is Internet distribution, a Matching Incumbent may not exercise such Game Rights via television distribution***) through a distributor reasonably acceptable to the NBA.

128. WBD also refused to match other material terms. For example, Amazon agreed to maintain an escrow account containing the billions in payments that would automatically pay out to the NBA, thereby removing counterparty risk. Instead of matching this term, WBD replaced it with a term calling for convoluted letters of credit accessible only upon default.

129. The Amazon offer also included several terms that WBD simply could not match, such as a commitment that Amazon's reach in U.S. Internet streaming would not fall below 80 million households – a level that would be unworkable for Max. *See* Amol Sharma and Joe Flint, *How Amazon's NFL Package Helped It Win NBA Rights Over Warner's TNT*, WALL ST. J., Aug. 6, 2024, https://www.wsj.com/business/media/how-amazons-nfl-package-helped-it-win-nba-rights-over-warners-tnt-b3515282?mod=Searchresults_pos9&page=1. Further, Amazon's offer included a provision that allowed the NBA to be promoted in Amazon's telecasts of the NFL – which WBD does not carry. *Id.*

130. Nor could WBD have matched the terms of the NBCUniversal offer, even if it had the financial resources and will to pay $2.45 billion per year. For example, NBCUniversal's offer included provisions like cross-promotion on NFL football games that WBD simply could not

match because it did not broadcast NFL games.

## IX. The Truth Emerges Through a Series of Disclosures

### A. The NBA announces that WBD was unable to exercise its Matching Clause, and therefore awarded NBA Rights to NBCUniversal and Amazon

131. On July 24, 2024, at the end of market hours, the NBA announced that "***Warner Bros. Discovery's most recent proposal did not match the terms of Amazon Prime Video's offer and, therefore, we have entered into a long-term arrangement with Amazon*** . . . Throughout these negotiations, our primary objective has been to maximize the reach and accessibility of our games for our fans. Our new arrangement with Amazon supports this goal by complementing the broadcast, cable and streaming packages that are already part of our new Disney and NBCUniversal arrangements. All three partners have also committed substantial resources to promote the league and enhance the fan experience."

132. On this news that WBD had lost its NBA Rights, WBD's stock price fell from a July 24, 2024 closing price of $8.47 per share by $0.76, or 8.97%, before rebounding to close at $7.99 per share on July 25, 2024.

133. Analysts tied EBD's July 25, 2024 stock price drop directly to WBD's loss of the NBA, stating that "NBA rights were important in [analysts'] view to the future success of the Max streaming service. The loss may hasten the downturn in linear networks too[.]" Lucas Manfredi, *Warner Bros. Discovery Stock Plunges Over 6% on NBA TV Rights Loss*, THE WRAP, July 25, 2024, https://www.thewrap.com/wbd-stock-falls-nba-tv-rights-loss/.

134. That same day, the NBA sent a letter to WBD informing it that the NBA was accepting Amazon's offer, and noting that WBD's proposal did not constitute a proper offer under the 2014 media agreement's Matching Clause. Specifically, the NBA documented that WBD, as successor to Turner Broadcasting, attempted to rewrite core provisions in Amazon's offer:

The Amazon Offer provides that NBA game rights can onlv be exercised via Internet distribution and that all games must be distributed by the licensee's most-widely distributed, digital-only, subscription video streaming service. In its purported match, ***[WBD] deleted and replaced that core grant of rights - eliminating the requirement of Internet streaming only and purporting to permit the distribution of NBA games on the linear TNT cable network - and thereby fundamentally changed (and expanded for [WBD's] benefit) a foundational element of the Amazon offer.***

Exhibit C of the [2014] NBA/[WBD] Agreement expressly forecloses [WBD's] attempt to match the Amazon offer in this fashion. Paragraph C.4 of Exhibit C provides:

> "In the event that an Incumbent Matches a Third Party Offer that provides for the exercise of Game Rights via any specific form of combined audio and video distribution, such Incumbent shall have the right and obligation to exercise such Game Rights ***only*** via the specified form of combined audio and video distribution (e.g., ***if the specified form of combined audio and video distribution is Internet distribution, a Matching Incumbent may not exercise such Game Rights via television distributor***) through a distributor reasonably acceptable to NBA" (emphasis added).

Further, Paragraphs B.l(a) & (b) of Exhibit C require an Incumbent attempting to Match an offer to "***accept each term***" of the offer, and to ***"enter[] into a license agreement on the terms and conditions provided for in [the offer] during the Match Window." [WBD] has failed to comply with these provisions by not accepting the numerous terms of the Amazon Offer that refer or relate to, or are based on, the streaming-only distribution platform authorized thereunder.*** See, e.g., Amazon Offer, Sections l0(a), l0(b), l0(c), 10(d). Accordingly, for this reason as well, TBS has failed to Match the Amazon Offer.

***

***[WBD's] rewrite of the grant of rights in the Amazon Offer does not stand alone. In its purported match of the Amazon Offer, [WBD] also changed - and thereby failed to accept - numerous other substantive terms of the Amazon Offer, with each of these changes representing an independent basis for concluding that it has failed to make a proper Match under Exhibit C.***

135. Accordingly, the NBA concluded that WBD did not have the ability to exercise the 2014 media agreement's Matching Clause and effectively lost the NBA Rights.

### B. WBD admits that the NBA Rights were more vital than had been described to investors

136. In ensuing litigation filed in New York state court, contrary to what Defendants were telling investors during the Class Period, WBD admitted that it considered the NBA Rights: (i) to be "irreplaceable" to WBD; (ii) to impact its advertising rates and downstream distributors (i.e., carriage rates); and (iii) to have a "halo effect" that helps lift up WBD's other content and allowed it to more effectively negotiate other sports deals:

> ***NBA telecast rights are a unique asset that cannot be replaced***. Each NBA game is a one-of-a-kind live sporting event. ***The ability to telecast NBA games not only drives significant viewership and ratings on TNT (which affects the price TBS and WBD can charge to their advertisers and downstream distributors that license TNT), it also provides a halo effect that is used to promote other content and drive attention and viewership to other TBS and WBD channels, networks, and properties. In addition, the NBA rights provide TBS with other competitive advantages. For example, having the rights to show NBA games on TNT makes TBS and WBD more likely to successfully negotiate rights to telecast other sports leagues' events and to obtain more favorable terms with TBS's own downstream distributors.***

137. WBD also stressed in its lawsuit filings that losing the NBA created "irreparable harm," and admitted – for the first time – that it would impact the goodwill of WBD, competitive advantage and market share:

> WBD also will suffer irreparable harm if this dispute is not resolved by the NBA's specific performance of its obligations, including by losing, among other things, the "halo" benefits that WBD uses to promote other WBD content, networks and properties, ***as well as its own goodwill, competitive advantages, and market share.***

138. Finally, WBD admitted that the NBA Rights was not simply another replaceable cog in its business, as Defendants previously conveyed to investors throughout the Class Period, but instead that it was a unique and unparalleled asset, stating, "this is not a mere case of losing one valuable sports property, but rather a case where the various implications of losing the NBA distribution rights are wide-ranging and not merely difficult, but impossible to fully calculate."

139. Markedly, in response to the NBA's motion to dismiss—and as noted by the NBA in its reply in support of its motion to dismiss—WBD essentially conceded that it did not match and instead changed numerous provisions from Amazon's offer. *See Turner Broadcasting System, Inc. et al., v. National Basketball Association, et al.*, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, NYSCEF 67, filed Sept. 20, 2024, at 22-26; *Turner Broadcasting System, Inc. et al., v. National Basketball Association, et al.*, Defendants' Reply in Further Support of Their Motion to Dismiss the Complaint, NYSCEF 72, filed Oct. 7, 2024, at 7-12.

### C. The loss of the NBA Rights spurs WBD to take a $9.1 billion goodwill impairment

140. On August 7, 2024, the full impact of WBD's loss of the NBA Rights was revealed when, during after-market hours, WBD issued a press release announcing its second quarter 2024 financial results (the "2Q24 Earnings Release"). Among other items, WBD reported disappointing revenue of $9.71 billion, as well as a net loss of approximately ***$10 billion*** resulting from a $9.1 billion non-cash goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects. With respect to WBD's reported net loss during the quarter, the 2Q24 Earnings Release stated, in relevant part:

> Net loss available to [WBD] was $(10.0) billion, which includes a $9.1 billion noncash goodwill impairment charge from the Networks segment, as well as $2.1 billion of pre-tax acquisition related amortization of intangibles, content fair value step-up, and restructuring expenses.
>
> - The goodwill impairment was triggered in response to the difference between market capitalization and book value, continued softness in the U.S. linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA.

141. That same day, during after-market hours, WBD hosted a conference call with investors and analysts to discuss the Company's second quarter 2024 results (the "Q2FY24

Earnings Call”). On the Q2FY24 Earnings Call, Wiedenfels stated, in relevant part:

> Little more color on the Goodwill impairment. And to get straight to the point here, there is no one factor that is driving this impairment. So the way this works is obviously with the amount of goodwill that we have, there’s a systematic process that we go through every quarter and we’re monitoring for so-called triggering events.
>
> ***And this is clearly where a sports right discussion like the one with the NBA comes into play as a triggering event, which then compels us to re-evaluate our business case*** in a strategic planning process with the latest assumptions, the best view of where the industry is and how we play in that field. ***And that’s what then leads to evaluation, which in the second quarter happened to be $9.1 billion below what was on the books for the network segment.*** So it’s really a full re-evaluation, not a response to one individual factor.

142. On this news, WBD’s stock price fell from an August 7, 2024 closing price of $7.71 per share by $0.98, or 12.71%, before rebounding to close at $7.02 per share on August 8, 2024.

143. As a result of Defendants’ wrongful acts and omissions, and the precipitous decline in the market value of the Company’s securities, Plaintiffs and other Class members have suffered significant losses and damages.

## X. Additional Allegations of Scienter

### A. Defendants’ access to and actual knowledge of the status of WBD’s negotiations with the NBA and the consequences of their failure

144. Defendants WBD, Zaslav, and Wiedenfels had access to and received information about the status of the negotiations with the NBA for the NBA Rights, the progress of those negotiations, the risks associated with losing the NBA Rights, and WBD’s actual ability to utilize the Matching Clause from the 2014 media agreement to retain the NBA Rights.

145. As outlined in ¶¶27-30, Defendants Zaslav and Wiedenfels occupied executive positions at WBD, which would have provided them full access to information about the actual importance of the NBA to WBD’s business, the advertising dollars that the NBA brings in, the “halo effect” that the NBA had on the rest of WBD’s business, the status of negotiations with the

NBA about the renewal of the rights to broadcast the NBA on WBD's networks, the Matching Clause, and WBD's inability to utilize the Matching Clause to retain the NBA Rights. They were also intimately involved in the negotiations themselves, as Zaslav was the lead negotiator and decision-maker for WBD. *See* ¶¶94-96. Therefore, any determination about how much to offer for the NBA Rights, as well as assessments of WBD's inability to comply with the Matching Clause and the resulting attempt to rewrite terms would have been directed by him. Wiedenfels was also in WBD's inner circle and, as the executive responsible for financial reporting, would have first-hand knowledge of the NBA's actual importance to WBD.

146. Consequently, Zaslav and Wiedenfels had access to information that belied their statements which downplayed the risks of losing the NBA Rights and misstated WBD's ability to retain the NBA Rights through the 2014 media agreement's Matching Clause.

### B. Defendants held themselves out as knowledgeable about the concealed information

147. Defendants' own statements show that they repeatedly held themselves out to investors as extremely knowledgeable about the NBA Rights and its importance to WBD, the negotiations with the NBA to renew the NBA Rights, the impact losing the NBA Rights would have on WBD, and WBD's ability to retain the NBA Rights through the 2014 media agreement's Matching Clause.

148. For example, both Zaslav and Wiedenfels routinely discussed the NBA Rights and negotiations with the NBA with investors during the Class Period. *See* ¶¶97, 99, 112, 118.

149. Moreover, Zaslav assured investors of WBD's ability to exercise the Matching Clause, such as on March 9, 2024 during WBD's Q1FY2024 earnings call when he said, "[s]ince we are in active negotiations with the league and under our current deal with the NBA, ***we have matching rights that allow us to match third-party offers before the NBA enters into an***

***agreement with them.***"

150. Wiedenfels similarly discussed WBD's ability to exercise the Matching Clause to retain the NBA Rights, such as on May 22, 2024 at the J.P. Morgan 52nd Annual Global Technology, Media and Communications Conference stating, "***[a]nd look, this is still very much an ongoing negotiation. . . . We do have a contractual matching, right? And that's an important part of our ongoing contractual relationship[.]***"

151. That the Individual Defendants held themselves out as knowledgeable about the concealed matters allows only two inferences: that Zaslav and Wiedenfels actually possessed the knowledge claimed but deliberately chose to withhold material adverse information from investors; or despite holding themselves out as knowledgeable, they chose not to inform themselves of the truth and were reckless to the risk of misleading investors.

### C. The importance of the NBA Rights to WBD bolsters scienter

152. The NBA Rights had been a cornerstone of Turner Broadcasting (and later WBD's) business since 1984, and its importance only magnified since the Merger, as it was the primary driver for WBD's Networks segment. *See* ¶¶38-45, 57-74.

153. The NBA Rights also gave WBD significant power to command high carriage fees from cable providers, as well as significant advertising dollars in the hundreds of millions of dollars annually. *See* ¶¶57-74.

154. Moreover, the effects of losing the NBA Rights were immediate and significant. WBD not only took a $9.1 billion non-cash goodwill impairment charge, and it has also been reported that WBD is projected to lose $1.1 billion in television advertising in 2026 as a result – a figure that would account for approximately 23% of its total advertising revenue. *See* Drew Lerner, *Warner Bros. Discovery to lose $1.1 billion in advertising without NBA*, AWFUL ANNOUNCING,

March 31, 2025, https://awfulannouncing.com/warner-bros-discovery/one-billion-nba-revenue-lost-tnt.html.

155. Therefore, it would be absurd to suggest that Defendants were unaware of the importance of the NBA Rights, the impact on the Company if WBD failed to renew the NBA Rights, or WBD's ability or willingness to exercise the Matching Clause to retain the NBA Rights due to its competitive and financial limitations.

**D. Defendants' admissions about the importance of the NBA Rights to WBD bolsters scienter**

156. Defendants' admission of the importance of the NBA Rights to WBD in their lawsuit further bolsters scienter. After WBD had effectively lost the NBA Rights, Defendants admitted in their lawsuit against the NBA – for the first time – that far from being another cog in WBD's programming, the NBA Rights were instead "a unique asset that cannot be replaced."

157. The Company went on to explain how the NBA Rights "not only drives significant viewership and ratings on TNT (which affects the price TBS and WBD can charge to their advertisers and downstream distributors that license TNT), it also provides a halo effect that is used to promote other content and drive attention and viewership to other TBS and WBD channels, networks, and properties. In addition, the NBA Rights provide TBS with other competitive advantages. For example, having the rights to show NBA games on TNT makes TBS and WBD more likely to successfully negotiate rights to telecast other sports leagues' events and to obtain more favorable terms with TBS's own downstream distributors."

158. Further, Defendants admitted facts that they previously withheld from investors about how WBD would suffer "irreparable harm" by losing the NBA Rights, and this harm would impact both the Company's revenue and the goodwill of WBD. *See* ¶¶136-41.

159. These admissions demonstrate that Defendants knew the serious risks associated

with losing the NBA Rights, even as the loss of the NBA Rights became a certainty in April/May 2024, but hid those risks from investors.

### E. The quick resolution of WBD's lawsuit against the NBA bolsters scienter

160. WBD's quick and unremarkable settlement with the NBA in its suit to enforce the Matching Clause demonstrated that, far from believing in their ability to enforce the Matching Clause, Defendants knew that they could not *and did not* use the Matching Clause to retain the NBA Rights, and instead filed their lawsuit as a face-saving measure and negotiation tactic that WBD quickly abandoned.

161. On November 18, 2024, it was announced that WBD had settled its lawsuit against the NBA. The settlement occurred less than four months after WBD filed its lawsuit, before any discovery had been completed, and before the court had ruled on the NBA's motion to dismiss.

162. Critically, WBD settled a pittance of what they were seeking and what they previously had in the NBA Rights. Specifically, the settlement did not allow WBD to retain the NBA Rights, aside from telecast rights in the Nordic countries (Denmark, Finland, Norway, and Sweden), along with Poland and Latin America, absent the two of the largest markets in Latin America (Brazil and Mexico).

163. WBD's settlement with the NBA also provided for Disney to license *Inside the NBA* from WBD, which destroys any "halo effect" that WBD received from the NBA Rights, instead transferring that "halo effect" to Disney and its networks.

164. Indeed, the settlement provided WBD with few tangible benefits compared to the benefits it enjoyed when it retained the NBA Rights.

165. Consequently, had WBD believed in the actual merits of its position, or that it was actually in a position both competitively and financially to adequately exercise the Matching

Clause to retain the NBA Rights, it would not have resolved its lawsuit against the NBA for minimal benefits compared to the losses it endured by losing the NBA Rights less than four months after filing its complaint and before any motions had been decided upon or discovery been taken.

**F. Wiedenfels' insider sales at inflated prices enhance an inference of scienter**

166. During the Class Period, Wiedenfels took advantage of WBD's artificially inflated stock price and earned approximately $971,614.35 from sales of WBD common stock on the open market:

**Wiedenfels' Class Period Stock Sales:[3]**

| Date | Shares Disposed | Price | Proceeds |
|---|---|---|---|
| 02/28/2024 | 8,695 | $8.71 | $75,733.45 |
| 03/01/2024 | 40,019 | $8.67 | $346,964.73 |
| 03/06/2024 | 43,577 | $8.41 | $366,482.57 |
| 07/11/2024 | 24,720 | $7.38 | $182,433.60 |
| **Total** | **117,011** | | **$971,614.35** |

167. Notably, in the eleven and a half months before the Class Period, Wiedenfels did not sell any stock, and instead increased his holdings in WBD.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

168. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities other than Defendants that purchased or otherwise acquired WBD common stock between February 23, 2024, and August 7, 2024, both dates inclusive (the "Class"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials. Excluded from the Class are Defendants,

[3] Excluded from this chart are shares granted to Wiedenfels, at no cost to Wiedenfels, for performance reasons.

former and current officers and directors of WBD, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of any of the above.

169. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, WBD securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are several thousands of members in the proposed Class. WBD's most recent Form 10-K indicates that as of February 13, 2025, there were 669,356 stockholders of record of its common stock. Because most stock is held in "street name" by brokers, Plaintiffs are informed and believe the actual number of impacted shareholders to be several times higher. Record owners and other members of the Class may be identified from records maintained by WBD or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

170. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

171. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

172. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of WBD;
- whether the Individual Defendants issues false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of WBD securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

173. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

174. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- WBD securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASQAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold WBD securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of

the omitted or misrepresented facts.

175. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

176. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the claims alleged herein sound primarily in omission of material information rather than affirmative misrepresentation.

## **COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

177. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

178. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

179. During the Class Period, Defendants omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and made material affirmative misrepresentations, *inter alia*, (a) that the that the NBA Rights were crucial to support the high carriage rates that WBD was able to command, produce significant advertising dollars, provide a "halo effect" that boosted all of WBD's other properties, and negotiate more favorable terms with other sports leagues; (b) that WBD internally viewed the NBA Rights as a unique, irreplaceable asset; and consequently; (c) that WBD was not then in "constructive negotiations" with the NBA because it was neither able nor willing to match the existing third party offers; (d) that the "matching rights" referenced provided WBD no protection because WBD could not match the terms offered by NBCUniversal and Amazon, such as cross-

promotion with the NFL and a high minimum Internet streaming presence; (e) that WBD was not in a financial position to match NBCUniversal's $2.45 billion per year offer; (f) that the best defense the Company had against churn, the NBA Rights, were already lost because WBA lacked the ability to match the terms of the NBCUniversal and Amazon offers; and (g) that losing the NBA Rights would significantly compromise WBD's revenue and goodwill, particularly in its Networks segment. Such misrepresentations were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of WBD securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire WBD securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

180. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, that were designed to influence the market for WBD securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about WBD's finances and business prospects.

181. By virtue of their positions, responsibilities and control at WBD, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions

of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

182. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives and/or directors of WBD, the Individual Defendants had knowledge of the details of WBD's internal affairs.

183. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their control and authority over WBD, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of WBD. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to WBD's businesses, operations, and financial condition. As a result of the dissemination of the aforementioned false and misleading statements, the market price of WBD securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning WBD's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired WBD securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

184. During the Class Period, WBD securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

of WBD securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of WBD securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of WBD securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

185. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

186. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

187. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

188. During the Class Period, the Individual Defendants participated in the operation, management and day-to-day control of WBD. Each conducted and participated, directly and indirectly, in the conduct of WBD's business affairs. Because of their senior positions, they knew the adverse non-public information about WBD's misstatement of income and expenses and false

financial statements. Both Zaslav and Wiedenfels held themselves out to investors as knowledgeable about the misrepresented topics, and involved in the underlying negotiations, which Zaslav led.

189. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to WBD's financial condition and results of operations, and to correct promptly any public statements issued by WBD which had become materially false or misleading.

190. Because of their control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which WBD disseminated in the marketplace during the Class Period concerning WBD's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause WBD to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of WBD within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of WBD securities.

191. Each of the Individual Defendants, therefore, acted as a controlling person of WBD. By reason of their senior management positions and/or being directors of WBD, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, WBD to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of WBD and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

192. By reason of the above conduct, the Individual Defendants are liable pursuant to

Section 20(a) of the Exchange Act for the violations committed by WBD.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: May 7, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ J. Alexander Hood II*
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (917) 463-1044
Email: ahood@pomlaw.com

-and-

Joshua B. Silverman
(admitted *pro hac vice*)
Christopher P.T. Tourek
(admitted *pro hac vice*)
Genc Arifi
(admitted *pro hac vice*)
10 South LaSalle Street, Suite 3505

Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com
ctourek@pomlaw.com
garifi@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim
Sara Fuks
275 Madison Avenue, 40th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
sfuks@rosenlegal.com

*Co-Lead Counsel for Co-Lead Plaintiffs Anthony Yuson and Michael Steinberg, and Additional Plaintiff Richard Collura*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Michael Steinberg*