**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| RICHARD COLLURA, Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>      v.<br><br>WARNER BROS. DISCOVERY, INC., DAVID M. ZASLAV, and GUNNAR WIEDENFELS<br><br>             Defendants. | Case No. 1:24-cv-09027-KPF<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Jonathan D. Polkes
Stacy Nettleton
Joshua D. Weedman
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Tel. (212) 819-8200
jonathan.polkes@whitecase.com
stacy.nettleton@whitecase.com
joshua.weedman@whitecase.com

Veronica Gordon (admitted *pro hac vice*)
WHITE & CASE LLP
200 South Biscayne Blvd, Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
veronica.gordon@whitecase.com

*Counsel for Defendants Warner Bros. Discovery, Inc., David M. Zaslav, and Gunnar Wiedenfels*

July 11, 2025

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................................1

FACTUAL BACKGROUND ...........................................................................................................4

    I.     WBD AND THE DECADES-LONG RELATIONSHIP WITH THE NBA .......................................................................................................................4

    II.    WBD REPEATEDLY CONFIRMS THE IMPORTANCE OF THE NBA RELATIONSHIP AND ENTERS THE EXCLUSIVE NEGOTIATING PERIOD ...............................................................................4

    III.   THE NBA NEGOTIATES WITH THIRD PARTIES WHILE WBD CONTINUES TO PURSUE A DEAL ...............................................................5

    IV.   WBD ENTERS MATCHING PERIOD WITH THE NBA, AND AGAIN, TRIES TO GET A DEAL DONE ............................................................7

    V.    THE NBA REFUSES TO RECOGNIZE WBD'S MATCHING OFFER ...............................................................................................................8

    VI.   THIS ACTION IS FILED...............................................................................8

ARGUMENT ...............................................................................................................................10

    I.     THE FAC FAILS TO STATE A SECTION 10(B) AND RULE 10B-5 CLAIM......................................................................................................11

         A.    The FAC Fails to Allege Any Actionable Misstatement or Omission ..................................................................................... 11

             1.    The Challenged Statements Were Neither False Nor Misleading .12

             2.    The Challenged Statements Are Inactionable Puffery.................. 23

             3.    Plaintiffs' Confidential Witnesses Add Nothing .......................... 23

         B.    Plaintiffs Fail to Plead Scienter................................................................. 25

             1.    The FAC Fails to Plead Motive and Opportunity......................... 26

             2.    Plaintiffs Fail to Plead Strong Circumstantial Evidence That Defendants Acted with Conscious Misbehavior or Recklessly .... 28

    II.    PLAINTIFFS FAIL TO STATE A SECTION 20(A) CLAIM ...........................30

CONCLUSION...............................................................................................................................30

i

## TABLE OF AUTHORITIES

Page(s)

## CASES

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995).................................................................................. 19, 27

*AIG Glob. Secs. Lending Corp. v. Banc of Am. Secs. LLC*,
    254 F. Supp. 2d 373 (S.D.N.Y. 2003)...................................................................... 17

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) .......................................................................... 11, 20, 28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................. 10

*ATSI Comm'ns v. Shaar Fund*,
    493 F.3d 87 (2d Cir. 2007)................................................................................. 11, 30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................. 10

*Davison v. Ventrus Biosciences, Inc.*,
    2014 WL 1805242 (S.D.N.Y. May 5, 2014) ......................................................... 23

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)............................................................................. 10, 26

*In re Express Scripts Holdings Co. Sec. Litig.*,
    773 F. App'x 9 (2d Cir. 2019)................................................................... 19, 20, 23

*In re Fed Ex Corp. Sec. Litig.*,
    517 F. Supp. 3d 216 (S.D.N.Y. 2021)................................................... 17, 23, 25

*In re FuboTV Inc. Sec. Litig.*,
    2023 WL 2711826 (S.D.N.Y. Mar. 30, 2023) ..................................................... 24

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009)........................................................... 28, 29

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................... 25, 26, 27

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007).................................................................................... 15

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd* 604 F. App'x 62 (2d Cir. 2015)............ 10, 11, 24

*In re Mylan N.V. Sec. Litig.*,
    666 F. Supp. 3d 266 (S.D.N.Y. 2023)................................................................. 30

*Nandkumar v. AstraZeneca PLC*,
    2023 WL 3477164 (2d Cir. May 16, 2023) ........................................................ 17

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008)............................................................ 12, 22

*In re Piedmont Lithium Inc. Sec. Litig.*,
    712 F. Supp. 3d 301 (E.D.N.Y. 2024) ........................................................... 27, 29

*Pipefitters Union Loc. 537 Pension Fund v. Am. Express Co.*,
    773 F. App'x 630 (2d Cir. 2019) .................................................................. 17

*In re Progress Energy, Inc. Sec. Litig.*,
    371 F. Supp. 2d 548 (S.D.N.Y. 2005)......................................................... 16, 17, 30

*In re PXRE Grp., Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y.)................................................................... 25

*Raja v. Burns*,
    2020 WL 568236 (E.D.N.Y. Feb. 5, 2020)....................................................... 30

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*,
    75 F.3d 801 (2d Cir. 1996)....................................................................... 20

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)...................................................................... 25

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)....................................................................... 20

*SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*,
    2010 WL 2473595 (S.D.N.Y. June 17, 2010) ................................................... 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)....................................................................... 21, 25, 29, 30

iii

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
    2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ....................................... 19, 20, 23, 25, 28, 29

*Turner Broadcasting Sys., Inc. et al., v. Nat'l Basketball Ass'n*,
    No. 653721/2024 (N.Y. Sup. Ct. July 26, 2024) ............................................................. 8, 21

*Woolgar v. Kingstone Companies, Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)................................................................................ 28

*In re Yukos Oil Co. Sec. Litig.*,
    2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ..................................................................... 16

## STATUTES

15 U.S.C.
    § 78u-4 ............................................................................................................................ 10
    § 78j(b)............................................................................................................................. 11

## REGULATIONS

17 C.F.R.
    § 240.10b-5 ...................................................................................................................... 11

## FEDERAL RULES

Fed. R. Civ. P.
    Rule 9(b) .......................................................................................................................... 10
    Rule 12(b)(6)..................................................................................................................... 10

Defendant Warner Bros. Discovery, Inc. ("WBD" or "Company"), and David M. Zaslav and Gunnar Wiedenfels ("Individual Defendants," and together with WBD, the "Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint ("FAC").

**PRELIMINARY STATEMENT**

This case arises from the most widely-publicized sports broadcast transaction in recent memory. In early 2024, after a 40 year-long relationship, WBD's media rights agreement with the National Basketball Association came up for renewal. WBD and the NBA did not reach agreement during the contractually mandated exclusive negotiation period. This opened the door for competitors to submit rival bids, subject to WBD's contractual matching rights. Months later, in July 2024, the NBA accepted bids from NBCUniversal and Amazon. WBD presented a matching offer to Amazon's bid, but the NBA rejected it and went with Amazon. WBD promptly sued the NBA, alleging breach of its matching rights. That case ultimately settled.

The FAC alleges that the Defendants made seven false and misleading statements regarding the transaction during the Class Period. The challenged statements characterize the ongoing negotiations in terms such as "constructive" and "productive" (mirroring similar statements from the NBA), they express hope for success (*e.g.*, "we've had a very, very strong partnership for 40 years, and [we] certainly hope that we're going to be able to continue that in the most positive way"), and they note that WBD had matching rights in the event it failed to reach agreement during the exclusive negotiating period (*e.g.*, "under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them"). Each of these seven statements is self-evidently true and none predicted the outcome of the negotiations. *The FAC does not allege otherwise*. Rather, it alleges that the

1

statements were rendered false or misleading because WBD failed to disclose (i) "the importance" of the NBA rights to its business, and how negatively impacted its business would be if it lost the contract, and (ii) that the matching rights were worthless because WBD "lacked the means" to match the competing offers from NBCUniversal and Amazon.

But Plaintiffs allege *no* particularized facts to support their alleged fraud.  First, as to WBD's supposed failure to disclose the importance of the NBA rights, that theory is directly contradicted by the wall-to-wall media coverage of the negotiations, much of it addressed in the FAC itself.  It was impossible to read the sports pages or watch ESPN without knowing about the ongoing NBA negotiations, that the negotiations were being monitored obsessively by the media, the industry, and the public, that the outcome was uncertain, and that the outcome would have a financial impact on both WBD and the NBA.  This media coverage is in addition to the steady drumbeat of disclosures in WBD's public filings and statements specifically discussing these facts. Defendants expressly warned investors about the possibility of losing the NBA rights and acknowledged that they were planning for various potential outcomes.

Second, as to the matching rights, WBD made all of the allegedly false and misleading statements in February and May 2024.  Yet the exclusive negotiations did not fail until April 22, 2024, and the matching period did not begin until July 17, 2024.  The competing bids to match thus did not even exist until around two months *after* the allegedly fraudulent statements.  And the statements merely stated the true fact that matching rights existed—they did not say if WBD would be able to exercise those rights.  In fact, the speculation about whether WBD could effectively exercise those rights was also widely discussed in the media.  Needless to say, there are no allegations of fact that support the claim that WBD could not match competing bids that were months away from being proposed.  The FAC tries to cover up this hole with allegations from five

2

confidential witnesses, but these allegations are window dressing and add nothing to contradict Plaintiffs' statements. Plaintiffs also perversely rely on the lawsuit WBD brought against the NBA, but that lawsuit demanded that the NBA honor WBD's matching rights. The suggestion in the FAC that it was a sham case is made utterly without any factual basis.

Plaintiffs also fail to plead the element of scienter. They offer no allegations of fact from which to infer that the admittedly accurate factual statements, which offered no predictions of the outcome of the negotiations, were intended to mislead. Plaintiffs rely on Defendant Wiedenfels's trades of WBD stock, but the vast majority of these happened well before negotiations with the NBA failed, and during the period when everyone knew (and publicly discussed) that there was a possibility that WBD could lose the NBA rights. Plaintiffs also suggest a conscious misbehavior and recklessness theory resting solely on the hindsight knowledge that the negotiations would eventually fail. They claim that Defendants' "access to information" about the NBA negotiations and WBD's lawsuit against the NBA, including its "quick resolution," is evidence that Defendants knew all along that they would lose the NBA contract and that the months of negotiations were a sham. But glaringly absent are any particularized allegations to support this argument of fraud-by-clairvoyance. There is simply no allegation of motive or other circumstantial evidence establishing the required cogent and compelling inference of fraudulent intent—let alone one sufficient to overcome the competing and straightforward inference: WBD was engaged in tough negotiations with the NBA and hoped it would secure the NBA rights, but, ultimately, the NBA chose competing offers.

3

## FACTUAL BACKGROUND

### I.    WBD AND THE DECADES-LONG RELATIONSHIP WITH THE NBA

WBD is a global media and entertainment conglomerate that provides content in the television, film, Internet streaming, and gaming industries.  FAC ¶ 32.

Since 1984, Turner Broadcasting System, Inc. ("TBS"), a subsidiary of WBD, has possessed the rights to broadcast National Basketball Association ("NBA") content.  *Id.* ¶¶ 34, 75–81.  In 2014, the NBA and TBS entered into a media rights agreement ("Agreement"), under which TBS agreed to pay the NBA $10.26 billion for the rights to distribute a package of NBA games and non-game content through the end of the 2024-2025 season.  *Id.* ¶ 82.  The Agreement gave TBS an exclusive renegotiation period, from March 9, 2024 to April 22, 2024, to negotiate renewal of these NBA distribution rights without competition from outside bidders ("Exclusive Negotiation Period").  *See id.* ¶¶ 83, 102.  The NBA could negotiate with other third-party bidders if the Exclusive Negotiation Period expired without a renewal agreement in place.  *Id.* ¶ 84.  The NBA was required to notify TBS of any third-party offers and provide a five-day period for TBS to match those offers ("Matching Period").  *Id.*

### II.    WBD REPEATEDLY CONFIRMS THE IMPORTANCE OF THE NBA RELATIONSHIP AND ENTERS THE EXCLUSIVE NEGOTIATING PERIOD

In 2024, the NBA rights came up for renewal—a fact widely discussed in the media and disclosed by Defendants.  *See, e.g.*, *id.* ¶¶ 88–89, 97, 99.  On February 23, 2024, WBD held an earnings call on which Defendant Zaslav addressed the Company's renewal discussions with the NBA and referenced the Company's "strong, positive 40-year relationship with the NBA."  *Id.* ¶ 97; Ex. 1 at 6.[1]  Zaslav confirmed that WBD was "fully engaged in renewal discussions" that were "constructive and productive."  *Id.*  At the end of his remarks, he stated without reference to the

---

[1] "Ex. _" refers to the exhibits attached to the accompanying Declaration of Jonathan D. Polkes.

NBA contract that "[t]he hard work we've done over the last nearly two years has positioned us well financially and creatively. And as we look towards the future, we will continue to make the tough calls and do that is necessary to get this business on a clear pathway to growth and to drive increased shareholder value." *Id.*

On the same February 23 earnings call, Plaintiffs allege that Defendant Wiedenfels was also asked about the NBA contract, and that he confirmed WBD was "in the middle of exclusive discussions," and that the Company had "enjoyed a very, very strong partnership [with the NBA] for 40 years" that he "certainly hope[d] . . . [was] going to be able to continue [] in the most positive way." FAC ¶ 99. Plaintiffs assert that Wiedenfels acknowledged "the enormous value, reach value, [and] emotional value of these [sports-broadcasting] deals," and stated that the Company stays "disciplined" during these discussions. *Id.*[2]

On March 9, 2024, WBD and the NBA entered into the Exclusive Negotiating Period. FAC ¶ 101. During this 45-day period, WBD tried to reach a renewal agreement, which the NBA itself described as "productive." *See* Ex. 2 at 2. WBD did not reach an agreement with the NBA before the period ended on April 22, 2024. FAC ¶ 101.

### III.    THE NBA NEGOTIATES WITH THIRD PARTIES WHILE WBD CONTINUES TO PURSUE A DEAL

After the Exclusive Negotiating Period ended, competitors began bidding for WBD's NBA rights. *Id.* ¶ 102. Within days, media outlets were publicly reporting that competitors like Amazon and NBCUniversal were preparing bids for the NBA. *See id.* ¶¶ 103–05. WBD was not informed of the specific terms of the offers the NBA accepted until the Matching Period commenced in July. *See id.* ¶¶ 122–23.

---

[2] According to the transcript of the February 23 earnings call, Defendant Wiedenfels did *not* make these challenged statements. Ex. 1 at 18–19. The statements referenced in FAC ¶ 99 were instead made by Jean-Briac Julien Perrette, who is CEO and President of Global Streaming and Games at WBD. *Id.*

While third parties vied for the NBA rights, WBD remained in the game, and the press covered WBD's continued efforts to secure these rights. *See, e.g.*, Ex. 3 at 2 (confirming that WBD was "still at the negotiating table"); Ex. 4 at 2 (stating that WBD "is making a 'last-ditch effort' to try to retain the [NBA] rights"). On May 6, 2024, Defendant Zaslav confirmed at the Milken Institute Global Conference that WBD "continue[s] to be in constructive negotiations with the NBA." FAC ¶ 109; Ex. 5 at 5.

On May 9, 2024, after the Exclusive Negotiation Period ended but long before the Matching Period began, WBD held another earnings call, during which Defendant Zaslav reiterated that "[w]e've enjoyed a strong partnership with the NBA for almost four decades" and "[w]e're in continuing conversations with them now, and we're hopeful that we'll be able to reach an agreement that makes sense for both sides." FAC ¶ 112; Ex. 6 at 6. He made clear that WBD "had a lot of time to prepare for this negotiation and [had] strategies in place for the various potential outcomes[,]" *id.*, but cautioned that it was "not the time to discuss any of this" since WBD was "in active negotiations with the league and . . . we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them." *Id.* Still, an analyst near the end of the call presented a question about cost and other improvements WBD might be willing to do to help "match on the NBA rights," alongside another question about the "churn benefits" the Company gets from offering "bundles" on its services. Ex. 6 at 18. "Churn" is the rate at which current customers of a company cancel a service with that company. FAC ¶ 71. To reduce churn, WBD offers various "bundles" on its products or services. *See* Ex. 6 at 18. Defendant Zaslav and others responded to these questions by addressing costs, churn, and the Company's initiatives on bundles, but did not specifically address the NBA negotiations, in line with Defendant Zaslav's earlier statement on the call that it was "not the time to discuss" it. *See*

*id.* at 6, 18–19.

Throughout May 2024, the media continued to closely cover the negotiations. *E.g.*, FAC ¶ 116. Meanwhile, Defendants remained consistent about what they could and could not share with the public. On May 22, 2024, Defendant Wiedenfels attended the J.P. Morgan 52nd Annual Global Technology, Media and Communications Conference and confirmed that "this is still very much an ongoing negotiation." *Id.* ¶ 118; Ex. 7 at 6. He reiterated that WBD had a "contractual matching right" under the Agreement and called it "an important part of [the] ongoing contractual relationship" with the NBA. *Id.* On May 30, 2024, Defendant Zaslav attended the Bernstein 40th Annual Strategic Decisions Conference and repeated that WBD "continue[s] to talk to the NBA" and that "[w]e feel very comfortable and we've been very strategically focused on making sure that we have a robust offering of sports for each [of] our sports channels in the U.S. and around the world." FAC ¶ 120; Ex. 8 at 7.

## IV. WBD ENTERS MATCHING PERIOD WITH THE NBA, AND AGAIN, TRIES TO GET A DEAL DONE

On July 17, 2024, the NBA informed WBD that it had accepted NBCUniversal's and Amazon's offers for the NBA rights. FAC ¶ 122–23. NBCUniversal had offered the NBA $2.45 billion per year to secure the package of rights held under the Agreement, including the right to broadcast primetime games, certain playoff games, and an in-studio show. *See id.* ¶¶ 88, 122. Amazon had offered the NBA $1.8 billion per year to stream 66 regular-season games and certain playoff games as well. *Id.* ¶ 122.

Under the Agreement, WBD had five days to match NBCUniversal's and Amazon's offers. *Id.* ¶ 123. On July 22, 2024, WBD informed the NBA that it would not try to match NBCUniversal's offer, but it would match Amazon's offer. *Id.* ¶ 124.

7

### V.     THE NBA REFUSES TO RECOGNIZE WBD'S MATCHING OFFER

WBD sent its matching offer to the NBA on July 22, 2024. *Id.* On July 24, 2024, the NBA publicly announced that it believed WBD's offer did not match Amazon's offer and that it was entering into a long-term contract with Amazon instead. *Id.* ¶ 131. WBD's stock price fell from a July 24, 2024 closing price of $8.47 per share by $0.76, before rebounding to close at $7.99 per share on July 25, 2024. *Id.* ¶ 132.

Two days later, on July 26, 2024, WBD and TBS sued the NBA, alleging that the NBA had breached the Agreement by "deliberately" refusing to honor TBS's matching offer ("State Case"). *See* Complaint, *Turner Broadcasting Sys., Inc. et al., v. Nat'l Basketball Ass'n*, No. 653721/2024 (N.Y. Sup. Ct. July 26, 2024), D.E. 10 at 1. WBD and the NBA announced they settled that lawsuit on November 18, 2024. *See* Stipulation of Discontinuance, *id.*, D.E. 99.

On August 7, 2024, WBD announced it would take a $9.1 billion non-cash goodwill impairment charge from its Networks segment. FAC ¶ 16. This impairment charge was "triggered" by several different factors, including "the difference between market capitalization and book value, continued softness in the U.S. linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA." *Id.* ¶ 140; Ex. 9 at 1. WBD's stock price fell from an August 7, 2024 closing price of $7.71 per share by $0.98, before rebounding to close at $7.02 per share on August 8, 2024. FAC ¶ 142.

### VI.     THIS ACTION IS FILED

This case started on November 25, 2024. ECF No. 1. Lead plaintiffs were appointed on February 21, 2025, *see* ECF No. 27, and the FAC was filed on May 7, 2025. ECF No. 41.

The FAC asserts two claims. Count I is a claim against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5. FAC ¶¶ 177–186.

Count II is a claim under Section 20(a) of the Exchange Act against the Individual Defendants. *Id.* ¶¶ 187–192. The FAC alleges that on seven separate occasions in February and May 2024, Defendants made statements that were "materially false and misleading" about the NBA negotiations. *Id.* ¶¶ 98, 100, 110, 113, 115, 119, 121. Plaintiffs generally do not allege that the statements were actually false, but rather that Defendants' statements omitted material facts.

In particular, the FAC offers supposed "facts" that Defendants "concealed" that rendered the statements misleading: (i) "the importance of" the Agreement "in justifying high carriage rates that WBD was commanding, producing significant advertising dollars . . . , providing a 'halo effect' that boosted all of WBD's other properties, and negotiating more favorable terms with other sports leagues"; (ii) "that WBD lacked the means to exercise its Matching Clause . . . because it could not meet terms offered by certain third party bidders" like cross-promotion with the NFL and a "large Internet streaming presence"; (iii) that the "Matching Clause . . . did not provide the protection Defendants conveyed to investors and did not allow WBD to ensure renewal of the NBA rights for another decade"; and (iv) "that losing the NBA rights would significantly compromise WBD's revenue and goodwill, particularly in its Networks segment." *Id*. ¶ 7; *see also id*. ¶ 179. The FAC also alleges that Defendants misled investors by omitting that (v) "WBD internally viewed the NBA rights as a unique, irreplaceable asset;" (vi) "WBD was not in a financial position to match NBCUniversal's $2.45 billion per year offer;" and (vii) "that the best defense [WBD] had against churn, the NBA Rights, was already lost because WBD lacked the ability to match the NBCUniversal and Amazon offers;" and by stating that (viii) WBD was in "constructive negotiations" when it "was neither able nor willing to match the existing third party offers." *Id.* ¶ 179.

## ARGUMENT

To survive dismissal under Rule 12(b)(6), Plaintiffs must state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires "more than a sheer possibility" of unlawful conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The FAC is subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) requires a complaint to state "with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and the PSLRA requires a complaint to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1). The PLSRA also requires that the complaint "with respect to each act or omission . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.*, scienter. 15 U.S.C. § 78u-4(b)(2)(A). The PLSRA requires dismissal if either requirement is unsatisfied. *Id.* § 78u-4(b)(3)(A).

"When these standards are combined with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, it is clear that plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd* 604 F. App'x 62 (2d Cir. 2015).

On a motion to dismiss a securities action, the Court may consider "any written instrument attached to the complaint, statements or document incorporated into the complaint by reference,

10

legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied [to] bring[] the suit." *ATSI Comm'ns v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007). The Court can, and should, also take judicial notice of the press coverage that reflects that the information Plaintiffs claim was concealed was openly and widely discussed. *See Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents[.]").

## I.    THE FAC FAILS TO STATE A SECTION 10(B) AND RULE 10B-5 CLAIM

Section 10(b) makes it unlawful to use "any manipulative or deceptive device or contrivance in contravention of" the SEC rules. 15 U.S.C § 78j(b). Rule 10b-5 makes it unlawful to "make any untrue statement of material fact or to omit to state a material fact necessary" to make the statements "not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). "To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Arkansas*, 28 F.4th at 352–53. The FAC fails to plead the first two elements.

### A.    The FAC Fails to Allege Any Actionable Misstatement or Omission

"The first element of a Section 10(b) and Rule 10b–5 securities fraud claim requires an actionable misstatement or omission." *Lululemon*, 14 F. Supp. 3d at 571. "In order to adequately plead falsity, lead plaintiff must allege that the identified statements were either false at the time they were made or failed to contain other information that would have made them not misleading." *Id.* at 577. "If . . . allegations of securities fraud conflict with the plain language of the publicly

filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quotations omitted). Plaintiffs generally do not contend the statements are false and instead rely on the theory that the statements are misleading because they omitted material information.

### 1.    The Challenged Statements Were Neither False Nor Misleading

The FAC is primarily based on Defendants' alleged failure to disclose (i) how important the NBA rights were to WBD and (ii) that WBD knew all along it could not match competitors' bids. But the FAC itself, the sources cited in it, and widely disseminated media reports show that all material facts were public knowledge and disclosed by Defendants themselves. Defendants explicitly disclosed the importance of the NBA rights to the Company, and WBD's disclosures expressly addressed the uncertainties associated with losing those rights. The FAC even concedes that the importance of the NBA rights to WBD's business was regularly reported and discussed across media outlets. Plaintiffs' theory also rests on the premise that somehow WBD failed in the period from February to May 2024 to disclose that it would be unable to exercise its matching rights during the Matching Period that did not begin until *July*. As the FAC concedes, WBD did have matching rights, exercised those rights, and even sued the NBA to enforce those rights when the NBA chose Amazon. Unable to plead that Defendants were psychic, Plaintiffs offer conclusory allegations based on hindsight developments that cannot support a securities fraud claim.

**<u>WBD did not mislead investors about the importance of the NBA rights</u>**

The FAC challenges six statements made during the Class Period concerning WBD's "strong" past relationship with the NBA, and its "constructive" and "ongoing" negotiations with the NBA. Specifically, Plaintiffs challenge the following statements:

- Defendant Zaslav's statement on a February 23, 2024 earnings call: "[WBD has] a strong positive 40-year relationship with the NBA, and in terms of our NBA rights, we are now fully engaged in renewal discussions and they are constructive and productive. . . .The hard work we've done over the last nearly two years has positioned us well financially and creatively, and as we look towards the future, we will continue to make the tough calls and do [what] is necessary to get this business on a clear pathway to growth and to drive increased shareholder value." FAC ¶ 97.

- Defendant Wiedenfels's alleged statement during the same February 23, 2024 earnings call: "[O]n the NBA, . . . we're in the middle of exclusive discussions here, so I want to lift it up maybe one level to a general statement on how we look at sports rights. We're spending close to $20 billion . . . on content and programming in the broadest sense, and every dollar we spend plays a different role across the portfolio. We generally like to own our content. That's not the case with sports, but we obviously acknowledge the enormous value, reach value, emotional value of these deals. And we have been able to strike profitable deals and we're always going to be disciplined. It's very easy to lose control over sports rights investments. That's not what we do. . . . [W]e know exactly what value we assign and we stay disciplined during our discussions. And if you take that into account, I think we have enormous opportunity to be much more efficient with our content spend overall across the entire company, and that will include certain areas in which . . . you probably have to assume that there is inflation going forward. On the NBA specifically, we've had a very, very strong partnership for 40 years, and I certainly hope that we're going to be able to continue that in the most positive way." *Id.* ¶ 99.

- Defendant Zaslav's statement at the May 6, 2024 Milken Institute Global Conference that "[w]e continue to be in constructive negotiations with the NBA[.]" *Id.* ¶ 109.

- Defendant Zaslav's statement at a May 9, 2024 earnings call: "We've enjoyed a strong partnership with the NBA for almost four decades. We're in continuing conversations with them now and we're hopeful that we'll be able to reach an agreement that makes sense for both sides. We've had a lot of time to prepare for this negotiation and we have strategies in place for the various potential outcomes. However, now is not the time to discuss any of this. Since we are in active negotiations with the league and under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them." *Id.* ¶ 112.

- Defendant Wiedenfels's statement at the May 22, 2024 J.P. Morgan 52nd Annual Global Technology, Media and Communications Conference: "Well you wouldn't be surprised that I'm not going to be breaking news here. And look, this is still very much an ongoing negotiation [with the NBA]. We've had a great partnership with the NBA. We value the product, and [we're] very hopeful that we're going to be able to find a solution here that's mutually beneficial to both sides. We do have a contractual matching, right? And that's an important part of our ongoing contractual relationship, but that's about as much as I want to say about the NBA." *Id.* ¶ 118.

- Defendant Zaslav's statement about the NBA at the May 30, 2024 Bernstein 40th Annual

13

Strategic Decisions Conference: "[W]e continue to talk to the NBA. And our team does an extraordinary job on the NBA, inside the NBA with Barclay and Shack it's maybe the best sports television show. I was just down in Atlanta. We've got a great team down there, and we love our experience with the NBA. But in general, we're a leader in sports around the world. And if -- we have the Olympics in Europe. With leading -- we have most of the football in the U.K. where TNT Sport, with a full buffet of content around the world. . . . We feel very comfortable and we've been very strategically focused on making sure that we have a robust offering of sports for each [of] our sports channels in the U.S. and around the world." *Id.* ¶ 120.

Plaintiffs cannot allege that these statements were untrue. Instead, they argue that these statements somehow omitted details reflecting how important the NBA rights were to WBD, including that the rights were "crucial" to its business and viewed as a "unique, irreplaceable asset," and that losing those rights would "significantly compromise WBD's revenue and goodwill." *See id.* ¶¶ 98, 100, 110, 113, 119, 121.

But Defendants *did* convey how important the NBA relationship and rights were to WBD. WBD clearly and regularly disclosed the importance of its sports content licenses, including the NBA rights, in its SEC filings, and expressly warned of the risks associated with losing these licenses—including on revenue and goodwill. *See, e.g.*, Ex. 10 at 15–16 ("Failure to renew, renewal with less favorable terms, or termination of our content licenses and similar distribution agreements may cause a decline in our revenue."); *id.* at 16 ("[T]here can be no assurance that [WBD] will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events . . . We face significant competition to acquire and maintain licenses to sports programming . . . ."); Ex. 11 at 10 ("The Company will continue to monitor its reporting units for triggers that could impact the recoverability of goodwill. These triggers include, but are not limited to . . . sports rights renewals, including the NBA, associated with the Company's Networks and DTC reporting units[.]"); *id.* at 43 (WBD faces "increased competition to license content from the NBA, which could result in significantly higher programming costs to us or a failure to maintain

14

our license for NBA programming," and failure to renew the NBA contract "could negatively affect our estimates of the fair value of our reporting units" and lead to an "impairment charge related to goodwill and other intangible assets").

WBD also openly discussed its "very, very strong [40-year] partnership" with the NBA, and "the enormous value, reach value, [and] emotional value of these deals." *See* FAC ¶ 99; *see also* ¶ 97 (similar); ¶ 112 (similar); ¶ 118 (similar); ¶ 120 (recognizing that *Inside the NBA* was "maybe the best sports television show" and that "we love our experience with the NBA").

Plaintiffs claim that Defendants "downplayed" the importance of the NBA, *see id.* ¶¶ 8, 10, 94, 108, 146, but offer no factual support for that conclusion. Plaintiffs cite one statement by Defendant Zaslav about WBD not needing the NBA from 2022. *See id.* ¶ 94. Not only is this statement legally irrelevant because it pre-dates the Class Period, *see*, *e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007) ("A defendant . . . is liable only for those statements made during the class period."), but Plaintiffs concede that this statement could have been part of a bargaining strategy, FAC ¶ 8, and do not otherwise allege the statement to be untrue. Plaintiffs also ignore the rest of Zaslav's remarks here, which acknowledged that WBD would indeed seek renewal of its contract with the NBA and would stay "very disciplined" in its approach to these negotiations. Ex. 12 at 2 (cited in FAC ¶ 111).

Even if WBD had said nothing about the NBA during the Class Period, the importance of the NBA rights to the Company was a well-known fact that was widely reported about and discussed in the mainstream media, sports outlets, and by talking heads on YouTube and X. The FAC admits as much, citing public sources to confirm that the tangible impact of the rights to the Company's Networks segment was about $1.8 billion per year. *See* FAC ¶ 68; *see also* ¶ 70 (citing September 2023 article to allege that "WBD depended on the NBA Rights not just for high TNT

15

carriage fees and linear advertising, but also for its new drivers of revenue"). During the Class Period, various news outlets consistently covered the importance of the NBA rights to WBD and the potential negative consequences on WBD's business if the NBA rights were lost. *See, e.g.*, Ex. 13 at 3 (Wall Street views NBA rights "necessary for WBD"); Ex. 14 at 2 ("Industry insiders have repeatedly underscored how important it is for . . . WBD to retain the NBA broadcast rights."); Ex. 15 at 3 ("Without the NBA, [WBD] would have had a hard time charging its current subscriber fees to cable and satellite companies."); Ex. 16 at 2 (similar); Ex. 17 at 2 (losing NBA rights would be a "blow" to TNT cable network); Ex. 18 at 2 (acknowledging that sports rights "have become increasingly important for legacy media giants" but that "the field has become more competitive"); Ex. 19 at 1 (losing NBA contract "could be devastating" for WBD); Ex. 20 at 2 (similar); Ex. 21 at 2 (WBD "now finds itself on the verge of losing the rights to televise the sport with which it has become inextricably linked"); CNBC Television, available at https://www.youtube.com/watch?v=fsYTfUeX0M4 (Charles Barkley expressing hope that deal would be reached, but stating opinion that it was lost).

The public discourse on the importance of the NBA rights to WBD—from Defendants and the media—is fatal to Plaintiffs' claims. *See In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552–53 (S.D.N.Y. 2005) ("It is well-established law that the securities laws do not require disclosure of information that is publicly known[.]"); *SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*, 2010 WL 2473595, at \*9 (S.D.N.Y. June 17, 2010) (purported misstatements were immaterial because information purportedly concealed was publicly available); *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at \*21 (S.D.N.Y. Oct. 25, 2006) (company's failure to disclose CEO's political activity was immaterial because of the extensive publicly-available information detailing that political activity).

16

In the face of all these public disclosures and publicly known information concerning the critical nature of the negotiations to WBD and the risk it could lose the contract, the FAC simply contains no allegations that contradict WBD's unambiguous statements or show that they were otherwise misleading—let alone any allegations that are pled with particularity. *See Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at \*2 (2d Cir. May 16, 2023) (holding that plaintiffs had not "identified anything in the statements in contradiction with the omitted information" or "explained with particularity how investors were misled because they lacked the details specified"); *AIG Glob. Secs. Lending Corp. v. Banc of Am. Secs. LLC*, 254 F. Supp. 2d 373, 382–83 (S.D.N.Y. 2003) (concluding that "no specific facts [were] pleaded that suggest that the representations . . . were indeed false or misleading"). In short, any reasonable investor during the Class Period would have understood the importance of the NBA rights to WBD and its business. *See Pipefitters Union Loc. 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630, 634 (2d Cir. 2019) (concluding that no reasonable investor could have interpreted CFO's statements acknowledging the company's relationship with Costco "as denying the existence of any ongoing renewal discussions"); *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 229 (S.D.N.Y. 2021) (holding that FedEx's disclosures belied contention that FedEx had belatedly disclosed damage caused by a cyberattack); *Progress Energy*, 371 F. Supp. 2d at 552 (concluding that proxy statement sufficiently "notif[ied] a reasonable investor as to the nature and value" of an obligation).

Moreover, the FAC's reliance on the fact WBD took out an impairment charge in August 2024 is based on conclusory allegations devoid of factual support. Plaintiffs allege that on August 7, 2024, "the full impact of WBD's loss of the NBA Rights was revealed" when the Company announced a $9.1 billion noncash goodwill impairment charge from its Networks segment. FAC ¶ 140. But this impairment charge was actually "triggered" by several different factors unrelated

17

to the NBA, including "the difference between [WBD's] market capitalization and book value [and] [the Company's] continued softness in the U.S. linear advertising market." Ex. 9 at 1. On August 7, WBD held an earnings call and addressed the Company's announcement. During that call, Defendant Wiedenfels further clarified that WBD is "using [its] content increasingly and increasingly more successfully in the streaming space and less so on the linear side" and that this impairment charge was "really a full reevaluation" of WBD's business case and strategic planning process—and "not a response to one individual factor." Ex. 22 at 5. Plaintiffs offer no particularized allegations of fact to suggest otherwise.

### WBD did not mislead investors about its matching rights

The FAC challenges four of the statements above as also having misleadingly omitted that WBD could not (and would not) match competing bids. *See* FAC ¶¶ 110, 113, 119, 121. But all the challenged statements were undeniably true. The FAC concedes that WBD in fact had matching rights under the Agreement. *Id.* ¶ 84. WBD accurately disclosed this fact, and the media publicly reported on it as well. *See, e.g.*, Ex. 6 at 6 ("[W]e have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them."); Ex. 15 at 1 (noting that WBD has matching rights); Ex. 16 at 2 (same).

Plaintiffs nonetheless claim that these matching rights offered "no protection" because WBD was "neither able nor willing" to match "existing" third party offers. *See* FAC ¶¶ 110, 113, 119. Plaintiffs allege that the NBA rights were "already lost" in May 2024 because WBD could not match the terms of NBCUniversal and Amazon's offers. *See id.* ¶ 115. This allegation is nonsensical: in May 2024, when the allegedly misleading statements were made, WBD had *not* lost the deal and had no way of knowing if it could or would match any competing offers. The NBA itself described the negotiations with WBD as "productive" the month before, and the

18

Matching Period was *months away*.  Ex. 2 at 2; FAC ¶¶ 123–24.  Defendants could not possibly know in *May* that WBD would not reach a deal with the NBA or match competing offers in *July*.  These allegations of clairvoyance fall squarely into a classic category of disallowed claims.  *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud."); *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 15 (2d Cir. 2019) (finding that allegations "that defendants should have anticipated future events" do not suffice to make out a claim of securities fraud).  Even if Defendants had contemplated in May that it was a long shot for WBD to match a competing bid and renew its contract with the NBA, it had no duty to disclose an uncertain outcome.  *See Express Scripts*, 773 F. App'x at 14 ("Defendants did not have a duty to disclose more about the uncertain state of the negotiations."); *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *13 (S.D.N.Y. Mar. 26, 2019) (similar).

Further, that the matching rights were a limited remedy which may not win the day for WBD was obvious and widely discussed in the media.  *See, e.g.*, Ex. 16 at 2 ("The new deals could include language and terms that would potentially make enforcing a matching-right clause challenging."); Ex. 23 at 2 (noting that the NBA could "dispute the definition of 'match'"); FAC ¶ 103 (citing Ex. 16) (stating that "the deals offered by Amazon or NBCUniversal could contain terms that were difficult or impossible to match").  Far from guaranteeing that WBD would match every competing offer, the challenged statements acknowledged WBD's contingency planning for "various potential outcomes."  *See* FAC ¶ 112; *see also id.* ¶¶ 97, 99, 120.  By acknowledging the complexity and uncertainty surrounding the NBA negotiations, Defendants' statements by their nature were not false or misleading.  *See Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019)

(dismissing challenged statements as "tentative and generic, and because they emphasize the complex, evolving regulatory environment that [defendant-company] faced").

The fact that WBD ultimately did not win the NBA rights does not render Defendants' true statements false or misleading. To be sure, Defendants stated that the ongoing discussions were "constructive" (so did the NBA), and said they were "hopeful" that such discussions would lead to a new contract. *See* FAC ¶¶ 97, 112. There is no factual allegation in the FAC to indicate these statements were not accurate. *See Express Scripts*, 773 F. App'x at 13 (concluding that statements that defendants were "actively engaged in good faith discussions" and were "excited to continue productive discussions" that were "very early on" did not become misleading because those negotiations failed); *Tempur Sealy*, 2019 WL 1368787, at *14 (concluding that statements about working with and continuing to work with retailer were "not actionable" where there was an insufficient factual basis for plaintiffs' assertion that "the relationship had deteriorated or that the risk of contract termination had increased" by the time the statement was made). Courts have also recognized that parties are under no obligation to disclose ever-changing details of ongoing negotiations given that such disclosure can itself interfere with these confidential discussions. *See Arkansas*, 28 F.4th at 353 (recognizing that disclosing precise details about pharmaceutical trial likely would have been "unwise" because it would have allowed "competitors to copy or undercut [defendant-company's] target patient population"); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996) (recognizing "concern[]" about interpreting securities laws "to force companies to give their competitors advance notice of sensitive . . . information").

Plaintiffs offer no particularized facts to support the inference that WBD could not match other offers, let alone that it was unwilling to do so, in May 2024 or anytime afterward. And of

20

course, Plaintiffs' threadbare allegations are directly contradicted by the fact that WBD submitted a matching offer during the Matching Period.  FAC ¶ 124.  WBD *did* match the offer—and filed the State Case to enforce its rights only days after the NBA refused to accept it.  Plaintiffs' efforts to twist that lawsuit into some sort of admission of liability, *see id.* ¶ 139, turns the obvious logical inference on its head.  WBD's filings in that case repeatedly assert that it had the right to, and did, match Amazon's offer.  *See*, *e.g.*, Complaint, State Case, D.E. No. 10 at 1 (". . . TBS has the right to match any 'Third Party Offer' for future NBA telecast rights.  TBS timely exercised these matching rights. . . ."); *id.* at 12 ("Amazon made an offer . . . and TBS matched it.  But in breach of the Agreement, the NBA refused to honor TBS's match."); Opposition to Motion to Dismiss, *id.*, D.E. 67 at 6 ("TBS matched the Amazon Offer consistent with its obligations under the Agreement's matching rights exhibit . . ."").  As explained in more detail below, *see infra* § I(B)(2), the fact that the case settled hardly gives rise to a "powerful or cogent" inference that WBD always knew it could not match.  *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007).

Plaintiffs conclusorily allege WBD could not match NBCUniversal and Amazon's offer because it could not cross-promote the NFL or offer an Internet streaming presence, and it could not match NBCUniversal's offer because of financial constraints.  FAC ¶¶ 113, 115, 119, 121.  But the FAC offers no particularized facts to support these allegations.  There is no fact pled to support the inference that the NBA required NFL rights to make a deal, or that WBD's offer could not match a third-party bid without them.  Instead, the FAC cites an article from August 2024—months after the challenged statements—speculating that the Amazon deal included a term involving the promotion of the NBA on Amazon's NFL telecasts.  *Id*. ¶ 129.  This article does not demonstrate that WBD was "unable" to match any offer under the Agreement.  *See Optionable*, 577 F. Supp. 2d at 690. Also, the fact that Amazon offered Internet streaming did not mean that WBD was

21

"unable" to match Amazon's offer.  The FAC concedes that WBD had "its [own] Internet streaming service."  FAC ¶ 126.  Plaintiffs' adoption of the NBA's litigation position on this point does not prove that Defendants could not match at the time the challenged statements were made.

Moreover, Plaintiffs' repeated and conclusory refrain that WBD could not financially match NBCUniversal's offer, *e.g.*, *id.* ¶¶ 116, 117, 119, 121, is equally unsupported.  The FAC cites only an online article from May 22, 2024, which speculated about what WBD would need to pay to match NBCUniversal's presumed offer.  *Id.* ¶ 116.  That article makes no claim that WBD could not match any offers and cannot be credited to support such an allegation.  *See*, *e.g.*, *Optionable*, 577 F. Supp. 2d at 690 ("[N]ewspaper articles should be credited only to the extent that other factual allegations would be . . . Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel.").

Lastly, the FAC accuses Defendant Zaslav as having purposefully evaded answering an analyst's question about "what [WBD] might be willing to do to match on the NBA rights" during the May 9 earnings call.  *See* FAC ¶ 115.  An analyst asked about what cost and other improvements WBD might be willing to try to help "match on the NBA rights," alongside another question about the "churn benefits" the Company gets from offering certain bundles.  Ex. 6 at 18.  Zaslav and others responded to these questions discussing costs, churn, and other initiatives.  *Id.* at 18–19.  Zaslav did not address matching rights in response to these questions, consistent with his earlier statement on the call that it was "not the time to discuss" the ongoing NBA negotiations.  *See id.* at 6, 18–19.  At the time the statement was made, the NBA rights were not lost and the Matching Period had not yet started—thus, there was nothing misleading about his response.

### 2.    The Challenged Statements Are Inactionable Puffery

At most, the challenged statements contain classic assertions of inactionable puffery.  For example, Defendants' statements acknowledging WBD's "strong" and "great" relationship with the NBA, their "hope" to continue the NBA relationship in "the most positive way," that they were "very comfortable" heading into negotiations, and that the negotiations were "constructive" and "productive," FAC ¶¶ 97, 99, 109, 112, 118, 120, are "expressions of puffery and corporate optimism" that do not give rise to securities fraud.  *See Express Scripts*, 773 F. App'x at 13.  In similar circumstances, the Second Circuit has found comparable statements insufficient to support Section 10(b) claims.  *Id*. (statements that company was "actively engaged in good faith discussions with [its most important customer]" were not misleading because they "suggest only hope . . . that the talks would go well"); *Tempur Sealy*, 2019 WL 1368787, at *13 (statements about contract renewal with top customer were "expressions of optimism and excitement that are mere corporate puffery"); *Fed Ex*, 517 F. Supp. 3d at 236 (statement that company was "progressing well" was inactionable puffery); *Davison v. Ventrus Biosciences, Inc.*, 2014 WL 1805242, at *9 (S.D.N.Y. May 5, 2014) (statement that discussions with FDA were "very productive" was puffery).

### 3.    Plaintiffs' Confidential Witnesses Add Nothing

Plaintiffs' allegations regarding five confidential witnesses are window dressing.  None of these witnesses are alleged to have interacted with the Individual Defendants, none were responsible for the Company's public disclosures, and none were involved in the NBA negotiations or even alleged to have had knowledge of the negotiations.  Indeed, four of them did not even work at WBD during the Class Period.  FAC ¶¶ 59, 64, 91–92; *see In re FuboTV Inc. Sec. Litig*., 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023) (disregarding allegations from two

confidential witnesses that left the company before the class period because it was unlikely they would have "any information that could support an inference of 'contemporaneous falsity'").

Even taken at face value, the confidential witnesses make only generic assertions that add no particularized allegations of fact needed to support the claim of fraud. These witnesses recite the publicly known fact that the NBA rights were important to WBD's revenue, advertising sales, and financial operations. *See* FAC ¶¶ 60, 63 (CW1 alleging that "WBD relied heavily on the NBA Rights" and "knew that losing the NBA Rights would also lead to advertisers abandoning WBD for its competitors who broadcast live sports"); *id.* ¶¶ 65, 70 (CW2 alleging "that the NBA Rights were a cornerstone of WBD's financial operations" and "NBA advertising sales were critical to financing the unprofitable Max"). They also provide speculative commentary on the "general understanding" at WBD that the NBA would be asking for more money to renew the NBA rights and that other companies "would compete" with WBD for those rights. *Id.* ¶ 93. And they confirm that WBD's negotiations with the NBA—like any high-stakes negotiations of any large company—were a "closed-door affair limited to a few select individuals." *See id.* ¶ 96.

The confidential witness allegations merely echo what WBD disclosed and what was reported in the media. *See id.* ¶¶ 60, 63, 65, 70, 93, 96. These allegations must be disregarded because they offer no specific facts to support Plaintiffs' position that Defendants failed to disclose how important the NBA rights were to WBD or WBD's purportedly true matching capabilities, and they fail to offer any internal memorandum, meeting, or other discussion that contradicts Defendants' public statements. *See, e.g.*, *Lululemon*, 14 F. Supp. 3d at 581 n.18 (rejecting confidential-witness allegations that did "not allege any internal information contradicting defendants' public statements"); *Fed Ex*, 517 F. Supp. 3d at 232 (rejecting confidential-witness allegation that there was "significant doubt" at defendant-company about its ability to meet a

24

financial target because it was vague and conclusory); *Tempur Sealy*, 2019 WL 1368787, at *7 (rejecting confidential-witness statement because it said "nothing of the state of negotiations or [Defendant's] relationship").[3]

### B.    Plaintiffs Fail to Plead Scienter

Plaintiffs' scienter theory presupposes that, somehow, Defendants knew that WBD would ultimately lose the bid before the NBA announced it was going with Amazon in July 2024, and for some reason not articulated in the FAC, refrained from disclosing this inevitable result which would ultimately become public anyway.  No reason is offered for such a fundamentally irrational scheme.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning."); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 530 (S.D.N.Y.) (holding that scienter was insufficiently pled when "at first blush, it would appear that [the defendant's] alleged scheme accomplished little more than putting off the inevitable collapse of the Company for several months").  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Here, the only plausible and reasonable inference that can be drawn from the facts is the plain truth: Defendants engaged in tough, widely publicized negotiations with the NBA; the NBA rejected WBD's matching offer; and WBD sued to enforce its rights.

---

[3] To the extent Plaintiffs use these five confidential witnesses to allege that Defendants acted with scienter, their argument fails for the same reasons.  *See, e.g.*, *Glaser v. The9, Ltd*., 772 F. Supp. 2d 573, 589–90 (S.D.N.Y. 2011) (holding that with respect to scienter, "even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge"); *id.* at 590–91 (holding that confidential sources cannot be used to merely parrot conclusory allegations and "as with all allegations going to scienter, [these] allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements").

25

Scienter—*i.e.*, "an intent to 'deceive, manipulate, or defraud,'" or recklessness—can be established by alleging facts showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. The FAC pleads neither with particularity. Instead, it presents half-hearted allegations about (i) Defendants' access to, and knowledge of, the status of WBD's negotiations and the consequences of their failure to retain the NBA rights; (ii) Defendants' "admission" of the importance of the NBA rights in the State Case; (iii) the nature and meaning behind WBD's "quick" resolution of that lawsuit; and (iv) Defendant Wiedenfels' stock sales earlier in the Class Period. *See* FAC ¶¶ 144–67. As shown below, Plaintiffs' scienter theory is implausible and illogical.

### 1.    The FAC Fails to Plead Motive and Opportunity

To sufficiently plead motive and opportunity, Plaintiffs must plead that Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. In this case, that would mean that Defendants knew months in advance that they could not win the NBA contract and that there was a benefit to the Defendants to delaying the inevitable disclosure of that fact. Here, Plaintiffs' sole "motive" allegation is that Defendant Wiedenfels sold shares during the Class Period for about $971,614.35 after he had increased his holdings in WBD without a sale during the previous eleven and a half months. FAC ¶¶ 166–67. It is settled law that Plaintiffs must establish that stock sales were "unusual" or "suspicious" to establish motive. *Glaser*, 772 F. Supp. 2d at 587. "Whether trading was unusual or suspicious turns on factors including (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants' selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether

sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5–1 plans." *Id*.

Plaintiffs plead no facts to show Defendant Wiedenfels's sales were either "unusual" or "suspicious." The FAC says nothing about the net profits these trades realized. *See id.* ("Plaintiffs must allege not only the insider defendants' selling activity during the relevant period, but also those defendants' net profits as opposed to gross proceeds [and] overall percentage changes in defendants' holdings"); *see also In re Piedmont Lithium Inc. Sec. Litig*., 712 F. Supp. 3d 301, 312 (E.D.N.Y. 2024) (collecting cases). The FAC also makes no claim about the percentages of Defendant Wiedenfels's holdings these trades represent. A review of public filings reflects that the February 28 trade represented 0.70% of his then-holdings; the March 1 trade represented 3.2% of his then-holdings; the March 6 trade represented 3.1% of his then-holdings; and the July 11 trade represented 1.8% of his then-holdings. *See* Ex. 24–27. As a matter of law, these percentages do not reflect unusual or suspicious trades. *See Acito*, 47 F.3d at 54 (holding that a trade was not unusual because it "represented less than 11% of [defendant's] holdings"); *Piedmont Lithium*, 712 F. Supp. 3d at 312 (holding that defendant's sale of 13.19% of his shares was a "small fraction" of his total shares).

The timing of Defendant Wiedenfels's sales also undercuts Plaintiffs' motive theory. The vast majority of the sales occurred in February and early March—*before* WBD entered the Exclusive Negotiating Period. *See* FAC ¶¶ 101, 166. And all of the trades occurred before the Matching Period even began and before the NBA announced that it was accepting Amazon's offer. *See id*. ¶¶ 123, 131, 166; *see also Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 235 (S.D.N.Y. 2020) (finding that stock sale was not unusual when it occurred before a negative disclosure). Plaintiffs' motive theory presupposes that Defendant Wiedenfels knew the NBA deal

was not going to go through long before both the Matching Period and Exclusive Negotiation Period. There are no particularized facts to support this unpled premise.

Moreover, no other insider is alleged to have traded during the Class Period, which further cuts against Plaintiffs' motive theory. *See In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271–72 (S.D.N.Y. 2009) (holding that plaintiffs failed to adequately allege motive in part because "the absence of any allegations of other insider trades" during the class period "undercuts" any finding of scienter); *Woolgar*, 477 F. Supp. 3d at 236 (finding no motive in part because "none of the other three Individual Defendants are alleged to have made any sales during the Class Period").

### 2. Plaintiffs Fail to Plead Strong Circumstantial Evidence That Defendants Acted with Conscious Misbehavior or Recklessly

Without a viable motive-and-opportunity theory, the strength of circumstantial evidence of conscious misbehavior or recklessness must be "correspondingly greater" to show "highly unreasonable" behavior or "an extreme departure from the standards of ordinary care." *Arkansas*, 28 F.4th at 355. Plaintiffs fail on this front too. Pleading "strong circumstantial evidence" of conscious misbehavior or recklessness involves alleging "deliberate, illegal behavior, or highly unreasonable conduct that constituted an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Tempur Sealy*, 2019 WL 1368787, at *15 (quotations omitted). It is not enough to allege that Defendants should have known something—Plaintiffs must show a reckless disregard for the facts. *See id.*

The FAC makes conclusory allegations that Defendants knew their statements were false because of their "positions with WBD, and their access to material information." FAC ¶ 30; *see also id.* ¶¶ 144–59. It claims that Defendants "had access to and received information about the

28

status of the negotiations for the NBA Rights," "the risks associated with losing the NBA Rights, and WBD's actual ability to utilize the Matching Clause[.]" *Id*. ¶ 144. The FAC argues that it would be "absurd" to suggest that the Individual Defendants were unaware of this information, and that Defendants either "deliberately chose to withhold" this information or "chose not to inform themselves and were reckless to the risk of misleading investors." *Id*. ¶¶ 151, 155.

These allegations are all legally insufficient: "It is well settled in this Circuit that allegations based on a defendant's corporate position alone should not be given weight . . . [n]or do bald assertions of access to information support an inference of scienter without more." *Piedmont*, 712 F. Supp. 3d at 319; *Gildan*, 636 F. Supp. 2d at 273 ("[G]eneral allegations that, by virtue of their senior positions [Defendants] necessarily had access to nonpublic information, are insufficient to show recklessness under the law of this Circuit.").

The FAC offers no particularized allegation showing that Defendants knew (or recklessly disregarded) that their statements were false or misleading at the time they were made. This is fatal. Instead, Plaintiffs point to the State Case, which was filed months after the challenged statements were made. *See* FAC ¶¶ 156–65. The State Case only underscores that Defendants strongly believed WBD was entitled to renewal rights and acted quickly to enforce the rights. This inference is at a bare minimum as likely—if not much more likely—than the adverse inference Plaintiffs seek. *See Tellabs*, 551 U.S. at 324 (finding that the inference of scienter "must be cogent and compelling, [and] strong in light of other explanations").

Moreover, the fact that WBD settled the State Case is a typical litigation and business decision that says nothing about whether Defendants knew the NBA would reject its matching offer months before it happened. *See Tempur Sealy*, 2019 WL 1368787, at \*15; *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 312 (S.D.N.Y. 2023) (settlement agreement was not probative of

scienter because "it does not matter what defendant was willing to settle for in 2017; what matters is what the defendant and its agents knew and believed when the challenged statements were made in 2015"). Lawsuits settle for various reasons, and WBD's decision to settle is not probative of its view of its claims. *See Raja v. Burns*, 2020 WL 568236, at *9 (E.D.N.Y. Feb. 5, 2020) (rejecting defendant's argument that the fact that plaintiff settled his previous lawsuit regarding his suspension evidenced plaintiff's concession that the suspension was legitimate, because "[a]fter all, parties settle for myriad reasons"). Obviously for there to be a settlement, the NBA also had to agree to it. Thus, the far more likely inference from the settlement is that WBD's claims had merit. *See Tellabs*, 551 U.S. at 324.

## II.     PLAINTIFFS FAIL TO STATE A SECTION 20(A) CLAIM

The FAC also fails to assert a claim under Section 20(a) of the Exchange Act against the Individual Defendants. Section 20(a) extends liability to persons who "control" entities alleged to have violated Section 10(b). *Progress Energy*, 371 F. Supp. 2d at 552. To state a claim under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108. Because the FAC fails to plead a primary Section 10(b) violation, the Section 20(a) claim fails. *E.g.*, *id.* (dismissing Section 20(a) claim because the plaintiff failed "to allege any primary violation").

## CONCLUSION

For all these reasons, Defendants respectfully request that the Court dismiss the FAC with prejudice and grant such further relief as the Court deems just and proper.

30

Dated: July 11, 2025

*/s/ Jonathan D. Polkes*
Jonathan D. Polkes
Stacy Nettleton
Joshua D. Weedman
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Tel. (212) 819-8200
jonathan.polkes@whitecase.com
stacy.nettleton@whitecase.com
joshua.weedman@whitecase.com

Veronica Gordon (admitted *pro hac vice*)
WHITE & CASE LLP
200 South Biscayne Blvd, Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
veronica.gordon@whitecase.com

*Counsel for Defendants Warner Bros. Discovery, Inc., David M. Zaslav, and Gunnar Wiedenfels*

## <u>WORD COUNT CERTIFICATION</u>

The undersigned hereby certifies that, pursuant to Local Civil Rule 7.1, this Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint contains 10,263 words, counted using Microsoft Word's word count feature.

Dated: New York, New York                     */s/ Jonathan D. Polkes*
          July 11, 2025                              Jonathan D. Polkes