**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD COLLURA, Individually and on Behalf of All Others Similarly Situated, <br><br> *Plaintiff*, <br><br> v. <br><br> WARNER BROS. DISCOVERY, INC., DAVID M. ZASLAV, and GUNNAR WIEDENFELS, <br><br> *Defendants*, | Case No. 1:24-cv-09027-KPF <br><br> <u>CLASS ACTION</u> |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................ii

I.    INTRODUCTION ................................................................................................1

II.   RELEVANT FACTS ...........................................................................................3

    A.  WBD'S Business and its Dependence on the NBA....................................3

    B.  The 2014 Agreement and the Matching Clause.........................................4

    C.  Defendants Make Misleading Statements About the Importance of the NBA Rights.........................................................................................................4

    D.  Defendants Make Misleading Statements About the Matching Clause......................5

    E.  The Truth is Disclosed: WBD Loses the NBA Rights and Takes a $9.1 Billion Goodwill Impairment.......................................................................6

III.   ARGUMENT ......................................................................................................8

    A.  Applicable Legal Standards ......................................................................8

    B.  The Complaint Pleads Actionable Misstatements and Omissions............................9

        1.  Defendants' misleading statements downplaying the critical nature of the NBA Rights .............................................................................9

        2.  Defendants' Matching Clause statements are actionable................................16

        3.  Defendants' statements are not inactionable puffery .....................................23

        4.  Plaintiffs' CW allegations support falsity and scienter ..................................25

    C.  Plaintiffs Plead Facts Giving Rise to a Strong Inference of Scienter ....................26

        1.  Defendants' Access to, and Notice of, the Concealed Information .................27

        2.  WBD's Resolution of the NBA Suit Supports Scienter ..................................28

        3.  Wiedenfels' Insider Sales Bolsters Scienter....................................................29

        4.  Defendants Concede Plaintiffs' Additional Scienter Grounds........................30

        5.  An Inference of Scienter is Far More Compelling than Defendants' Implausible Competing Inference.................................................................32

    D.  The Individual Defendants Are Liable as Control Persons....................................33

IV.   CONCLUSION..................................................................................................34

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..........................................................................................21

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)..............................................................................................19

*AIG Glob. Secs. Lending Corp. v. Banc of Am. Secs. LLC*,
254 F.Supp.2d 373 (S.D.N.Y. 2003).............................................................................14

*Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*,
No. 19CV9270 (DLC), 2020 WL 3318029 (S.D.N.Y. June 18, 2020) ..........................12

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012).........................................................................................22

*Babaev v. Grossman*,
312 F.Supp.2d 407 (E.D.N.Y. 2004) ......................................................................10, 11

*Barron v. Helbiz, Inc.*,
No. 21-278, 2021 WL 4519887 (2d Cir. Oct. 4, 2021).................................................34

*Calfo v. Messina*,
No. 15 CIV. 4010, 2016 WL 3661548 (S.D.N.Y. July 5, 2016) ...................................10

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F.Supp.2d 277 (S.D.N.Y. 2013).............................................................................24

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*,
No. 17 CIV. 10014 (LGS), 2019 WL 719751 (S.D.N.Y. Feb. 19, 2019)......................28

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F.Supp.2d 359 (S.D.N.Y. 2012).............................................................................24

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F.Supp.2d 395 (S.D.N.Y. 2011).............................................................................29

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entertainment*,
477 F.Supp.3d 123 (S.D.N.Y. 2020).........................................................16, 17, 26, 28, 29

*Conn. Bar Ass'n v. United States*,
620 F.3d 81 (2d Cir. 2010)...............................................................................21, 30, 32

*Davison v. Ventrus Biosciences, Inc.*,
　　No. 13 CIV. 3119 (RMB), 2014 WL 1805242 (S.D.N.Y. May 5, 2014) ...............................25

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
　　794 F.3d 297 (2d Cir. 2015)........................................................................................9

*Freudenberg v. E\*Trade Fin. Corp.*,
　　712 F.Supp.2d 171 (S.D.N.Y. 2010)................................................................24, 27

*Gabelli v. SEC*,
　　133 S. Ct. 1216 (2013).................................................................................................9

*Ganino v. Citizens Utils. Co.*,
　　228 F.3d 154 (2d Cir. 2000).................................................................................12, 24

*Gauquie v. Albany Molecular Rsch., Inc.*,
　　No. 14CV6637 (FB)(SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016).....................30, 31

*Genesee Cnty. Employees' Ret. Sys. v. DocGo Inc.*,
　　773 F.Supp.3d 62 (S.D.N.Y. 2025) ..............................................................................22

*Gross v. GFI Grp. Inc.*,
　　162 F.Supp.3d 263 (S.D.N.Y. 2016)......................................................................23, 24

*IBEW Local Union No. 58 Pension Tr. v. Royal Bank of Scotland Grp. PLC*,
　　783 F.3d 383 (2d Cir. 2015)........................................................................................23

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
　　818 F.3d 85 (2d Cir. 2016)....................................................................................27, 33

*In re Aphria, Inc. Sec. Litig.*,
　　No. 18 CIV. 11376 (GBD), 2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020)..................9, 27, 28

*In re Aphria, Inc. Sec. Litig.*,
　　No. 18 CIV. 11376 (GBD), 2021 WL 4442818 (S.D.N.Y. Sept. 28, 2021)......................27, 28

*In re Avon Sec. Litig.*,
　　No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ........................25, 32

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
　　No. 22 CIV. 3925 (LGS), 2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) .....................18, 21, 31

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
　　390 F.Supp.3d 432 (S.D.N.Y. 2019)..............................................................................26

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig,*
    763 F.Supp.2d 423 (S.D.N.Y. 2011)............................................................................26

*In re Chembio Diagnostics, Inc. Sec. Litig.,*
    586 F.Supp.3d 199 (E.D.N.Y. 2022) ...............................................................9, 17, 18

*In re Delcath Sys., Inc. Sec. Litig.,*
    36 F.Supp.3d 320 (S.D.N.Y. 2014) .............................................................................10

*In re Didi Glob. Inv. Sec. Litig.,*
    No. 21-CV-05807 (LAK), 2024 WL 1119483 (S.D.N.Y. March 14, 2024) ...........................17

*In re Express Scripts Holdings Co. Sec. Litig.,*
    773 F. App'x 9 (2d Cir. 2019) ...........................................................................19, 24

*In re Fed Ex Corp. Sec. Litig.,*
    517 F.Supp.3d 216 (S.D.N.Y. 2021)...........................................................14, 15, 25

*In re Gildan Activewear, Inc. Sec. Litig.,*
    636 F.Supp.2d 261 (S.D.N.Y. 2009)............................................................................28

*In re Grab Holdings Ltd. Sec. Litig.,*
    No. 1:22-CV-02189 (JLR), 2024 WL 1076277 (S.D.N.Y. Mar. 12, 2024)......................15, 16

*In re Hain Celestial Grp., Inc. Sec. Litig.,*
    20 F.4th 131 (2d Cir. 2021) ......................................................................................30

*In re Hi-Crush Partners L.P. Sec. Litig.,*
    No. 12 CIV. 8557 (CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013)................................27

*In re Inv. Tech. Grp., Inc. Sec. Litig.,*
    251 F.Supp.3d 596 (S.D.N.Y. 2017)......................................................................10, 21

*In re MF Glob. Holdings Ltd. Sec. Litig.,*
    982 F.Supp.2d 277 (S.D.N.Y. 2013)............................................................................11

*In re Mylan N.V. Sec. Litig.,*
    666 F.Supp.3d 266 (S.D.N.Y. 2023)............................................................................29

*In re Petrobras Sec. Litig.,*
    116 F.Supp.3d 368 (S.D.N.Y. 2015) .....................................................................24, 27

*In re Pfizer, Inc. Sec. Litig.,*
    538 F.Supp.2d 621 (S.D.N.Y.2008).............................................................................12

*In re Piedmont Lithium Inc. Sec. Litig.*,
  712 F.Supp.3d 301 (E.D.N.Y. 2024) .......................................................................28

*In re Progress Energy, Inc. Sec. Litig.*,
  371 F.Supp.2d 548 (S.D.N.Y. 2005) ........................................................................13

*In re PXRE Grp., Ltd., Sec. Litig.*,
  600 F.Supp.2d 510 (S.D.N.Y. 2009) ........................................................................33

*In re Sanofi-Aventis Sec. Litig.*,
  774 F.Supp.2d 549 (S.D.N.Y. 2011) ........................................................................28

*In re Symbol Techs., Inc. Sec. Litig.*,
  No. 05-CV-3923 (DRH)(AKT), 2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) .......................28

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
  No. 17-CV-2169 (LAK), 2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ...................19, 25, 29

*In re Teva Sec. Litig.*,
  671 F.Supp.3d 147 (D. Conn. 2023) ........................................................................12

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ...............................................................................13, 14

*In re Vale S.A. Sec. Litig.*,
  No. 19CV526 (RJD)(SJB), 2020 WL 2610979 (E.D.N.Y. May 20, 2020) ......................10, 24

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ..................................................................................9

*In re Xerox Corp. Sec. Litig.*,
  165 F.Supp.2d 208 (D. Conn. 2001) ....................................................................24, 25

*In re Yukos Oil Co. Sec. Litig.*,
  No. 04 CIV. 5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ...........................13

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F.Supp.3d 381 (S.D.N.Y. 2022) ....................................................................12, 13

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F.Supp.2d 221 (S.D.N.Y. 2006) ....................................................................13, 20

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir.2008) ...............................................................................32

*Martinek v. AmTrust Fin. Servs., Inc.*,
  No. 19 CIV. 8030 (KPF), 2020 WL 4735189 (S.D.N.Y. Aug. 14, 2020) ...............................18

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).................................................................................................................8

*Meyer v. Concordia Int'l Corp.*,
  No. 16 CIV. 6467 (RMB), 2017 WL 4083603 (S.D.N.Y. July 28, 2017)..............................11

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)......................................................................................10, 16, 21

*Micholle v. Ophthotech Corp.*,
  No. 17-CV-210 (VSB), 2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019) ...................................9

*Nandkumar v. AstraZeneca PLC*,
  No. 22-2704-CV, 2023 WL 3477164 (2d Cir. May 16, 2023) ...............................................14

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)...................................................................................................20

*Nguyen v. New Link Genetics Corp.*,
  297 F.Supp.3d 472 (S.D.N.Y. 2018)......................................................................................25

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...............................................................................24, 26, 28, 29

*Nutriband, Inc. v. Kalmar*,
  No. 19CV2511(NGG)(SJB), 2020 WL 4059657 (E.D.N.Y. July 20, 2020) ...........................8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...............................................................................................................21

*Peifa Xu v. Gridsun Holding Inc.*,
  No. 18 CIV. 3655 (ER), 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020)..................................15

*Pipefitters Union Local 537 Pension Fund v. Am. Express Co*,
  773 F. App'x 630 (2d Cir. 2019) ............................................................................................14

*Puddu v. 6D Glob. Techs., Inc.*,
  No. 15CV8061 (AJN), 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021).............................13, 20

*Raja v. Burns*,
  No. 19-CV-01328, 2020 WL 568236 (E.D.N.Y. Feb. 5, 2020) .............................................29

*Rmed Intern., Inc. v. Sloan's Supermarkets, Inc.*,
No. 94 CIV. 5587 (PKL)(RLE), 2002 WL 31780188 (S.D.N.Y. Dec. 11, 2002) .............28, 29

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F.Supp.3d 300 (S.D.N.Y. 2024)....................................................................30, 32

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2021)......................................................................................29

*SEC v. Gabelli,*
653 F.3d 49 (2d Cir. 2011)........................................................................................9

*Shields v. Citytrust Bancorp, Inc.,*
25 F.3d 1124 (2d Cir. 1994).....................................................................................33

*Singh v. Cigna Corp.,*
918 F.3d 57 (2d Cir. 2019).......................................................................................20

*Sjunde AP-Fonden v. Gen. Elec. Co.,*
No. 17-CV-8457 (JMF), 2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023) ................33

*Solomon v. Sprint Corp.*,
No. 1:19-CV-05272 (MKV), 2022 WL 889897 (S.D.N.Y. Mar. 25, 2022).............26

*SRM Global Fund L.P. v. Countrywide Financial Corp.*,
No. 09 CIV. 5064 (RMB), 2010 WL 2473593 (S.D.N.Y. June 17, 2010) ..............13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)........................................................................................ *passim*

*United Indus. Workers Pension Plan v. Waste Mgmt., Inc.*,
No. 22 CIV. 4838 (LGS), 2024 WL 1312593 (S.D.N.Y. Mar. 27, 2024) ...............30

*Van Dongen v. CNinsure Inc.*,
951 F.Supp.2d 457 (S.D.N.Y. 2013)....................................................................2, 3

*Wang v. Cloopen Grp. Holding Ltd.*,
661 F.Supp.3d 208 (S.D.N.Y. 2023)..................................................................19, 28

*Wash. State Inv. Bd. v. Odebrecht S.A.*,
461 F.Supp.3d 46 (S.D.N.Y. 2020).........................................................................24

*zCap Equity Fund LLC v. LuxUrban Hotels, Inc.*,
No. 24 CIV. 1030 (PAE), 2025 WL 2097951 (S.D.N.Y. July 25, 2025) ...........21, 22

**Statutes and Rules**

Fed. R. Civ. P. 9(b) ............................................................................................................9

Fed. R. Civ. P. 12(b)(6).....................................................................................................8

Fed. R. Civ. P. 12(d) .........................................................................................................9

17 C.F.R. §240.10b-5(b) ...................................................................................................9

Section 10(b) of the Exchange Act of 1934.........................................................9, 12, 33

Private Securities Litigation Reform Act of 1995 ............................................................9

Lead Plaintiffs Anthony Yuson and Michael Steinberg and Named Plaintiff Richard Collura ("Plaintiffs") hereby submit this opposition to Defendants' Motion to Dismiss the First Amended Complaint.[1] ECF No. 46; *see also* Memorandum of Law In Support of Defendants' Motion to Dismiss First Amended Complaint, ECF No. 47 ("MTD").

## I.    INTRODUCTION

This is a straightforward case of securities fraud by a company and its executives who were not honest with their investors about the importance of a critical business contract and the company's ability to keep that contract. Specifically, when speaking to investors, Defendants concealed: (i) the paramount importance of the NBA Rights to WBD's revenue and goodwill, and how losing the NBA Rights would significantly compromise WBD's business; and (ii) that the Matching Clause in the prior NBA contract, which Defendants touted to investors, provided WBD no actual protection because the Company could not match third-party offers for the NBA Rights.

The Complaint pleads each misrepresentation in detail, including why Plaintiffs contend each was false. ¶¶97–121. Unable to dispute the allegations pled, Defendants argue that they fully disclosed the omitted information, that the market already knew that the NBA Rights were more important than they conceded, and the Matching Clause was more limited than they claimed. But the text to which Defendants refer does not actually disclose the particular omitted information and is mostly boilerplate. Moreover, with respect to the Matching Clause statements, none of the articles referenced by Defendants describe the severe limitations of the Matching Clause or Defendants' inability to match competing offers. Nor could they; the Matching Clause terms and

---

[1] Defendants are Warner Bros. Discovery ("WBD" or "Company"), David Zaslav, and Gunnar Wiedenfels. The First Amended Complaint is referred to herein as "Complaint," (cited as "¶__"). ECF 41. All capitalized terms shall be ascribed the same meaning as in the Complaint. All internal citations and quotation marks omitted, and emphasis added unless otherwise noted.

limitations were known only to Defendants during the Class Period, and Defendants' unequivocal statements about the potency of the Matching Clause counteracted any public statements from analysts speculating on its scope.

Defendants also impermissibly dispute the well-pled factual allegations establishing that WBD could not, *and did not*, match competing bids by disputing the veracity of the NBA's explicit statement that WBD did not submit a proper matching offer. Not only is this attempt to transform a Rule 12(b)(6) motion into a factual dispute improper, but the supposed "facts" consist of Defendants' *ipse dixit* (which is categorically wrong and will be disproved at trial), and their baseless litigation position in the NBA suit, which was explicitly dispelled **by the NBA**.

Defendants' challenges to scienter fare no better. Defendants devote much of their argument to a purported lack of motive and insider sales, neither of which is required, while ignoring—and therefore conceding—other indicia of scienter. Defendants cannot deny well-pled factual allegations demonstrating that Defendants frequently held themselves out as knowledgeable to investors and analysts regarding the NBA Rights and the Matching Clause, had actual knowledge of the misrepresented facts, were intimately involved in the closed-door negotiations with the NBA, and admitted in sworn-court filings that NBA Rights were indispensable to WBD's core business. Further, WBD's surrender of its lawsuit against the NBA further bolsters scienter. And its submission of a non-matching response to the Amazon offer that made substantive changes to critical terms, including internet-only distribution, demonstrates that Defendants knew that the Matching Clause could not salvage the NBA Rights. These allegations establish a strong inference of scienter that is sufficient at the pleadings stage. Defendants' factual disputes should be resolved at trial, on admissible evidence. *See Van Dongen v. CNinsure Inc.*, 951 F.Supp.2d 457, 470 (S.D.N.Y. 2013) ("Defendants' [fact-based arguments] amount to an

appeal to the referee to call a foul while the opposing team is still announcing its lineup and taking the field").

Accordingly, Defendants' motion to dismiss should be denied in its entirety, and the parties should be directed to commence discovery without further delay.

## II.    RELEVANT FACTS

### A.    WBD's Business and its Dependence on the NBA

WBD is a global media entertainment company whose current iteration was formed in 2022. ¶32. Heavily indebted, WBD was predominantly reliant on its only consistently profitable business segment – its Networks segment. ¶¶36–39. WBD's Networks segment consists of WBD's domestic and international television networks, including TNT, historically the home of NBA games on cable television. ¶38.

The Networks segment – which primarily generates revenue through advertising and distribution revenue – is highly profitable because of TNT's live sports programming, particularly the NBA. ¶¶41–45. Indeed, in an increasingly fractured and highly saturated media environment, live sports have remained an irreplaceable revenue driver because dedicated sports fans pay a premium to watch sports live, despite the inconvenience of sitting through advertisements. ¶¶48–56. WBD (and its predecessors) have had the NBA Rights since the mid-1980s, which gave WBD exclusive rights to distribute certain NBA season and playoff games, pregame and postgame content, and other NBA-related content, such as the beloved show *Inside the NBA*. ¶¶57, 69. The NBA Rights were so critical to WBD and its Networks segment that, according to former WBD employees, 80% of WBD's ability to negotiate carriage fees depended on live sports like the NBA, and live sports accounted for 30-40% of WBD's total advertising revenue. ¶¶60–65. In 2022 alone, analysts calculated that advertising revenue for WBD's NBA content garnered WBD

3

approximately $750 million, and its importance to WBD has grown exponentially since then. ¶¶66–69. Moreover, the NBA Rights provided a "halo effect" for other WBD content, helped prevent customers from cancelling service with WBD (*i.e.* "churn"), and contributed significantly to WBD's goodwill. ¶¶70–72.

### B.    The 2014 Agreement and the Matching Clause

Leading into the Class Period, WBD held the NBA Rights pursuant to the 2014 Agreement, a 9-year licensing agreement between WBD's predecessor, Turner Broadcasting, and the NBA. ¶¶81–82. The 2014 Agreement allowed WBD to exclusively negotiate for renewal beginning on March 9, 2024. ¶83. If no agreement was reached during the Exclusive Negotiating Period, the NBA was free to negotiate with third-party bidders. ¶84. However, the 2014 Agreement provided WBD with the ability to match any third-party offer within a five-day period after the NBA received a formal third-party offer (the "Matching Clause"). ¶84.

WBD hid the language of the Matching Clause from investors during the Class Period, but it was extremely stringent. WBD could exercise the Matching Clause only if it matched the monetary amount *and* "each term" of the third-party offer. ¶¶84–85. Additionally, and critically, WBD would have to match the distribution type of the third-party offer. *Id*. Consequently, WBD could not match a third-party internet streaming-only offer with an internet-or-cable distribution offer. *Id*. Accordingly, when the NBA Rights came up for renewal in 2024, Defendants knew that WBD could only exercise the Matching Clause by meeting the monetary amount, distribution means, and other terms of any third-party offer. ¶87. They were not candid about these limitations with investors.

### C.    Defendants Make Misleading Statements About the Importance of the NBA Rights

At the start of 2024, the NBA announced that the NBA Rights would be marketed for

4

renewal in three packages, including one internet-streaming-only package. ¶¶88–90. Due to the growing importance of live sports in commanding advertising revenue, it was understood both inside and outside WBD that bidding for the NBA Rights would be extremely competitive. ¶¶90–93. However, as Defendants prepared to enter the Exclusive Negotiating Period, they downplayed the critical importance of the NBA Rights to WBD, and the implications of WBD losing the NBA Rights. ¶¶97–100. For example, Zaslav discussed WBD's "strong positive 40 year relationship with the NBA," but then touted the "global sports portfolio" and Paris Summer Olympics, assuring investors WBD was well-positioned "financially and creatively" and "as we look towards the future, we will continue to make the tough calls and do [w]hat is necessary to get this business on a clear pathway to growth and to drive increased shareholder value." ¶97. In truth, WBD's "pathway to growth" depended on the NBA Rights as WBD admitted after the Class Period, because WBD internally regarded the NBA Rights as a "unique irreplaceable asset." ¶98. Wiedenfels also downplayed the vital importance of the NBA Rights, omitting that the Company depended on revenue derived from the NBA Rights. ¶¶99–100. In doing so, Defendants misled investors about the true risk of losing the NBA Rights.

On March 9, 2024, WBD entered the Exclusive Negotiating Period with the NBA, with Zaslav leading the negotiations on behalf of the Company. ¶101. WBD failed to secure renewal of the NBA Rights during the Exclusive Negotiating Period, thereby opening the NBA Rights up to third-party bidding. *Id*.

### D.    Defendants Make Misleading Statements About the Matching Clause

When the Exclusive Negotiating Period ended on April 22, 2024, third-party bidders immediately emerged. On April 25, 2024, the *Wall Street Journal* reported that Amazon and Google were vying for the internet streaming portion of the NBA Rights. ¶103. On April 29, 2024,

the *Wall Street Journal* subsequently reported that NBCUniversal was preparing to offer approximately $2.5 billion, and news reports came out the same day announcing that Amazon had reached a framework deal with the NBA for internet streaming-only rights. ¶¶104–05. This news caused WBD's stock price to fall nearly 10%, damaging investors. ¶106.

Critically, WBD was both unable and unwilling to match the terms of the NBCUniversal and Amazon offers. WBD was categorically unable to match the NFL cross-promotion offered by NBCUniversal and Amazon, and lacked the streaming and audience infrastructure to match the distribution terms of Amazon's offer. ¶¶10–13, 116, 125–30. Moreover, Zaslav refused to pay more than $2.1 billion per year, $400 million less than what NBCUniversal offered for a streaming and cable package, and refused to bid for streaming only. ¶¶11, 116–17, 126, 134. Consequently, WBD had no chance of exercising the Matching Clause, and the Company's negotiations with the NBA were anything but "constructive." ¶¶109–10.

Instead of coming clean about their failed negotiation, Defendants falsely reassured investors that WBD would be able to utilize the Matching Clause to retain the NBA Rights. ¶¶111–13, 118–19. Moreover, Defendants continued to downplay the business damage from losing the NBA Rights to WBD's business, even as that risk neared a certainty. ¶¶112–15, 118–21.

### E.    The Truth is Disclosed: WBD Loses the NBA Rights and Takes a $9.1 Billion Goodwill Impairment

In July 2024, the NBA formally accepted NBCUniversal's $2.45 billion per year offer and Amazon's $1.8 billion per year internet-streaming offer. ¶122. On July 22, 2024, WBD informed the NBA that it would exercise the Matching Clause for Amazon's offer, but instead of complying with the Matching Clause, WBD issued a counter-offer that did not match Amazon's offer at all, but instead attempted to rewrite virtually all material terms. ¶¶124–29. Not only did WBD fail to match all material terms as the Matching Clause required, but it sought to revise eight sections and

6

22 subsections, changing 11 defined terms, striking 300 words, adding 270 words, and substantially altering the parties' rights and obligations. *Id.* Most notably, instead of matching Amazon's internet-streaming distribution term (which was the reason this internet-only package carried a much lower price tag than the cable package bid by NBCUniversal), WBD demanded to be able to distribute the subject NBA games via internet *or cable*. ¶126. This revision directly contradicted the express terms of the Matching Clause, which prohibited WBD from "matching" an internet-distribution offer with a cable-distribution offer. ¶127.

On July 24, 2024, the NBA announced that WBD did not match under the terms of the Matching Clause, and, accordingly, lost the NBA Rights. ¶131. That same day, the NBA sent WBD a letter outlining how its extensive rewrite of Amazon's offer directly contradicted the Matching Clause. ¶134. On this news, WBD's stock price fell by nearly 9%. ¶132.

On July 26, 2024, to save face and extract a monetary settlement, WBD filed suit against the NBA. ¶¶136–39. In that litigation, WBD admitted in sworn filings—for the first time—that it had considered the NBA Rights to be "irreplaceable," that it impacted WBD's carriage rates, and had a halo effect that enabled WBD to more effectively negotiate other sports deals. ¶136. WBD also stated that loss of the NBA Rights would cause WBD to "suffer irreparable harm" and lose "goodwill, competitive advantages, and market share," a far cry from WBD being "well positioned financially and creatively" due to its "global sports portfolio." ¶¶137–38. Significantly, WBD conceded that it did not match but changed many provisions in Amazon's offer, and the NBA itself outlined the myriad ways that WBD refused to properly exercise the Matching Clause. ¶¶125–30, 134–39.

On August 7, 2024, less than three weeks after the NBA rejected its attempt to rewrite rather than match Amazon's bid, WBD announced that it was taking a *$9.1 billion* non-cash

goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects. ¶140. WBD admitted that the charge directly related to "uncertainty related to affiliate and sports rights renewals, including the NBA." ¶140. On the earnings call that day, Wiedenfels admitted that "***this is clearly where a sports right[s] discussion like the one with the NBA comes into play as a triggering event***, which then compels us to reevaluate our business case . . . [a]nd that's what then leads to an evaluation, which in the second quarter happened to be $9.1 billion below what was on the books for the network segment." ¶141. On this news, WBD's stock price fell nearly 13%, further damaging investors. ¶142. Shortly thereafter, WBD folded its nascent lawsuit with the NBA, settling prior to discovery for nominal relief, demonstrating WBD's understanding that its suit was baseless all along. ¶¶160–65.

## III.    ARGUMENT

### A.    Applicable Legal Standards

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). On a Rule 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007). At this stage, "the court's task is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Nutriband, Inc. v. Kalmar*, No. 19CV2511(NGG)(SJB), 2020 WL 4059657, at *6 (E.D.N.Y. July 20, 2020).[2]

---

[2] Defendants improperly cite to documents that are outside of the Complaint. *See* ECF 48 & Exhs. 2, 3, 13, 15, 19, 20, 21, 23 thereto. "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer to documents attached to the complaint as an exhibit or incorporated in it by reference,

**B.    The Complaint Pleads Actionable Misstatements and Omissions**

Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). "The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016). Additionally, "so-called half-truths--literally true statements that create a materially misleading impression--will support claims for securities fraud." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. SEC*, 133 S. Ct. 1216 (2013).

**1.    Defendants' misleading statements downplaying the critical nature of the NBA Rights**

Plaintiffs' Complaint easily satisfies the particularity requirements of Rule 9(b) and the PSLRA. Under Rule 9(b), "a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).

---

to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *In re Aphria, Inc. Sec. Litig.*, No. 18 CIV. 11376 (GBD), 2020 WL 5819548, at *1 n.1 (S.D.N.Y. Sept. 30, 2020). If a motion to dismiss introduces additional materials outside the pleadings, Federal Rule of Civil Procedure 12(d) specifies that a court may either exclude those materials or convert the motion to one for summary judgment. *Micholle v. Ophthotech Corp.*, No. 17-CV-210 (VSB), 2019 WL 4464802, at *6 (S.D.N.Y. Sept. 17, 2019). Plaintiffs take no position on Defendants' submission of documents relied upon as part of the moving allegations of the Complaint (*see* ECF 48 & Exhs. 1, 4–12, 14, 16–18, 22, 24 –27 thereto) except to note that Defendants do not dispute that they are accurately quoted in the Complaint and that the Court should only refer to such external documents to "determine what statements the documents contain, not for the truth of the matters asserted." *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F.Supp.3d 199, 216 (E.D.N.Y. 2022).

9

The Complaint details how Defendants omitted from their discussion of the NBA Rights that losing the NBA Rights would significantly compromise WBD's revenue and goodwill; that the NBA Rights were crucial to WBD's high carriage rates, advertising revenue, and negotiating position with other sports leagues; and that, accordingly WBD internally viewed the NBA Rights as an "irreplaceable asset." ¶¶97–100, 109–10, 112–15, 118–21. The Complaint identifies each statement alleged to be misleading, who made the statement, how, when and where such statements were disseminated, and why Plaintiffs contend each statement is misleading. *Id*. No more is required. *In re Vale S.A. Sec. Litig.*, No. 19CV526 (RJD)(SJB), 2020 WL 2610979, at *18–19 (E.D.N.Y. May 20, 2020).

By discussing the NBA Rights and the upcoming negotiations for retaining the NBA Rights, Defendants undertook "a duty to tell the whole truth," even if there was no "independent duty to disclose [such] information" before making the statements. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F.Supp.3d 596, 611 (S.D.N.Y. 2017) (describing "a significant aspect of [defendants'] business model" required full disclosure, including of negative aspects of the business). When Defendants "make[] statements about [their] product, [they are] required to disclose information that would render those statements not misleading." *In re Delcath Sys., Inc. Sec. Litig.*, 36 F.Supp.3d 320, 332 (S.D.N.Y. 2014). Omitting the monumental importance of the NBA Rights to WBD and the significant known risk the Company faced if WBD lost the NBA Rights is actionable, as "a reasonable investor would have viewed [them] as having significantly altered the total mix of information made available." *Calfo v. Messina*, No. 15 CIV. 4010, 2016 WL 3661548, at *6–7 (S.D.N.Y. July 5, 2016); *see also Babaev v. Grossman*, 312 F.Supp.2d 407, 410 (E.D.N.Y. 2004) (sustaining claim that company omitted notice of termination from "most important

10

customer" and was "about to lose a main source of revenue").

Defendants wrongly claim that they disclosed the importance of the NBA Rights. *See* MTD 14–15. But the statements to which they point are only vague allusions that fall far short of "disclos[ing] hard facts critical to appreciating the magnitude of the risks described." *Meyer v. Concordia Int'l Corp.*, No. 16 CIV. 6467 (RMB), 2017 WL 4083603, at *4 (S.D.N.Y. July 28, 2017); MTD 14–15. None disclosed WBD's reliance on the NBA Rights for its viewership, carriage fees and advertising revenue, that WBD relied upon the halo effect of the NBA Rights to boost non-NBA programming and avoid churn, or that WBD faced a massive charge if the NBA Rights were not renewed. *Id.* Worse, the risk warnings made on February 23, 2024 ***never even discussed*** the NBA Rights. *Id.* "By superficially warning of possible risks while failing to disclose critical facts, [Defendants were] akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277, 318 (S.D.N.Y. 2013).

A simple comparison of what Defendants said during the Class Period to what they said at the end of the Class Period leaves no doubt that Defendants' statements were misleading. During the Class Period, Defendants were nonchalant about the prospect of a future without the NBA Rights, often responding to pointed inquiries with assurances that the Company would be fine with or without the NBA Rights. ¶¶97–100, 114–15, 120–21. Indeed, Defendants never informed investors that the NBA Rights were anything more than one piece of WBD's "robust offering of sports[.]" ¶120. In stark contrast, after losing the NBA Rights, Defendants admitted they actually believed that the NBA Rights were "a unique asset that cannot be replaced." ¶136. Only then did they concede that WBD relied on the NBA Rights to provide "a halo effect that is used to promote

11

other content and drive attention and viewership to other TBS and WBD channels, networks, and properties" and gain negotiating leverage for bidding on "rights to telecast other sports leagues' events and to obtain more favorable terms with [WBD's] own downstream distributors." *Id.*; *see Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, No. 19CV9270 (DLC), 2020 WL 3318029, at *1–3 (S.D.N.Y. June 18, 2020) (defendant's admission supported falsity).

These concealed facts were not only material, but vital. "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). A complaint may only be dismissed on materiality grounds if the misstatements or omissions at issue are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id*. at 162.

Defendants mistakenly assert that their statements were not misleading because the market was aware that the NBA Rights were important to WBD. MTD 15. "[W]hether an allegedly omitted fact was available to the market often is a fact intensive inquiry that is rarely an appropriate basis for dismissing." *In re Pfizer, Inc. Sec. Litig.,* 538 F.Supp.2d 621, 632 n.61 (S.D.N.Y. 2008). Here, the argument is particularly misplaced. The Complaint alleges that investors were unaware, and Defendants point to no disclosure – by themselves or anyone else – of the specific facts concealed by Defendants. At best, Defendants raise a trial argument that can only be resolved by a jury. "Courts routinely reject similar arguments at the motion to dismiss stage because the truth-on-the-market defense is intensively fact-specific and is rarely an appropriate basis for dismissing a Section 10(b) complaint." *In re Teva Sec. Litig.*, 671 F.Supp.3d 147, 197–98 (D. Conn. 2023) (collecting cases); *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F.Supp.3d 381, 394–95

12

(S.D.N.Y. 2022). To establish this defense, Defendants must show that "the corrective information that was conveyed to the public was done so with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Puddu v. 6D Glob. Techs., Inc.*, No. 15CV8061 (AJN), 2021 WL 1198566, at *7 (S.D.N.Y. Mar. 30, 2021). Defendants have failed to meet this high burden. Indeed, statements by the "talking heads on YouTube and X" were "counteracted by contemporaneous [misleading] statements by" Defendants who assured investors that WBD was "***very comfortable***" with its "***robust offering of sports***" "***whatever happens with the NBA[,]***" negating any truth of the market defense. *Lapin v. Goldman Sachs Grp., Inc.*, 506 F.Supp.2d 221, 238–39 (S.D.N.Y. 2006).

Defendants' authority on this point is unhelpful. The allegedly omitted information in *In re Progress Energy, Inc. Sec. Litig.* was a general tax provision that applied to all corporations. 371 F.Supp.2d 548 (S.D.N.Y. 2005); MTD 16. Accordingly, the court held that even if defendants' disclosure was inadequate, the omitted information was not the type of information defendants had a duty to disclose. *Id.* at 552–53. In *SRM Global Fund L.P. v. Countrywide Financial Corp.*, the allegedly omitted information—an email stating Countrywide was "flying blind"—was merely a "more colorful[]" way to convey Countrywide's existing disclosure that it "lack[ed] significant historical experience." No. 09 CIV. 5064 (RMB), 2010 WL 24735935 at *8 (S.D.N.Y. June 17, 2010); MTD 16. *In re Yukos Oil Co. Sec. Litig.*, concerned extremely detailed public information that the CEO of a Russian oil company was "politically active" where plaintiffs *admitted* they were aware that the CEO was politically active. No. 04 CIV. 5243 (WHP), 2006 WL 3026024, at *21 (S.D.N.Y. Oct. 25, 2006); MTD 16.

Defendants also falsely claim that their statements are inactionable because they do not directly contradict the omitted information. MTD 17. This is not the standard. Instead, "[a] duty to

13

disclose arises whenever secret information renders prior public statements materially misleading, ***not merely when that information completely negates the public statements***.” *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993). Defendants' cases do not hold otherwise. In *Nandkumar v. AstraZeneca PLC*, plaintiffs did not explain how statements about different age groups in a clinical trial were rendered misleading by omitting to disclose that the company only included a substantial number of patients over 55 years old in the trial. No. 22-2704-CV, 2023 WL 3477164, at *2 (2d Cir. May 16, 2023); MTD 17. Here, the Complaint explains how Defendants' statements in response to analysts' questions about it “being a big positive to retain [the NBA] rights,” misleadingly minimized the critical nature of the NBA Rights by concealing, *inter alia,* that losing the NBA Rights would significantly impact WBD's revenue, churn, bargaining leverage and goodwill. ¶¶99–100. The statements in *AIG Glob. Secs. Lending Corp. v. Banc of Am. Secs. LLC*, about defendant's collection system were not misleading in light of disclosures in offering memos of decentralized collection practices. 254 F.Supp.2d 373, 382-83 (S.D.N.Y. 2003); MTD 17.

In *Pipefitters Union Local 537 Pension Fund v. Am. Express Co*., the court rejected plaintiff's claim that by touting the importance of Costco as a partner, defendants were, in effect, denying that defendants were in negotiations with Costco, which they were. 773 F. App'x 630, 634 (2d Cir. 2019); MTD 17. Here, no inference is needed to establish the falsity of Defendants' statements – Defendants discussed the NBA Rights while omitting their paramount importance to WBD's revenue and goodwill. ¶¶97–100, 109–10, 112–15, 118–21. This straightforward claim distinguishes this Action from *Pipefitters*. In *In re Fed Ex Corp. Sec. Litig.*, unlike here, defendants accurately and specifically disclosed FedEx's expenses from a cyberattack and warned that its ongoing impact could negatively affect FedEx's financial condition going forward. 517 F.Supp.3d

14

216, 229 (S.D.N.Y. 2021); MTD 17. By contrast, Defendants' vague boilerplate here about "failure to renew" provided investors with no substantive information to appreciate the true implications of the gamble Defendants were taking with the NBA Rights. MTD 14-15, Def. Exhs. 10-11.

Defendants next seek to gin up a factual dispute by claiming, contrary to their contemporaneous statements, that WBD's $9.1 ***billion*** impairment charge does not support falsity because it was "triggered" by factors unrelated to the NBA. MTD 17–18. This factual dispute belongs to the trier of fact, where Defendants' own words will prove the argument to be wholly without merit. *See* ¶141 ("***And this is clearly where a sports right discussion like the one with the NBA comes into play as a triggering event, which then compels us to re-evaluate our business case*** . . . And that's what then leads to evaluation, which in the second quarter happened to be ***$9.1 billion below what was on the books for <u>the network segment</u>***."). At any rate, Defendants' tortured counterfactual cannot be credited at this stage. *See, e.g., Peifa Xu* v. *Gridsun Holding Inc.*, No. 18 CIV. 3655 (ER), 2020 WL 1508748, at *13 (S.D.N.Y. Mar. 30, 2020) (falsity was adequately alleged when the facts "leave room for the reality" supporting defendants' view, but "leave the same amount of room for a reality" supporting plaintiffs' theory).

Finally, Defendants argue that Zaslav's May 9th statement, where he again downplayed the importance of the NBA Rights when responding to a direct question from an analyst, is not actionable because "Zaslav did not address matching rights." MTD 22; ¶114. But Plaintiffs do not allege that this particular statement omitted material facts about the Matching Clause. ¶¶114–15.[3] Instead, Plaintiffs allege, in detail, that Zaslav omitted the critical importance of the NBA Rights as WBD's best defense against churn and the increasing risk of losing the NBA Rights, which is actionable. *See In re Grab Holdings Ltd. Sec. Litig.*, No. 1:22-CV-02189 (JLR), 2024 WL

---

[3] Zaslav also made materially misleading statements about the Matching Clause earlier in the same earnings call, which the Complaint and this Opposition detail. ¶¶112–13, *infra* at Section III(B)(2).

15

1076277, at *15 (S.D.N.Y. Mar. 12, 2024) (collecting cases).

### 2.    Defendants' Matching Clause statements are actionable

With actual knowledge of the 2014 Agreement's stringent language on what was required to "match" competing offers, Defendants misleadingly portrayed to investors WBD's Matching Clause as a potent tool to ensure that WBD retained the NBA Rights, even though it offered only a limited path which was of no use to WBD given the circumstances of the bids actually offered. ¶¶112–13, 118–19. Indeed, under the plain language of the Matching Clause—which did not become public until after the Class Period—Defendants had virtually no chance of retaining the NBA Rights through the Matching Clause. Having decided to tout the Matching Clause to investors and discuss their negotiations with the NBA, Defendants undertook "a duty to tell the whole truth[,]" even if there was no "independent duty to disclose [such] information." *Jinkosolar*, 761 F.3d at 250.

Analysts and investors relied on Defendants' assurances. They had no reason not to. Defendants expressly claimed that the Matching Clause enabled WBD to retain the NBA Rights because "[w]e've had a lot of time to prepare for this negotiation . . . under our current deal with the NBA, *we have matching rights that allow us to match third-party offers before the NBA enters into agreement with them"* (¶112) and "We've had a great partnership with the NBA . . . *We do have a contractual matching, <u>right</u>? And that's an important part of our <u>ongoing</u> contractual relationship."* ¶118.

This case is analogous to *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entertainment, Inc.* ("*WWE*"), 477 F.Supp.3d 123 (S.D.N.Y. 2020). In *WWE*, Judge Rakoff held as actionable defendants' statements that they believed WWE had reached an agreement "in principle" with the Saudi government for a media rights agreement that (according to defendants)

16

would be finalized "very soon" because "strong circumstantial evidence" showed that the parties were far apart in their negotiations and had not agreed to key terms at the time defendants issued their statements. *Id*. at 127. Judge Rakoff rejected defendants' assertion that their statements could not have been misleading because they were cabined by cautionary language warning that "this understanding is nonbinding" and might "not occur on expected terms," and likewise rejected defendants' assertion that statements related to ongoing negotiations are inactionable, holding that defendants' statements were concrete and likely to mislead a reasonable investor. *Id.* at 135. Additionally, Judge Rakoff rejected similar arguments to those raised here about the tenor of negotiations, which impermissibly disputed the truth of plaintiffs' allegations by asserting that WWE's relationship with Saudi Arabia was amicable and that the allegations were based on "unreliable news sources" and hearsay. *Id.* at 133.

Here, strong circumstantial evidence (the actual contract language on "matching" and Zaslav's unwillingness to pay above $2.1 billion per year for NBA rights) likewise demonstrates that when Defendants issued their statements touting the Matching Clause, Defendants were neither willing nor able to effectively utilize the Matching Clause to renew the NBA Rights. ¶¶84– 87, 116–17. As in *WWE*, WBD's cautionary language was insufficient because Defendants failed to disclose the insurmountable limitations to matching under the 2014 Agreement, *i.e.*, that a matching bid must match all monetary and non-monetary terms of any competing offer as well as the means of distribution. *See, e.g. In re Didi Glob. Inv. Sec. Litig.,* No. 21-CV-05807 (LAK), 2024 WL 1119483, at *8 (S.D.N.Y. March 14, 2024) (risk disclosures inadequate where they warned "only of the general risk that [] failure to comply with applicable laws [ ] jeopardized [ ] future operations" but "made no mention of far more specific risk" that the company defied government directive); *In re Chembio*, 586 F.Supp.3d at 230–31 (cautionary language was

17

insufficient because warning did not directly address that the particular reason that investors should be concerned that authorization would be revoked, *i.e.*, that accuracy of test came into question).

Defendants' additional arguments about the Matching Clause are even weaker.

First, Defendants assert that they could not have known in May that WBD could not match the NBCUniversal and Amazon offers, which were made in July. MTD 18-19. But Plaintiffs allege that they knew at the time of crippling limitations: that they could not and would not match NBCUniversal's compensation, that they could not match NBCUniversal or Amazon's cross-promotion via NFL games, and that they could not match Amazon's minimum internet-streaming audience commitment or escrow account provision. ¶¶102–08, 116–17, 122–35. Plaintiffs do not allege that Defendants failed to predict the future. Instead, Plaintiffs allege that Defendants omitted then-known and highly material risks when discussing the Matching Clause. *See In re Axsome Therapeutics, Inc. Sec. Litig.*, No. 22 CIV. 3925 (LGS), 2025 WL 965265, at *5 (S.D.N.Y. Mar. 31, 2025) (omissions of hinderances to a business's capabilities were materially misleading and actionable, especially when those omitted facts increased the likelihood of risks materializing); *Martinek v. AmTrust Fin. Servs., Inc.*, No. 19 CIV. 8030 (KPF), 2020 WL 4735189, at *13–15 (S.D.N.Y. Aug. 14, 2020) (defendants' statements that they expected to remain listed on the NYSE were actionable because they omitted known risks and obstacles that undermined that expectation).

Moreover, by the last week in April, news reports emerged that the NBA and Amazon had reached a framework deal with internet-only distribution and NBCUniversal was preparing to offer $2.5 billion. ¶¶103–05. Because Defendants were in close negotiations with the NBA, they could not possibly be ignorant of this information. No "clairvoyance" (MTD 19) was required to discern that WBD could not match the internet streaming only quality of Amazon's offer, NBCUniversal's and Amazon's NFL cross-promotion, or the $2.45 billion price tag of NBCUniversal's offer,

18

notwithstanding that those offers had yet to be fully accepted. Consequently, assuring investors that WBD would be able to use its Matching Clause without disclosing its severe limitations, while it became increasingly apparent that the Matching Clause provided no protection to WBD under those circumstances, was misleading. *Wang v. Cloopen Grp. Holding Ltd.*, 661 F.Supp.3d 208, 230–31 (S.D.N.Y. 2023) (finding actionable a company's omissions regarding an increase in risk of customer non-payments, which was "a crucial component of its business").

Defendants' cited authority is inapposite. In *Acito v. IMCERA Grp., Inc.*, it was not a "foregone conclusion" that a third FDA inspection would fail, given that FDA told the company in a second inspection that its plant was improving. 47 F.3d 47, 53 (2d Cir. 1995); MTD 19. Here, Defendants do not, and cannot, assert that the NBA ever told WBD it would relax the stringent contract language in the Matching Clause which WBD could not fulfill. The defendants in *In re Express Scripts Holdings Co. Sec. Litig.* did not mislead investors concerning their contract negotiations with Anthem, and disclosed that they were trying to negotiate a new agreement. 773 F. App'x 9, 15 (2d Cir. 2019); MTD 19. By contrast, here analysts and investors relied on Defendants' assurances precisely because they indicated "***we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them.***" ¶112. In *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, plaintiffs had no factual basis to assert that the risk of contract termination had increased at the time of defendants' alleged misstatements and omissions. No. 17-CV-2169 (LAK), 2019 WL 1368787, at *13 (S.D.N.Y. Mar. 26, 2019); MTD 19. Here, Defendants knew when they touted the Matching Clause, that it provided no refuge given the language in the 2014 Agreement, which Defendants concealed from investors.

Defendants also erroneously argue that, even if they misled investors, some third parties thought that WBD's Matching Clause might not "win the day," and the candor of third parties

19

offset their own duplicity. MTD 19–20. This truth-on-the-market defense fails. *Supra* at Section

III(B)(1). None of the articles actually discuss the limitations of the Matching Clause, which

Defendants apparently concealed from media as well as investors. Def. Exh. 23 ("The NBA could

accept the bid. The league could also dispute the definition of 'match.' . . . ***So contract language***

***about what 'match' entails will determine everything here.***"). Therefore, the news articles did

not—and could not—counter-balance Defendants' misleading statements. *Puddu*, 2021 WL

1198566, at \*7; *see also N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709

F.3d 109, 126–27 (2d Cir. 2013) (holding that news articles which did not disclose, "clarify[,] or

contextualize" the alleged omitted information could not immunize defendants' misleading

statements). Even were the Court to entertain Defendants' argument that news stories discussed

the Matching Clause, those stories were "counteracted by contemporaneous [misleading]

statements by" Defendants who unequivocally touted the Matching Clause as a silver bullet to

retain the NBA Rights. *Lapin*, 506 F.Supp.2d at 238–39; ¶¶112, 118.[4]

Erecting a strawman, Defendants next assert that they had no obligation to discuss details

of ongoing contract negotiations. MTD 19–20. Fair enough, had they kept quiet about the

negotiations. But they repeatedly chose to discuss the negotiations, and the pivotal role they

claimed the Matching Clause played as a shield against losing the NBA Rights. Having made that

---

[4] Defendants' reliance on *Singh v. Cigna Corp.* to argue that they are immune from liability
because they acknowledged "various potential outcomes" of negotiations is misplaced. MTD 19–
20. In *Singh*, the Second Circuit held that "framing" statements outlining regulatory compliance
policies with an acknowledgment of the complexity of regulatory compliance "suggests caution
(rather than confidence) regarding" defendant's compliance. 918 F.3d 57, 64 (2d Cir. 2019).
Conversely, here, Defendants did not "frame" their Matching Clause statement. Nor did they
acknowledge any "complexity." ¶112. Instead, Defendants assured investors that they were
prepared for "various potential outcomes[,]" and then two sentences later, reassured investors that
WBD had the Matching Clause to beat any third-party offer. *Id*. Accordingly, the careful language
of *Singh* stands in stark contrast to Defendants' confident, unequivocal (and misleading) language.

choice, they were bound to speak about those subjects honestly and completely, so as not to mislead investors. *Jinkosolar*, 761 F.3d at 250; *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F.Supp.3d at 612.[5]

Finally, Defendants assert that the Complaint's allegations that WBD was incapable of matching competitors' offers are insufficiently particularized and come solely from "a newspaper article." MTD 21–22. Not so. WBD's self-serving litigation position that it was possible for WBD to match the offers is belied by the plain language of the Matching Clause, which required a match to "accept each term" and "if the specified form . . . is Internet distribution, a Matching Incumbent may not exercise such Game Rights via television distribut[ion]." ¶134. It was also belied by WBD's own responsive offer to Amazon's bid, which sought to rewrite rather than match virtually every term set forth by Amazon. ¶¶134–35. Defendants do not contest the authenticity of the contract language which they concealed from investors, or that their responsive offer failed to match the terms and distribution of Amazon's offer. At the motion to dismiss stage, the Court must credit Plaintiffs' plausible narrative over Defendants' creative reimagining of the negotiations. *See, e.g., zCap Equity Fund LLC v. LuxUrban Hotels, Inc.*, No. 24 CIV. 1030 (PAE), 2025 WL 2097951, at *19 (S.D.N.Y. July 25, 2025) (refusing to credit "defendants' self-serving spin as to

---

[5] Defendants also assert that the statements in paragraphs 97 and 112 describing the ongoing negotiations as "constructive" and being "hopeful" were not misleading because they were accurate, MTD 20, but a plain reading of the Complaint shows that Plaintiffs never allege those statements to be subjectively false. ¶¶97–98, 112–13. Instead, they were misleading because Defendants omitted the critical importance of the NBA Rights and the limitations of the Matching Clause. *Id.*; *Axsome*, 2025 WL 965265, at *7 (applying *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189–90, 194 (2015)); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) ("[P]laintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false"). Defendants cannot escape liability by focusing on the less problematic parts of a misstatement. Further, Defendants have waived any argument that their accuracy defense applies to any other misleading statements. *See Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) (issues not raised in an opening brief "are generally deemed waived").

the import of their public statements," because at the motion to dismiss stage court assumes an expression "carried its ordinary, plain language meaning, not the specialized counter-textual one defendants urge"); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("[T]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.").

Moreover, Defendants' claim that Plaintiffs failed to "offer particularized facts" to support the allegations that WBD could not match the distribution terms of NBCUniversal and Amazon's offers—including cross-promotion with the NFL (MTD 21–22)—is rejected by the NBA's own statements, as well as the NBCUniversal and Amazon offers themselves. While Defendants rely on their lawsuit against the NBA to counteract falsity, MTD 21, they ignore that **the NBA itself** explicitly told them that WBD's proposal did not constitute a proper offer under the 2014 Agreement and that in its "purported match of the Amazon Offer, [WBD] also changed – and thereby failed to accept – numerous other substantive terms of the Amazon Offer, with each of these changes representing an independent basis for concluding that it has failed to make a proper Match" under the 2014 Agreement. ¶134. As alleged, the NBA's July 24, 2024 letter to WBD and the offers themselves show otherwise. ¶¶134–35.[6] Defendants' attempt to reimagine the negotiations will be categorically disproved at trial by the referenced negotiation documents. The NBA letter explicitly notes that WBD failed to match Amazon's offer of cross-promotion with the NFL, instead seeking to replace it with "NASCAR and certain college sporting events . . . [a] promotional commitment less valuable to the NBA[.]" *See* Declaration of J. Alexander Hood II, Exh. 1, p. 4. The NBA also explicitly noted that the "minimum reach commitment" offered by WBD failed to meet that of Amazon, even after WBD rewrote multiple provisions of Amazon's

---

[6] These documents were incorporated by reference in the Complaint. *See Genesee Cnty. Employees' Ret. Sys. v. DocGo Inc.*, 773 F.Supp.3d 62, 71 n.2, 72, 78 (S.D.N.Y. 2025).

offer. *Id.* at pp. 3–4. Further, the NBCUniversal and Amazon offers explicitly contain terms concerning cross-promotion with the NFL. *Id.* at Exh. 2, p. 23; *Id.* at Exh. 3, p. 7. Thus, far from "speculating that the Amazon deal included a term involving the promotion of the NBA on Amazon's NFL telecasts[,]" MTD 21, the Complaint provides particularized facts to support the allegations that both NBCUniversal and Amazon's offers contained terms, including cross-promotion with the NFL, that WBD could not and did not match.

That WBD filed a frivolous suit against the NBA (MTD 21) shows nothing. Neither the responsive pleadings nor any judicial ruling lends even a shred of support to Defendants' position. Moreover, the fact that the WBD, NBCUniversal, and Amazon offers set forth in those pleadings clearly did not match substantive terms including distribution and cross-promotion fully undermines any strategic assertion here that Defendants reasonably submitted a valid matching offer. The articles Defendants cite demonstrate that many observers also found their filing baseless. *See, e.g.,* Def. Exh. 23 ("***Did WBD match solely to ensure the company gets some kind of settlement? Some people think so***."). And, that WBD quickly settled the suit for inconsequential relief to avoid discovery without ever adjudicating its position, coupled with the unambiguous language in the NBA contract, demonstrate that WBD's lawsuit was entirely without merit.

### 3. Defendants' statements are not inactionable puffery

Defendants incorrectly contend that certain misrepresentations were immaterial puffery. MTD 23. To constitute puffery, a statement must be so vague or "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *IBEW Local Union No. 58 Pension Tr. v. Royal Bank of Scotland Grp. PLC*, 783 F.3d 383, 389–90 (2d Cir. 2015). Thus, "[s]tatements are not puffery if shareholders could reasonably interpret them as material misstatements." *Gross v. GFI Grp. Inc.*, 162 F.Supp.3d 263,

23

268 (S.D.N.Y. 2016). "The materiality requirement poses a very low burden," *Freudenberg v. E*Trade Fin. Corp.*, 712 F.Supp.2d 171, 181 (S.D.N.Y. 2010), and is a fact-intensive inquiry typically reserved for the jury. *Ganino*, 228 F.3d at 162.

Even if some contain "adjectives that may be vague in other circumstances," the key statements alleged "are sufficiently specific to survive a motion to dismiss given their context and clear inaccuracy." *Vale*, 2020 WL 2610979, at *10 (citing *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)). Many statements that use "hope" and "very comfortable" were tethered to false descriptions of the importance of the NBA Rights to WBD and the potency of the Matching Clause. ¶¶97, 99, 112, 118, 120; *contra In re Express Scripts*, 773 F. App'x at 13 (defendants' statements inactionable because they used vague terms to describe a business relationship and not, like here, to describe the importance of a business relationship and the ability to use a contractual remedy to retain a key business deal). For example, Defendant Wiedenfels' statement that he was "hopeful" was made both in response to an analyst's question about renewal[7] and as a qualifier to the rhetorical statement "we do have a contractual matching, right?" ¶118. Thus, Defendants' statements were "made to reassure investors as to specific risks" and therefore "cannot be dismissed as mere puffery." ¶¶97, 99, 112, 118, 120; *Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F.Supp.3d 46, 74 (S.D.N.Y. 2020); *see also Vale*, 2020 WL 2610979, at *12; *In re Petrobras Sec. Litig.*, 116 F.Supp.3d 368, 381 (S.D.N.Y. 2015). Additionally, "optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted . . . or that the opinions imply certainty." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F.Supp.2d 277, 297 (S.D.N.Y. 2013); *see also In re Xerox Corp. Sec. Litig.*, 165

---

[7] *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F.Supp.2d 359, 366-67 (S.D.N.Y. 2012) (statement "that there were no 'performance issues'" not puffery because made in response to analyst question).

F.Supp.2d 208, 218 (D. Conn. 2001) (statements were not puffery where defendants made optimistic statements "knowing they were contrary to the company's actual situation"); *contra Tempur Sealy*, 2019 WL 1368787, at *13 (defendants' statement was puffery because, unlike here, it expressed optimism, not the ability to exploit a contractual remedy, and did not "rest[] on a questionable basis"). Here, Defendants' statements about the NBA Rights and the Matching Clause were misleading because they did not align with the true facts known to Defendants.[8]

### 4.    Plaintiffs' CW allegations support falsity and scienter

Defendants ask the Court to discount the CW allegations because they did not directly interact with the Individual Defendants and were not directly involved in the NBA negotiations. This is not the standard. Second Circuit courts are clear that for CW statements to be credited on a motion to dismiss, "confidential sources must be described in the complaint with sufficient particularity to support the probability ***that a person in the position occupied by the source would possess the information alleged.***" *In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019). In other words, "a plaintiff need only plead the probability that the confidential witness knows what [they are] talking about." *Nguyen v. New Link Genetics Corp.*, 297 F.Supp.3d 472, 484 (S.D.N.Y. 2018).

Thus, the relevant inquiry is not whether the CW was directly involved in any negotiation with the NBA or exchanged messages with Defendants, but instead whether the individual "was in a position to possess information about" the facts attributed to the CW—in this case, WBD's dependence on the NBA Rights for high carriage fees, advertising revenues, and new drivers of

---

[8] Plaintiffs' allegations of known contradictory facts distinguish this Action from Defendants' other authority. ¶¶84–86, 136–39, 144–46; *Fed Ex*, 517 F.Supp.3d at 236 (defendants' claim of "progressing well" was inactionable puffery because, unlike here, plaintiff failed to allege contradictory facts); *Davison v. Ventrus Biosciences, Inc.*, No. 13 CIV. 3119 (RMB), 2014 WL 1805242, at *9 & n.8 (S.D.N.Y. May 5, 2014) (statement was puffery because it described current state of discussions, and, unlike here, plaintiff failed to plead contradictory facts).

revenue (¶¶63–65, 70), and Defendant Zaslav's participation in the renewal negotiations (¶¶95–96). Further, courts credit CW allegations based on hearsay and indirect knowledge. *See, e.g., WWE*, 477 F.Supp.3d at 132–33 (crediting CW testimony based on indirect knowledge because "heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources, even where those sources offer indirect knowledge, that is, information and belief that is hearsay but plausible").

### C.    Plaintiffs Plead Facts Giving Rise to a Strong Inference of Scienter

"The scienter requirement can be satisfied by alleging facts to show … strong circumstantial evidence of conscious misbehavior or recklessness." *Solomon v. Sprint Corp.*, No. 1:19-CV-05272 (MKV), 2022 WL 889897, at *8 (S.D.N.Y. Mar. 25, 2022). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences," but instead "only strong in light of other explanations[.]" *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F.Supp.3d 432, 451 (S.D.N.Y. 2019).

Omissions are reckless if defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308; *see also In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F.Supp.2d 423, 501 (S.D.N.Y. 2011). Courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323.

The Complaint alleges with specificity contemporaneous facts establishing Defendants knew or recklessly disregarded that their Class Period statements concerning the importance of the NBA Rights and WBD's ability to retain the NBA Rights through the Matching Clause were false

26

and misleading. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (finding that where plaintiffs' allegations strongly suggest that defendant knew about the loss of future contracts, they "support[ed] the inference that [the defendant] acted with at least reckless disregard of a known or obvious duty to disclose"); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 CIV. 8557 (CM), 2013 WL 6233561, at *22–23 (S.D.N.Y. Dec. 2, 2013) (holding that plaintiffs sufficiently pled recklessness where defendant disregarded "clear duty to disclose" by making statements that "selectively reveal[ed] positive information" about company's major customers while "concealing closely-related negative information" that company's largest customer had repudiated their contract).

### 1.    Defendants' Access to, and Notice of, the Concealed Information

The Complaint alleges that both Zaslav and Wiedenfels were personally involved in the NBA Rights negotiations and that Zaslav was the lead negotiator and decision-maker for WBD. ¶¶94–96. Given Individual Defendants' personal involvement in the negotiations, their recklessness in misleading investors about the importance of the NBA Rights and concealing the strict limitations of the Matching Clause is beyond dispute. *See Petrobras*, 116 F.Supp.3d at 382 (finding scienter for company and executives involved in the deceptive conduct); *Freudenberg*, 712 F.Supp.2d at 198 (first-hand involvement in actions that would by necessity provide information contradicting public statements is indicative of scienter). Individual Defendants also had access to the 2014 Agreement, including the express language of the Matching Clause they concealed throughout the Class Period. Therefore, they could not possibly be ignorant of the limiting terms of the Matching Clause. *In re Aphria, Inc. Sec. Litig.*, No. 18 CIV. 11376 (GBD), 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020), *reconsideration denied*, 2021 WL 4442818 (S.D.N.Y. Sept. 28, 2021) (finding scienter because defendants' high-level positions would have

provided them access to crucial information contradicting their public positions); *WWE*, 477 F.Supp.3d at 132–34, 137 (similar); *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923 (DRH)(AKT), 2013 WL 6330665, at *10–11 (E.D.N.Y. Dec. 5, 2013) (similar); *In re Sanofi-Aventis Sec. Litig.*, 774 F.Supp.2d 549, 571 (S.D.N.Y. 2011) (similar). Thus, Plaintiffs sufficiently allege that Defendants' actions, knowledge and conduct, not their "corporate positions" alone, establish scienter. *Compare Novak*, 216 F.3d at 309; *Wang*, 661 F.Supp.3d at 233–34; *City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, No. 17 CIV. 10014 (LGS), 2019 WL 719751, at *7–8 (S.D.N.Y. Feb. 19, 2019); *with In re Piedmont Lithium Inc. Sec. Litig.*, 712 F.Supp.3d 301, 319 (E.D.N.Y. 2024) (scienter not established by defendants' positions where, unlike here, plaintiff failed to identify contemporaneous information that contradicted defendants' public statements); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F.Supp.2d 261, 273 (S.D.N.Y. 2009) (similar).

## 2.    WBD's Resolution of the NBA Suit Supports Scienter

That WBD settled its lawsuit against the NBA a mere four months after WBD filed it, before any discovery or even a ruling on the motion to dismiss, and for a pittance of what WBD sought, supports an inference of scienter. ¶¶160–65. In other words, it demonstrates that Defendants, far from genuinely or reasonably believing that the Matching Clause entitled WBD to retain the NBA Rights, used it as a pretext to salvage something through a quick settlement and file a lawsuit as a face-saving measure. Viewed in context, this inference is far more compelling than (or at least equally as strong, all that is required at the motion to dismiss stage) Defendants' suggested inference that WBD "strongly believed" it was entitled to renewal rights yet quickly settled the lawsuit because it was a "typical litigation and a business decision." MTD 29. Courts can and do find related litigations and settlements relevant to scienter (and falsity). *See, e.g., Rmed*

28

*Intern., Inc. v. Sloan's Supermarkets, Inc.*, No. 94 CIV. 5587 (PKL)(RLE), 2002 WL 31780188, at *2 (S.D.N.Y. Dec. 11, 2002) (finding evidence regarding FTC settlement "is relevant to materiality, scienter and falsity" because the fact that FTC settlement did not require plaintiff to divest any stores supports that FTC did in fact make assurances to CEO that he could acquire more stores).[9]

### 3. Wiedenfels' Insider Sales Bolsters Scienter

Though not required, *see Tellabs*, 551 U.S. at 325, the Complaint alleges that Wiedenfels personally benefited from the fraud by selling inflated stock for $971,614.35, representing approximately 9% of his total holdings, thereby bolstering his scienter. ¶166; *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2021) (finding "motive and opportunity" where defendant sold stock while withholding information on declining trend of sales); *Novak,* 216 F.3d at 318 (similar); *see also WWE*, 477 F.Supp.3d at 136; *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F.Supp.2d 395, 420–22 (S.D.N.Y. 2011). Wiedenfels' sales are unusual, given that he sold no shares and increased his holdings, in the 11.5 months before the Class Period. ¶167. The timing is also suspicious. The first three sales (between 2/28/2024 and 3/6/2024) occurred prior to the Exclusive Negotiating Period, when Defendants downplayed the

---

[9] Defendants' citations are far afield. *Raja v. Burns* was a §1983 action where the court held plaintiffs' agreement to a temporary suspension with no admission of wrongdoing could not be used to argue plaintiff could not sue the city for suspending him. No. 19-CV-01328, 2020 WL 568236, at *9 (E.D.N.Y. Feb. 5, 2020); MTD 30. It bears no relevance to the facts here. *In re Mylan N.V. Sec. Litig.*, 666 F.Supp.3d 266, 312 (S.D.N.Y. 2023) (MTD 29-30) was a summary judgment ruling where Mylan's 2017 settlement of a DOJ suit was proved not probative of what Mylan knew two years prior. Here, WBD settled the NBA lawsuit less than 6 months after making misleading statements. ¶¶120–21. In *Tempur Sealy*, the language cited did not demonstrate falsity or scienter because it did not evidence that the risk of contract termination had increased by the date of the suit was filed and plaintiffs failed to cite what sources the petition relied on in including it in their allegations. 2019 WL 1368787, at *7; MTD 29. Here, Plaintiffs cite the language in the 2014 NBA contract which was filed as an exhibit in the suit, that directly proved that WBD did not and could not match the offers provided. ¶¶134, 136–37.

importance of the NBA Rights and investors were less focused on WBD losing the NBA Rights given that the Exclusive Negotiating Period had not yet begun. ¶101. The final sale occurred on July 11, 2024, less than one week prior to the Matching Period, in which WBD submitted its disingenuous bid purporting to "match" Amazon's offer. ¶¶122–26. While Defendants cite cases stating that trades are not unusual where they represent small percentages of a defendant's total holdings (MTD 27), there is no *per se* rule as to a required minimum percentage or amount. Instead, when assessing scienter, courts must "assess the total weight of the circumstantial allegations *together with* the allegations of motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137–38 (2d Cir. 2021).

### 4. Defendants Concede Plaintiffs' Additional Scienter Grounds

Recognizing the strength of Plaintiffs' additional scienter allegations, Defendants chose not to respond and thereby concede several of them. *See Conn. Bar Ass'n*, 620 F.3d at 91 n.13. For example, Defendants spoke with a high degree of specificity and on numerous occasions on investor conference calls and in response to analysts' questions about the NBA Rights and the Matching Clause. That Defendants repeatedly held themselves out as knowledgeable on these topics supports an inference of scienter. *See United Indus. Workers Pension Plan v. Waste Mgmt., Inc.*, No. 22 CIV. 4838 (LGS), 2024 WL 1312593, at *7 (S.D.N.Y. Mar. 27, 2024) (scienter where defendant's "detailed answers to questions regarding the merger . . . point at least to her knowledge of – if not outright involvement in – the merger negotiations"); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F.Supp.3d 300, 319 (S.D.N.Y. 2024) ("detailed statements" showed that executives were "highly attuned" to those topics); *Gauquie v. Albany Molecular Rsch., Inc.*, No. 14CV6637 (FB)(SMG), 2016 WL 4007591, at *2–3 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about [an] issue demonstrates defendants' sensitivity to

30

it."). This is especially the case with the Matching Clause, as Defendants were the sole conduit for investors to be informed regarding the express terms of the non-public 2014 Agreement.

Moreover, Defendants' admissions bolster scienter. After disclosing WBD's $9.1 billion goodwill impairment, triggered by the loss of the NBA Rights, Defendants admitted that the NBA Rights were a "unique asset that cannot be replaced" and that losing the NBA Rights would cause WBD to suffer "irreparable harm." ¶¶136–41; *see also, e.g., Axsome*, 2025 WL 965265, at *10 (finding scienter based, in part, on post-class period admission). Indeed, Defendants stated, "this is not a mere case of losing one valuable sports property, but rather a case where the various implications of losing the NBA distribution rights are wide–ranging and not merely difficult, but impossible to fully calculate." ¶138. This stands in stark contrast to Zaslav's prior assurances, where he told the press that "[WBD does not] have to have the NBA." ¶94.

Additionally, while publicly representing that WBD was willing and able to exercise its Matching Clause, WBD's extensive revision of the Amazon offer showed that WBD did not even attempt to match all substantive terms—it sought substantive revisions to 8 of 27 sections, (including revisions to 22 different subsections), changed 11 defined terms (that are used, collectively 100 times), struck nearly 300 words and added 270 words. ¶¶125–29. That these extensive revisions so blatantly contradicted the Matching Clause demonstrates that Defendants knew or recklessly disregarded that WBD could not exercise the Matching Clause to retain the NBA Rights.

Finally, the importance of the NBA Rights to WBD bolsters the already strong inference of scienter. The NBA Rights were a key driver of revenues in WBD's Networks segment (which in turn was responsible for keeping TBS afloat), brought in hundreds of millions in advertising revenues per year, drove WBD's ability to negotiate carriage fees, a cornerstone of WBD's

31

financial operations, and was a major concern for WBD's investors (as well as Defendants). ¶¶57–74. Indeed, the NBA Rights were so important that the Individual Defendants frequently discussed the NBA Rights on investor conference calls and with the media. ¶¶97, 99, 112, 118. Consequently, it would be "absurd to suggest that [Defendants were] unaware" of the importance of the NBA Rights and the limitations of the Matching Clause to retain the NBA Rights. *In re Avon Sec. Litig.*, 2019 WL 6115349, at \*20 (core operations applicable for business segment comprising 21% of revenue); *see also Dentsply Sirona Inc.*, 732 F.Supp.3d at 319 (core operations bolster scienter where a specific segment of defendants' business was "key to the company's profits . . . so [defendants would've monitored them closely").[10] These allegations, all of which Defendants concede, are together sufficient to establish Defendants' scienter. *Conn. Bar Ass'n*, 620 F.3d at 91 n.13. When viewed in combination with Plaintiffs' other scienter allegations, the inference of scienter is overwhelming.

> **5.      An Inference of Scienter is Far More Compelling than Defendants'
> Implausible Competing Inference**

Although Plaintiffs' inference of culpability need only be "at least as compelling" as Defendants' non-culpable inference, *Tellabs*, 551 U.S. at 324, it is far more compelling here. Defendants contend that it is "irrational" that they would conceal the truth because "this inevitable event would ultimately become public anyway." Courts in the Second Circuit and across the country routinely reject this because the "argument confuses expected with realized benefits." *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 710 (7th Cir. 2008). Moreover, Defendants' conjecture would immunize virtually any corporate lie, because the truth eventually

---

[10] To the extent that Defendants argue that they never believed that the loss of the NBA Rights would be devastating to WBD or that the Matching Clause was sufficient to safeguard WBD from losing the NBA Rights, Defendants were reckless in speaking about something they "never bothered to investigate[.]" *Avon*, 2019 WL 6115349, at \*20.

might become known. *See, e.g., SAIC, Inc.*, 818 F.3d at 96–97 (rejecting similar argument and finding it "cogent and at least as compelling as any opposing inference" that company believed it had more time before its role in scheme was revealed); *Sjunde AP-Fonden v. Gen. Elec. Co.,* No. 17-CV-8457 (JMF), 2023 WL 6314939, at *11 (S.D.N.Y. Sept. 28, 2023) ("Defendants may have thought that there was a chance that the situation ... would right itself. If so, the benefits of concealment might exceed the costs .... The fact that a gamble — concealing bad news in the hope that it will be overtaken by good news — fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.").

While Defendants may have hoped, however unreasonably, that the NBA would somehow decide to excuse the terms of the 2014 Agreement, that does not excuse Defendants' misrepresentation of the terms of that 2014 Agreement to investors. At this stage the Court is required to draw all reasonable inferences in Plaintiffs' favor. *Tellabs*, 551 U.S. at 322–23. This is a far cry from Defendants' cited authority. In *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F.Supp.2d 510, 529–33 (S.D.N.Y. 2009) was superseded by *SAIC, Inc.*, 818 F.3d at 96–97, in which the Second Circuit clarified that a desire to avoid revealing the truth as long as possible is a cogent and compelling motive supporting scienter. Even further afield, the motive outlined in *Shields v. Citytrust Bancorp, Inc.* was simply for defendants to retain their positions. 25 F.3d 1124, 1130 (2d Cir. 1994). These older cases have no bearing under the circumstances here.

**D.    The Individual Defendants Are Liable as Control Persons**

Because the Complaint states a Section 10(b) claim, and scienter has been pled with particularity, Plaintiffs have also stated a control-person claim with culpable participation, to the extent necessary.

33

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' Motion to Dismiss in its entirety. Should the Court find the Complaint to be deficient in any respect, Plaintiffs respectfully request leave to amend. *See, e.g., Barron v. Helbiz, Inc.,* No. 21-278, 2021 WL 4519887, at *3 (2d Cir. Oct. 4, 2021) (consistent with Rule 15's "permissive standard," leave to amend should be "freely give[n]").

Dated: August 25, 2025                                 Respectfully submitted,

                                                       **POMERANTZ LLP**

                                                       */s/  J. Alexander Hood II*

                                                       Joshua B. Silverman
                                                       (admitted *pro hac vice*)
                                                       Christopher P.T. Tourek
                                                       (admitted *pro hac vice*)
                                                       Genc Arifi
                                                       (admitted *pro hac vice*)
                                                       10 South LaSalle Street, Suite 3505
                                                       Chicago, Illinois 60603
                                                       Tel: (312) 377-1181
                                                       Fax: (312) 229-8811
                                                       jbsilverman@pomlaw.com
                                                       ctourek@pomlaw.com
                                                       garifi@pomlaw.com

                                                       -and-

                                                       J. Alexander Hood II
                                                       600 Third Avenue, 20th Floor
                                                       New York, New York 10016
                                                       Tel: (212) 661-1100
                                                       Fax: (917) 463-1044
                                                       Email: ahood@pomlaw.com

                                                       **THE ROSEN LAW FIRM, P.A.**

                                                       Phillip Kim

34

Sara Fuks
275 Madison Avenue, 40th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
          sfuks@rosenlegal.com

*Co-Lead Counsel for Co-Lead*
*Plaintiffs Anthony Yuson and*
*Michael Steinberg*

**BRONSTEIN, GEWIRTZ &**
**GROSSMAN, LLC**

Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Michael*
*Steinberg*

35

**WORD COUNT CERTIFICATION**

The undersigned hereby certifies that, pursuant to Local Civil Rule 7.1, and in accordance with the Court's Order dated July 8, 2025 (ECF 43) this Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint contains 11,075 words, counted using Microsoft Word's word count feature.


Dated: August 25, 2025

/s/ *J. Alexander Hood II*
J. Alexander Hood II
