# EXHIBIT 3

CONFIDENTIAL
EXECUTION VERSION

## Amazon-NBA U.S. Rights Agreement

### Principal Terms

These "**Principal Terms**", together with the "**Standard Terms and Conditions**" attached hereto as Exhibit G and incorporated herein by this reference (collectively, the "**Agreement**") dated as of the date of the last signature set forth below (the "**Effective Date**") confirms the agreement between, on the one hand, the NBA entities in the signature blocks hereto (collectively, "**NBA**") and, on the other hand, Amazon Content Services LLC ("**Licensee**"), with respect to the rights set forth herein. NBA and Licensee are each referred to herein as a "**party**" and collectively as the "**parties**". For good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1. **Term; Territory**: 11 years, commencing on October 1, 2025, and continuing through the end of the 2036 NBA Finals ("**Term**" and each 12-month (or shorter, in the case of the final period of the Term) period commencing October 1 and ending September 30 during the Term (or the end of the 2036 NBA Finals, as applicable), a "**Year**").

    a) <u>Exclusive Negotiation; Back-End Rights</u>: NBA and Licensee will exclusively negotiate for a renewal (in whole or in part) of the Games (defined below) package of rights granted herein,  NBA represents and warrants that no Other Distributor has a matching right, right of last refusal or similar backend right in respect of its live games package ("**Backend Right**"), in whole or in part, after such Other Distributor's exclusive negotiation window expires.

    b) <u>Territory</u>: "**Territory**" means the United States and its territories and possessions. References to the "**United States**" herein shall include the entire Territory.

2. **Exclusive Games**: Subject to the terms and conditions hereof, NBA hereby grants Licensee during the Term the exclusive (to the extent set forth in Section 3 (Exclusivity) below) right, and Licensee shall have the obligation (subject to Section 10 (Distribution) below), to distribute on a live basis (and, non-exclusively, on an on-demand basis as set forth herein) solely via the "Licensed Distribution Means" on the applicable "Authorized Endpoints" (each as defined below) the NBA games described below (collectively, the "**Games**") in the Territory:

    a) <u>Regular Season NBA Games</u>.

        i. <u>Games</u>: 60 regular season games per NBA season, which will be scheduled as 1-2 games per day on Thursdays and Fridays each Year throughout the regular season (such regular season days, "**Licensee Days**," excluding (x) Christmas Day and (y) the last day of the regular season, if either fall on a Thursday or Friday [and in such case, that day will not be a Licensee Day]). The regular season games will be scheduled on Thursdays and Fridays, provided that if based on the scheduling process outlined in Section 2(a)(ii) below additional games are needed to reach Licensee's regular season game count (e.g., for games that would have otherwise been scheduled on an Impacted Friday [defined below]), Licensee may elect in meaningful consultation with the NBA to distribute games on Saturday afternoons (to be scheduled pursuant to Section 2(a)(ii) below) as Games; provided further that Licensee acknowledges that distributing a limited number of games on Saturday afternoons may be necessary to provide Licensee with 60 regular season games. Consistent with Section 2(a)(ii) below, the parties will work in good faith on an annual basis to develop a schedule that maximizes the viewership of regular season NBA games. Such regular season NBA games will include:

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 3 of 82

**CONFIDENTIAL**
**EXECUTION VERSION**

    A.   Black Friday: 1 or 2 NBA games every Year on Black Friday following Licensee's distribution of NFL football on such date, if applicable.

    B.   

    C.   An opening week double header.

    D.   

Notwithstanding the foregoing, the parties acknowledge and agree that NBA may schedule ESPN games on 5 Fridays between January 1 and March 31 each Year during the Term ("**Impacted Fridays**"), and any such Impacted Friday will not be a Licensee Day. NBA will inform Licensee regarding which Fridays will be Impacted Fridays by ▮▮▮ prior to the applicable season.

    ii.   <u>Game Quality</u>: The schedule of regular season games (including start / tip times) will be determined by NBA in meaningful consultation with Licensee and



    iii.   <u>Appearances</u>: For regular season games (excluding the NBA Cup Semifinals and Finals), Licensee's maximum number of appearances (including exclusive appearances [i.e., appearances in games that are not SBS Games (defined below)]) per team shall be



Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 4 of 82

CONFIDENTIAL
EXECUTION VERSION



"SBS Games" means Games that are also distributed or licensed by or on behalf of the participating team(s) within such participating team's local market. ▮▮▮▮▮

iv.   Flex Scheduling: Once the schedule of Games has been established in accordance with the terms hereof, NBA will consider in good faith, and in a manner no less favorable to the manner in which NBA considers the requests of Other Distributors, any request by Licensee to swap a game for another "unencumbered" game taking place on the same day, subject in each instance to (A) the availability of another unencumbered game, (B) Licensee requesting in writing to "flex" a game at least two weeks before the scheduled date (provided the NBA will consider such request in good faith even if the request is made less than two weeks before the scheduled date) and (C) NBA's written approval.

v.   Game Day Exclusivity: Licensee will be the only national distributor of NBA games on Licensee Days (and during any window on Saturdays on which Licensee distributes regular season NBA games), subject to Impacted Fridays and any other exceptions mutually agreed upon as part of the scheduling process contemplated in Section 2(a)(ii), such agreement not to be unreasonably withheld taking into account the reality that a limited number of national games may need to be scheduled on Licensee Days to allow the NBA to fulfill its game count commitment to Other Distributors (provided any such mutually-agreed upon exceptions will still preserve the exclusivity of Licensee's exhibition window on the affected Licensee Day as otherwise provided herein). If Licensee elects not to use one of its typical days (e.g., Thursdays due to distributing Thursday Night Football), which initial election must be made by ▮▮▮▮ ▮ prior to the applicable season (it being understood that NBA will work with Licensee during the summer scheduling process set forth in Section 2(a)(ii) above to finalize Licensee's telecast dates/windows), such days shall not constitute Licensee Days, and NBA may schedule a game for an Other Distributor or NBA TV on such days. In addition:

   A.   Black Friday: No other NBA games will be scheduled with a start time earlier than ▮▮▮ ▮▮. Eastern on Black Friday (for clarity, no other nationally distributed games will be scheduled on Black Friday).

   B.   Licensee will have an amount of live cut-ins for all other NBA games (excluding live cut-ins to games distributed by an Other Distributor provided such restriction is reciprocal for such Other Distributor vis a vis games distributed by Licensee) being played on a day that Licensee is distributing Games that is no less favorable than the amount afforded to Other Distributors in connection with their live games packages, which cut-ins shall be subject to the same restrictions that apply to the Other Distributors ▮▮▮ ▮▮▮▮ ▮▮ ▮ ▮▮▮▮ ▮▮ ▮▮ ▮▮ ▮▮▮▮▮, as more fully described in Exhibit A. For

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM    INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 5 of 82

INDEX NO. 653721/2024

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

**CONFIDENTIAL**
**EXECUTION VERSION**

clarity, Licensee may not use such live cut-ins to other games in a manner that undermines or substantially detracts from the live stream of its applicable Game (if NBA reasonably concludes that Licensee's use of live cut-ins violates the foregoing, Licensee and NBA will confer in good faith to develop and apply a mutually-acceptable system that addresses NBA's concerns).

b) <u>NBA Cup Games</u>.

    i.    <u>Games</u>: All games during the single-elimination "Knockout Round" (i.e., 7 games) that follows "Group Stage" play, which such Knockout Round games shall be incremental to the 60 regular season games described in Section 2(a)(i) above.

    ii.    <u>Timing/Structure</u>: In accordance with Section 12(d) below, Licensee and NBA will discuss potential adjustments to the structure and timing of the NBA Cup  and Licensee's schedule of Group Stage games (which, for clarity, are regular season games for purposes of this Agreement), taking into consideration Licensee's preferences, viewership optimization and various basketball considerations.

    iii.    The parties will collaborate on a unique viewing experience for the Authorized Service (as defined in Section 10 (Distribution) below) subscribers to consume NBA Cup Games on Licensee Days ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ including Licensee's production of a standalone live announcement show for the NBA Cup, which show will occur on a mutually agreed upon time and date when Licensee is distributing other NBA games and will be deemed "Additional Programming" (as defined below) hereunder and will include the unveiling of the NBA Cup Groups and noteworthy tournament changes for the season ahead.

    iv.    <u>Exclusivity</u>: Subject to Section 3 (Exclusivity) below, all NBA Cup Semifinals and Finals games licensed to Licensee will be exclusive in the United States (i.e., the games will not be distributed live either nationally or locally by RSNs or any Other Distributor).

c) <u>Post-Season NBA Games</u>.

    i.    <u>Play-In Tournament</u>: All Play-In Tournament games (i.e., 6 games).

    ii.    <u>Playoffs Rounds 1 and 2</u>: Two (2) games fewer than 1/3 of the total games in Rounds 1 and 2, which in Year 1 amounts to between 14 – 26 games total based on the minimum number and maximum number of possible games in each series; it being understood that Licensee will receive no fewer than 9-17 games in Round 1 and 5-9 games in Round 2. ▮▮▮▮▮▮▮▮ Without limiting the foregoing, each season, NBA will determine the match-ups for Licensee's Round 1 and 2 games in meaningful consultation with Licensee ▮▮▮▮▮▮▮▮▮

    iii.    <u>Conference Finals</u>: All games from 6 Conference Finals series during the Term, scheduled in Years 2, 4, 6, 8, 10 and 11. Over the Term, Licensee will receive an equal number of Western Conference Finals and Eastern Conference Finals (i.e., 3 each).

CONFIDENTIAL
EXECUTION VERSION

> iv. **Exclusivity**: Subject to Section 3 (Exclusivity) below, the NBA post-season Games licensed to Licensee will be exclusive in the United States (i.e., the Games will not be distributed live either nationally or locally by anyone other than Licensee, including any RSNs or any Other Distributor).

d) **Near-Live Rights**. Wherever Licensee is granted the right hereunder to distribute content on a "live" basis, such right (and any corresponding exclusivities) shall include distribution on a near-live basis (subject to the same terms and conditions).

3. **Exclusivity**: The NBA will not distribute or authorize or license any third party to distribute on a live or near-live basis the Games in the United States via any audiovisual means or media in any language except for:



4. **Production**:

a) Licensee will produce all Games in English (and additional languages will be discussed), as well as shoulder programming for such Games (e.g., pre/half/post-game shows) ("**Shoulder Programming**"), in each case in 1080p HDR and otherwise subject to league standards that are no less favorable to Licensee than the standards for games produced by Other Distributors (parties to discuss in good faith the applicable standards and implementation thereof). Licensee and NBA will discuss in good faith partnership opportunities for production; provided that NBA will retain an approval right over certain key production decisions, in each case, to the same extent that the NBA retains such approval rights over Other Distributors ███ ███ █.
███████ ████████ ████████ ██ ██ █████████ ████████.

b) Licensee will create original theme music ("**Theme Music**") for the Games, to be approved by NBA, and will grant NBA a royalty-free, worldwide, perpetual license to use such Theme Music in any and all media in connection with its licensing, distribution (in each case, subject to Section 3 (Exclusivity) above) and promotion of the content licensed hereunder and as otherwise mutually agreed by the parties, and no further clearances will be necessary from any guild or other third party in connection therewith other than music public performance licenses and fees to the extent Licensee is legally unable to obtain full royalty buy-outs in a given territory for NBA use, in which case, Licensee will notify NBA accordingly (it being understood that Licensee shall have the right to collect any public performance fees as a result of any such uses). Licensee will be able to use the Theme Music in "Licensed Content" (as defined in the Standard Terms and Conditions), in tune-in messaging, publicity and promotion for the Licensed Content (and otherwise in furtherance of the Licensed Content and the Authorized Service), in NBA-related segments of Licensee's other sports programming (in each case, to the extent permitted herein and subject to the terms hereof, including any approval rights NBA may have in respect of the execution of any of the foregoing), and on Licensee Music. If NBA reasonably concludes that Licensee's use of the Theme Music outside of Licensed Content and the promotion thereof is detrimental to reputation of NBA, NBA will notify Licensee in writing and Licensee and NBA will promptly confer in good faith to address NBA's concerns.

CONFIDENTIAL
EXECUTION VERSION

c) Licensee will, at no cost to NBA, supply the NBA or its designee, in each case in a format reasonably requested by the NBA, with (A) any and all live feeds of each Game telecast as requested by the NBA (e.g., dirty feed, clean feed, individual camera feeds) and (B) no later than twenty-four hours of the conclusion of the applicable Game, recording(s) of Licensee's live feeds of each Game telecast as requested by the NBA.

d) Licensee, at Licensee's sole expense, shall obtain all rights, releases, waivers and other clearances from its talent, employees, agents, subcontractors and other third parties necessary to permit NBA to distribute and use, at no cost to NBA, by any means worldwide, in perpetuity, each Game telecast and related Shoulder Programming (and any portion(s) thereof) in any manner that is not inconsistent with the exclusive rights granted to Licensee hereunder; provided that such clearance obligation does not apply to (x) third party-owned music or (y) other NBA-approved third party materials ███ █ ███ ██████ █ ██ ██ ██ █████ ██ ██ █ ██████ ██ ██ █ ████ ██████ ████ █ ██ ████ █ ███ ████ █ ███████ ███ █████ █ ██ █ ███ ████ █████ ██ ████ ██ █ ██████ █ ██ ██ ███ ██ █████ ██████ that Licensee includes within any such Game telecast and which, in each case with respect to (x) and (y), would not customarily be cleared by a telecast partner, it being understood that the parties shall mutually agree upon a process whereby Licensee must secure NBA's approval over any restrictions imposed by third parties on the use of their materials within any such Game telecast (any restrictions so approved referred to as "Approved Restrictions"); provided further that Licensee will provide the NBA with a separate live feed of any such Game telecast with third-party music which is not cleared by Licensee for NBA use (subject to NBA or its licensee securing any required music public performance licenses) and, if applicable, other third party materials that are subject to Approved Restrictions removed from the feed.

e) Licensee and NBA will discuss in good faith annually NBA assuming responsibility for "below the line" production for the Games, including any applicable reimbursements.

5. **NBA Tonight**: If the NBA elects to produce a new "NBA Tonight" whiparound program that is designed to drive viewership of Licensee NBA Game telecasts, and to distribute the same via NBA -owned, -controlled and -branded platforms (e.g., NBA.com and NBA App), including on Licensee Days, then it will offer Licensee the right to distribute the same on Thursdays and Fridays (but not Saturdays) via the Authorized Service ███ ██



6. **Alternate Telecasts**: Subject to all of the same terms and conditions that apply to production and distribution of the primary feeds of the Games, Licensee will have the right, but not the obligation, to produce and distribute alternate telecast feeds ██ █████ █ ████████████ ██ ███ ██ ███ █████ ████ █ ████ ) for all Games; provided that Licensee will (a) discuss in good faith producing and distributing alternate telecast feeds for certain mutually agreed games and tentpoles ██ ████ ████ , ███ ███ and (b) distribute via mutually agreed Authorized Endpoints any alternate telecast feed produced by the NBA and provided to Licensee for distribution.

7. **Highlights Rights**: Licensee will have non-exclusive rights to distribute on Authorized Endpoints approved by NBA and to monetize consistent with Exhibit B hereto, the following highlights of all NBA games (for clarity, these rights include distribution of highlights on official "Amazon" social media accounts), which are in any event individually and in the aggregate no less favorable than the highlight rights granted to any Other Distributor in connection with its live games package:

a) In-progress:

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 8 of 82

CONFIDENTIAL
EXECUTION VERSION

    i.    ██████ ████████, provided there will be a █-minute cap on any in-progress highlights from SBS Games (and not more than ████ of in-progress highlights per half of such SBS Game) and no in-progress highlights during ██ ███████████████ of such SBS Games.

    ii.    Subject to (iii) below, up to █ minutes of in-progress highlights from all other NBA games on a per execution basis (and not more than ███ of in-progress highlights per half of such game), provided there will be no in-progress highlights during ██████ ████████████ of such games.

    iii.    No in-progress highlights from games distributed by an Other Distributor, provided such restriction is reciprocal for such Other Distributor *vis a vis* games distributed by Licensee.

b)    <u>Post-game</u>: █-minute cap on all Games and █ minute-cap on all other NBA games, provided post-game highlights do not exceed ████ of the overall content offering (e.g., multi-sport studio show, social media post). Post-game highlights may be made available only either (A) through the ██████ following the applicable season in which the highlight debuted, if made available on a standalone basis or (B) ██ █████████ ██ ████, if the highlights are from a Game or made available on a non-standalone basis (e.g., as part of a multi-sport studio show).

c)    Distribution of highlights will be subject to a distribution plan proposed by Licensee on an annual basis, subject to NBA approval in a manner no less favorable to Licensee than NBA's approval for Other Distributors, which shall include, without limitation, on-ramp mechanisms as described in Section 10(f), volume, cadence and appearance of tune-in messaging.

d)    The following Authorized Endpoints are hereby pre-approved for highlights distribution: Amazon.com (including any successor homepage for Licensee), Prime Video, Fire TV, Licensee-branded video enabled devices on which the Alexa Assistant Services are made available (e.g., Echo devices with screens [Echo Show]), and official "Amazon" social media channels/accounts (in each case, including successor services).

e)    Highlights will include tune-in messaging and be used to promote live games, where reasonably practicable, and will be subject to the same restrictions that apply to the Other Distributors.

8.    <u>Advertising/Sponsorship</u>: The general rights and obligations for the sale of advertising and sponsorship positions in the Licensed Content are set forth in Exhibit B (collectively, the **"ad sales rights"**). ████ ███ ██ ████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████

9.    <u>Language</u>: English. Subject to meaningful consultation with NBA, Licensee will have the right, but not an obligation, to make additional languages available (e.g., audio and graphics). Parties to discuss priority languages prior to each season.

10.    <u>Distribution</u>:

a)    <u>Authorized Distribution; Minimum Reach</u>.

    i.    Licensee must distribute the Games live and in their entirety throughout the Territory on the "Base Level Subscription Tier" of an "Authorized Service" (as such terms are defined herein) that (A) satisfies the Minimum Reach Commitment and (B) also distributes each Year through 2029 one of the following in the United States: (1) at least thirteen (13) live NFL games or (2) at least three (3) non-NBA sporting event telecasts that are rated among the top 100 U.S. telecasts across broadcast, cable and live streaming content in that Year (as measured by Nielsen, Metric: US Average Audience Units Projection and Demographic: Persons 2+). For purposes hereof:

CONFIDENTIAL
EXECUTION VERSION

a.  **"Authorized Service"** means an SVOD Service that has been approved by NBA and is (A) owned, operated and controlled by Licensee or an Affiliate of Licensee, (B) "Licensee-branded" (as defined herein), (C) Licensee's most widely distributed paid video streaming service in the United States, and (D) Licensee's premier video streaming service for the distribution of top-tier live and on-demand programming. The SVOD Service currently known as "Prime Video" (which is currently included in a "Prime" subscription) is hereby pre-approved as an Authorized Service.

b.  **"Base Level Subscription Tier"** means the most broadly distributed subscription tier on the Authorized Service (i.e., the tier with the most subscribers), where a bona fide subscription fee is required (other than customary free trials that are limited in number and duration); it being acknowledged and agreed that the Base Level Subscription Tier may have advertising-supported and non-advertising supported subscription plans, both of which qualify as the Base Level Subscription Tier.

c.  **"Licensee-branded"** means the name of the Authorized Service, Authorized Endpoint or other applicable product or service is a brand, trademark or service mark that is wholly-owned by Licensee or an Affiliate of Licensee and does not include any brands, trademarks or service marks of any third party.

d.  **"Minimum Reach Commitment"** means that the Base Level Subscription Tier is received by at least (x) 80 million "U.S. Paid Digital Subscribers" (defined below) in the Territory as of each of the following dates: October 22, 2024 (i.e., the first day of the 2024-25 NBA season), April 1, 2025, April 1, 2026, April 1, 2027, and April 1, 2028, and (y) a mutually-agreed number of U.S. Paid Digital Subscribers in the Territory as of each April 1 thereafter, beginning with April 1, 2029, and continuing throughout the remainder of the Term. For purposes of this Section 10, each such date in the foregoing clauses (x) and (y) of the preceding sentence shall be referred to as a **"Check-In Date"**. The parties will endeavor to mutually agree on the U.S. Paid Digital Subscriber number referred to in clause (y) in the first sentence of this Section 10(a)(i)(d) by October 1, 2025. For purposes of calculating the Minimum Reach Commitment, U.S. Paid Digital Subscribers will not include: (i) any subscriber or viewership metric or measurement other than U.S. Paid Digital Subscribers to the Authorized Service in the United States; (ii) unpaid subscribers who access the Authorized Service (e.g., through free trials); (iii) without limiting the terms of Section 10(d) below, subscribers who authenticate into the Authorized Service via a multichannel video programming distributor (**"MVPD"**) or virtual multichannel video programming distributor (**"vMVPD"**) subscription, and/or subscribers who receive access to the Authorized Service in connection with an MVPD or vMVPD subscription (including "TV Everywhere" subscribers); or (iv) without limiting the terms of Section 10(d) below, subscribers who access the Authorized Service by purchasing the Authorized Service as part of a bundle with a third party's product or service.

e.  **"SVOD Service"** means a digital only distribution platform that is used to deliver an offering of audio-visual content on a live and on-demand basis (with or without ads) directly to end-users via the Internet, where a bona fide subscription fee is required to be paid in order for the end users to receive access to the content offering (other than customary free trials that are limited in number and duration each Year), it being understood and agreed that such SVOD Service may also include advertising supported digital subscription plans.

f.  **"U.S. Paid Digital Subscribers"** means, as of the applicable date of measurement, the average number of United States paid subscribers to the Authorized Service per month over the 12-month period immediately preceding the date of measurement (or, with respect to the first two Check-In Dates, over the period commencing with the earlier of (i) the first full month after the Effective Date and (ii) August 1, 2024, and continuing through the applicable Check-In Date (for clarity, for the first Check-In Date, the average for the partial month of

**CONFIDENTIAL**
**EXECUTION VERSION**

October will be calculated based on the average number of United States paid subscribers to the Authorized Service from October 1, 2024 to the October 22, 2024 Check-In Date).

ii. Licensee acknowledges that the live Games package set forth in this Agreement is the NBA's first "streaming-only" package, and the NBA is seeking to partner with a streaming platform that has proven broad subscriber reach as of the date of this Agreement and continuing into the Term, and the Minimum Reach Commitment is a material inducement to the NBA's willingness to enter into this Agreement on the terms and conditions (including License Fees) set forth herein. By no later than November 1, 2024 (the "**First Verification Deadline**"), Licensee will provide NBA with a written (email being acceptable) certification by an officer of Licensee (the "**Subscriber Certification**") that the number of U.S. Paid Digital Subscribers that received the Base Level Subscription Tier in the Territory as of the first Check-In Date either satisfies or does not satisfy the Minimum Reach Commitment. On or before the First Verification Deadline, Licensee will also provide to NBA verification confirmed in writing by Deloitte, Ernst & Young LLP (EY), BDO, or another mutually-acceptable third party (it being understood that in the absence of mutual agreement on another such third party, Licensee must select one of Deloitte, Ernst & Young LLP (EY) or BDO no later than October 1, 2024 and shall notify NBA of its selection) (such selected named entity above or another entity as mutually agreed, as applicable, the "**Audit Firm**" and the Audit Firm's written verification, the "**Audit Confirmation**") that the number of U.S. Paid Digital Subscribers that received the Base Level Subscription Tier in the Territory as of the first Check-In Date satisfies (or does not satisfy) the Minimum Reach Commitment, provided that any delays in delivery of such Audit Confirmation outside of Licensee's reasonable control will not result in any breach of this Agreement so long as such Audit Confirmation is delivered within ten (10) days following receipt of notice from NBA of such late delivery. If Licensee fails to provide the Subscriber Confirmation or Audit Confirmation by the First Verification Deadline (for clarity, subject to the ten (10) day forbearance period applicable to such Audit Confirmation), then the Minimum Reach Commitment will be deemed not satisfied as of the first Check-In Date. For each subsequent Check-In Date, Licensee will provide NBA with a new Subscriber Certification within five (5) days of the applicable Check-In Date (provided that any inadvertent delays in delivery of such Subscriber Certification will not result in any breach of this Agreement as long as such Subscriber Certification is delivered within ten (10) days following receipt of notice from NBA of such late delivery) (the "**Subscriber Certification Deadline**") that the number of U.S. Paid Digital Subscribers that received the Base Level Subscription Tier in the Territory as of the applicable Check-In Date either satisfies or does not satisfy the Minimum Reach Commitment. If requested by NBA in connection with any such Check-In Date, Licensee will provide NBA with an Audit Confirmation within twenty (20) days following the date of such request (provided that [x] such time period may be adjusted, subject to good faith mutual agreement by the parties, to account for the actual length of time needed by the Audit Firm to complete and provide the Audit Confirmation for the First Verification Deadline (it being understood that such adjusted time period shall be no longer than ninety (90) days) and [y] any delays in delivery of any such Audit Confirmation outside of Licensee's reasonable control will not result in any breach of this Agreement so long as such Audit Confirmation is delivered within ten (10) days following receipt of notice from NBA of such late delivery) (the "**Audit Confirmation Deadline**"). The Audit Firm will be subject to customary confidentiality obligations, and Licensee will provide the Audit Firm with any backup documentation or information that the Audit Firm needs to verify its report as delivered to the NBA hereunder. If Licensee fails to provide any Subscriber Confirmation or Audit Confirmation by the applicable Subscriber Confirmation Deadline or Audit Confirmation Deadline (for clarity, subject to the applicable forbearance periods described in the respective definitions thereof), then the Minimum Reach Commitment will be deemed not satisfied as of the applicable Check-In Date.

iii. If the Subscriber Certification or Audit Confirmation concludes that, as of any Check-In Date, the Authorized Service fails to satisfy the Minimum Reach Commitment, then within five (5) days after the Subscriber Certification Deadline or Audit Verification Deadline (or, in the case of the first Check-In Date, the First Verification Deadline), as applicable, NBA may elect in its sole discretion, exercisable via written notice to Licensee, to terminate this Agreement either (x) immediately; or (y) effective at the end of the then-current NBA season. In the event that the NBA elects to terminate this Agreement due to failure to meet the Minimum Reach Commitment (A) on either of the first two

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM INDEX NO. 653721/2024

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 11 of 82

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

INDEX NO. 653721/2024

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

CONFIDENTIAL
EXECUTION VERSION

Check-In Dates, Licensee shall pay to the NBA, within 30 days of such termination, an amount equal to the aggregate License Fees otherwise payable hereunder in respect of the first Year of the Term; and (B) on any subsequent Check-In Date, Licensee shall pay to NBA, within 30 days of such termination, an amount equal to the aggregate License Fee otherwise payable hereunder for the remainder of then-current Year (if the NBA elects to terminate before all License Fee installments for such Year have been paid) and the immediately following Year (or the remaining aggregate License Fee otherwise payable hereunder if such termination occurs in the final Year of the Term) (the **"Subscriber Shortfall Termination Amount"**).

iv. In addition to ensuring that the Games are available in the Base Level Subscription Tier, and subject to the restrictions set forth in Sections 10(b)-(d), Licensee may, after meaningful consultation with NBA, also include the Games on other digital subscription tiers on the Authorized Service where a bona fide subscription fee is required to be paid in order for the end users to receive access to the content offering (other than customary free trials that are limited in number and duration each Year) (**"Other Authorized Service Tiers"**) and customary free trials of the Authorized Service that are limited in number and duration each Year.

v. All Games may be distributed on an on-demand basis throughout the Territory on the Authorized Service to all Base Level Subscription Tier subscribers and may be distributed on any Other Authorized Service Tiers on which the applicable Games are distributed on a live basis; provided that such on-demand distribution complies with the following **"On-Demand Terms"**: (A) each such Game is distributed in a manner identical (except that Licensee may replace the non-NBA institutional ad inventory) to that in which such Game is distributed live on the Authorized Service (or another Authorized Endpoint, as applicable) (i.e., a Game telecast in its entirety, including all NBA institutional inventory); (B) each Game telecast is made available only for ███████ ██ hours after the completion of the initial live Game telecast; and (C) such offering of on-demand programming is not marketed as a stand-alone NBA programming offering. For any Game, immediately following the conclusion of such game and until ██ ██ █████, █████ █████ ██████ (the **"Exclusive On-Demand Window"**), Licensee will have the exclusive right within the U.S. to offer such Game on-demand or as a replay on a full-length basis in accordance with the foregoing, it being understood that the local team playing in such Game may replay and/or offer on-demand (and/or authorize its RSN to replay and/or offer on-demand) a SBS Game during the Exclusive On-Demand Window solely within the applicable team's local territory. For clarity, all on-demand rights afforded to Licensee hereunder are subject to the same distribution limitations applicable to the live content licensed hereunder (e.g., Authorized Endpoints, no sublicensing). If the NBA provides any Other Distributor On-Demand Terms or an Exclusive On-Demand Window in respect of such Other Distributor's NBA live games package that are more favorable than the On-Demand Terms or Exclusive On-Demand Window applicable to Licensee, respectively, then NBA will provide Licensee with such more favorable term(s) on the same terms and conditions provided to such Other Distributor.

vi. Licensee will distribute the Additional Programming on the Authorized Service via the Base Level Subscription Tier and may also distribute the Additional Programming on any Other Authorized Service Tiers.

vii. In addition to distribution via the Authorized Service (including via any devices that subscribers can use to access the Authorized Service via the Licensed Distribution Means), Licensee may also distribute the Games (on both a live and on-demand basis as described above) and Additional Programming on any other Licensee-owned or -controlled endpoint (that is in compliance with the restrictions set forth in Sections 10(b)-(d) below) that is approved by NBA in advance (each, an **"Authorized Endpoint"**). The following Authorized Endpoints (for clarity, in addition to the Authorized Service) are hereby pre-approved for Game distribution: Amazon.com (including any successor homepage for Licensee) so long as the distribution of the Games thereon is generally consistent with Licensee's distribution of live games for other "Major Sporting Leagues" (as defined herein) on Amazon.com in the Territory as of the Effective Date), Fire TV, Licensee-branded video-enabled devices on which the Alexa Assistant Services are made available (e.g., Echo devices with screens) to subscribers of the Authorized Service, and Twitch.

CONFIDENTIAL
EXECUTION VERSION

b) <u>Distribution Technology</u>. For purposes of clarification and the removal of doubt, the terms "telecast" and "distribute" are used interchangeably in this Agreement to mean and refer to all forms of audiovisual exhibition, and it is understood and agreed that, except in connection with (i) Licensee's commercial distribution rights set forth in Section 11 (Commercial Distribution) below, (ii) any distribution of Additional Programming (for clarity, incremental to Licensee's rights and obligations to distribute Additional Programming via the Authorized Service) that is mutually agreed pursuant to Section 13 (Additional/Original Programming) below (if any); and (iii) any non-live portions of Licensed Content (e.g., clips, highlights) included in promotional materials created pursuant to and in accordance with the terms of this Agreement (if any) ("**Permitted Content**"), as to Licensee, the only rights being licensed hereunder with respect to the Licensed Content are Internet-only audiovisual exhibition rights (the "**Licensed Distribution Means**") via the applicable Authorized Endpoints as more fully set forth herein, it being understood that the Internet can be accessed via various methods, including Wi-Fi, wired connections and cellular data. Licensee acknowledges and agrees that with respect to the Licensed Content, no over-the-air broadcast, cable, satellite or other linear television rights (including Internet-based distribution to authenticated linear television subscribers e.g., "TV Everywhere" rights) (collectively, "**Excluded Distribution Channels**") are licensed to Licensee hereunder (except in connection with the Permitted Content), it being understood that SVOD Services do not constitute an Excluded Distribution Channel. The parties acknowledge and agree that distribution by Licensee of the live content (e.g., Games, Shoulder Programming) licensed hereunder through any Excluded Distribution Channels, other than as a result of a "Security Breach" (as defined in the Standard Terms and Conditions), shall be deemed a material breach hereunder by Licensee that Licensee shall have no opportunity to cure prior to the exercise of any applicable rights or remedies by the NBA, which shall include the right, upon notice to Licensee, to unilaterally and immediately require Licensee to suspend (or take its own actions to suspend) the availability of the applicable Licensed Content on the Excluded Distribution Channels (and any violation of Section 10(d) below shall constitute distribution by Licensee via an Excluded Distribution Channel for purposes of the foregoing suspension right).

c) <u>Successor Technology</u>. The parties acknowledge that audio-visual content distribution technologies will evolve over the course of the Term, and such evolution could lead to forms of successor technologies and business models that meaningfully replace, supersede or supplant standalone SVOD Services in the market (each, a "**Successor Technology**"). After the third Year of the Term, Licensee shall be entitled to exploit the distribution rights granted to it hereunder on any such Successor Technology with the NBA's approval, not to be unreasonably withheld, conditioned on additional payment or delayed (it being understood that, among other things, NBA may reasonably consider the following in granting or withholding its approval: (i) the rights granted hereunder are for an Internet-only "streaming" package of a premium nature to be distributed on Licensee's flagship video service via its broadest subscription tier, (ii) Successor Technologies may not include the Excluded Distribution Channels, and (iii) in no event will any approved Successor Technology relieve Licensee of any of its obligations or restrictions under this Agreement (except to the extent expressly waived by NBA as part of any NBA approval)). To the extent a Successor Technology is so approved by NBA, (i) for purposes of this Agreement, such Successor Technology shall be deemed and "Licensed Distribution Means" hereunder, and (ii) if Licensee then-currently distributes live games for any other Major Sporting League on the Authorized Service or other predecessor of the Successor Technology, Licensee will distribute the live games of such other Major Sporting League(s) on the same Successor Technology on which the Games are distributed, subject only to any contractual restrictions imposed by such Major Sporting League ███████████████████████████████████████ ████████████████████████████████████████████ which restrictions Licensee will use good faith, reasonable efforts to overcome.

d) <u>No Sublicensing or Bundling</u>. Other than as set forth below in connection with commercial distribution, the rights licensed to Licensee hereunder may not be sublicensed, subdistributed or syndicated to a third party without the prior written approval of the NBA, acting in its sole discretion, and Licensee shall not provide any portion of the licensed content hereunder as a "white label" content offering for any third party without the prior written approval of the NBA, acting in its sole discretion. Nothing contained in this Agreement prohibits Licensee from bundling the Authorized Service with any Licensee-branded product or service or any third party product or service; provided that Licensee agrees it will not, without the prior written consent of NBA, (A) bundle or authorize the bundling of, the Authorized Service with (i) any broadcast, cable,

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM   INDEX NO. 653721/2024
NYSCEF DOC. NO. 81   INDEX NO. 653721/2024
NYSCEF DOC. NO. 5   RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 13 of 82

CONFIDENTIAL
EXECUTION VERSION

satellite or other linear television audio-visual content service, or (ii) any MVPD or vMVPD content offering, in each case, in the United States, or (B) otherwise make the Licensed Content available as part of any broadcast, cable, satellite or other linear audio-visual content service or any MVPD or third party vMVPD offering in the United States. For purposes of this section, **"bundle"** refers to a combination of audio-visual content services and/or offerings offered together as a package for a single price, including without limitation, allowing subscribers of an MVPD or third party vMVPD to use their MVPD or third party vMVPD subscriber status or account to access, manage or activate a subscription to the Authorized Service (including any tier thereof) at a single price or at a discount or for no additional cost.

e) NBA "Front Door". All feeds of NBA games/events may be made available via NBA-owned, -controlled and -branded platforms (e.g., NBA.com and NBA app) to authenticated subscribers of such games/events (e.g., a Prime subscriber to a game could access such game via the Front Door);

f) On-Ramp. To drive viewership of NBA game and event telecasts, NBA and Licensee will work together in good faith to facilitate an "on-ramp" that enables viewers of in-progress game/event highlights on Authorized Endpoints to access the full in-progress game telecast (e.g., via a click-through, deep link or other platform-specific option) on a geo-targeted and platform-specific basis. To the extent the platforms on which such highlights are distributed do not make available the functionality to facilitate such an "on-ramp," Licensee and the NBA will jointly and promptly approach the platforms to develop and implement such functionality as soon as possible during the Term.

11. **Commercial Distribution**: Licensee shall have the exclusive right to distribute the Games via commercial establishments such as bars and restaurants, which right shall include the right to sublicense such distribution to leading providers of distribution to commercial establishments ███ ████████ ████████. To the extent that Licensee is not exercising (itself or via a permitted sublicensee) the foregoing commercial distribution rights on a broad-based national basis for any particular season during the Term, such rights shall revert to the NBA for such season (and Licensee will notify NBA no later than the ████ ahead of each season if it does not intend to exercise such commercial distribution rights on a national basis for the upcoming season).

12. **Ongoing Cooperation**: The parties, including senior executives from each party and applicable subject matter experts, will meet quarterly over the Term to discuss in good faith partnership topics identified by either party (**"Quarterly Meeting"**). Without limiting the applicable obligations as set forth herein, each party will consider the other's input in good faith. Such discussion topics may include, among other things:

    a. the marketing and promotion of Licensed Content by Licensee;
    b. commercial distribution;
    c. potential adjustments to paywall and subscription requirements;
    d. NBA Cup scheduling ███ ████████ █ ████████ █████ █████ █ ██████████
    e. Conference Finals scheduling;
    f. digital and innovation initiatives; and
    g. potential for additional partnership.

13. **Additional/Original Programming**: For no additional consideration, subject to NBA creative approvals to be exercised in good faith and not unreasonably conditioned, withheld or delayed, Licensee will have the right (but not the obligation other than with respect to Shoulder Programming) to produce NBA focused original long and short form programming (video and/or audio content) (**"Additional Programming"** and any such individual program, an **"Additional Program"**) to engage fans (e.g., Originals/docuseries, weekly ancillary shows, etc.) utilizing a mutually agreed upon NBA footage bank ██ █████████████████ ████ █ ████ ███ ██ █████ — █████████████████ ███ ███ █████████ █ ████ ████████ ████████ and fees in the event the footage bank is exceeded, in each case, to the extent within NBA's control, on terms no less favorable than that of any Other Distributor). Additional details and parameters (e.g., the scope of Licensee's exclusive distribution rights and NBA holdback periods) regarding the Additional Programming will be mutually agreed by the parties. Licensee's foregoing footage bank rights shall include the right to use a de minimis amount of NBA game or event footage ████ ██ █████ ██████████ ███ ███ ███

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

INDEX NO. 653721/2024

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 14 of 82

CONFIDENTIAL
EXECUTION VERSION



in any other Licensee-produced programming that is not Additional Programming as well as for promotion of the foregoing and the Additional Programming; it being understood that any such footage used by Licensee will be subject to NBA's standard approval process and will be deemed licensed pursuant to NBA's standard footage license agreement (which will include, for clarity, the right to use such footage on a royalty-free basis, worldwide, in perpetuity [excluding Greater China]).

14. **Cross-Promotion from Other Distributor(s)**: Licensee will promote NBA games and events distributed by each Other Distributor (subject to reciprocal promotion by such Other Distributor).

15. **Interactivity/Innovation**:

a) Subject to NBA reasonable approval, Licensee will have right to enable interactive features on top of Games to enhance the customer viewing experience. The parties acknowledge and agree that the foregoing approval right shall not apply to interactive features that are deployed against or in conjunction with non-NBA content on the Authorized Service or the other Authorized Endpoints, and the following features are pre-approved, subject to meaningful consultation with NBA on implementation on Licensed Content:

    i. X-Ray
    ii. Rapid Recaps
    iii. Key Plays / Moments

b) The parties further acknowledge and agree that the following interactive features must be approved by the NBA in each case:

    i. AI-powered visualizations (e.g., Prime Vision)
    ii. AWS-powered personalization
    iii. Alternate Feeds
    iv. Betting integrations
    v. Shopping integrations (e.g., QR codes, via X-Ray, etc.)

c) The parties will collaborate to innovate with respect to the Game telecasts distributed by Licensee, and Licensee will consider and discuss in good faith integrating innovations and enhancements developed by NBA for its game telecasts. Without limiting the foregoing (including clause (v)), during each Year of the Term, Licensee will make available certain mutually agreed, NBA-authorized products (e.g., branded merchandise) to Authorized Service viewers within the Game telecasts ("**e-Commerce Items**"). Licensee will offer and sell the e-Commerce Items directly to viewers of the Game telecasts through an interactive integration in such telecasts that allows users to complete the purchase of such e-Commerce Items (x) within the live game experience, (y) using the same payment credentials as the viewer used to purchase the Base Level Subscription Tier, and (z) while receiving the benefits of Prime (e.g., one-day shipping) for such e-Commerce Items.

d) In connection with the foregoing collaboration, commencing as of the Effective Date and continuing throughout the Term, NBA commits to invest to innovate with respect to Game telecasts and other content licensed hereunder. The parties will discuss such innovation at a regular cadence throughout the Term (e.g., as part of the Quarterly Meeting).

CONFIDENTIAL
EXECUTION VERSION

e)

### 16. Marketing/Advertising Innovations:

a) Marketing Plan.

    i. Licensee and NBA will work together in good faith to develop and implement optimal promotion strategy for the Game telecasts and other content licensed hereunder to maximize viewership, revenue and fan experience (e.g., placement, tactics) (the "**Marketing Plan**"). Licensee and NBA marketing executives will meet regularly (e.g., quarterly) to review results and endeavor to align on priorities and KPI/goals, media planning, testing opportunities, and measurement solutions. Each subsequent Year's Marketing Plan will be based on the prior Year's Marketing Plan, as adjusted by input from such meetings. At a minimum, the Marketing Plan will include tactics that are reasonably comparable in amount and quality to the tactics used by Licensee for any other generally comparable Major Sporting League (defined below) in the Territory taking into account the number and dates of applicable games, length and timing of the applicable seasons and experimentation/tests/stunts, but in any event NBA will be treated as a top-tier sports content provider in the United States with respect to promotion of the games licensed hereunder.

    ii. The Marketing Plan implemented by Licensee for the promotion of the Game telecasts and other content licensed hereunder will reflect a committed value (to be allocated at Licensee's discretion) of at least ▮▮▮ ▮▮▮▮ during each Year of the Term.

b) Initial Promotional Commitment. During the period from September 1, 2024 (i.e., coinciding with start of Thursday Night Football) through the commencement of the 2025-26 NBA season (the "**Initial Promotional Period**"), Licensee will execute a robust marketing campaign (via prominent marketing placements) on the Authorized Service informing NBA fans, potential NBA fans and general sports fans of the availability of NBA content on the Authorized Service, including the Games and other Licensed Content. Such campaign will include executions and impressions in live sporting events (e.g., in Thursday Night Football games in 2024) as well as in non-sports programming of broad demographic interest (e.g., Amazon Originals), in each case that are distributed by the Authorized Service. Licensee shall consult meaningfully with NBA regularly during the Initial Promotional Period on the particulars of such ongoing campaign.

c) Advertising Innovations.

    i. Subject to the terms of Exhibit B, Licensee will make unique advertising features available to advertisers within the Game telecasts (**"Advertising Innovations"**), including (1) audience based creative that allows advertisers to deliver custom creative to distinct cohorts of live viewers during the Game telecasts, and (2) interactive ads that allow users to purchase an advertiser's e-commerce items (x) from the live game experience, (y) using the same payment credentials as the viewer used to purchase the Base Level Subscription Tier, and (z) while receiving the benefits of Prime (e.g., one-day shipping) for such e-commerce items. All such Advertising Innovations specific to Game telecasts will be mutually agreed by the parties.

    ii. Licensee will make premiere marketing placements available to NBA during the Term to promote the Game telecasts (flighting and tactics to be mutually agreed), which in the first three Years of the Term will include the following: NBA branding on Licensee e-commerce shipping boxes or Licensee delivery vans, marketing of the Games on Licensee.com homepage, marketing placements on FireTV homepage, and promotion in *Thursday Night Football* on Prime Video. Licensee will also provide NBA with access to unique customer marketing features, including the ability for NBA to target and build direct marketing activations for viewers watching the Games via the Authorized Service, which subject to applicable law and each party aligning its independent privacy practices, will include (1) the ability for NBA to upload its NBA ID database into a secure, privacy-safe, and

CONFIDENTIAL
EXECUTION VERSION

dedicated cloud-based environment, (2) combine this NBA data set with Licensee advertising data sets on the Authorized Service subscribers watching the Games to perform analytics across multiple, pseudonymized data sets to generate aggregated reports, and (3) utilize ad engagement and conversion signals across NBA and Licensee sources to build bespoke audiences for direct marketing activation via the Licensee Demand-Side Platform (DSP) for advertising.

17. **IP**:

18. **Reporting**: With respect to the Games and any Additional Programming distributed on a live basis, Licensee will provide the NBA with the aggregated, anonymized, and de-identified data identified in Exhibit C attached hereto ("**Consumption Data**"). The parties will have good faith discussions about ways to present viewers of Games with opportunities and incentives to share their (A) name and (B) email address ("**PII Data**") with the NBA in a manner substantially similar as that presented to viewers of live programming of other Major Sporting Leagues. Licensee represents and warrants that as of the Effective Date, it does not agree (contractually or by common practice) to provide any other Major Sporting League with data similar to the Consumption Data in respect of any non-live (e.g., on demand) programming on the Authorized Service. If Licensee begins (contractually or by common practice) to provide such Consumption Data to any Major Sporting League in respect of any non-live programming licensed by Licensee from such Major Sporting League and distributed on an on-demand basis on the Authorized Service, Licensee will provide the equivalent Consumption Data to NBA in respect of any non-live Additional Programming licensed hereunder, subject to the same terms and conditions that apply to such Major Sporting League (Licensee acknowledges it will not engage in any activity with Major Sporting Leagues designed to frustrate the purpose of the foregoing). Without limiting the foregoing, Licensee shall provide NBA with high-level, directional feedback regarding the performance of any such non-live Additional Programming, beginning in Year 1, in a manner substantially similar to the feedback then-provided for similar content. For purposes hereof, "**Major Sporting League**" means a professional sporting league, including National Football League, Major League Baseball, and National Hockey League.

19. **Copyright**: As between the parties, the National Basketball Association will own the exclusive worldwide copyright in all Licensed Content, and may exercise all rights with respect to such content except to the extent prohibited by the exclusivity provisions of this Agreement or as otherwise mutually agreed by the parties. Licensee hereby irrevocably transfers and assigns to the National Basketball Association or its designee, as applicable, any and all of its copyright and other property rights and interests in all aspects of the Licensee-Created Licensed Content (subject to customary exclusions for Licensee Materials and other pre-existing third party intellectual property embodied therein, provided that Licensee will provide a perpetual, royalty-free, worldwide license to use all such Licensee Materials and other pre-existing intellectual property as so incorporated, except that Licensee need not provide such license with respect to third party music to the extent it provides the NBA with a separate feed of the applicable content with uncleared music removed from the feed). Licensee agrees, and shall use its best efforts to ensure, that Licensee's production of all Licensee-Created Licensed Content shall constitute a "work made for hire" for the National Basketball Association or its designee, as applicable. If it is determined by a court or other legal or administrative body of competent jurisdiction that any Licensee-Created Licensed Content is not a "work made for hire" for the National Basketball Association or its designee, as applicable, this Section 19 shall be deemed sufficient to irrevocably assign to the National Basketball Association

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM INDEX NO. 653721/2024
NYSCEF DOC. NO. 81
NYSCEF DOC. NO. 5
Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 17 of 82
INDEX NO. 653721/2024
RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024

CONFIDENTIAL
EXECUTION VERSION

or its designee, as applicable, all right, title and interest that Licensee may have in and to such Licensee-Created Licensed Content.

20.

21. <u>Hospitality</u>: Each NBA team will provide Licensee, upon Licensee's request to NBA, with ▮ tickets (and, to the extent available, "Host/VIP" passes) for "best available" seats to each Game distributed by Licensee. In addition, if requested by Licensee, on a "best efforts" basis, NBA agrees to provide Licensee with up to ▮ additional tickets for "best remaining" seats for each such Game. NBA will also provide Licensee with ▮ ▮▮▮▮ ▮▮▮ ▮▮▮ ▮ tickets to other premium NBA events (e.g., All Star Game, NBA Finals), including suite(s), courtside seats, premium hospitality access (e.g., courtside), etc. The aforementioned hospitality benefits provided to Licensee will be comparable to the hospitality benefits provided to Other Distributors in connection with such Other Distributors' live games packages, taking into account each partner's respective tentpoles.

22. <u>Economics</u>:

a) <u>License Fee</u>: The annual "**License Fees**" shall be as set forth in Exhibit D to this Agreement.

b) <u>Marketing and Promotion</u>: Without limiting any of its promotional commitments set forth in this Section or Section 16 (Marketing/Advertising Innovations), during each Year of the Term Licensee shall pay to NBA a "**Marketing and Innovation Fee**" in the applicable amount set forth in Exhibit D. Each Year's Marketing and Innovation Fee shall be payable in two equal installments on November 15 and January 15 of the applicable Year. NBA shall use a portion of the Marketing and Innovation Fee, together with its own marketing expenditures, on marketing and promotional inventory (e.g., the purchase of advertising time), innovation, research and initiatives (e.g., marketing campaigns aimed at attracting college basketball fans) in order to promote tune-in to the Games and other NBA games and event telecasts and to attract new fans to NBA basketball.

c)

d) <u>Payment Terms</u>: ▮▮▮▮ ▮▮▮▮ ▮▮▮ ▮▮▮▮ ▮ ▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮. For so long as Licensee is required to maintain funds in the "Escrow Account" (defined below) pursuant to Section 26 below, NBA shall be entitled to draw down on the Escrow Account to collect each installment of the License Fee in lieu of direct payment by Licensee, and nothing in the "Escrow Agreement" (defined below) will relieve Licensee of its obligation to pay NBA Licensee Fee installments hereunder. If Licensee fails to timely pay (or cause to be paid) any amount due under this Agreement, then upon notice of this failure to timely pay and Licensee's failure to remit such amount within ten (10) days of its receipt of such notice, without prejudice to any other rights that NBA may have under this Agreement or otherwise, Licensee shall pay interest on such amount at a rate equal to the lesser of (A) three percent (3%) per annum over the average prime rate (announced by J.P. Morgan Chase, New York branch) prevailing during the period between the date the payment first became due and the date such

CONFIDENTIAL
EXECUTION VERSION

payment is actually paid or (B) the highest rate permitted by law during the period between the date the payment first became due and the date such payment is actually paid. Unless otherwise noted herein, the aggregate fees set forth above are inclusive of all payments to NBA entities/Affiliates, and NBA may allocate such fees across NBA entities/Affiliates in its discretion.

23. **Change of Control**:



24. **Reservation of Rights**: Subject to the exclusivities expressly granted to Licensee hereunder, all rights in respect of NBA games shall be reserved by and to the NBA and its member teams.

25. **Work Stoppage**: In the event of a strike by the National Basketball Players Association or a lockout of NBA players by the NBA (in either case, an "**NBA Work Stoppage**") the provisions set forth on Exhibit E shall apply. To the extent NBA provides any Other Distributor a more favorable NBA Work Stoppage provision, NBA will extend such provision to Licensee.

26. **Licensee Parent Guaranty; Escrow**:

a)

b)



i.

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 19 of 82

**CONFIDENTIAL**
**EXECUTION VERSION**



FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM

INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

RECEIVED NYSCEF: 10/29/2024

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 20 of 82

**CONFIDENTIAL**
**EXECUTION VERSION**



e) ███████████████████

f) ███████████████████

27. **Miscellaneous**:

a) Each party represents and warrants that it has the right, power and authority to enter into this Agreement and entering into this Agreement will not violate the terms and conditions of any agreement between it or any of its Affiliates, on the one hand, and any third party, on the other hand.

b) The balance of the parties' agreement with respect to the subject matter hereof shall consist of the Standard Terms and Conditions.

c) Each of the NBA parties hereto may assign their rights (including rights to receive payment) and delegate their duties under this Agreement to one or more Affiliates (including, without limitation, another NBA party

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM   INDEX NO. 653721/2024
NYSCEF DOC. NO. 81   INDEX NO. 653721/2024
NYSCEF DOC. NO. 5   RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 21 of 82

CONFIDENTIAL
EXECUTION VERSION

hereto and/or the NBA member teams) that is capable of performing the NBA's obligations hereunder and expressly assumes such obligations for the express benefit of Licensee. Licensee may subcontract to third party independent contractors its production obligations related to the Games and Additional Programming and may assign, subcontract, delegate, or sublicense any of its rights or obligations hereunder to any Licensee Affiliate or Licensee Parent as deemed necessary by Licensee to exercise its rights and obligations under this Agreement, provided that any such assignment, subcontract, delegation, or sublicense will not relieve Licensee of its obligations under this Agreement (and any action or omission by any such assignee, subcontractor, delegee or sublicensee in connection with its exercise of any such rights or performance of any such obligations shall constitute an action or omission, respectively, of Licensee for purposes of this Agreement). This Agreement will be binding upon, inure to the benefit of, and be enforceable by and against the parties and their permitted successors, assigns, and sublicensees. This Agreement will be governed by federal, state and local laws and regulations of the United States of America and the State of New York without regard to conflicts of law rules. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other generally accepted electronic means (e.g., PDF, DocuSign) will be effective as delivery of a manually executed counterpart of this Agreement. This Agreement, including the Exhibits hereto, constitutes the entire agreement of the parties and cancels and supersedes any previous or contemporaneous contracts, agreements, arrangements, representations, warranties and understandings (whether oral or written, express or implied) between the parties with respect to such subject matter. This Agreement may only be amended in writing signed by both parties.

[Signature Page Follows]

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 22 of 82
Docusign Envelope ID: A91F7E69-F709-4891-9A25-50AB2CF17F8F

**CONFIDENTIAL**
**EXECUTION VERSION**

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have executed and delivered this Agreement as of the Effective Date:

**AMAZON CONTENT SERVICES LLC**                    **NBA MEDIA VENTURES, LLC**

By: ███████████████████                           By: _____
Name: ██████████████████                          Name:
Title: Authorized Signatory                        Title:
Date: July 12, 2024                                Date:

Solely for purposes of acknowledging the obligation to    **NBA PROPERTIES, INC.**
provide the Licensee Parent Guaranty under Section
26(a) and Exhibit F attached hereto, **AMAZON.COM,**
**INC.**, the publicly traded corporation that is the ultimate
parent of Licensee ("**Licensee Parent**"):

By: ███████████████████                           By: _____
Name: ██████████████████                          Name:
Title: Authorized Signatory                        Title:
Date: July 13, 2024                                Date:

[Signature Page to NBA-Amazon U.S. Rights Agreement]

legal

CONFIDENTIAL
EXECUTION VERSION

## Exhibit A

### Licensee Cut-In Rights

- Game cut-ins (which may be included in telecasts of Games and Shoulder Programming) must comply with the following:
    - No cut-ins from any game distributed by an Other Distributor, provided such restriction is reciprocal for such Other Distributor vis a vis games distributed by Licensee
    - No more than ▮ cut-ins may be from any one game (or any part thereof)
    - Except for a cut-in from the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, no cut-in may be longer than ▮ minutes (real time)
    - Cut-ins must be non-consecutive
    - Only ▮ cut-ins may be taken prior to ▮▮▮▮▮▮▮
    - No cut-in is permitted if ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, except for either:
        - ▮ cut-in may occur prior to ▮▮▮▮▮▮▮▮▮▮; or
        - ▮ cut-in may occur during ▮▮▮▮▮▮, which may extend through the end of the game (including overtime)
    - All cut-ins must include the following:
        - An oral "courtesy" to the announcers of the game that is being cut into during the cut-in;
        - A visual "courtesy" to the television service distributing the game that is being cut into every ▮ minutes (real time); and
        - A visual "courtesy" to the television service distributing the game that is being cut into during the applicable Game or Shoulder Programing telecasts' closing sequence.

*** End of Exhibit A ***

CONFIDENTIAL
EXECUTION VERSION

## Exhibit B

### Summary of Sales Rights and Obligations

I. **Commercials Units**

- <u>Number of Commercial Units</u>: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████

- <u>Licensee Sales</u>: Licensee may use or sell 100% of all commercial units in all Games (other than NBA-retained units) and Additional Programming.

- <u>NBA Institutional Units</u>: █████████████████████████████████████████████████████████████████.

II. **Camera Visible Signage**

- <u>Courtside Rotational Signage</u>: ███████████████████████████████████████████████████████████████████████████████████████████████

- <u>Virtual Signage</u>: NBA retains the right to use or sell virtual signage in Game telecasts, ████, ████████████████████████████████████████████████████████████████████████████████

- <u>Signage Financial Commitment</u>:

- <u>Other Camera Visible Signage/Branding</u>: NBA may use or sell other camera-visible physical signage around the court, ████████████████████████████████████████████████████████████████████████████████████████

**CONFIDENTIAL**
**EXECUTION VERSION**

and brand messaging may appear on game-related equipment/apparel, in the replay center, and on apparel patches without such financial commitment.



### III.   Enhancements

- <u>Number of Enhancements:</u> ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- <u>Licensee Sales:</u> ████████████████████████████████████████████████████

- <u>Competing Advertisers:</u> ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM

INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

RECEIVED NYSCEF: 10/29/2024

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 26 of 82

CONFIDENTIAL
EXECUTION VERSION

- The types and format of enhancements are subject to NBA approval (standard enhancement types/formats used across NBA game telecast partners will be approved).



- Each of the parties may insert or include (and NBA may cause Licensee to insert or include) standard graphics and other promotional messaging in the form of "crawls" and lower 3rd graphics and announcer audio drops for institutional purposes. NBA may include such graphics and promotional messaging consistent with past practice. Licensee may include such graphics and promotional messaging subject to NBA's reasonable approval.

## IV. Title and Presenting Sponsorships

- Licensee may sell presenting and other mutually agreed sponsorships to regular season Games, individual rounds of the NBA playoffs (in which Licensee has distribution rights), and designated Licensee tentpoles approved by NBA (e.g., "NBA Black Friday on Amazon Prime Presented by [X]").

- Licensee may sell presenting sponsorships to Additional Programs (e.g., a weekly ancillary show).



- NBA maintains the right to sell presenting, title, and other sponsorships to the NBA Play-In Tournament, NBA Cup, and NBA Playoffs (as a whole).

  o Licensee will pass-through any such presenting or title partner branding during applicable Game telecasts and Additional Programs.

  o

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

INDEX NO. 653721/2024
INDEX NO. 653721/2024
RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 27 of 82

CONFIDENTIAL
EXECUTION VERSION

### V. Authorized Digital Channels

- Licensee may insert presenting sponsorships and pre-roll and mid-roll advertising in game highlights that it distributes on the approved Authorized Endpoints in accordance with the Agreement.

- For clarity, no pre-roll or mid-roll advertising may depict any NBA IP unless for an NBA official marketing partner and such advertising has been approved by the NBA.

### VI. "First Look" and Protections for NBA Official Marketing Partners

- <u>"First Look" Opportunity</u>: Licensee will offer NBA official marketing partners a "first opportunity" review period of ▮ days to assess and purchase any enhancement or presenting sponsorship before it provides such opportunity to any other advertiser,

- <u>Modified Enhancement/Presenting Sponsorship Opportunities</u>: If the nature of any enhancement or presenting sponsorship is materially modified after providing a "first look" then Licensee must provide each NBA official marketing partner an additional ▮ business days to review the modified opportunity before providing it to another advertiser.

- <u>Incumbency Limits</u>:

- <u>Protected Partners</u>:

### VII. Sports Betting

- <u>Authorized Gaming Operator Requirement</u>: In addition to the requirements in the Agreement and herein, no promotional opportunity or messaging (e.g., a commercial unit or enhancement) may be used or included in any Game, Additional Program or other NBA content to promote any sports betting operator or its associated brand or messaging unless the sports betting operator is then-currently designated by NBA as an Authorized Gaming Operator in accordance with NBA rules. (For clarity, an Authorized Gaming Operator is not an NBA official marketing partner unless the NBA has an applicable official marketing partnership agreement with such operator.) As set forth in the NBA sports betting rules referenced in this Exhibit B, such rules apply generally to primary telecasts (including, for example, any non-sports betting related Shoulder Programming) and any betting-focused experience / content will be subject to a separate set of rules to be defined and approved by NBA (for clarity, certain of the NBA's

**CONFIDENTIAL**
**EXECUTION VERSION**

sports betting rules will continue to apply – e.g., no sports betting operator may be promoted or included even as part of a betting-focused experience / content unless it is an Authorized Gaming Operator).

- <u>Other Promotional Rules</u>: The promotion or inclusion of any Authorized Gaming Operator and/or any sports betting messaging or activity in any Game, Additional Program or other NBA content is subject to NBA rules of general applicability (e.g., regarding limits on the amount of sports betting messaging in a game telecast) and compliance with all applicable laws and regulations.

## VIII.    Policies and Standards

- All advertising, sponsorship and other commercial inventory appearing in connection with the Licensed Content will be subject to each party's guidelines and standards ("**Policies and Standards**") that shall be negotiated in good faith between the parties prior to any such appearance, it being understood that (x) NBA's Policies and Standards shall be no less favorable to Licensee than NBA's guidelines and standards applicable to advertising in connection with games televised by the Other Distributors, and (y) Licensee's Policies and Standards shall be no less favorable to NBA than Licensee's guidelines and standards applicable to advertising during games of other Major Sporting Leagues televised by Licensee on the Authorized Service, in each case of the foregoing (x) and (y), in the Territory ███ ████



*** End of Exhibit B ***

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 29 of 82

CONFIDENTIAL
EXECUTION VERSION

**Exhibit C**

**Consumption Data Reporting and Measurement**



CONFIDENTIAL
EXECUTION VERSION

2.

*** End of Exhibit C ***

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM

INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 31 of 82

INDEX NO. 653721/2024

RECEIVED NYSCEF: 10/29/2024

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 07/26/2024

CONFIDENTIAL
EXECUTION VERSION

**Exhibit D**

**License Fees**

1.  **Annual License Fees:**

| Year | Annual License Fee (U.S. Dollars) |
|---|---|
| ███████ | ████████ |
| ███████ | ████████ |
| ███████ | ████████ |
| ███████ | ████████ |
| ███████ | ████████ |
| ███████ | ████████ |
| ███████ | ████████ |
| ███████ | ████████ |
| ███████ | ████████ |
| ███████ | ████████ |
| ███████ | ████████ |

2.  **Annual Marketing and Innovation Fees:**

| Year | Annual Marketing and Innovation Fee (U.S. Dollars) |
|---|---|
| ███████ | ██████ |
| ███████ | ██████ |
| ███████ | ██████ |
| ███████ | ██████ |
| ███████ | ██████ |
| ███████ | ██████ |
| ███████ | ██████ |
| ███████ | ██████ |
| ███████ | ██████ |
| ███████ | ██████ |
| ███████ | ██████ |

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024
NYSCEF DOC. NO. 81
RECEIVED NYSCEF: 10/29/2024
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 32 of 82

CONFIDENTIAL
EXECUTION VERSION

## Exhibit E

## Work Stoppage

(a)      In the event of an NBA Work Stoppage that causes the pre-emption of the playing, in whole or in part, of any NBA game, all other obligations of the parties shall continue (subject to the provisions of this Exhibit E), including all obligations under Section 22 (Economics) of and Exhibit D to the Agreement, ███████████ ██████████████████████████ ███████████████████████████████████████ ████████████ ████████ If such NBA Work Stoppage causes the preemption, in whole or in part, of the live distribution of any Game that Licensee cannot reschedule for distribution, the parties shall, when such NBA Work Stoppage has ceased, confer in good faith with each other to negotiate with respect to (i) an equitable reduction in the License Fee due hereunder, (ii) a mutually agreeable comparable substitute Game for each Game not distributed or (iii) if the parties deem appropriate, an extension of this Agreement, on mutually agreeable terms (or any combination of the foregoing), with the intent of properly compensating Licensee for any financial losses relating directly to the NBA Work Stoppage, taking into account all relevant factors and circumstances occurring during and after the cessation of the NBA Work Stoppage (e.g., the type of Game(s) that were pre-empted due to the NBA Work Stoppage and the effect of the NBA Work Stoppage on advertising sales for the Games distributed during the affected season(s), Game distribution ratings, sponsorship revenues, etc.).

(b)      Notwithstanding anything to the contrary in Paragraph (a) of this Exhibit E, in the event that a NBA Work Stoppage causes the pre-emption of the live distribution of any Game and the parties do not agree with respect to the manner in which the rights of Licensee shall be adjusted in accordance with Paragraph (a) above, then:

(i)      If such NBA Work Stoppage has not ceased by the date on which the License Fee installment payment due under Section 22 (Economics) of the Agreement immediately following the first such pre-empted Game (the **"First Subsequent Installment"**) is due, then on such date or on any day thereafter during such NBA Work Stoppage, NBA shall be entitled to receive from Licensee, upon at least seven (7) days prior written request, an amount up to the amount of the First Subsequent Installment ███████ ████ ███ ████, subject to, and in accordance with, Paragraph (c) below (the **"First Work Stoppage Payment"**).

(ii)      If such NBA Work Stoppage has not ceased by the date on which the License Fee installment payment due under Section 22 (Economics) of the Agreement immediately following the date of the First Subsequent Installment (the **"Second Subsequent Installment"**) is due, then on the date of the Second Subsequent Installment or on any day thereafter during the NBA Work Stoppage, NBA shall be entitled to receive from Licensee, upon at least seven (7) days prior written request, an amount up to the amount of the Second Subsequent Installment ██████████████ █████, subject to, and in accordance with, Paragraph (c) below (the "**Second Work Stoppage Payment**").

(iii)      If such NBA Work Stoppage has not ceased by the date on which the License Fee installment payment due under Section 22 (Economics) of the Agreement immediately following the date of the Second Subsequent Installment (the **"Third Subsequent Installment"**) is due, then on such date or on any day thereafter during the NBA Work Stoppage, NBA shall be entitled to receive from Licensee, upon at least seven (7) days prior written request, an amount up to the amount of the Third Subsequent Installment ███████████, ████ █████ subject to, and in accordance with, Paragraph (c) below (the **"Third Work Stoppage Payment"**).

(iv)      If such NBA Work Stoppage has not ceased by the date on which the License Fee installment payment due under Section 22 (Economics) of the Agreement immediately following the date of the Third Subsequent Installment (the **"Fourth Subsequent Installment"**) is due, then on such date or on any day thereafter during such NBA Work Stoppage, the NBA shall be entitled to receive from Licensee, upon at least seven (7) days prior written request, an amount up to the amount of the Fourth Subsequent Installment ███████████████████████████████████ subject to, and in accordance with, Paragraph (c) below (the **"Fourth Work Stoppage Payment"**).

(v)      If such NBA Work Stoppage has not ceased by the date on which the License Fee installment payment due under Section 22 (Economics) of the Agreement immediately following the date of the Fourth



FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024
NYSCEF DOC. NO. 81
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024
Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 33 of 82

CONFIDENTIAL
EXECUTION VERSION

Subsequent Installment (the "**Fifth Subsequent Installment**") is due, then on such date or on any day thereafter during such NBA Work Stoppage, NBA shall be entitled to receive from Licensee, upon at least seven (7) days prior written request, an amount up to the amount of the Fifth Subsequent Installment ██ ██ █ ███████, ██████ █ █████████ ██ █████████████████████, subject to, and in accordance with, Paragraph (c) below (the "**Fifth Work Stoppage Payment**").

(vi)     If such NBA Work Stoppage has not ceased by the date on which the License Fee installment payment due under Section 22 (Economics) of the Agreement immediately following the date of the Fifth Subsequent Installment (the "**Sixth Subsequent Installment**") is due, then on such date or on any day thereafter during such NBA Work Stoppage, NBA shall be entitled to receive from Licensee, upon at least seven (7) days prior written request, an amount up to the amount of the Sixth Subsequent Installment ██ ██ █ ███████, ██████ ██ ████ █ ████ ████· ████████████ ████, subject to, and in accordance with, Paragraph (c) below (the "**Sixth Work Stoppage Payment**"). The amount of the First Work Stoppage Payment (if any), the amount of the Second Work Stoppage Payment (if any), the amount of the Third Work Stoppage Payment (if any), the amount of the Fourth Work Stoppage Payment (if any), the amount of the Fifth Work Stoppage Payment (if any) and the amount of the Sixth Work Stoppage Payment (if any) are collectively referred to as the ("**Work Stoppage Payments**" and the sum of the Work Stoppage Payments that are actually paid by Licensee is referred to as the "**Total Work Stoppage Payment**".

(c)     Following the cessation of a NBA Work Stoppage for which any Work Stoppage Payments are made pursuant to Paragraph (b) above, except as the parties may otherwise agree, NBA shall repay Licensee an amount equal to



(the result being the "**Repayment Amount**"); provided, however, that in no event shall the Repayment Amount exceed the Total Work Stoppage Payment. The Repayment Amount shall be repaid following the cessation of such NBA Work Stoppage in accordance with Paragraph (d) below; provided, however, that:

(i)     ████ █████ ████ █████ ██ █ ██ ███ █ ████ ██ ████ ████████ ██ ██████ ████ █ █ ████ ██ ████ █ ███ ████ █ █████ █ ████████████ █ ████ ████ ████ ████████ █ ████ ████

(ii)     Repayment by NBA of any individual Work Stoppage Payment from the Repayment Amount shall be deemed made in the inverse order in which any such Work Stoppage Payment was received by NBA (e.g., if the Repayment Amount includes an amount attributable to any Sixth Work Stoppage Payment, such amount shall be deemed repaid first by NBA; if the Repayment Amount includes an amount attributable to any Fifth Work Stoppage Payment, such amount shall be deemed repaid after repayment of any amount attributable to the Sixth Work Stoppage Payment but prior to repayment of any amount attributable to the First, Second, Third or Fourth Work Stoppage Payments).

(d)     In the event that, upon the cessation of such NBA Work Stoppage, the value (as determined by the parties) of the regular season, NBA Cup and playoff Games distributed by Licensee during any season in which live Game distributions were pre-empted due to such NBA Work Stoppage exceeds (i) the aggregate amount of License Fee installment payments remaining to be paid to NBA under this Exhibit E for such season (if any) plus (ii) the Total Work Stoppage Payments received by NBA for such season (if any), then an amount equal to such excess shall be paid to NBA by Licensee during the Term pursuant to a schedule to be determined jointly by the parties.

(i)     The Repayment Amount shall be repaid through equal deductions from the remaining License Fee installment payments due to NBA under Section 22 (Economics) of the Agreement, following the cessation of the NBA Work Stoppage.

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 07/26/2024

**CONFIDENTIAL**
**EXECUTION VERSION**

          (ii)     In the event that, upon the cessation of the NBA Work Stoppage, the Repayment Amount exceeds the aggregate amount of the License Fee installment payments due for the remainder of the Term under Section 22 (Economics) of the Agreement, the amount of such excess shall be paid by NBA to Licensee no later than December 31, 2036 (unless Licensee is licensed to distribute Games during the 2036-2037 NBA season, in which case such excess shall be paid in eight (8) equal quarterly installments, the first of which shall be paid on or before October 1, 2036 and the last of which shall be paid on or before July 1, 2038).

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 35 of 82

CONFIDENTIAL
EXECUTION VERSION

**Exhibit F**



NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 07/26/2024

CONFIDENTIAL
EXECUTION VERSION



8.

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 37 of 82
Docusign Envelope ID: A91F7E69-F709-4891-9A25-50AB2CF17F8F

**CONFIDENTIAL**
**EXECUTION VERSION**

**AMAZON.COM, INC.**

By: _____

Printed Name: _____

Title: __Authorized Signatory_____

Date Signed: ___July 13, 2024_____

[Signature Page to Exhibit F – Parent Guaranty]

legal

NYSCEF DOC. NO. 5                                   RECEIVED NYSCEF: 07/26/2024

CONFIDENTIAL
EXECUTION VERSION

**Exhibit G**

**Standard Terms and Conditions**

**[attached]**

**CONFIDENTIAL**
**EXECUTION VERSION**

## STANDARD TERMS AND CONDITIONS

All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Amazon-NBA U.S. Rights Agreement – Principal Terms ("**Principal Terms**") to which these Standard Terms and Conditions ("**Standard Terms**") are attached. In the event of a conflict between the Principal Terms and these Standard Terms, the Principal Terms shall prevail to the extent necessary to resolve the conflict.

1. **Certain Definitions**:
   a) "**Affiliate**" means, with respect to any party to the Agreement, any Person that directly or indirectly Controls, is Controlled by, or is under common Control with such party, whether existing as of the Effective Date or thereafter. For purposes hereof, "**Control**" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. "Controlling" and "Controlled" have correlative meanings. "**Person**" means any association, corporation, individual, limited liability company, partnership, or other non-governmental entity.
   b) "**Intellectual Property Rights**" means any and all worldwide rights, titles and interests, whether foreign or domestic, in and to any and all trade secrets, patents, copyrights, service marks, trademarks, trade dress, know-how, or similar intellectual property rights, as well as any and all moral rights, and similar rights of any type under the laws or regulations of any governmental, regulatory or judicial authority.
   c) "**Licensed Content**" means the Licensee-Created Licensed Content and the NBA-Created Licensed Content.
   d) "**Licensee-Created Licensed Content**" means the Game exhibitions (including all versions thereof), Shoulder Programming, Additional Programming, any highlights of or excerpts from the foregoing, and any other content that is, in each case, created or produced by or on behalf of Licensee pursuant to the rights licensed by NBA pursuant to this Agreement.
   e) "**Licensee Marks**" means the Marks owned by, or exclusively licensed to, Licensee and its Affiliates (including any such Marks associated with their respective products and services).
   f) "**Licensee Materials**" means (i) the Licensee Marks, (ii) Theme Music, and (iii) all Licensee Tools.
   g) "**Licensee Tools**" means any and all intellectual property or proprietary materials that Licensee includes in its exhibition of Licensed Content (excluding, for clarity, the game telecast itself and any NBA Materials), including, without limitation, graphics, titles (excluding any Licensed Content title), music, slogans, sponsored segments, commercials (excluding NBA inventory), branded elements, enhancements, interactive features, functionalities, utilities, engines, subroutines, software systems, source and object codes, program logic, software systems and other procedures and routines utilized by Licensee in or in connection with its exhibition of Licensed Content, including all rights in and to all copyrights, patents, trademarks, and other Intellectual Property Rights therein and appurtenant thereto.
   h) "**Marks**" means trademarks, service marks, names, logos, symbols, slogans, designations, emblems, designs, trade dress and uniforms and all identifications, labels, insignia or indicia thereof.
   i) "**NBA-Created Licensed Content**" means any programming (e.g., NBA Tonight, NBA-produced alternate feeds of Games, etc.) and any other content that is, in each case, created or produced by or on behalf of NBA and licensed to Licensee pursuant to this Agreement.
   j) "**NBA Footage**" means non-live, moving visual images of action from NBA games or events (exclusive of any audio).
   k) "**NBA Marks**" means the Marks owned by, or exclusively licensed to, the National Basketball Association, its teams, and their respective Affiliates.
   l) "**NBA Materials**" means the NBA Marks, NBA Footage, NBA Photos and any other materials furnished by or on behalf of NBA pursuant to the Agreement (excluding the NBA-Created Licensed Content).
   m) "**NBA Photos**" means photographs of action from NBA games or events, as well as photographs of NBA players, coaches, officials and such other photographs, in each case, obtained from NBA or its designee.
   n) "**Security Breach**" means the circumvention of Licensee's Required Security Measures that leads to either (1) the unauthorized distribution of the Games on Excluded Distribution Channels or (2) the use by third parties of Licensed Content in such a material manner or to such a degree that the NBA reasonably determines that it has been or is reasonably likely to be materially harmed by such unauthorized access.

2. **Confidentiality**: The terms and contents of this Agreement shall be kept strictly confidential and shall not be disclosed to any third party except (a) to a party's board of directors (or, in the case of NBA, to the NBA Board

1

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM    INDEX NO. 653721/2024
NYSCEF DOC. NO. 81    Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 40 of 82    RECEIVED NYSCEF: 10/29/2024

NYSCEF DOC. NO. 5    RECEIVED NYSCEF: 07/26/2024

CONFIDENTIAL
EXECUTION VERSION

of Governors or the NBPA) to whom such confidential information shall only be disclosed after such directors (or, in the case of NBA, such Governors or the NBPA, as applicable) have been made aware of the confidential nature of this Agreement; (b) to a party's legal and professional advisors and representatives (the foregoing in this clause (b) are collectively referred to herein as **"Representatives"**), provided that (i) the disclosing party shall take reasonable steps to prevent public disclosure by its Representatives (to whom such confidential information shall only be disclosed after such Representatives have been made aware of the confidential nature of this Agreement and have agreed to be bound by this confidentiality provision or are otherwise subject to a professional duty of confidentiality), and (ii) the disclosing party shall be responsible for any breach of this provision by any of its Representative; (c) disclosure shall be permitted if required by law, regulation, appropriate court order or government agency, provided that (i) the disclosing party shall notify the other party as promptly as practicable of the existence, terms and circumstances surrounding such requirement or request; (ii) prior to making any disclosure, the disclosing party shall (and shall direct its Representative to, if applicable) permit such other party a reasonable opportunity to take such legal action as such party, in its reasonable discretion, deems advisable to resist or narrow the scope of such requirement or request or obtain confidential treatment, protective orders or other appropriate legal remedies for any information required to be disclosed pursuant to such requirement or request, in each case, at the non-disclosing party's expense; (iii) the disclosing party shall (and shall direct its Representative to, if applicable) reasonably cooperate with such party in undertaking any such legal action at the non-disclosing party's expense; and (iv) to the extent that any such confidential information is required to be disclosed, the disclosing party shall (and shall direct its Representative to, if applicable) disclose only that portion of the confidential information that the disclosing party and/or its Representative, as applicable, are legally required to disclose, use reasonable efforts to obtain confidential treatment for any such confidential information so disclosed and provide the other party with copies of any such confidential information so disclosed; and (d) solely to the extent necessary to enforce its rights hereunder in a dispute resolution proceeding. Each party acknowledges that the other party may now have, or in the future may develop or receive, information that is the same as, or similar to, such confidential information without having breached this Agreement. Nothing in this Agreement (A) prevents the receiving party from using, for any purpose and without compensating the disclosing party, information retained in the memory of the receiving party's personnel who have had access to such confidential information or (B) obligates the receiving party to restrict the scope of employment of the receiving party's personnel; provided, however, that this section does not create a license under any copyright or patent of the disclosing party. Upon execution of this Agreement, the parties shall coordinate on (I) a press release, and (II) press announcement timing and release strategy regarding this Agreement and the relationship hereunder, with such release and announcement subject to the mutual approval of the parties, such approval not to be unreasonably withheld.

3. **Intellectual Property Matters**:
   a) Trademarks.
      i.   As between the parties, all worldwide rights in the NBA Marks and other NBA Materials and the goodwill attached thereto and Intellectual Property Rights therein belong exclusively to NBA, and any use by Licensee of the NBA Marks shall inure exclusively to the benefit of NBA. Any right in or to the NBA Marks that may accrue to Licensee shall be assigned to NBA or its designee upon NBA's request.
      ii.  As between the parties, all worldwide rights in the Licensee Marks and other Licensee Materials and the goodwill attached thereto and Intellectual Property Rights therein belong exclusively to Licensee, and any use by NBA of the Licensee Marks shall inure exclusively to the benefit of Licensee. Any right in or to the Licensee Marks that may accrue to NBA shall be assigned to Licensee or its designee upon Licensee's request.
   b) Copyright Notices. Licensee shall affix a copyright notice in the name of the National Basketball Association (Copyright [Year] National Basketball Association), at least once during, and at the close, of each Game telecast hereunder in such form as the NBA may reasonably require. In addition, Licensee shall telecast an animated graphic provided by the NBA containing the following announcement, or a substantially similar announcement, at least once during each such telecast: "This copyrighted telecast of the National Basketball Association is intended solely for the entertainment of our audience and any retransmission, reproduction, rebroadcast or other use or dissemination of this telecast, or the pictures, descriptions, or accounts of this Game, without the express written consent of the National Basketball Association, is prohibited." Licensee shall record each Game telecast in whatever form as may be necessary to preserve the copyright of the National Basketball Association therein and, at the NBA's request, execute any affidavit necessary to confirm

2

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM

INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 41 of 82

CONFIDENTIAL
EXECUTION VERSION

such recording.

c) <u>Protection of Intellectual Property Rights</u>.

   i.   Licensee shall employ industry-standard geo-filtering and digital rights management solutions in connection with its distribution of Licensed Content (the "**Required Security Measures**").

   ii.  Licensee shall cooperate and reasonably assist NBA in the protection of the rights of NBA in and to the Licensed Content and the NBA Marks, and NBA shall cooperate and reasonably assist Licensee in the protection of the rights of Licensee in and to the Licensee Materials (other than the Licensee Tools); provided that each party (x) shall be required to provide such cooperation and reasonable assistance only to the extent that the need to protect the rights in question arises out of or relates to this Agreement, and (y) shall be reimbursed for any reasonable out-of-pocket costs actually incurred in providing such cooperation and assistance.

d) <u>Take-Down</u>. If NBA requests in good faith that any NBA Materials be deleted, corrected, replaced or made inaccessible because NBA reasonably and in good faith believes that such NBA Materials violates applicable law or the Intellectual Property Rights of any third party, then (x) other than with respect to NBA Materials included in a live telecast of a Game, Licensee shall promptly delete or make inaccessible, as applicable, the affected NBA Material, and (y) NBA shall similarly and promptly, if reasonably practicable, (A) edit the affected materials to cure such alleged violation, and (B) deliver to Licensee such corrected replacement materials compliant with the terms set forth in this Agreement (and Licensee may then use such corrected materials consistent with the terms of this Agreement). In addition, without limiting Licensee's John Q Public Rights, if NBA reasonably and in good faith believes that any Licensed Content, in whole or in part (in either case, "**offending elements**"), created or produced by Licensee (x) reflects unfavorably upon the NBA, any team, player or personnel in a manner that creates a significant reputational issue for such party or (y) is reasonably likely to cause material harm to the NBA's business, NBA may share such concern with Licensee and, unless Licensee promptly (as reasonably practicable) raises a bona fide objection in response to the NBA sharing its concern, Licensee shall thereafter delete or make inaccessible the offending elements of the Licensed Content in question as promptly as reasonably practicable. If Licensee raises a bona fide objection, the parties shall promptly (as reasonably practicable) discuss in good faith whether the offending elements of the Licensed Content in question should be deleted or made inaccessible. NBA will not discriminate against Licensee (vis a vis any other NBA-licensed distributor of similar NBA content) with respect to the take-down process set forth in this Section 3(d).

e) <u>Security Breach</u>. In the event of any known or suspected Security Breach, the party identifying such Security Breach will promptly notify the other party, and the parties will cooperate in good faith to remedy the Security Breach in a manner that is reasonably satisfactory to NBA as soon as reasonably practicable.

f) <u>Approvals</u>.

   i.   NBA Marks may be used by Licensee only in a form approved by NBA, and Licensee Marks may be used by NBA only in a form approved by Licensee.

   ii.  Subject to the terms and conditions of this Agreement, including Sections 13 (Additional/Original Programming) and 17 (IP) of the Principal Terms, during the Term, Licensee shall, at no additional consideration (except for any fees that may apply – e.g., standard search and edit fees for footage requests, fees for photos from Getty Images (or successor) and fees in the event the footage bank is exceeded, in each case, to the extent within NBA's control, on terms no less favorable than that of any Other Distributor), have the right and license to use the (x) NBA Materials, (y) the name, image and likeness of, and any biographical information provided by NBA about, NBA players, coaches and other personnel solely as set forth in Section 17 of the Principal Terms, and (z) footage from NBA's footage archives and from pre-existing NBA-produced promotional or marketing materials, in each case in connection with promotion of the Licensed Content in accordance with the terms hereof (including advertising, marketing, promotion and publicity for the Licensed Content and the availability of the Licensed Content on the Authorized Endpoints). For clarity, all promotional and marketing materials using any NBA Materials will be subject to NBA's standard "business review" process, which NBA will complete in a reasonably prompt manner (i.e., consistent with the manner in which it completes the process for Other Distributor). In each instance in which approval, consent or authorization by either party is required hereunder, unless otherwise stated in a particular section hereof, such approval, consent or authorization is required to be in writing (email being sufficient) and may be given or withheld in such party's sole discretion. If NBA provides its approval for use of any jointly-created or Licensee-created promotional templates or materials, such promotional templates or materials will be deemed approved for the purposes set forth in such approval, and

3

Case 1:24-cv-09027-KPF Document 51-4 Filed 08/25/25 Page 42 of 82

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 07/26/2024

CONFIDENTIAL
EXECUTION VERSION

Licensee will not be required to obtain approval for any substantially similar use of such jointly-created or Licensee-created promotional templates or materials, subject to any time period or other limitations imposed by NBA as part of its approval.

4. **Indemnification**:

a) <u>NBA's Indemnification</u>. NBA shall defend, indemnify and hold Licensee, its Affiliates and each of their respective directors, officers, employees and agents (collectively, "**Licensee Indemnitees**") harmless from and against any claims, demands, disputes, causes of action or damages, including reasonable outside attorneys' fees (collectively, "**Claims**") asserted by a third party against any Licensee Indemnitee that is caused by, arises out of or relates to (all of the foregoing, "**arises out of**"):

  i. NBA's gross negligence, willful misconduct, or fraud in connection with this Agreement;

  ii. any breach of this Agreement by NBA, including any representation, warranty or covenant made hereunder by NBA;

  iii. any use of NBA Materials, including any NBA Materials incorporated into or used in conjunction with the Licensed Content (to the extent such Claims would not have arisen absent such NBA Materials), in each case, in accordance with the Agreement; provided that NBA shall have no obligation to indemnify Licensee (or the Licensee Indemnitees) under this Section 4(a)(iii) to the extent a Claim arises out of modifications by Licensee to any such NBA Materials after delivery by NBA (to the extent such Claims would not have arisen absent such modifications);

  iv. any use in accordance with the terms of this Agreement by Licensee of NBA-Created Licensed Content; provided that NBA shall have no obligation to indemnify Licensee (or the Licensee Indemnitees) under this Section 4(a)(iv) to the extent a Claim arises out of:

    A. the use in accordance with the terms hereof of Licensee-Created Licensed Content included therein,

    B. modifications by Licensee to any NBA-Created Licensed Content after delivery by NBA (to the extent such Claims would not have arisen absent such modifications); and

    C. any use of Licensee Materials in or in conjunction with such NBA-Created Licensed Content in accordance with the terms hereof (to the extent such Claims would not have arisen absent such Licensee Materials);

  v. any physical damage to tangible property and/or personal injuries, including death, to any person, arising from the negligent act(s) or omission(s) or willful misconduct of the NBA, its employees or agents in connection with the staging or playing of the Games hereunder; or

  vi. NBA's violation (or alleged violation) of laws in connection with the performance of its obligations or exercise of its rights under this Agreement.

b) <u>Licensee's Indemnification</u>. Licensee shall defend, indemnify and hold NBA, the National Basketball Players Association ("**NBPA**"), the teams of the NBA, and their respective Affiliates, owners, directors, governors, officers, employees and agents (collectively, "**NBA Indemnitees**") harmless from and against any Claims asserted by a third party against any NBA Indemnitee that arises out of:

  i. Licensee's gross negligence, willful misconduct, or fraud in connection with this Agreement;

  ii. any breach of this Agreement by Licensee, including any representation, warranty or covenant made hereunder by Licensee;

  iii. any use of Licensee Materials, including any Licensee Materials (e.g., enhancements, features, functionalities) incorporated into or used in conjunction with the Licensed Content, (to the extent such Claims would not have arisen absent such Licensee Materials), in each case, in accordance with the Agreement; provided that Licensee shall have no obligation to indemnify NBA (or the NBA Indemnitees) under this Section 4(b)(iii) to the extent a Claim arises out of modifications by NBA to any such Licensee Materials after delivery by Licensee (to the extent such Claims would not have arisen absent such modifications);

  iv. any use in accordance with the terms of this Agreement by NBA of the Licensee-Created Licensed Content (including commercial advertisements inserted by Licensee); provided that Licensee shall have no obligation to indemnify NBA (or the NBA Indemnitees) under this Section 4(b)(iv) to the extent a Claim arises out of:

    A. the actual staging and playing of a game by NBA,

    B. the use in accordance with the terms hereof of NBA-Created Licensed Content included therein,

    C. modifications by NBA to any Licensee-Created Licensed Content after delivery by

4

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 43 of 82

**CONFIDENTIAL**
**EXECUTION VERSION**

Licensee (to the extent such Claims would not have arisen absent such modifications), or

    D. any use of NBA Materials in or in conjunction with such Licensee-Created Licensed Content in accordance with the terms hereof (to the extent such Claims would not have arisen absent such NBA Materials);

    v. any physical damage to tangible property and/or personal injuries, including death, to any person, arising from the negligent act(s) or omission(s) or willful misconduct of Licensee, its employees or agents in connection with the production of the Games hereunder;

    vi. a Claim that the Authorized Endpoints (but excluding, for clarity, assertions relating to the Licensed Content, which for clarity are covered under Sections 4(a)(iv) and 4(b)(iv) above), or any Licensee Tools utilized by Licensee to facilitate Licensee's distribution of the Licensed Content thereby, infringes upon or violate the Intellectual Property Rights or other proprietary rights of a third party; or

    vii. Licensee's violation (or alleged violation) of laws in connection with the performance of its obligations or exercise of its rights under this Agreement.

  c) <u>Indemnification Procedure</u>. The indemnified party shall promptly notify the indemnifying party of the existence of any Claim giving rise to indemnification under this Agreement. The failure to provide such notice, however, shall not release the indemnifying party from any of its indemnification obligations except to the extent that the indemnifying party is prejudiced by such failure. The indemnifying party shall have the right to control the litigation or other action with respect to which it has an indemnification obligation, provided it does so diligently and in good faith, and to select its own counsel. The indemnified party may also be represented by counsel of its own choosing at its own expense. The indemnifying party will have full control over such defense, including any settlement discussions or agreement, provided that the indemnifying party may not offer any settlement, compromise or discharge that admits any liability or affects the rights of, or requires payment by, the indemnified party, in each case, without the prior written approval of the indemnified party. Notwithstanding the foregoing, the indemnified party may elect to assume full control over the litigation and defense of any Claim for which it is indemnified if (i) the indemnified party has been advised by external counsel that a conflict of interest exists between the indemnifying party and the indemnified party with respect to such Claim, or (ii) it relates to or otherwise arises in connection with any regulatory enforcement action, investigation, suit or proceeding (any such Claim, an **"Exception Claim"**). In the event of an Exception Claim, the indemnifying party shall also pay for the reasonable fees of the indemnified party's external counsel. Further, if, within a reasonable time after receipt of notice of a Claim, the indemnifying party fails to reasonably defend such Claim, then the indemnified party shall have the right, but not the obligation, to defend and to compromise or settle (exercising reasonable business judgment) such Claim on account and at the risk and expense of the indemnifying party. The indemnified party shall make available to the indemnifying party, at the indemnifying party's expense, such information and assistance as the indemnifying party shall reasonably request in connection with the defense of such third party proceeding (provided that the indemnified party shall not be required to waive any privilege or breach any confidentiality undertakings in doing so). The indemnities of the parties hereunder shall survive the expiration or earlier termination of this Agreement.

5. **Termination for Breach**: In addition to any other rights either party may have pursuant to the Agreement, either party shall have the right to terminate the Agreement (a) for material breach by the other party or (b) if the other party suffers an event whereby (i) such party files a petition for winding up; (ii) a proceeding or other action is filed against such party under insolvency or similar laws (unless such petition or proceeding is dismissed within 60 days); (iii) such party becomes insolvent; or (iv) such party makes an assignment for the benefit of creditors; provided that any termination pursuant to clause (a) above shall only take effect (unless otherwise provided for in the Agreement) (x) thirty (30) days after delivery of notice of the breach if the breach is curable and has not been cured during such thirty (30)-day period, or (y) immediately upon notice if the breach is not curable.

6. [Reserved].

7. **Force Majeure**: If a party is prevented from performing any of its obligations under this Agreement as a result of a "Force Majeure Event" (defined below), then (a) such party shall promptly give notice thereof to the other party and shall thereafter act diligently and in good faith to mitigate the effects of such Force Majeure Event as promptly as reasonably possible, (b) such party shall be excused from the performance of such obligation to the extent caused by such Force Majeure Event until such time as such Force Majeure Event ceases or is resolved,

CONFIDENTIAL
EXECUTION VERSION

and (c) if such party does not perform such obligation, then the other party shall not be obligated to perform any of its obligations (other than payment of the License Fee) that require the performance of the obligation or obligations that such party has not performed. If any Game is not able to be played as scheduled due to a Force Majeure Event, the NBA will use good faith efforts to (x) reschedule such game or (y) provide Licensee with a reasonably comparable substitute game during the then-current season (and NBA will meaningfully consult with Licensee regarding the match-up, date and time of any such substitute game). To the extent NBA provides Licensee with such a rescheduled or substitute game, such game shall be deemed a Game hereunder. If any Game itself is played (either as initially scheduled or as rescheduled during such NBA season or provided as a substitute due to a Force Majeure Event), but Licensee's distribution of all or part thereof is prevented or interrupted due to a Force Majeure Event, Licensee will not be entitled to any refund or reduction of the License Fees due hereunder. In the event that a game that was initially scheduled as a Game is not able to be played as scheduled due to a Force Majeure Event, and (i) such game is not re-scheduled by the NBA during such NBA season or (ii) NBA does not make available a reasonably comparable substitute Game during such NBA season (each, a "**Lost Game**"), then (x) NBA will provide Licensee with a reasonably comparable substitute game in the immediately following season or (y) if NBA is unable to so provide a substitute game the following season, the portion of the License Fee that should be reasonably allocated to the Lost Game, taking the type of Lost Game (e.g., regular season, post-season) and all other relevant circumstances into account, shall be mutually agreed by Licensee and NBA and such allocated amount shall be deducted from the next License Fee payment or refunded by NBA if the last License Fee payment of the Term of this Agreement has theretofore been made. If the parties cannot agree on the amount of any Lost Game License Fee reduction within 30 days, either party may submit the matter to arbitration in front of JAMS pursuant to the JAMS commercial arbitration rules, with the site of such arbitration to be New York, New York. "**Force Majeure Event**" means, whether or not foreseeable, an Act of God; epidemic; pandemic (including the COVID-19 pandemic and any future resurgence and related governmental and/or sport governing body restrictions); strike, lockout, work stoppage or other labor disturbance (but excluding an NBA Work Stoppage, which shall not constitute a breach hereunder, but which shall be addressed via the other terms hereof); fire, storm, earthquake, flood or other casualty event; act or threat of terrorism; riot, invasion or accident; government interference, regulation, appropriation or rationing; delivery failure or transmission failure; failure at the origination and uplinking center or other inability to secure the feeds or any necessary goods and materials or shipments; or any other event or condition beyond the reasonable control of the party obligated to perform hereunder.

8. **LIMITATION OF LIABILITY**:

   a) EXCEPT WITH RESPCT TO THE PARTIES' OBLIGATION TO INDEMNIFY AGAINST THIRD PARTY CLAIMS AS SET FORTH IN SECTION 4 OF THESE STANDARD TERMS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NO PARTY SHALL BE LIABLE FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL, STATUTORY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR FOR LOSS OF PROFITS, IN EACH CASE, ARISING OUT OF OR RELATED TO THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY, OR ANY OTHER LEGAL OR EQUITABLE THEORY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

   b) EXCEPT WITH RESPECT TO (A) THE PAYMENT OF LICENSE FEES DUE HEREUNDER, (B) THE PARTIES' OBLIGATION TO INDEMNIFY AGAINST THIRD PARTY CLAIMS AS SET FORTH IN SECTION 4 OF THESE STANDARD TERMS, (C) EITHER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; AND (D) A BREACH OF THE CONFIDENTIALITY OBLIGATIONS HEREUNDER, THE PARTIES' RESPECTIVE CUMULATIVE LIABILITY FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES OR DAMAGES FROM ANY CAUSE WHATSOEVER AND REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY SHALL NOT EXCEED AN AMOUNT EQUAL TO THE AGGREGATE LICENSE FEES DUE HEREUNDER.

9.

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024
NYSCEF DOC. NO. 81
RECEIVED NYSCEF: 10/29/2024
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 45 of 82

CONFIDENTIAL
EXECUTION VERSION

██████████████████████████████████████████████████████
██████████████

10. [Reserved].

11. **Notices**: Except where this Agreement specifically states that notice by email suffices, all notices that have legal consequences under this Agreement (e.g., default notice, termination notice) shall be delivered in writing and shall be by personal delivery, overnight delivery, or registered or certified mail, return receipt requested. Any written notice shall be deemed to have been given (a) if by personal delivery, when actually delivered; and (b) if by overnight delivery, certified or registered mail, one day after pre-paid delivery into the custody of the United States Postal Service or other courier service. Notices to NBA shall be sent to President, Global Content and Media Distribution, NBA Properties, Inc., 645 Fifth Avenue, New York, New York 10022, (212) 407-8000, with a courtesy copy to General Counsel, NBA Properties, Inc., at the same address. Notices to Licensee shall be sent to P.O. Box 81226, Seattle, WA 98108-1226, with a courtesy copy to Email: contracts-legal@amazon.com, Attn: General Counsel. If the date a notice or other communication is due hereunder falls on a Saturday, Sunday or Federal holiday, then such notice or other communication shall be due on the next business day. All other notices may be delivered by email (if to NBA: ███████████ if to Licensee: contracts-legal@amazon.com, with a courtesy copy to █████████████████████).

12. **Miscellaneous.**
   a) The relationship of the parties under this Agreement is that of independent contractors and nothing in this Agreement shall be construed to place the parties in the relationship of partners or joint venturers. Neither party shall have the power to obligate or bind the other to a third party in any manner whatsoever.
   b) This Agreement may not be amended or modified except by a writing executed by both parties.
   c) None of the provisions of this Agreement can be waived or modified except expressly by a writing signed by both parties. There are no representations, promises, agreements, warranties, covenants or undertakings by either party other than those contained in this Agreement. No failure on the part of either party to exercise any right under this Agreement shall operate as a waiver of such right; nor shall any single or partial exercise of any right preclude any other or further exercise or the exercise of any other rights. Unless otherwise set forth herein, all rights and remedies provided in this Agreement are cumulative and not exclusive of any other rights or remedies that may be available to the parties, whether provided by law, equity, statute, in any other agreement between the parties or otherwise.
   d) This Agreement has been negotiated between the parties, and no provision of this Agreement shall be construed against one party on the basis that such party drafted such provision or this Agreement.
   e) If this Agreement is terminated by Licensee, then without prejudice to any of the rights or remedies of the parties, Licensee shall only be obligated to pay NBA that portion of the License Fee that has accrued and become payable prior to the effective date of termination, and Licensee shall be entitled to a refund for any amounts paid to NBA and allocable to rights that were not received prior to such termination. The provisions of Sections 1, 2, 3, 4, 8, 11 and 12 of these Standard Terms and any other provisions that by their nature reasonably should survive such termination or expiration shall survive the expiration or termination of this Agreement, it being understood that Licensee's exclusive negotiation right and any other Backend Right(s) NBA may provide Licensee pursuant to Section 1(a) of the Principal Terms (if any) shall survive the natural expiration, but not any early termination, of this Agreement.
   f) Neither party shall issue a press release or other public announcement relating to this Agreement or the subject matter hereof without the prior approval of the other party.
   g) Except as expressly provided in Section 4 of these Standard Terms in the case of Licensee Indemnitees and NBA Indemnitees, no person or entity who is not a party to this Agreement shall be a third-party beneficiary of this Agreement.

*** End of Standard Terms ***

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 46 of 82

**CONFIDENTIAL**
**EXECUTION VERSION**

**Exhibit H**

**Escrow Agreement**

**[attached]**

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
NYSCEF DOC. NO. 81
NYSCEF DOC. NO. 5

INDEX NO. 653721/2024
INDEX NO. 653721/2024
RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 47 of 82

**Execution Version**

## ESCROW AGREEMENT
### (Basic Three Party Escrow)

THIS ESCROW AGREEMENT (this "**Agreement**") is entered into as of the date of the last signature hereto (the "**Effective Date**") by and among AMAZON CONTENT SERVICES LLC ("**Party A**"), NBA MEDIA VENTURES, LLC ("**Party B**", and together with Party A, sometimes referred to individually as "**Party**" and collectively as the "**Parties**"), and JPMorgan Chase Bank, N.A. ("**Escrow Agent**").

**WHEREAS**, the Parties have agreed to deposit in escrow certain funds and wish such deposit to be subject to the terms and conditions set forth herein.

1.       **Appointment**. In accordance with the terms of the "Amazon-NBA U.S. Agreement" (as defined herein), the Parties hereby appoint Escrow Agent as their escrow agent for the purposes set forth herein, and Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein. As used herein, the "**Amazon-NBA U.S. Agreement**" means and refers to that certain Amazon-NBA U.S. Rights Agreement, dated as of the Effective Date, between, on the one hand, NBA Media Ventures, LLC and NBA Properties, Inc. and, on the other hand, Amazon Content Services LLC, and, only with respect to Section 26(a) thereto and Exhibit F attached thereto, Amazon.com, Inc., the publicly traded corporation that is the ultimate parent of Party A ("**Party A Parent**"), with respect to the distribution of the NBA games described therein in the United States and its territories and possessions. The "**Term**" of the Amazon-NBA U.S. Agreement is 11 years, commencing on October 1, 2025, and continuing through the end of the 2036 NBA Finals, and each 12-month (or shorter, in the case of the final period of the Term) period commencing October 1 and ending September 30 during the Term (or the end of the 2036 NBA Finals, as applicable) is referred to as a "**Year**". Subject to Section 5, the Escrow Account (as defined below) will remain open during the Term so long as there is a greater than zero balance left in the account, unless closed by joint written instruction signed by Party A and Party B pursuant to the terms of Section 10(e) hereto. For the avoidance of doubt, subject to Section 5, the Escrow Account shall not be closed, and this Agreement shall not terminate, while there is an Objected Disbursement until the relevant Disbursement Objection is resolved.

2.       **Fund; Investment**. (a) Within five (5) days following the Effective Date, Party A agrees to deposit with Escrow Agent an amount equal to **$3,216,415,820** ("**Initial Deposit**") which shall be replenished by Party A with additional deposits from time to time as required by the Amazon-NBA U.S. Rights Agreement ("**Additional Deposits**," and together with the Initial Deposit, collectively the "**Escrow Deposit**"), the Initial Deposit being the aggregate Year 1, Year 2, and Year 3 fees due under the Amazon-NBA U.S. Agreement ▮▮▮▮ ▮▮▮▮ ▮ ▮▮▮▮. Party B shall be entitled in accordance with Section 3 below to (x) draw down the balance of and/or receive disbursements from the Escrow Deposit in order to receive payment of the License Fees (as defined in the Amazon-NBA U.S. Agreement) that are due each Year on the date as set forth on the payment schedule attached hereto as <u>Schedule 6</u>, and each amount designated as an "Installment" and reflected on such <u>Schedule 6</u> is referred to herein as a "**Scheduled Payment**" and (y) if applicable under the Amazon-NBA U.S. Agreement, draw down the balance of the Escrow Deposit in order to receive payment of the "**Termination Amount**" (as defined in the Amazon-NBA U.S. Agreement). The Escrow Agent shall hold the Escrow Deposit in one or more demand deposit accounts, and invest and reinvest the Escrow Deposit and all interest or other income thereof (collectively, the "**Fund**") (X) in an interest bearing demand deposit account at JPMorgan Chase Bank, N.A. (and the Fund will be initially invested in such an interest bearing demand deposit account), or (Y) if an Authorized Representative (as defined below) of Party A so elects in writing, after deposited to the demand deposit account, in a money market mutual fund (in either case, the "**Escrow Account**"), including without limitation a JPMorgan Money Market Mutual Fund (collectively, "**MMF**"), selected by Party A and as set forth in Schedule 5 attached hereto, which selection may be updated from time to time by Party A, and as shall be acceptable to Escrow Agent, based upon Party A's independent review of prospectuses previously delivered to Party A. All or any part of the Escrow Deposit may be allocated between the demand deposit account or any MMF as directed by Party A from time to time. The Parties and Escrow Agent acknowledge that any funds invested in MMF remain part of the Fund and subject to the terms of this Agreement (including Party B's right to draw down on and/or receive disbursements from such portion of the Escrow Deposit), and that in the event of any loss in value of the Escrow Deposit so invested, reasonably promptly following notice of any such loss, Party A will be responsible for depositing such additional amounts as are necessary to maintain the balance of the Escrow Deposit as required by the Amazon-NBA U.S. Agreement. Party A acknowledges that an affiliate of Escrow Agent, JPMorgan Asset Management ("**JPMAM**"), serves as investment manager for any selected JPMorgan MMF and receives fees from the MMFs from invested funds for services rendered separate from the fees for services rendered by Escrow Agent as further provided within the Agreement. No other investment of the Escrow Deposit will be permitted during the term of this Agreement. The demand deposit account will be titled ▮▮▮▮ ▮▮▮▮; ▮▮▮▮ ▮▮▮▮ / ▮▮▮▮" and any MMF or other investment will be noted similarly by Escrow Agent's affiliates. As noted above, Party A may be required to replenish the Escrow Deposit as and to the extent required in the Amazon-NBA U.S. Agreement.

(b) Escrow Agent is hereby authorized to execute purchases and sales of investments requested by Party A in writing through the facilities of its own trading or capital markets operations or those of any Escrow Agent affiliate and Escrow Agent or any Escrow Agent affiliate may act as counterparty with respect to such investments. Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Fund or the purchase, sale, retention or other disposition of any investment described herein, and each Party acknowledges that it was not offered any investment, tax or accounting advice or recommendation by Escrow Agent with regard to any investment and has made an independent assessment of the suitability and appropriateness of any investment selected hereunder for purposes of this Agreement. Market values, exchange rates and other valuation information (including without limitation, market value, current value or notional value) furnished in any report or statement may be obtained from third party sources and is furnished for the exclusive use of the Parties. Escrow Agent has no responsibility whatsoever to determine the market or other value and makes no representation or warranty, express or implied, as to the accuracy of any such valuations or that any values necessarily reflect the proceeds that may be received on the sale. Except to the extent such losses arise out of the fraud, gross negligence or willful misconduct of Escrow Agent in executing any investment instructions from the Parties delivered in accordance with this Agreement and was the cause of a direct loss to any Party, Escrow Agent shall not have any liability for any loss sustained as a result of any investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of an Authorized Representative of Party A to give Escrow Agent instructions to invest or reinvest the Fund. Notwithstanding the foregoing, Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments to the Parties under this Agreement without the consent of either Party. If the Fund is held in an interest bearing demand deposit account at JPMorgan Chase Bank, N.A., Party A shall be provided with log-in credentials allowing Party A to confirm the balance of the Fund at any time. Party A and Escrow Agent shall work in good faith towards a solution for Party A to monitor the balance of the Fund if moved into an MMF (provided that, at minimum, Escrow Agent will provide monthly balance reporting for the Fund if moved into an MMF). As a courtesy but not an obligation, Escrow Agent shall promptly notify the Parties if the balance in the Escrow Account is less than the Escrow Deposit, less any Scheduled Payments made in accordance with Section 3(a)(I). Upon request by any Party, Escrow Agent shall promptly provide the balance of the Escrow Account to such Party. Escrow Agent shall also provide more regular balance reporting to the Parties as agreed by the Parties and Escrow Agent from time to time.

(c) All interest or other income earned under this Agreement shall be allocated to Party A and reported, by Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042/1042-S (or other appropriate form) as income earned from the Escrow Deposit by Party A whether or not said income has been distributed during such year. Escrow Agent shall withhold any taxes as required by law, and shall remit such taxes to the appropriate authorities. If taxes are required to be withheld, then Escrow Agent will deliver to the applicable Party legally required documentation for any taxes withheld as required under applicable laws.

3.     **Disbursement and Replenishment.**

(a) The following clauses govern disbursement and replenishment of the Escrow Deposit and Fund:

I.   An Authorized Representative of Party B shall be entitled from time to time to draw on or receive disbursements from the Fund (w) in order to receive payment of the Termination Amount if Party B is entitled to such Termination Amount under the terms of the Amazon-NBA U.S. Agreement and (x) in order to receive payment of the Scheduled Payments, in accordance with the dates of the Scheduled Payments set forth in <u>Schedule 6</u> hereto and (in the case of such Scheduled Payments) pursuant to Party B's Standing Instructions (as defined below). Subject to Section 3(a)(V) below, to the extent there are sufficient amounts in the Fund, Escrow Agent shall (y) automatically disburse such Scheduled Payments from the Fund on Schedule 6 attached hereto, on the dates set forth in Schedule 6 (or the immediately preceding Business Day if the date of the Schedule Payment is not a Business Day) and in accordance with Party B's Standing Instructions, and in the case of the payment of a Termination Amount, within six (6) Business Days following Escrow Agent's receipt of written instructions from an Authorized Representative of Party B in substantially the form of <u>Exhibit A-1</u> hereto ("**Party B Release Instructions**"), in each case, so long as Escrow Agent has not received a Disbursement Objection from Party A pursuant to Section 3(a)(V) hereto. Notwithstanding the foregoing, to the extent the balance of the Fund is less than the Scheduled Payment then due and payable, Escrow Agent shall disburse the entire balance of the Fund to Party B in partial satisfaction of the Scheduled Payment.

II.  Subject to Party A's obligation to maintain the balance of the Escrow Deposit if and to the extent required by the Amazon-NBA U.S. Agreement, an Authorized Representative of Party A shall be entitled from time to time in Party A's discretion to draw on the Fund to collect interest and income by delivering written instructions to Escrow Agent (with a copy to Party B) in substantially the form

2

of Exhibit A-2 hereto ("**Party A Release Instructions**"). Escrow Agent shall disburse such income and interest from the Fund within three (3) Business Days following its receipt of and in accordance with Party A Release Instructions so long as Party B has not objected to such disbursement on the basis that it would cause the balance of the Escrow Deposit to fall below the balance required by the Amazon-NBA U.S. Agreement. In the event that Party B does so object, it will follow the provisions of Section 3(a)(V) below, which shall apply mutatis mutandis for any Party B objection.

III.   If, and for so long as, Party A Parent's long-term unsecured credit ratings are both (i) Baa1 or above for Moody's, and (ii) BBB+ or above for S&P (clause (i) and (ii) together, the "**Medium Ratings Threshold**") at any time after the end of Year 1, an Authorized Representative of Party A may, pursuant to a Joint Instruction (as defined below), withdraw from the Fund (by first withdrawing interest and other income and then withdrawing all or a portion of the Escrow Deposit) an amount to leave the remaining Fund equal to the aggregate License Fees scheduled to be paid over the subsequent one (1) Year period. Escrow Agent shall disburse the applicable portion of the Fund within three (3) Business Days following its receipt of and in accordance with such Joint Instruction and may rely upon the validity, accuracy and content of the statements contained in such Joint Instruction.

IV.   If, and for so long as, Party A Parent's long-term unsecured credit ratings are both (i) A3 or above for Moody's, and (ii) A- or above for S&P at any time after the end of Year 2 (clause (i) and (ii) together, the "**High Ratings Threshold**"), an Authorized Representative of Party A may, pursuant to a Joint Instruction, withdraw the balance of the Fund. Escrow Agent shall so disburse the applicable portion of the Fund within three (3) Business Days following its receipt of and in accordance with such Joint Instruction and may rely upon the validity, accuracy and content of the statements contained in such Joint Instruction.

V.   Notwithstanding anything to the contrary set forth above or elsewhere herein, if Party A has a good faith, reasonable basis for claiming a disbursement (including Scheduled Payments or the Termination Amount, if applicable) is not owed, in whole or in part, (the "**Objected Disbursement**") under the Amazon-NBA U.S. Agreement, an Authorized Representative of Party A shall have the right to object to the disbursement by providing Party B and Escrow Agent with a written objection to the disbursement substantially in the form of Exhibit A-3 (the "**Disbursement Objection**"). A Disbursement Objection, whether in connection with a Scheduled Payment or otherwise, must be provided to Party B and Escrow Agent prior to 4:00 p.m. Houston, Texas time on the date that is no later than (i) the fifth (5th) Business Day following Party A and Escrow Agent's receipt of such Party B Release Instructions in the case of a Termination Amount instruction, or (ii) the date that is at least five (5) Business Days prior to the applicable date set forth in Schedule 6 with respect to such Scheduled Payment. Upon receipt of timely written notice of the Disbursement Objection, Escrow Agent will withhold any and all disbursements to either Party A or Party B, including Objected Disbursement in full until Escrow Agent receives either:

    a.   Joint written instructions from Authorized Representatives of Party A and Party B in substantially the form of Exhibit A-4 attached hereto ("**Joint Instructions**"); or

    b.   A final, non-appealable order issued by a court of competent jurisdiction directing the disposition of any amounts disputed in a Disbursement Objection ("**Final Determination**") and accompanied by a written instruction from an Authorized Representative of the instructing Party given to effectuate such Final Determination. The instructing Party shall simultaneously provide a copy of any Final Determination, certification and written instructions to the other Party. Escrow Agent shall be entitled to conclusively rely upon any such certification and instruction and shall have no responsibility to review the Final Determination to which such certification and instruction refers or to make any determination as to whether such Final Determination is final, non-appealable and by a court of competent jurisdiction.

    c.   Escrow Agent shall within three (3) Business Days after its receipt of any such Joint Instructions or such Final Determination, certificate and related instructions, as applicable, distribute the amounts set forth in such Joint Instructions or written instruction accompanying a copy of such Final Determination.

VI.   In the event that any additional funds are required to be deposited into the Escrow Deposit in accordance with the Amazon-NBA U.S. Agreement, including without limitation following a reduction in the Fund pursuant to Sections 3(a)(I), 3(a)(II), 3(a)(III) or 3(a)(IV), in the event that Party A Parent no longer maintains a Medium Ratings Threshold or High Ratings Threshold, as applicable, or in the event that the Fund suffers investment losses or is reduced by other disbursements, Party A shall deposit additional funds into the Escrow Deposit as and to the extent contemplated in the Amazon-NBA U.S. Agreement.

3

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM

INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 50 of 82

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

VII.  In each instance of an instruction under this Escrow Agreement, the instructing Party shall simultaneously provide a copy of such instructions to the other Party. Neither Party will unreasonably withhold or delay their execution of any Joint Instructions hereunder so long as the same is consistent with the Parties' rights and obligations under the Amazon-NBA U.S. Agreement. Subject to Section 3(a)(V), Escrow Agent shall be entitled to conclusively rely upon any such instruction.

Notwithstanding anything to the contrary, any instructions in any way related to the transfer or distribution of all or a portion of the Fund must, in order to be deemed delivered and effective, be in writing and executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons signing this Agreement or one of the designated persons as set forth on the Designation of Authorized Representatives attached hereto as <u>Schedule 1-A</u> and <u>1-B</u> (each an "**Authorized Representative**"), and delivered to Escrow Agent only as a Portable Document Format ("**PDF**") attached to an email only at the email address set forth in <u>Section 8</u> below or through an online platform offered by Escrow Agent's escrow services business. Escrow Agent shall not be liable to any Party or other person for refraining from acting upon any instruction for or related to the transfer or distribution of the Fund that does not satisfy the requirements herein. Escrow Agent may rely and act upon the confirmation of anyone purporting to be an Authorized Representative in connection with any of Escrow Agent's verifying callbacks or email confirmations. Notwithstanding anything to the contrary, the Parties acknowledge and agree that Escrow Agent (i) shall have no obligation to take any action in connection with this Agreement on a non-Business Day and any action Escrow Agent may otherwise be required to perform on a non-Business Day may be performed by Escrow Agent on the following Business Day and (ii) may not transfer or distribute the Fund until Escrow Agent has completed its security procedures.

(b)  Each Party authorizes Escrow Agent to use the funds transfer instructions ("**Standing Instructions**") specified for it in <u>Schedule 3</u> attached hereto (as may be updated from time to time if signed by an Authorized Representative from the applicable Party) to disburse any funds due to such Party, without a verifying callback or email confirmation as set forth below.

(c)  If any funds transfer instructions other than Standing Instructions are set forth in a permitted instruction from a Party or the Parties in accordance with this Agreement, Escrow Agent shall confirm such funds transfer instructions by a telephone callback or email confirmation to an Authorized Representative of such Party or Parties and thereafter, such funds transfer instructions shall also be considered the applicable Party's Standing Instructions hereunder. No funds will be disbursed until such confirmation occurs. If multiple disbursements are provided for under this Agreement pursuant to any Standing Instructions, only the date, amount and/or description of payments may change without requiring a telephone callback or email confirmation.

(d)  The persons designated as Authorized Representatives and telephone numbers and email addresses for same may be changed only in a writing executed by an Authorized Representative or other duly authorized person of the applicable Party setting forth such changes and actually received by Escrow Agent as a PDF attached to an email or through an online platform offered by Escrow Agent's escrow services business. Escrow Agent shall confirm any such change in Authorized Representatives by a telephone callback or email confirmation according to its security procedures.

(e)  Escrow Agent and other financial institutions, including any intermediary bank and the beneficiary's bank, may rely upon the identifying number of the beneficiary, the beneficiary's bank or any intermediary bank included in a funds transfer instruction, even if it identifies a person different from the beneficiary, the beneficiary's bank or intermediary bank identified by name. It is understood that the purpose of Escrow Agent's security procedures is to verify the authenticity of, and not to detect errors in, instructions.

(f)  As used in this Agreement, "**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which Escrow Agent located at the notice address set forth below is authorized or required by law or executive order to remain closed. The Parties acknowledge that the security procedures set forth in this <u>Section 3</u> are commercially reasonable.

(g)  Notwithstanding anything to the contrary contained in this Agreement, in the event that an electronic signature is affixed to an instruction issued hereunder to disburse or transfer funds, such instruction may be confirmed by a verifying callback (or email confirmation) to an Authorized Representative.

4.       **Escrow Agent**. Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duty, shall be implied. Notwithstanding anything to the contrary, Escrow Agent has no knowledge of, nor any obligation to comply with, the terms and conditions of any other agreement, Escrow Agent shall not be responsible for determining the meaning of any capitalized term not entirely defined herein, nor shall Escrow Agent be required to determine if any Party has complied with any other agreement. Notwithstanding the terms of any other agreement,

4

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 51 of 82

INDEX NO. 653721/2024

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

the terms and conditions of this Agreement shall control the actions of Escrow Agent. Escrow Agent may conclusively rely upon any written notice, document, instruction or request delivered by the Parties believed by it in good faith to be genuine and to have been signed by an Authorized Representative(s), as applicable, without inquiry (other than pursuant to the security procedures described in Section 3 of this Agreement) and without requiring substantiating evidence of any kind and Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request except to the extent required by this Agreement. With respect to any instruction or notice from a Party that Escrow Agent has received, Escrow Agent shall be entitled to conclusively presume that the other Party (or Parties) has simultaneously received such instruction or notice. Any notice, document, instruction or request delivered by a Party but not contemplated under this Agreement may be disregarded by Escrow Agent. ESCROW AGENT SHALL NOT BE LIABLE FOR ANY ACTION TAKEN, SUFFERED OR OMITTED TO BE TAKEN BY IT IN GOOD FAITH EXCEPT TO THE EXTENT THAT ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, FRAUD OR BAD FAITH WAS THE CAUSE OF ANY DIRECT LOSS TO EITHER PARTY. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through its affiliates or agents. In the event Escrow Agent shall be uncertain, or believes there is some ambiguity, as to its duties or rights hereunder or receives instructions, claims or demands from any Party hereto which in Escrow Agent's judgment conflict with the provisions of this Agreement, or if Escrow Agent receives conflicting instructions from the Parties, Escrow Agent shall be entitled either to: (a) refrain from taking any action until it shall be given (i) a joint written direction executed by Authorized Representatives of the Parties which eliminates such ambiguity or conflict or (ii) a court order issued by a court of competent jurisdiction (it being understood that Escrow Agent shall be entitled conclusively to rely and act upon any such court order and shall have no obligation to determine whether any such court order is final); or (b) file an action in interpleader. Escrow Agent shall have no duty to solicit any payments which may be due to it or the Fund, including, without limitation, the Escrow Deposit nor shall Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. ANYTHING IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, IN NO EVENT SHALL ESCROW AGENT (ON THE ONE HAND) OR THE PARTIES (ON THE OTHER HAND) BE LIABLE TO THE OTHER FOR SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF ESCROW AGENT OR THE PARTIES (AS APPLICABLE) HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION EXCEPT TO THE EXTENT SUCH LOSS OR DAMAGE IS CAUSED BY ESCROW AGENT'S OR THE PARTIES' (AS APPLICABLE) BAD FAITH, FRAUD OR WILLFUL MISCONDUCT.

5.    **Succession.** Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving no less than thirty (30) days advance notice in writing of such resignation to the Parties or may be removed, with or without cause, by the Parties at any time after giving not less than thirty (30) days advance joint written notice to Escrow Agent. Escrow Agent's sole responsibility after such thirty (30) day notice period expires shall be to hold the Fund (without any obligation to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, appointed by the Parties, or such other person designated by the Parties, or in accordance with the directions of a final court order, at which time of delivery, Escrow Agent's obligations hereunder shall cease and terminate. If prior to the effective resignation or removal date, the Parties have failed to appoint a successor escrow agent, or to instruct Escrow Agent to deliver the Fund to another person as provided above, or if such delivery is contrary to applicable law, at any time on or after the effective resignation date, Escrow Agent may either (a) appoint a successor escrow agent of its own choice; or (b) deliver the Fund to Party A using the Standing Instructions. If neither (a) nor (b) are possible, Escrow Agent may interplead the Fund with a court located in the State of New York and the costs, expenses and reasonable and documented attorney's fees which are incurred in connection with such proceeding may be charged against and withdrawn from the Fund. Any appointment of a successor escrow agent shall be binding upon the Parties and no appointed successor escrow agent shall be deemed to be an agent of Escrow Agent. Escrow Agent shall deliver the Fund to any appointed successor escrow agent, at which time Escrow Agent's obligations under this Agreement shall cease and terminate. Any entity into which Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business may be transferred, shall be Escrow Agent under this Agreement without further act.

6.    **Compensation; Acknowledgment.** Party A agrees to pay Escrow Agent upon execution of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing, shall be as described in Schedule 2. The Parties agree that, notwithstanding anything to the contrary, to the extent any Party deposits such compensation into an account governed by this Agreement, Escrow Agent shall have the right to withdraw such compensation from such account. Each of the Parties further agrees to the disclosures and agreements set forth in Schedule 2.

7.    **Indemnification and Reimbursement.** The Parties agree to jointly and severally indemnify, defend, hold harmless, pay or reimburse Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the **"Indemnitees"**) from and against any and all losses, damages, claims, liabilities, taxes (other than

5

Case 1:24-cv-09027-KPF     Document 51-4     Filed 08/25/25     Page 52 of 82

taxes on income earned by an Indemnitee in connection herewith), costs or expenses (including reasonable and documented attorney's fees) (collectively "**Losses**"), resulting directly from (a) Escrow Agent's performance of this Agreement, except to the extent that such Losses are finally determined by a court of competent jurisdiction to have been caused by the gross negligence, willful misconduct, fraud or bad faith of such Indemnitee; and (b) Escrow Agent's following, accepting or acting upon any instructions or directions, whether joint or singular, from the Parties received in accordance with this Agreement. It is understood and agreed that Escrow Agent does not have a contractual lien or security interest or a contractual right of set-off under this Agreement; provided, however, that nothing herein shall be construed as a waiver of any statutory or common law rights to which Escrow Agent may otherwise be entitled with respect thereto. No Party nor, any of their respective agents, employees, officers and directors shall, in any event, be liable for indirect, incidental, special, consequential, or punitive loss or damage of any kind (including lost profits). The obligations set forth in this Section 7 shall survive the resignation, replacement or removal of Escrow Agent or the termination of this Agreement.

8.      **Notices.**  Except as otherwise provided in Section 3, all communications hereunder shall be in writing (which may be a PDF attached to an email) and shall be delivered by email or overnight courier only to the appropriate fax number, email address, or notice address set forth for each party below (or to such updated fax number, email address, or notice address as provided to the other parties in writing).

If to Party A:



Account statements
and billing:              Same as the above

With courtesy copies
(which shall not constitute
notice) to:

If to Party B:

Account statements
and billing:              Same as the above.

With copies to:



If to Escrow Agent:



6

9.   **Compliance with Directives.**  In the event that a legal garnishment, attachment, levy, restraining notice, court order or other governmental order (a "**Directive**") is served with respect to any of the Fund, or the delivery thereof shall be stayed or enjoined by a Directive, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such Directives so entered or issued, and in the event that Escrow Agent obeys or complies with any such Directive it shall not be liable to any of the Parties hereto or to any other person by reason of such compliance notwithstanding such Directive be subsequently reversed, modified, annulled, set aside or vacated.

10.   **Miscellaneous.**  (a)  The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing signed by Escrow Agent and the Parties.  Neither this Agreement nor any right or interest hereunder may be assigned by any Party without the prior consent of Escrow Agent and the other Party and any assignment in violation of this Agreement shall be ineffective and void.  This Agreement shall be governed by and construed under the laws of the State of New York.  Each Party and Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of New York  To the extent that in any jurisdiction either Party may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process or immunity from liability, such Party shall not claim, and hereby irrevocably waives, such immunity.  Escrow Agent and the Parties further hereby knowingly, voluntarily and intentionally irrevocably waive, to the fullest extent permitted by applicable law, any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.

(b)  No party to this Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, public health emergencies, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control; it being understood that such party shall use commercially reasonable efforts (and with respect to Escrow Agent's efforts, consistent with accepted practices among banks of similar size) to resume performance as soon as reasonably practicable under the circumstances. This Agreement and any joint instructions from the Parties may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable. This Agreement may be executed and transmitted as a PDF attached to an email and each such execution shall be of the same legal effect, validity and enforceability as a manually executed original, wet-inked signature.  If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.  The Parties each represent, warrant and covenant that (i) each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations; (ii) such Party has full power and authority to enter into this Agreement and to perform all of the duties and obligations to be performed by it hereunder; and (iii) the person(s) executing this Agreement on such Party's behalf and certifying Authorized Representatives in the applicable Schedule 1 has been duly and properly authorized to do so, and each Authorized Representative of such Party has been duly and properly authorized to take actions specified for such person in the applicable Schedule 1.  Except as expressly provided in Section 7 above, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of the Fund or this Agreement.

(c) Party A and Party B acknowledge and agree that, solely as between Party A and Party B, this Agreement is subject to the terms and conditions set forth in the Amazon-NBA U.S. Agreement. In the event of any conflict or inconsistency between the terms and conditions of this Agreement and the terms and conditions of the Amazon-NBA U.S. Agreement, then solely as between Party A and Party B, the terms and conditions of the Amazon-NBA U.S. Agreement shall prevail, govern and control.

(d) Escrow Agent agrees to keep confidential and not disclose, and to cause any of its affiliates or agents to keep confidential and not to disclose, any and all documents, materials, and any other non-public information which it shall have obtained regarding the Parties or the Amazon-NBA U.S. Agreement in connection with the execution and delivery of this Agreement and its performance of its duties and obligations hereunder ("**Confidential Information**"); provided, however, that Confidential Information shall not include information that (i) is publicly available other than as a result of Escrow Agent's breach of this Agreement, (ii) obtained from a third party not known by Escrow Agent to be under an obligation of confidentiality with respect to such information or (iii) was independently developed by Escrow Agent without use of or reference to such information. Escrow Agent shall be permitted to disclose Confidential Information as set forth in Schedule 2. This Section 10(d) shall survive termination of this Agreement for a period of 24 months after such termination.

7

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

RECEIVED NYSCEF: 10/29/2024

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 54 of 82

(e) The Fund and this Agreement can be terminated in a written termination notice signed by both Parties. Upon any such termination pursuant to this clause 10(e), all amounts remaining in the Fund will (unless otherwise provided for in such joint written notice) be returned to Party A.

8

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024
NYSCEF DOC. NO. 81
RECEIVED NYSCEF: 10/29/2024

NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 55 of 82

Docusign Envelope ID: 0E5FED98-7D53-4A37-88B8-BA47AD17D047

CC VND 00276649 2024 TR

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date set forth above.

**PARTY A:**                                        **ESCROW AGENT:**

**AMAZON CONTENT SERVICES LLC**                     **JPMORGAN CHASE BANK, N.A.**

By: ██████                                          By: _____

Name: ██████                                        ██████

Title:   Authorized Signatory                       Title:   Vice President

██████                                              Date: _____

██████

Date:   July 15, 2024

**PARTY B:**

**NBA MEDIA VENTURES, LLC**

By: _____

Name: _____

Title: _____

Phone: _____

Email: _____

Date: _____

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024

NYSCEF DOC. NO. 81
RECEIVED NYSCEF: 10/29/2024

NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 56 of 82

**EXHIBIT A-1**

**FORM OF PARTY B RELEASE INSTRUCTIONS**



Fax No.:

Email Address:

Attention:

Tel No.:

Email Address:

[Date]

Re:  Amazon Content Services LLC, NBA Media Ventures, LLC – Escrow Agreement dated [         ], 2024
Escrow Account no. [    ]

Dear Sir/Madam:

We refer to an escrow agreement dated [         ], 2024  among Amazon Content Services LLC ("**Party A**"), NBA
Media Ventures, LLC ("**Party B**"), and JPMorgan Chase Bank, N.A., as Escrow Agent (the "**Escrow Agreement**").

Capitalized terms in this letter that are not otherwise defined shall have the same meaning given to them in the Escrow
Agreement.

Pursuant to Section 3 of the Escrow Agreement, Party B instructs Escrow Agent to release the portion of the Fund
specified below in connection with a Termination Amount.

Party B hereby certifies to Escrow Agent that this notice was delivered to Party A.

[Amount (In writing): [INSERT ONLY IF LESS THAN ENTIRE FUND IS BEING DISBURSED]]
Beneficiary:
City:
Country:

**US Instructions:**
Bank Name:
Bank Address:
ABA Number:
Credit A/C Name:
Credit A/C #:
Credit A/C Address:
If Applicable:
        FFC A/C Name:
        FFC A/C #:
        FFC A/C Address:

**International Instructions:**
Bank Name:
Bank Address
SWIFT Code:
US Pay Through ABA:
Credit A/C Name:

10

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 57 of 82

Credit A/C # (IBAN #):
Credit A/C Address:
If Applicable:
      FFC A/C Name:
      FFC A/C # (IBAN #):
      FFC A/C Address:

**PARTY B:**

**NBA MEDIA VENTURES, LLC**

By: _____
Name: _____
Title: _____
Phone: _____
Email: _____

11

**EXHIBIT A-2**

**FORM OF PARTY A INCOME AND INTEREST DISBURSEMENT INSTRUCTIONS**

Email Address: ██████████████████
Attention: ████████

Attention: ████████████████████████
Tel No.: ████████
Email Address: ██████████████████

[Date]

Re:  Amazon Content Services LLC, NBA Media Ventures, LLC – Escrow Agreement dated [        ]
Escrow Account no. [    ]

Dear Sir/Madam:

We refer to an escrow agreement dated [        ], 2024  among Amazon Content Services LLC ("**Party A**"), NBA Media Ventures, LLC ("**Party B**"), and JPMorgan Chase Bank, N.A., as Escrow Agent (the "**Escrow Agreement**").

Capitalized terms in this letter that are not otherwise defined shall have the same meaning given to them in the Escrow Agreement.

Pursuant to Section 3 of the Escrow Agreement, Party A instructs Escrow Agent to release the portion of the Fund (specified below), which shall solely be comprised of the income and interest of the Fund in excess of the Escrow Deposit. Escrow Agent shall complete such disbursement within three (3) Business Days following receipt of and in accordance with the instructions contained herein.

Party A hereby certifies to Escrow Agent that this notice was delivered to Party B.

[Amount (In writing): [INSERT AMOUNT OF INCOME AND INTEREST OF FUND TO BE COLLECTED]]
Beneficiary:
City:
Country:

**US Instructions:**
Bank Name:
Bank Address:
ABA Number:
Credit A/C Name:
Credit A/C #:
Credit A/C Address:
If Applicable:
    FFC A/C Name:
    FFC A/C #:
    FFC A/C Address:

**International Instructions:**
Bank Name:

12

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 59 of 82
INDEX NO. 653721/2024
INDEX NO. 653721/2024
RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024
NYSCEF DOC. NO. 81
NYSCEF DOC. NO. 5

Bank Address
SWIFT Code:
US Pay Through ABA:
Credit A/C Name:
Credit A/C # (IBAN #):
Credit A/C Address:
If Applicable:
     FFC A/C Name:
     FFC A/C # (IBAN #):
     FFC A/C Address:

**PARTY A**

Amazon Content Services LLC

By: _____
Name: _____
Title: _____
Phone: _____
Email: _____

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 60 of 82

**EXHIBIT A-3**

**FORM OF PARTY A OBJECTION NOTICE**

Fax No.: ███████████

Email Address: ███████████

Attention: ███████████

Attention: ███████████

Tel No.: ███████████

Email Address: ███████████

[Date]

Re: Amazon Content Services LLC, NBA Media Ventures, LLC – Escrow Agreement dated [        ]
Escrow Account no. [    ]

Dear Sir/Madam:

We refer to an escrow agreement dated [        ], 2024 among Amazon Content Services LLC ("**Party A**"), NBA Media Ventures, LLC ("**Party B**"), and JPMorgan Chase Bank, N.A., as Escrow Agent (the "**Escrow Agreement**"). Capitalized terms in this letter that are not otherwise defined shall have their meanings set forth in the Escrow Agreement.

Party A hereby objects to the disbursement of the Termination Amount or applicable Scheduled Payment amount (such amount, the "**Disputed Amount**") scheduled to be delivered by Escrow Agent to Party B on _____, and requests that the Disputed Amount not be disbursed to Party B.

Party A hereby certifies to Escrow Agent that this notice was delivered to Party B in accordance with the terms of the Escrow Agreement.

**PARTY A:**
**AMAZON CONTENT SERVICES LLC**

By: _____

Name: _____

Title: _____

14

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024

NYSCEF DOC. NO. 81
RECEIVED NYSCEF: 10/29/2024

NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 61 of 82

**EXHIBIT A-4**

**FORM OF JOINT INSTRUCTIONS**

[REDACTED]

Fax No.: [REDACTED]
Email Address: [REDACTED]
Attention: [REDACTED]

[Date]

Re:  Amazon Content Services LLC, NBA Media Ventures, LLC – Escrow Agreement dated [        ], 2024 Escrow Account no. [   ]

Dear Sir/Madam:

We refer to an escrow agreement dated [        ], 2024 among Amazon Content Services LLC ("**Party A**"), NBA Media Ventures, LLC ("**Party B**"), and JPMorgan Chase Bank, N.A., as Escrow Agent (the "**Escrow Agreement**").

Capitalized terms in this letter that are not otherwise defined shall have the same meaning given to them in the Escrow Agreement.

Pursuant to Section [___] of the Escrow Agreement, the Parties instruct Escrow Agent to release the Fund, or the portion specified below, to the specified party as instructed below.

Amount:
(In writing)
Beneficiary:
City:
Country:

**US Instructions:**
Bank Name:
Bank Address:
ABA Number:
Credit A/C Name:
Credit A/C #:
Credit A/C Address:
If Applicable:
      FFC A/C Name:
      FFC A/C #:
      FFC A/C Address:

**International Instructions:**
Bank Name:
Bank Address
SWIFT Code:
US Pay Through ABA:
Credit A/C Name:
Credit A/C # (IBAN #):
Credit A/C Address:
If Applicable:
      FFC A/C Name:
      FFC A/C # (IBAN #):
      FFC A/C Address:

**PARTY A:**

15

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024
NYSCEF DOC. NO. 81
RECEIVED NYSCEF: 10/29/2024
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 62 of 82

**AMAZON CONTENT SERVICES LLC**

By: _____

Name: _____

Title: _____

**PARTY B:**

**NBA MEDIA VENTURES, LLC**

By: _____

Name: _____

Title: _____

Phone: _____

Email: _____

16

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 63 of 82

NYSCEF DOC. NO. 5
Docusign Envelope ID: 42C21434-9750-45AB-8600-F20963973F1B
RECEIVED NYSCEF: 07/26/2024

CC VND 00276568 2024 TR

**Schedule 1-A**

AMAZON CONTENT SERVICES LLC

**DESIGNATION OF AUTHORIZED
REPRESENTATIVES**

The undersigned, ███████████, being the duly elected, qualified and acting Authorized Signatory of Amazon Content Services LLC ("Party A"), does hereby certify:

1.    That each of the following representatives is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, by and among Party A, NBA Media Ventures, LLC ("Party B"), and JPMorgan Chase Bank, N.A., as Escrow Agent, to which this Schedule is attached (the "Escrow Agreement"), that the signature appearing opposite each Authorized Representative's name is the true and genuine signature of such Authorized Representative, and that each Authorized Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by Party A such that only the Authorized Representative who issued the instruction is available to receive a callback or email confirmation, or (c) Party A is an individual.  Party A acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if Party A nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, Party A agrees to be bound by any instruction, whether or not authorized, confirmed by callback or email confirmation to the issuer of the instruction.



| NAME | SIGNATURE | DIRECT TELEPHONE, CELL NUMBER and EMAIL ADDRESS |
|---|---|---|
| ██████ Authorized Representative | | (ph): ████ (cell): ████ (email): ████ |
| ██ Authorized Representative | | (ph): ████ (email): ████ |
| ██ Vice President, Product | | (ph): ████ (email): ████ |
| ████ Authorized Representative | | (ph): ████ (email): ████ |
| ████ Authorized Representative | | (ph): ████ (email): ████ |

2.    Email confirmation not accompanied by other means of authentication (such as DocuSign initiated by Escrow Agent) approved by Escrow Agent is only permitted to a corporate email address (and not a personal email address) for purposes of this Schedule.

3.    This Schedule may be signed in counterparts and the undersigned certifies that any signature set forth on an attachment to this Schedule is the true and genuine signature of an Authorized Representative and that each such Authorized Representative's contact information is current and up-to-date at the date hereof.

4.    That pursuant to Party A's governing documents, as amended, the undersigned has the power and authority to execute this Designation on behalf of Party A.



Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 64 of 82

RECEIVED NYSCEF: 07/26/2024

CC VND 00276568 2024 TR

5. Notwithstanding the above, if Party A is an individual and the sole Authorized Representative, no signature will be required below.

Signature:
Name:
Title:   Authorized Signatory
July 15, 2024

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-A**

All instructions, including but not limited to funds transfer instructions, whether set forth in a PDF attached to an email or through an online platform offered by Escrow Agent's escrow services business, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement) of the Authorized Representative authorizing said funds transfer on behalf of such Party.

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM

INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 65 of 82    INDEX NO. 653721/2024

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

**Schedule 1-B**

NBA MEDIA VENTURES LLC

### DESIGNATION OF AUTHORIZED
### REPRESENTATIVES

The undersigned, ████ ████, being the duly elected, qualified and ████; ███████████████████ Media Ventures, LLC ("Party B"), does hereby certify:

1.     That each of the following representatives is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, by and among Amazon Content Services LLC ("Party A"), Party B, and JPMorgan Chase Bank, N.A., as Escrow Agent, to which this Schedule is attached (the "Escrow Agreement"), that the signature appearing opposite each Authorized Representative's name is the true and genuine signature of such Authorized Representative, and that each Authorized Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by Party B such that only the Authorized Representative who issued the instruction is available to receive a callback or email confirmation, or (c) Party B is an individual. Party B acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if Party B nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, Party B agrees to be bound by any instruction, whether or not authorized, confirmed by callback or email confirmation to the issuer of the instruction.

| NAME | SIGNATURE | DIRECT TELEPHONE, CELL NUMBER and EMAIL ADDRESS |
|---|---|---|



2.     Email confirmation not accompanied by other means of authentication (such as DocuSign initiated by Escrow Agent) approved by Escrow Agent is only permitted to a corporate email address (and not a personal email address) for purposes of this Schedule.

3.     This Schedule may be signed in counterparts and the undersigned certifies that any signature set forth on an attachment to this Schedule is the true and genuine signature of an Authorized Representative and that each such Authorized Representative's contact information is current and up-to-date at the date hereof.

4.     That pursuant to Party B's governing documents, as amended, the undersigned has the power and authority to execute this Designation on behalf of Party B.

5.     Notwithstanding the above, if Party B is an individual and the sole Authorized Representative, no signature will be required below.

Signature: _____

19

Name:
Title:

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS
SCHEDULE 1-B**

All instructions, including but not limited to funds transfer instructions, whether set forth in a PDF attached to an email or through an online platform offered by Escrow Agent's escrow services business, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement) of the Authorized Representative authorizing said funds transfer on behalf of such Party.

20

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 67 of 82

SCHEDULE 2

# J.P.Morgan

## Schedule of Fees and Disclosures for Escrow Agent Services

Account Acceptance Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ■
Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation. Payable upon closing.

Annual Administration Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ■

The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction. Payable upon closing and annually in advance thereafter, without pro-ration for partial years.

**Extraordinary Services and Out-of-Pocket Expenses:** Escrow Agent or any of its affiliates may receive compensation with respect to any investment directed hereunder including without limitation charging any applicable agency fee or trade execution fee in connection with each transaction. Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at Escrow Agent's then standard rate. Escrow Agent may impose, charge, debit, pass-through and modify fees and/or charges for any account established and services provided by Escrow Agent, including but not limited to, transaction, maintenance, balance-deficiency, and service fees, agency or trade execution fees, and other charges, including those levied by any governmental authority.

**Fee Disclosure & Assumptions:** Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review, and assumes the escrow deposit will be continuously invested in a interest bearing demand deposit accounts initially or, later, MMF if Party A elects. Escrow Agent reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or other factors change from those used to set the fees described herein.

Payment of the invoice is due upon receipt.

**Disclosures and Agreements:**

**Taxes.** The Parties shall duly complete such tax documentation or other procedural formalities necessary for Escrow Agent to complete required tax reporting and for the relevant Party to receive interest or other income without withholding or deduction of tax in any jurisdiction. Should any information supplied in such tax documentation change, the Parties shall promptly notify Escrow Agent. Escrow Agent shall withhold any taxes it deems appropriate in the absence of proper tax documentation or as required by law, including without limitation, the Foreign Account Tax Compliance Act ("FATCA"), and shall remit such taxes to the appropriate authorities.

**Representations Relating to Section 15B of the Securities Exchange Act of 1934 (Rule 15Ba1-1 et seq.) (the "Municipal Advisor Rule").** Each Party represents and warrants to Escrow Agent that for purposes of the Municipal Advisor Rules, none of the funds (if any) currently invested, or that will be invested in the future, in money market funds, commercial paper or treasury bills under this Agreement constitute or contain (i) proceeds of municipal securities (including investment income therefrom and monies pledged or otherwise legally dedicated to serve as collateral or a source or repayment for such securities) or (ii) municipal escrow investments (as each such term is defined in the Municipal Advisor Rule). Each Party also represents and warrants to Escrow Agent that the person providing this certification has access to the appropriate information or has direct knowledge of the source of the funds to be invested to enable the forgoing representation to be made. Further, each Party acknowledges that Escrow Agent will rely on this representation until notified in writing otherwise.

**Know Your Customer.** To assist in the prevention of the funding of terrorism and money laundering activities, applicable law may require financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for the Parties: when the Parties open an account, Escrow Agent may ask for each Party's name, address, date of birth (for natural persons), and/or other information and documents that will allow Escrow Agent to identify such Party. Escrow Agent may also request and obtain certain information from third party vendors regarding any Party. To fulfill Escrow Agent's "know your customer" responsibilities and in connection with its performance of this Agreement, Escrow Agent may request information and/or documentation from each Party from time to time, including, without limitation, regarding such Party's organization, business and, to the extent applicable, beneficial owner(s) of such Party, including relevant natural or legal persons, and such Party shall procure and furnish the same to Escrow Agent in a timely manner. Any information and/or documentation furnished by any Party is the sole responsibility of such Party and Escrow Agent is entitled to rely on the information and/or documentation without making any verification whatsoever (except for the authentication under the security procedures, as applicable). Each Party represents and warrants that all such information and/or documentation is true, correct and not misleading and shall advise Escrow Agent promptly of any changes and, except as prohibited by applicable law, such Party agrees to provide complete responses to Escrow Agent's requests within the timeframes specified. If any Party fails to provide or consent to the provision of any information required by this paragraph, Escrow Agent may suspend or discontinue providing any service hereunder and resign pursuant to this Agreement.

21

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 68 of 82
NYSCEF DOC. NO. 81
RECEIVED NYSCEF: 07/26/2024

**OFAC Disclosure**. Escrow Agent is required to act in accordance with the laws and regulations of various jurisdictions relating to the prevention of money laundering and the implementation of sanctions, including but not limited to regulations issued by the U.S. Office of Foreign Assets Control. Escrow Agent is not obligated to execute payment orders or effect any other transaction where the beneficiary or other payee is a person or entity with whom Escrow Agent is prohibited from doing business by any law or regulation applicable to Escrow Agent, or in any case where compliance would, in Escrow Agent's opinion, conflict with applicable law or banking practice or its own policies and procedures. Where Escrow Agent does not execute a payment order or effect a transaction for such reasons, Escrow Agent may take any action required by any law or regulation applicable to Escrow Agent including, without limitation, freezing or blocking funds. Transaction screening may result in delays in the posting of transactions.

**Abandoned Property**. Escrow Agent is required to act in accordance with the laws and regulations of various states relating to abandoned property, escheatment or similar law and, accordingly, shall be entitled to remit dormant funds to any state as abandoned property in accordance with such laws and regulations. Without limitation of the foregoing, notwithstanding any instruction to the contrary, Escrow Agent shall not be liable to any Party for any amount disbursed from an account maintained under this Agreement to a governmental entity or public official in compliance with any applicable abandoned property, escheatment or similar law.

**Information**. The Parties authorize Escrow Agent to disclose information with respect to this Agreement and the account(s) established hereunder, the Parties, or any transaction hereunder if such disclosure is: (i) necessary in Escrow Agent's opinion, for the purpose of allowing Escrow Agent to perform its duties and to exercise its powers and rights hereunder or for operational or risk management purposes or compliance with legal, tax and regulatory requirements, including, without limitation, FATCA; (ii) to a proposed assignee of the rights of Escrow Agent; (iii) to a branch, affiliate, subsidiary, employee or agent of Escrow Agent or to their auditors, regulators or legal advisers or to any competent court; (iv) to the auditors of any of the Parties; or (v) required by applicable law, regardless of whether the disclosure is made in the country in which each Party resides, in which the Escrow Account is maintained, or in which the transaction is conducted. The Parties agree that such disclosures by Escrow Agent and its affiliates may be transmitted across national boundaries and through networks, including those owned by third parties.

**Acknowledgment of Compensation and Multiple Roles**. Escrow Agent is authorized to act under this Agreement notwithstanding that Escrow Agent or any of its subsidiaries or affiliates (such subsidiaries and affiliates hereafter individually called an "Affiliate" and collectively called "Affiliates") may (A) receive fees or derive earnings (float) as a result of providing an investment product or account on the books of Escrow Agent pursuant to this Agreement or for providing services or referrals with respect to investment products, or (B) (i) act in the same transaction in multiple capacities, (ii) engage in other transactions or relationships with the same entities to which Escrow Agent may be providing escrow or other services under this Agreement, (iii) refer clients to an Affiliate for services or (iv) enter into agreements under which referrals of escrow or related transactions are provided to Escrow Agent. JPMorgan Chase Bank, N.A. may earn compensation from any of these activities in addition to the fees charged for services under this Agreement.

**FDIC Disclosure**. In the event Escrow Agent becomes insolvent or enters into receivership, Escrow Agent may provide to the Federal Deposit Insurance Corporation ("FDIC") account balance information for any account governed by this Agreement, as reflected on Escrow Agent's end-of-day ledger balance, and the customer name and tax identification number associated with such accounts for the purposes of determining the appropriate deposit insurance coverage. Funds held in such accounts will be insured by the FDIC under its applicable rules and limits.

THE FOLLOWING DISCLOSURES ARE REQUIRED TO BE PROVIDED UNDER APPLICABLE U.S. REGULATIONS, INCLUDING, BUT NOT LIMITED TO, FEDERAL RESERVE REGULATION D. WHERE SPECIFIC INVESTMENTS ARE NOTED BELOW, THE DISCLOSURES APPLY ONLY TO THOSE INVESTMENTS AND NOT TO ANY OTHER INVESTMENT.

**Demand Deposit Account Disclosure**. Escrow Agent is authorized, for regulatory reporting and internal accounting purposes, to divide an escrow demand deposit account maintained in the U.S. in which the Fund is held into a demand deposit internal account and a savings internal account, and to transfer funds on a daily basis between these internal accounts on Escrow Agent's general ledger in accordance with U.S. law at no cost to the Parties. Escrow Agent will record the internal accounts and any transfers between them on Escrow Agent's books and records only. The internal accounts and any transfers between them will not affect the Fund, any investment or disposition of the Fund, use of the escrow demand deposit account or any other activities under this Agreement, except as described herein. Escrow Agent will establish a target balance for the demand deposit internal account, which may change at any time. To the extent funds in the demand deposit internal account exceed the target balance, the excess will be transferred to the savings internal account, unless the maximum number of transfers from the savings internal account for that calendar month or statement cycle has already occurred. If withdrawals from the demand deposit internal account exceeds the available balance in the demand deposit internal account, funds from the savings internal account will be transferred to the demand deposit internal account up to the entire balance of available funds in the savings internal account to cover the shortfall and to replenish any target balance that Escrow Agent has established for the demand deposit internal account. If a sixth transfer is needed during a calendar month or statement cycle, it will be for the entire balance in the savings internal account, and such funds will remain in the demand deposit internal account for the remainder of the calendar month or statement cycle.

**MMDA Disclosure and Agreement**. Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days' notice prior to a withdrawal from a money market deposit account.

**Account Use**. The Parties acknowledge and agree that the Fund may not be deposited or withdrawn by the Parties unless pursuant to the terms of this Agreement and consistent with the underlying purpose of this Agreement as communicated to Escrow Agent by the Parties, and the Fund will not be used for the general operating needs of the Parties while the Fund is held in any accounts governed by this Agreement.

22

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
NYSCEF DOC. NO. 81
NYSCEF DOC. NO. 5

INDEX NO. 653721/2024
INDEX NO. 653721/2024
RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024

**Unlawful Internet Gambling**. The use of any account to conduct transactions (including, without limitation, the acceptance or receipt of funds through an electronic funds transfer, or by check, draft or similar instrument, or the proceeds of any of the foregoing) that are related, directly or indirectly, to unlawful Internet gambling is strictly prohibited.

**Recordings.** Each Party and Escrow Agent consent to the other party or parties making and retaining recordings of telephone conversations between any Party or Parties on one hand and Escrow Agent on the other hand in connection with Escrow Agent's security procedures.

**Use of Electronic Records and Signatures.** As used in this Agreement, the terms "writing" and "written" include electronic records, and the terms "execute", "signed" and "signature" include the use of electronic signatures. Notwithstanding any other provision of this Agreement or the attached Exhibits and Schedules, any electronic signature that is presented as the signature of the purported signer, regardless of the appearance or form of such electronic signature, may be deemed genuine by Escrow Agent in Escrow Agent's sole discretion, and such electronic signature shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-inked signature. Any electronically signed agreement shall be an "electronic record" established in the ordinary course of business and any copy shall constitute an original for all purposes. The terms "electronic signature" and "electronic record" shall have the meanings ascribed to them in 15 USC § 7006. This Agreement and any instruction or other document furnished hereunder may be transmitted as a PDF file attached to an email.

23

INDEX NO. 653721/2024
Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 70 of 82
RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024

## SCHEDULE 3

### STANDING INSTRUCTIONS

| Party A: | | Party B: | |
|---|---|---|---|
| Bank Name: | | Bank Name: | ████████ |
| Bank Address: | | Bank Address: | ██████████ |
| ABA number: | | ABA number: | ██████ |
| Credit A/C Name: | | Credit A/C Name: | █████████████ |
| Credit A/C # | | Credit A/C # | ██████ |
| If Applicable: | | If Applicable: | |
| FFC A/C Name: | | FFC A/C Name: | |
| FFC A/C #: | | FFC A/C #: | |
| FFC A/C Address: | | FFC A/C Address: | |

24

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024

NYSCEF DOC. NO. 81
NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 71 of 82

## SCHEDULE 4

### ESCROW DIRECT (ONLINE PLATFORM) – ADDITIONAL USERS

Please list the names and email addresses of any additional contacts other than Authorized Representatives and contacts with email addresses listed in the Notice Section who shall have access for this transaction in Escrow Direct. Note that Authorized Representatives will be entitled to full access to Escrow Direct and contacts with email addresses in the notice section will automatically be added as additional users.

**Party A:**

██████████████

Email Address: ████████████

████████  █

Email Address: ████████████


**Party B:**

Name:
Email Address:

Name:
Email Address:

25

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

INDEX NO. 653721/2024

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 72 of 82

# SCHEDULE 5

## ESCROW U.S. INTRADAY MONEY MARKET MUTUAL FUND SWEEP SCHEDULE

**Customer(s):**   AMAZON CONTENT SERVICES LLC ("Party A")

**Effective Date:**

**Fund(s) Selected and Share Class:**   ▮▮▮▮▮▮▮▮ ▮▮ ▮ ▮▮▮▮ ▮▮▮ ▮▮ ▮

**Participating Accounts:**

Customer Account Name:                          Account Number:

**Target Balance:**         $0

### 1. Service.

This Escrow U.S. Intraday Money Market Mutual Fund Sweep Schedule is entered into by and among each Customer (identified above) and JPMorgan Chase Bank, N.A. (the "Bank"). The Bank will provide each Customer with its automatic intraday investment sweep service to J.P. Morgan and/or third party money market mutual funds (the "Service") by which the Bank will: (i) arrange for the automatic investment of Customer balances into the J.P. Morgan and/or third party money market fund(s) as selected above by Party A; (ii) arrange for the return of invested funds; and (iii) credit the applicable Customer's account with dividends; all as more fully described below. The parties acknowledge and agree that the provisions of the Escrow Agreement by and among Amazon Content Services LLC, NBA Media Ventures, LLC, and the Bank., as Escrow Agent, to which this Schedule is attached as may be amended (the "Agreement") are incorporated into this Schedule by reference in its entirety. Each Customer responsible for selecting the MMF(s) must sign this Schedule in order to participate in the Service, and by doing so authorizes the transactions described herein.

### 2. Accounts.

(a)  Each Customer hereby authorizes the Bank to establish and/or maintain in Party A as Customer's name one or more demand deposit accounts with the Bank, as designated above (the "Customer Account(s)").

(b)  The Bank will maintain on the books of the money market mutual fund(s) selected above (the "MMF(s)") an account for the purchase of shares (the "Shares") in the Fund(s) in the name of: JPMorgan Chase Bank, N.A. for the benefit of itself and its Customers (the "MMF Account").

### 3. Sweep Operation; Investments.

(a)  Each applicable Customer will select the MMF(s), as designated above, to which its investment will be made. In addition, this Schedule establishes parameters for the sweep of balances under the service ("Sweep Parameters"), by setting forth the following Customer-specific information: (i) a "Target Balance," which is the level of available balances that will remain in the demand deposit account ("DDA") after the posting of all debits and credits. Sweep Parameters are subject to review and modification by the Bank upon notice to each Customer.

(b)  The Bank, on each business day on which the Bank is open to the public for substantially all banking services and the MMF(s) companies are open (a "Business Day"), at a time prior to the cut off time for investment into the MMF(s) (the "Assessment Time"), will assess the available balance in the Customer Account(s) designated above and determine a net balance (the "Net Available Balance"). Any amount of the Net Available Balance that exceeds the Target Balance (the "Sweep Balance") will be debited from such Customer Account(s) and will be invested in Shares. The Shares purchased shall be recorded in the Fund Account.

(c)  If on any Business Day the Net Available Balance is below the Target Balance at the Assessment Time, then the Bank will issue a redemption order to the MMF(s) for an amount of Shares to bring the Net Available Balance to the Target Balance, to the extent the applicable Customer has Shares available, and the Bank will credit the Customer Account(s), provisionally or otherwise, for the amount or anticipated amount, as applicable, of the redemption order ("Credit"). If, for any reason, the amount of the Credit is determined to have exceeded the net asset value of the redeemed Fund shares or if any Fund suspends redemptions on the day that the Credit is granted, each Customer hereby authorizes and directs the Bank, in its discretion, to immediately debit the Customer Account(s) for an amount up to and including the full amount of the Credit. The Bank may debit the Customer Account(s) even though such debit may bring about or increase an overdraft.

26

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM                INDEX NO. 653721/2024

NYSCEF DOC. NO. 81    Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 73 of 82    INDEX NO. 653721/2024
                                                                                RECEIVED NYSCEF: 10/29/2024
NYSCEF DOC. NO. 5                                                                RECEIVED NYSCEF: 07/26/2024

**(d)** The Bank will invest the Sweep Balance of the applicable Customer in a share class (the "Share Class") of the designated MMF(s), based on the amount of the Sweep Balance. The Bank is authorized, on a periodic basis, to re-evaluate whether the applicable Customer's Sweep Balance should be invested in a different Share Class or should continue in the current Share Class based on the aggregate Sweep Balances invested in the prior assessment period. Upon sufficient prior written notice to Party A to allow Party A to change the designated Fund (e.g., to an interest bearing demand deposit account), the Bank is authorized and directed to invest the applicable Customer's Sweep Balance in such different Share Class of the designated MMF(s) in accordance with such re-evaluation. Party A as Customer reserves the right to change the designated Fund(s) at its discretion as set forth in the Agreement.

## 4. Acknowledgments.

Each Customer acknowledges that:

**(a)** The Service and the Share transactions for each Customer shall be subject to, as applicable, the terms and conditions of (i) this Schedule, (ii) the prospectus for each Fund (the "Prospectus"), the application for each Fund (the "Fund Application") and the Statement of Additional Information for each Fund (the "SAI"), each as amended from time to time; and (iii) such further conditions as the Bank or each Fund impose and make known to such Customer from time to time; each of which such Customer has received, reviewed and agreed to be bound by. The Prospectus sets forth such Fund's fees and expenses applicable to each Customer's purchase of Shares. Each Customer acknowledges that it is relying solely on the representations contained in the Prospectus and SAI for the purpose of making its investments.

**(b)** Each Customer: (i) consents to receiving all information from the Bank, including without limitation, the Prospectus and the SAI (and the Key Investor Information Document ("KIID"), if applicable), and proxy materials, via electronic means; (ii) acknowledges that it is able to open and read all such communications; (iii) has received, reviewed and understands the current Prospectus, SAI (and KIID, if applicable), which contains information about such Fund, including management fees and fund expenses paid by such Fund; and (iv) consents to having its sweep statements delivered by electronic means including the internet.

**(c)** Each applicable Customer's selection of the MMF(s) to be used for the Service is identified above.

**(d)** Investment Minimums, Rebalancing

Pursuant to each Customer's direction, the Bank, will invest the Sweep Balance of the applicable Customer in a particular share class as stated above. For JPMorgan Funds, the investment minimum is based upon the Fund's Prospectus, for all other Funds, the investment minimum is based upon the Fund's Prospectus or as limited by the Fund's share classes made available on the platform. The Bank, from time to time, may review the applicable Customer's Sweep Balance to determine whether they are in line with the threshold amounts stated in the Fund's Prospectus and in the event that the Bank concludes that they are not, the Bank is authorized to invest the applicable Customer's Sweep Balance, in the appropriate share class based on the Fund Prospectus minimums, upon notice to each Customer.

**(e)** The Bank receives compensation from each Fund, its investment adviser and/or such Fund's distributor for providing services as described in the Prospectus and/or the SAI, which may include, but not be limited to, shareholder servicing and 12b-1 fees as described in the Prospectus and SAI; and fees paid by the investment adviser which range from 0 to 10 basis points depending on the share class, calculated as a percentage of its Customer's assets invested in such Fund ("Revenue Share Payments"). The amount of compensation received by the Bank with regard to a given investment in any Fund generally will be greater in the case of an investment in a share classes with a higher expense ratio. Revenue Share Payments are negotiated separately with each fund family and not all fund families pay the same amount or pay according to the same formula. There may be, therefore, a potential conflict of interest in the form of an additional financial incentive to the Bank for making available to customers mutual funds whose affiliates enter into revenue sharing arrangements. Funds whose affiliates do not make such Revenue Share Payments to the Bank are generally not offered by the Bank, and, in some cases, have higher returns or yields than funds whose affiliates do make Revenue Share Payments.

**(f)** The compensation discussed in Section 4(e) above is distinct from the express fees the Bank charges any Customer for trust, agency, escrow, custody or cash management services, including the Bank's express sweep fee which may be imposed from time to time, (either related or unrelated to the Service). Such compensation is also distinct from the express fees the Bank may receive from the MMF(s) for acting as custodian and securities lending agent to the MMF(s) and from the express fees the Bank and/or its affiliates may receive for acting as the MMF(s)'s investment adviser, administrator, distributor, shareholder servicing agent, transfer agent, fund accountant or providing other services to the MMF(s) as more fully described in the Prospectus and/or SAI.

**(g)** Affiliates of the Bank provide services to the MMF(s) and receive fees from the MMF(s) for such services as described in the Prospectus, including acting as investment advisor, administrator, custodian, distributor and shareholder servicing agent, and the Bank may receive fees from its affiliates for providing services to the Bank's customers that invest in the MMF(s).

**(h)** NO CUSTOMER WAS OFFERED ANY INVESTMENT, TAX OR ACCOUNTING ADVICE OR RECOMMENDATION ON INVESTING IN THE MMF(s) BY THE BANK OR ITS AFFILIATES, AND FURTHER: (I) NO INVESTMENT ACCOUNT ESTABLISHED WITH RESPECT TO THE MMF(s) OR FUND ACCOUNT IS A BANK DEPOSIT AND NONE OF SUCH ACCOUNT(S) OR SHARES ARE INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION (THE "FDIC") OR ANY OTHER GOVERNMENT AGENCY; (II) SHARES IN THE MMF(s) ARE NOT THE OBLIGATIONS OF, AND ARE NOT GUARANTEED BY, THE BANK OR THE U.S. GOVERNMENT OR ANY STATE GOVERNMENT OR ANY UNIT OR AGENCY THEREOF; (III) FOR FUNDS THAT SEEK TO MAINTAIN A STABLE NET ASSET VALUE PER SHARE (I.E., "GOVERNMENT FUNDS" (AS DEFINED 12 CFR 270.2A-7(A)(14)) OR "CNAV FUNDS" (AS DEFINED IN ANNEX III)), THERE IS NO ASSURANCE THAT THE MMF(s) WILL BE ABLE TO MAINTAIN A STABLE NET ASSET VALUE OF $1.00 PER SHARE AND THAT INVESTMENTS IN MUTUAL FUNDS INVOLVE RISK, INCLUDING POSSIBLE LOSS OF PRINCIPAL AND, FOR "INSTITUTIONAL FUNDS" OR "LVNAV" AND "VNAV" FUNDS (AS DEFINED BELOW), BECAUSE THE SHARE PRICE OF THE MMF(s) MAY FLUCTUATE, THE SHARES MAY BE WORTH MORE OR LESS THAN WHAT

27

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 74 of 82

ANY CUSTOMER ORIGINALLY PAID FOR THEM; (IV) EACH CUSTOMER HAS MADE ITS OWN INDEPENDENT INVESTMENT ASSESSMENT AS TO THE SUITABILITY AND APPROPRIATENESS OF THE SERVICE AND THE INVESTMENTS HEREUNDER FOR THE NEEDS AND REQUIREMENTS OF ITS BUSINESS, AND CONSULTED ITS OWN FINANCIAL, LEGAL, TAX OR OTHER ADVISORS, AND ASSUMES ALL RISK OF LOSS RESULTING FROM ANY DECISION IT MAKES TO PURCHASE, EXCHANGE OR SELL SHARES, OR TO AUTHORIZE THE SAME ON ITS BEHALF; AND (V) NO CUSTOMER IS SUBJECT TO BACKUP WITHHOLDING.

(i)   Each Customer has no right to demand delivery or transfer of Shares purchased for it hereunder, but the Bank may deliver such Shares to the applicable Customer in discharge hereof if redemption is precluded. In the normal course, redemption proceeds, including any interest or dividends, will be deposited in the Customer Account upon receipt from the applicable Fund. Dividends will be posted to the Customer Account when received by the Bank. Since MMF(s) interest or dividends are paid monthly, although accrued daily, such interest dividends will actually be credited to the applicable Customer once a month, in arrears. The calculation method for interest or dividends is disclosed in the Prospectus and SAI.

(j)   **Setoff.** Each Customer understands that the Bank may from time to time, at its sole discretion, advance funds to facilitate the settlement of transactions in securities, other transactions involving securities or the administration of the Customer Account(s), including but not limited to, the purchase and redemption of money market fund shares. Each Customer acknowledges and agrees that, without prejudice to the Bank's rights under applicable law and under the Agreement, the Bank shall have the right, without contacting any Customer, to act on its own or to instruct any Bank affiliate through or at which any Customer holds any securities, including any securities owned by any Customer as a result of transactions that are related to this agreement, to sell any or all such securities related to the Customer Account/the Fund and set-off in an amount sufficient to cover all amounts owing to the Bank, including, without limitation, any overdraft amounts, interest, fees or other charges. The Bank or the Bank's affiliates may choose which securities to sell and the process related to such transactions, and such actions may have adverse tax investment and/or other implications.

(k)   The Bank reserves the right, in its sole discretion: (i) to suspend the Service on any given day; or (ii) to limit the amount of the Sweep Balance actually transferred to the MMF(s), and, such limits may vary between DDAs and between Customers. To the extent any Customer expects a significant increase or decrease in the level of available balances in the DDA, such Customer will notify its client service representative at the Bank, prior to the increase or decrease in order to reduce the possibility that the Sweep Balance, or parts thereof, remain in the DDA. The applicable Customer will receive earnings credits for any Sweep Balance, or parts thereof, remaining in the DDA, and will be responsible for any overdrafts that occur if a redemption order is not completed or balances are not returned to the DDA. In the event any Fund fails to fund a redemption or fails to meet any of its other obligations to such Customer, such Customer's recourse for such failure is to such Fund.

(l)   The Bank shall not be liable for errors or delays in transmission of orders for purchase or redemption of Shares sent from the Bank to any Fund or to any Fund's distributor.

(m)   All claims for adjustments shall be made by the applicable Customer within ninety (90) days of the corresponding account statement or be waived.

(n)   Transactions involving the MMF(s) will be reflected on the applicable Customer's monthly Sweep Account statement. The Bank may omit sending a statement(s) of sweep activity to such Customer for any month when the Account has had a zero balance and no activity.

(o)   Upon prior written notice to Party A sufficient to allow Party A to change the designated Fund, the Bank may amend this Schedule at any time in any respect effective upon written notice to each Customer.

(p)   If any Customer, its employees, subcontractors and agents ("Users") elect to use the J.P. Morgan ACCESS portal ("ACCESS") for any service and/or product offered therein, the Client agrees and acknowledges that such use of ACCESS shall be subject to the JP Morgan TS Electronic Channels Service Terms the Users must accept in a form of a click-through

(q)   **Additional Money Market Fund Reform Terms and Money Market Fund Reform Disclosures.** Each Customer acknowledges that it has received, reviewed and understands the current Fund Prospectus, SAI and the Additional Money Market Fund Reform Disclosures attached hereto as Annex II (for US Registered Funds) and Annex III (for non-US (Off-Shore) Funds) and agrees to be bound by the provisions set forth therein and in addition, each Customer acknowledges and agrees that the following terms will apply to its investment in Funds:

(i).   **For US Registered Funds:**

(a). **Floating Net Asset Value ("FNAV").** Each Customer acknowledges that an "Institutional Fund" (i.e., not a Government or Retail Money Market Fund as defined in 12 CFR 270.2a-7(a)(14) and (21)) is subject to a FNAV and priced to the nearest basis point (e.g., $1.0000), which may result in a gain or loss on investment when redemptions are processed and may result in a capital gain or loss for such Customer. Each Customer should refer to the Institutional Fund's Prospectus and SAI for additional information regarding the tax implications of investing in such Fund.

(b). **Liquidity Fee.** If a Fund imposes a liquidity fee on the redemption of Fund Shares:

(i).   The Bank will execute all scheduled redemption orders of Fund Shares when such Fund has imposed a liquidity fee (provided that such Fund is accepting redemption orders at such time), even though the fee will be deducted from the redemption proceeds and will reduce the amount actually received by the applicable Customer and may cause an overdraft in such Customer's account.

28

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 75 of 82

INDEX NO. 653721/2024

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

      (ii).    Each Customer agrees that after such Fund has imposed a liquidity fee, the Bank may, in its discretion, determine to no longer offer that particular Fund in the future.

(c). **Redemption Gate.** If a Fund imposes a redemption gate:

    (i).    Each Customer understands that (i) it may not receive redemption proceeds for a pre-determined period of time (up to regulatory limits) in such Fund's discretion (ii) the Net Asset Value ("NAV") of the Fund Shares may fluctuate during the time period that the redemption gate is in effect and (iii) redemption gates may cause an overdraft in the applicable Customer's account.

    (ii).    Each Customer agrees that after such Fund has imposed a redemption gate, (i) the Bank will not execute purchase orders of Fund Shares and (ii) the Bank may, in its discretion, determine to no longer offer that particular Fund in the future.

**(ii).**    **For non-US (Off-Shore) Funds:**

(a). **Variable Net Asset Value ("VNAV") and Low Volatility Net Asset Value ("LVNAV").** Each Customer acknowledges that VNAV Funds are (and LVNAV Funds may be) subject to a variable net asset value, which may result in a gain or loss on investment when redemptions are processed and may cause overdrafts (in certain circumstances) in the underlying applicable Customer's account(s).

(b). **Liquidity Fee.** If a Fund imposes a liquidity fee on the redemption of Fund shares:

    (i).    The Bank will execute all scheduled redemption orders of Fund shares when such Fund has imposed a liquidity fee, even though the fee will be deducted from the redemption proceeds and will reduce the amount actually received by the applicable Customer and may cause an overdraft in such Customer's account.

    (ii).    Each Customer agrees that when such Fund has imposed a liquidity fee, the Bank may, in its discretion, determine to no longer offer that particular Fund in the future.

(c). **Redemption Gate.** If a Fund imposes a redemption gate:

    (i).    Each Customer understands that (i) it may not receive redemption proceeds for a pre-determined period of time (up to regulatory limits) in such Fund's discretion, (ii) the Net Asset Value ("NAV") of the Fund shares may fluctuate during the time period that the redemption gate is in effect and (iii) redemption gates may cause an overdraft in the applicable Customer's account.

    (ii).    Each Customer agrees that when such Fund has imposed a redemption gate, (i) the Bank will not execute purchase orders of Fund shares and (ii) the Bank may, in its discretion, determine to no longer offer that particular Fund in the future.

**(iii).**    **For all Funds:**

(a). **Multiple NAV Calculations.** Each Customer acknowledges that certain Funds may calculate NAVs multiple times per business day, as set forth in the Fund's Prospectus, SAI or offering documents. The Bank will submit all Customer purchase and redemption orders to each Fund on or before such Fund's last NAV calculation time of the business day. In each case, the applicable Customer will receive the NAV per share next calculated after the MMF(s) (or its designee) receives and accepts the order from the Bank.

(b). **New Investment Cutoff Times.** Each Customer acknowledges that Funds may have new trade cutoff times that may be earlier than previously set by any Fund and under certain circumstances, such cutoff times may change from time to time. For Intraday Sweep Customers, the Bank's cutoff time will be one hour before such Fund cutoff time.

## 5. Fees.

Each Customer shall compensate the Bank for the Service, in accordance with the Bank's fee schedules (if any such schedules exist) as disclosed to such Customer or as reflected on a customer statement or as otherwise agreed.

## 6. Required FDIC Disclosures.

**For Sweeps to JPMorgan Funds**

(a)  In the event of a failure of the Bank, funds swept to a Fund, as reflected on the Bank's end-of-day ledger balance, would not be considered deposits by the FDIC. However, the FDIC would treat the beneficial owner's swept funds in one of two ways: (a) if the failed Bank's assets were transferred to an acquiring institution, the swept funds would be returned back into the beneficial owner's deposit account on the business day following the failure of the Bank; or (b) if the failed Bank will be dissolved, the beneficial owner would receive a check or other payment from the FDIC to reacquire the beneficial owner's allotted interest in such Fund in accordance with the FDIC's normal procedures.

**For Sweeps to Funds Other than JPMorgan Funds**

(b)  In the event of a failure of the Bank, funds swept to a Fund (whether the sweep actually occurs will depend on the transaction cut-off time used by the FDIC), as reflected on the Bank's end-of-day ledger balance, would not be considered deposits by the FDIC. However, the FDIC would treat the beneficial owner's swept funds in one of two ways: (a) if the failed Bank's

29

**FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM** INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

NYSCEF DOC. NO. 5

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 76 of 82

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

assets were transferred to an acquiring institution, the swept funds would be returned back into the beneficial owner's deposit account on the business day following the failure of the Bank; or (b) if the failed Bank will be dissolved, the beneficial owner would receive a check or other payment from the FDIC to reacquire the beneficial owner's allotted interest in the money market fund in accordance with the FDIC's normal procedures. If the funds are not swept, such funds would remain in the deposit account, be treated as deposits, and be insured under the applicable insurance rules and limits of the FDIC.

7. **Representations and Warranties.**

Each Customer represents and warrants to the Bank that:

(a) This Schedule will, upon execution and delivery, constitute the legal, valid and binding obligation of such Customer, enforceable against such Customer in accordance with applicable law.

(b) **Certification Relating to Section 15B of the Securities Exchange Act of 1934 (Rule 15Ba1-1 et seq.) (the "Municipal Advisor Rule").** Each Customer represents and warrants to the Bank, that for purposes of the Municipal Advisor Rule, none of the funds currently invested in the money market funds, or the funds that any Customer may seek to invest in the money market funds in the future, constitute or contain (i) proceeds of municipal securities (including investment income therefrom and monies pledged or otherwise legally dedicated to serve as collateral or a source of repayment for such securities) or (ii) municipal escrow investments (as each such term is defined in the Municipal Advisor Rule). Each Customer also represents and warrants to the Bank that the person providing this certification has access to the appropriate information or has direct knowledge of the source of the funds to be invested in the money market funds to enable the forgoing representation to be made. Further, each Customer acknowledges that the Bank will rely on this representation until notified in writing otherwise.

8. **Termination.** This Schedule shall be in effect as of the Effective Date noted above and shall remain in effect unless and until terminated. In addition, this Service will terminate upon the closing of the applicable DDAs for any reason. In the ordinary course of business, interest accrued prior to termination will be paid to the applicable Customer following the end of the month during which termination occurs.

9. **Authorized Changes.** The Customer (or if multiple Customers, the Customers jointly) may submit additions, deletions or changes to the table at the beginning of this Schedule, effective upon the Bank's acceptance and implementation, which shall extend the representations and warranties, acknowledgments and terms of this Schedule for each Customer relating to such revisions.

10. **Miscellaneous.** In the event of any conflict between the terms of this Schedule and the terms of the Agreement, including this Schedule, the terms of this Schedule shall prevail.

11. **Governing Law; Jurisdiction.** This Schedule shall be governed by and construed in accordance with the laws of the State of New York, U.S.A. without reference to the conflict of laws provisions thereof. Each Customer consents to the jurisdiction of the state and federal courts located within the City of New York, Borough of Manhattan, for the adjudication of all matters relating hereto or arising under this Schedule, and agrees that due and adequate service of legal process therefor may be made by receipted mail or courier service to an address for such Customer on the books and records of the Bank.

12. If any Customer has selected a U.S. domestic Fund as a Fund, the provision of Section 12 shall apply in addition to the provisions of Sections 1 through 11. These Funds are only available to entities or individuals domiciled in the United States.

**Distributor.**

Each Customer acknowledges that the distributor of the JPMorgan Money Market Mutual Funds is JPMorgan Distribution Services Inc., which is affiliated with the Bank. Each Customer acknowledges that the distributors of the third party Funds are not affiliated with the Bank. The Bank may receive compensation from any Fund, the management company for any Fund and/or the distributor of any Fund for providing services as described in the Prospectus.

13. If any Customer has selected an Offshore Fund as a Fund, the provisions of Section 13 shall apply in addition to the provisions of Sections 1 through 11. These funds are not available to U.S. persons.

a) **Distributor.**

Each Customer acknowledges that the distributor of the JPMorgan Liquidity Funds is JPMorgan Asset Management (Europe) S.a.r.l. which is affiliated with the Bank. Each Customer acknowledges that the distributors of the third party Funds are not affiliated with the Bank. The Bank may receive compensation from any Fund, the management company for any Fund and/or the distributor of any Fund for providing services as described in the Prospectus.

b) **Representations.**

Each Customer represents and warrants to the Bank that:

i) it is not a "U.S. person", as such term is defined in Regulation S, promulgated by the Securities Exchange Commission pursuant to the Securities Act of 1933 and it will notify the Bank immediately of any change in this status;

ii) it was not formed principally for the purpose of investing in securities not registered under the U.S. Federal Securities laws;

iii) the funds that will be used to purchase Shares will not be obtained from a U.S. person; and

iv) it is acquiring Shares as an investment for its own account, or if purchasing for the account of a customer, the customer is not a U.S. person.

30

INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 77 of 82

INDEX NO. 653721/2024

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024

Docusign Envelope ID: 0E5FED98-7D53-4A37-88B8-BA47AD17D047

CC VND 00276649 2024 TR

c)    Indemnity.

Each Customer shall (if multiple Customers, jointly and severally) indemnify and hold the Bank harmless from and against any and all claims, damages, demands, liabilities, losses, costs and expenses (including attorneys' fees) as a result of or in connection with the breach of any representation or warranty hereunder.

14.  If any Customer has selected a JPMorgan Offshore Fund as a Fund, the provision of Section 14 apply in addition to the provisions of Sections 1 through 11 and 13.

Additional Terms Applicable to an Investment in a JPMorgan Offshore Fund.

Each Customer acknowledges that it has read the Additional Terms Applicable to an Investment in a JPMorgan Offshore Fund attached hereto as Annex I and agrees to be bound by the provisions set forth therein.

Agreed to:

**Amazon Content Services LLC**

By: ███████████████                          (Signature)

Name: ███████████

Title:   Authorized Signatory

July 15, 2024

Agreed to:

**JPMorgan Chase Bank, N.A.**

By: _____
                          (Signature)

Name: _____

Title: _____

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM

INDEX NO. 653721/2024

NYSCEF DOC. NO. 81

RECEIVED NYSCEF: 10/29/2024

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF     Document 51-4     Filed 08/25/25     Page 78 of 82

## ANNEX I
## ADDITIONAL TERMS APPLICABLE TO AN INVESTMENT IN AN OFFSHORE FUND

### 1. Defined Terms.

"Bank" means JPMorgan Chase Bank, N.A.

"CSSF" means Commission de Surveillance du Secteur Financier.

"Fund" or "Funds" means the collective investment schemes managed and/or distributed by JPMAME.

"JPMAME" means JPMorgan Asset Management (Europe) S.a.r.l. with its registered address at European Bank and Business Centre, 6, route de Treves, L – 2633 Senningerberg, Grand-Duchy of Luxembourg.

"Shares" means shares or units of any Fund.

### 2. Representations. Each Customer represents and warrants that:

(a) Either the applicable Customer is the ultimate economic beneficiary of the Shares or such Customer has provided all relevant identification documentation relating to the ultimate economic beneficiary as requested;

(b) Such Customer will be solely responsible for complying with all the relevant legal, tax and exchange control regulations in force in the applicable country of our citizenship, residence or domicile;

(c) Such Customer is not an applicant that would be prohibited by applicable law to own or hold shares of the MMF(s); and

(d) Such Customer shall not subscribe for Shares in breach of any applicable restrictions.

### 3. Acknowledgments. Each Customer acknowledges and agrees that:

(a) If at any time after the date hereof such Customer becomes aware that such Customer is no longer eligible to invest in the Share Classes: (i) such Customer will notify Bank immediately, (ii) Bank may redeem or transfer such Customer's holdings, and (ii) such Customer agrees to indemnify Bank and the relevant Fund for any penalties, costs or liabilities resulting from such Customer's failure to inform Bank of a change in such Customer's status.

(b) Should the relevant Fund be notified at any time by Bank or any other relevant entity of the JPMorgan Chase & Co. group of companies that such Customer ceases to satisfy the minimum eligibility criteria for the Share Classes such Customer's holding in the Share Classes may be compulsorily redeemed without prior notice and the proceeds placed into a share class within the same sub-fund for which such Customer qualifies net of any fees and expenses allocable to the Share Classes and any tax or penalties which the relevant Fund or any sales agent may be obliged to deduct, or if there is no such share class, the proceeds will be returned, without interest, to such Customer net of any fees and expenses allocable to the Share Classes and any tax or penalties which the relevant Fund or any sales agent may be obliged to deduct.

(c) That the minimum eligibility criteria for Share Classes are fixed in accordance with the applicable current Luxembourg regulations and that, accordingly, neither the Bank nor the MMF(s) can be held responsible for any changes in such criteria or for any costs or losses resulting from the compulsory redemption as a result of non-satisfaction of such criteria at any time.

(d) Such Customer will not assign, transfer, sell, loan, charge, mortgage, pledge or hypothecate such Customer's holding in the Share Classes through clearing houses or through any other means, without prior written notification to Bank.

(e) Such Customer has made all prudent and diligent investigations, including the taking of tax, legal and exchange control advice, in respect of the suitability of this investment.

(f) Such Customer has the sole responsibility to determine the suitability of this investment, and that the characteristics of any Fund may be modified from time to time, including via Fund mergers and/or liquidations.

(g) Bank reserves the right to reject either in whole or in part any application for and transactions in Shares which are not fully supported by all documents and information requested by Bank as well as payment with good value or for any other reason at Bank's absolute discretion.

(h) Such Customer shall not perform any act or make any misrepresentation which may or will reflect adversely upon the business integrity or goodwill of the JPMorgan Chase & Co. group of companies or any of the Funds or which may imperil or prejudice any authorization of the Funds by any relevant authority.

(i) Such Customer will not permit transactions which such Customer knows to be, or has reason to believe to be, related to late trading or market timing practices as defined in CSSF Circular 04/146.

(j) Bank shall have the right to terminate this relationship without notice for cause if any Customer is trading or permitting transactions or practices in the Funds in a manner which, in the opinion of the Bank or JPMAME is considered to be contrary to the Bank's or JPMAME's respective policies and procedures related to late trading or market timing practices as defined in CSSF Circular 04/146 or is otherwise considered not to be in the interests of the Bank, JPMAME and/or the Funds and such Customer has failed to remedy such practices to the satisfaction of Bank.

(k) Each Customer will (if multiple Customers, jointly and severally) indemnify the Bank, the MMF(s), each Customer's agents and JPMAME upon first demand against any losses, costs and expenses (including interest, transaction charges and any other charges attributable to the late settlement of any purchase transactions) arising from any misrepresentation hereunder or any breach of the provisions related to any Customer's subscription for Shares unless such losses are due to the willful default or negligence of the Bank or such Customer's agents.

(l) Such Customer will immediately notify Bank if any of the information presented to or representations made to Bank are no longer accurate or complete in all respects.

32

FILED: NEW YORK COUNTY CLERK 10/29/2024 12:56 AM
INDEX NO. 653721/2024

NYSCEF DOC. NO. 81
Case 1:24-cv-09027-KPF   Document 51-4   Filed 08/25/25   Page 79 of 82
INDEX NO. 653721/2024
RECEIVED NYSCEF: 10/29/2024

NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 07/26/2024

## ANNEX II
## ADDITIONAL MONEY MARKET FUND REFORM DISCLOSURES FOR US REGISTERED FUNDS

On July 23, 2014, the Securities and Exchange Commission ("SEC") approved amendments to Rule 2a-7 and other rules under the Investment Company Act of 1940 ("Fund Reforms") that govern the operation of money market funds ("Funds"). The Fund Reforms became fully effective on **October 14, 2016.** Pursuant to the Fund Reforms, US Registered Funds are categorized as Institutional, Government and Retail. Institutional Funds are subject to a floating net asset value ("FNAV") per share. Further, during periods of market turmoil, when certain triggers are met and depending on how they are categorized, certain money market funds could be subject to liquidity fees and redemption gates. Please refer to the Fund's Prospectus and SAI for more detailed information regarding Fund Reforms and other important information.

## ANNEX III

## ADDITIONAL MONEY MARKET FUND REFORM DISCLOSURES FOR NON-US (OFF-SHORE) FUNDS

On July 20, 2017 the European Securities and Markets Authority ("ESMA") published its final report on European Money Market Fund Regulation ("MMFR"), marking the start of an 18-month transition period for existing money market funds ("Funds") to adapt to the new regulation. The aim of the MMFR is to strengthen the resiliency of European-domiciled money market funds during times of stress, mitigate potential market contagion caused by high levels of redemptions, and provide additional transparency and flexibility to both investors and intermediaries. MMFR became effective on **January 21, 2019.** Pursuant to the MMFR, European-domiciled Funds will be categorized into one of four designations; Short Term Public Debt Constant Net Asset Value ("CNAV"), Short Term Low Volatility Net Asset Value ("LVNAV"), Short Term Variable Net Asset Value ("VNAV") and Standard Variable Net Asset Value. As more fully described in the Funds' Prospectus, KIID and offering documents, VNAV Funds are subject to a floating net asset value per share. Further, during periods of market turmoil, when certain triggers are met and depending on how they are categorized, CNAV and LVNAV funds could be subject to new liquidity fees and redemption gates. JPMorgan Chase Bank, N.A. (the "Bank") only offers CNAV, LVNAV and VNAV Funds and does not offer Standard Variable Net Asset Value Funds through its Treasury Services channel. Please refer to the Funds' Prospectus, KIID and offering documents for more detailed information regarding MMFR and other important information.

33

INDEX NO. 653721/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 80 of 82

RECEIVED NYSCEF: 10/29/2024

RECEIVED NYSCEF: 07/26/2024

## SCHEDULE 6

### SCHEDULED PAYMENTS



INDEX NO. 653721/2024
INDEX NO. 653721/2024
NYSCEF DOC. NO. 81
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 10/29/2024
RECEIVED NYSCEF: 07/26/2024

Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 81 of 82



Case 1:24-cv-09027-KPF    Document 51-4    Filed 08/25/25    Page 82 of 82

INDEX NO. 653721/2024
RECEIVED NYSCEF: 07/26/2024

