UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY YUSON and MICHAEL STEINBERG, *Individually and on Behalf of All Others Similarly Situated,*<br><br>                    Plaintiffs,<br><br>              -v.-<br><br>WARNER BROS. DISCOVERY, INC., DAVID M. ZASLAV, and GUNNAR WIEDENFELS,<br><br>                  Defendants. | 24 Civ. 9027 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:[1]

In 2024, Warner Bros. Discovery, Inc. ("WBD" or "Defendant") failed to renew its media rights agreement with the National Basketball Association (the "NBA"). WBD and the NBA had had a 40-year-long relationship, but after periods of exclusive and competitive negotiation to renew the agreement, the NBA ultimately accepted rival bids from NBCUniversal and Amazon. As a result of WBD's failure to renew its NBA media rights, Co-Lead Plaintiffs Anthony Yuson and Michael Steinberg ("Plaintiffs") brought this federal securities class action against WBD, its CEO David Zaslav, and its CFO Gunnar Wiedenfels (collectively, "Defendants") on behalf of a putative class of purchasers and acquirers of WBD common stock during the period from February 23, 2024, through August 7, 2024 (the "Class Period"). Plaintiffs allege that seven statements Defendants made during the Class Period were materially false or misleading in violation of the federal securities laws.

---

[1]      The Clerk of Court is directed to amend the caption of the case as reflected above.

Specifically, Plaintiffs say that Defendants downplayed the importance of the NBA media rights to WBD while simultaneously overstating WBD's ability to match rival bids.  Before the Court is Defendants' motion to dismiss Plaintiffs' claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  For the reasons set forth below, the Court grants Defendants' motion.

**BACKGROUND**[2]

## A.    Factual Background

### 1.    WBD Fails to Renew the NBA Rights

WBD is a global media and entertainment conglomerate that provides content in the television, film, internet streaming, and gaming industries.  (FAC ¶ 32).  A WBD subsidiary, Turner Broadcasting System, Inc. ("TBS"), possessed the rights to broadcast NBA content (the "NBA Rights" or the "Rights") from 1984 to 2024.  (*Id.* ¶¶ 14, 57-58, 75-81).

The NBA Rights were a critical element of WBD's business.  They were a key driver of its profitability and provided WBD with a "halo effect" that "boosted all of WBD's other properties" and "contributed towards WBD's non-tangible assets like goodwill."  (FAC ¶¶ 3-4; *see also id.* ¶¶ 39-45, 57-73).  The

---

[2] This Opinion draws its facts from the First Amended Complaint ("FAC" (Dkt. #41)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Jonathan D. Polkes ("Polkes Decl., Ex. [ ]" (Dkt. #48)), each of which is incorporated by reference in the Complaint.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #47); to Plaintiffs' memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #51); and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #52).

2

NBA Rights also allowed WBD to realize high "carriage rates," or fees charged to cable and satellite providers for each customer. (*Id.* ¶¶ 3-4). And the Rights helped WBD prevent "churn" — the rate at which current customers cancel over a given period — because "sports attract loyal fans who stay with a service at least through the season, which is often long." (*Id.* ¶ 71). Given the impact of the NBA Rights on WBD's business, Plaintiffs allege that WBD "internally viewed the NBA Rights as a unique, irreplaceable asset." (*Id.* ¶¶ 98, 100, 113, 119, 121, 179; *see also id.* ¶¶ 136-138).

In 2014, the NBA and TBS entered into a media rights agreement (the "2014 Agreement"), under which TBS agreed to pay the NBA $10.26 billion for the rights to distribute a package of NBA games and non-game content through the end of the 2024-2025 season. (FAC ¶ 82). The 2014 Agreement also gave TBS the right to exclusively negotiate renewal of the NBA Rights from March 9, 2024, to April 22, 2024, without competition from outside bidders (the "Exclusive Negotiation Period"). (*Id.* ¶¶ 9, 83, 102). The 2014 Agreement provided that if the Exclusive Negotiation Period expired without a renewal agreement in place, the NBA could then negotiate with third-party bidders. (*Id.* ¶ 84). However, the 2014 Agreement also required the NBA to notify TBS of any third-party offers and to provide a five-day period for TBS to match those offers (the "Matching Period"). (*Id.*). To satisfy this "Matching Clause" of the 2014 Agreement, WBD had to match the monetary amount and "each term" of a rival bid, as well as the distribution type (*e.g.*, WBD could not match a third-

party's internet-streaming-only offer with a more lucrative cable-distribution offer). (*Id.* ¶¶ 84-85; *see also* Pl. Opp. 4).

As provided in the 2014 Agreement, the NBA Rights came up for renewal or third-party bidding in 2024. (FAC ¶ 88). WBD and the broader industry expected this process to be "aggressive" and "extremely competitive." (*Id.* ¶ 90; Pl. Opp. 5). In advance of the Exclusive Negotiation Period, on February 23, 2024, WBD held an earnings call with investors. (FAC ¶ 97). This is where Plaintiffs allege that Defendants' materially false and misleading statements began. (*See id.* ¶¶ 97-98; Pl. Opp. 4-5).

On the earnings call, Mr. Zaslav acknowledged the negotiations and mentioned WBD's "strong[,] positive 40-year relationship with the NBA." (FAC ¶ 97). He reported that WBD was "now fully engaged in renewal discussions[,] and they are constructive and productive." (*Id.*). Mr. Zaslav also commented that "[t]he hard work we've done over the last nearly two years has positioned us well financially and creatively, and as we look towards the future, we will continue to make the tough calls and do [w]hat is necessary to get this business on a clear pathway to growth and to drive increased shareholder value." (*Id.*). Plaintiffs allege that these statements misleadingly downplayed the importance of the NBA Rights to WBD and the consequences of losing them. (*Id.* ¶ 98; *see also* Pl. Opp. 5).

Soon thereafter, WBD and the NBA entered the Exclusive Negotiation Period on March 9, 2024. (FAC ¶ 101). But WBD failed to secure renewal of the NBA Rights before this Period expired on April 22, 2024. (*Id.* ¶¶ 101-102).

The NBA Rights therefore opened to third-party bidding, and within days media outlets reported that competitors, including NBCUniversal and Amazon, had prepared bids.  (*Id.* ¶¶ 102-105).  This news caused WBD's stock to drop nearly 10% from April 29, 2024, to April 30, 2024.  (*Id.* ¶¶ 106-107).

According to Plaintiffs, as the NBA Rights were slipping away, Defendants continued to falsely and misleadingly assure investors about WBD's ability to retain the Rights through the Matching Clause.  (FAC ¶¶ 102-121; *see also* Pl. Opp. 5-6).  For example, on May 9, 2024, Mr. Zaslav stated, "We're in continuing conversations with [the NBA] now and we're hopeful that we'll be able to reach an agreement that makes sense for both sides. …  [W]e are in active negotiations with the league and under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them."  (FAC ¶ 112).  Similarly, on May 22, 2024, Mr. Wiedenfels remarked, "[T]his is still very much an ongoing negotiation. …  We do have a contractual matching, right?  And that's an important part of our ongoing contractual relationship, but that's about as much as I want to say about the NBA."  (*Id.* ¶ 118).

Plaintiffs allege that these statements were false and misleading because Defendants knew at the time that WBD was unable and unwilling to match the competing offers submitted by NBCUniversal and Amazon.  Both competitors offered the NBA cross-promotion alongside their pre-existing National Football League ("NFL") media rights, which WBD did not have.  (FAC ¶¶ 10-11; *see also* Pl. Opp. 6).  Amazon also offered an internet streaming audience and

infrastructure that WBD could not match. (FAC ¶¶ 10, 12-13; *see also* Pl. Opp. 6). And, Plaintiffs contend, Mr. Zaslav "refused to pay above $2.1 billion per year" for the NBA Rights, which fell about $400 million short of NBCUniversal's $2.45 billion offer. (FAC ¶¶ 11, 122; *see also* Pl. Opp. 6).

On July 17, 2024, the NBA informed WBD that it had accepted offers from NBCUniversal and Amazon. (FAC ¶¶ 122-123). This notification kicked off the Matching Period. (*Id.* ¶ 123). On July 22, 2024, WBD advised the NBA that it would not match NBCUniversal's offer, but it would attempt to match Amazon's offer, which was $1.8 billion per year. (*Id.* ¶¶ 122, 124). Plaintiffs allege that WBD then submitted a bid that equaled Amazon's monetary offer but substantively revised Amazon's terms so significantly as to not match Amazon's offer. (*Id.* ¶¶ 124-129; *see also* Pl. Opp. 6-7). In particular, Plaintiffs say, Amazon offered an internet-streaming-only package (which was the reason its offer was less than NBCUniversal's cable-only bid), but WBD proposed to distribute NBA games by internet or cable. (*Id.* ¶ 126; *see also* Pl. Opp. 7).

Defendants dispute that WBD's offer failed to match Amazon's. (*See* Def. Br. 8; Def. Reply 9-10). But on July 24, 2024, the NBA publicly announced that it believed WBD's offer did not match Amazon's and that it was entering into a long-term contract with Amazon instead. (FAC ¶ 131). WBD's stock price then fell "from a July 24, 2024[,] closing price of $8.47 per share by $0.76, or 8.97%, before rebounding to close at $7.99 per share on July 25, 2024." (*Id.* ¶ 132).

6

The next day, on July 26, 2024, WBD sued the NBA in New York state court, alleging that it had breached the 2014 Agreement by deliberately refusing to honor WBD's matching offer.  (FAC ¶¶ 136-139; Def. Br. 8).  WBD's papers in that litigation noted that it considered the NBA Rights to be "irreplaceable," to impact its carriage rates, and to have a "halo effect."  (FAC ¶ 136).  WBD's state court papers also expressed that losing the NBA Rights would cause WBD to "suffer irreparable harm" and lose "goodwill, competitive advantages, and market share."  (*Id.* ¶ 137 (emphasis omitted)).  On November 18, 2024, WBD and the NBA announced that they had settled this lawsuit.  (Def. Br. 8).

On August 7, 2024, WBD announced that it would take a $9.1 billion non-cash goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects.  (FAC ¶ 140).  The impairment charge was "triggered" by several different factors, including the loss of the NBA Rights.  (*Id.* ¶ 141).  "On this news, WBD's stock price fell from an August 7, 2024[,] closing price of $7.71 per share by $0.98, or 12.71%, before rebounding to close at $7.02 per share on August 8, 2024."  (*Id.* ¶ 142).

### 2.    Defendants' Allegedly Materially False and Misleading Statements

Plaintiffs allege that seven specific statements made by Defendants during the Class Period were materially false or misleading in violation of the federal securities laws.  (FAC ¶¶ 97-121).  The statements fall into two categories: the "Importance Statements" and the "Matching Clause Statements."

### a.    The Importance Statements

Plaintiffs allege first that in the lead-up to the Exclusive Negotiation Period, Defendants made two statements that misleadingly downplayed the importance of the NBA Rights to WBD.  (FAC ¶¶ 97-101).  *First,* on the February 23, 2024 earnings call, Mr. Zaslav remarked:

> *We have a strong positive 40-year relationship with the NBA, and in terms of our NBA rights, we are now fully engaged in renewal discussions and they are constructive and productive.*
>
> Our global sports portfolio continues to provide real, meaningful value to all of our platforms.  We're proud to be the home of one of the most coveted collections of premium sports content in the industry, along with a best-in-class talent roster and exceptional production values.  We're excited for our expansive coverage of the Paris Summer Olympics throughout all of Europe as well.
>
> *The hard work we've done over the last nearly two years has positioned us well financially and creatively, and as we look towards the future, we will continue to make the tough calls and do that is necessary to get this business on a clear pathway to growth and to drive increased shareholder value.*

(*Id.* ¶ 97).[3]  Plaintiffs assert that this statement was materially false and misleading when made because Mr. Zaslav omitted to disclose the following information:

> [i] that the NBA Rights were crucial to support the high carriage rates that WBD was able to command, produce significant advertising dollars, provide a "halo effect" that boosted all of WBD's other properties, and negotiate more favorable terms with other sports

---

[3]    The seven statements are presented in this section of the Opinion in block-quote form with the italicization conventions Plaintiffs employ in the FAC.

8

leagues; [ii] that WBD internally viewed the NBA Rights as a unique, irreplaceable asset; and consequently, [iii] losing the NBA Rights would significantly compromise WBD's revenue and goodwill, particularly in its Networks segment.

(*Id.* ¶ 98).

*Second*, Plaintiffs allege that Mr. Wiedenfels also made a materially false and misleading statement during this earnings call when articulating a "general statement on how we look at sports rights." (FAC ¶ 99). Plaintiffs misattribute this statement. Another WBD executive, Jean-Briac Julien Perrette, made it — not Mr. Wiedenfels. (Polkes Decl., Ex. 1 at 18-19; *see also* Def. Br. 5 n.2). The Court therefore finds that Plaintiffs have not adequately pleaded a Section 10(b) or Section 20(a) claim predicated on this statement. *See SEC* v. *Farnsworth*, 692 F. Supp. 3d 157, 191-92 (S.D.N.Y. 2023) (finding that the Securities and Exchange Commission (the "SEC") had not pleaded a company's primary securities violation because it had "not identified which specific statements by [employees] it believe[d] should be imputed to [the company], and under Rule 9(b), the SEC is required to specifically connect the speakers and the misstatements"); *In re Glob. Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 1907005, at *11 (S.D.N.Y. Aug. 8, 2005) ("Having failed to plead respondeat superior liability, or that [employees'] actions were attributable to [companies], plaintiffs have failed to state claims under Section 10(b) of the Exchange Act and Section 11 of the Securities Act.").[4]

---

[4]     Plaintiffs do not respond to Defendants' clarification regarding the speaker of this statement — a clarification this Court has no basis to dispute. Instead, Plaintiffs continue to attribute the statement to Mr. Wiedenfels. (*See, e.g.,* Pl. Opp. 5 ("Wiedenfels

### b.    The Matching Clause Statements

The remainder of Defendants' alleged misstatements concern the Matching Clause.  Generally, Plaintiffs contend that Defendants touted the Matching Clause as an assurance that WBD would be able to match any rival bid and thus retain the NBA Rights despite knowing that WBD would not and could not match the competing offers.  (*See* FAC ¶¶ 109-121; Pl. Opp. 5-6).

*Third,* when speaking at a conference on May 6, 2024, Mr. Zaslav stated, "[w]e continue to be in constructive negotiations with the NBA[.]"  (FAC ¶ 109 (alterations in original)).

*Fourth,* Mr. Zaslav stated on a May 9, 2024 earnings call:

> *Before I close, I want to mention a topic I know is top of mind for everyone and that's the NBA.  We've enjoyed a strong partnership with the NBA for almost four decades.  We're in continuing conversations with them now and we're hopeful that we'll be able to reach an agreement that makes sense for both sides.  We've had a lot of time to prepare for this negotiation and we have strategies in place for the various potential outcomes.  However, now is not the time to discuss any of this.  Since we are in*

---

also downplayed the vital importance of the NBA Rights, omitting that the Company depended on revenue derived from the NBA Rights"); *id.* at 14 ("Here, the Complaint explains how Defendants' statements in response to analysts' questions about it 'being a big positive to retain [the NBA] rights,' misleadingly minimized the critical nature of the NBA Rights by concealing, *inter alia*, that losing the NBA Rights would significantly impact WBD's revenue, churn, bargaining leverage and goodwill." (alteration in original)); *id.* at 24 ("Thus, Defendants' statements were 'made to reassure investors as to specific risks' and therefore 'cannot be dismissed as mere puffery.'" (quoting *Wash. State Inv. Bd.* v. *Odebrecht S.A.*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020))).

Even if the statement were correctly attributed in the FAC, and even if Mr. Perrette's statement could be imputed to WBD for purposes of the Section 10(b) analysis, Plaintiffs' claim would still fail.  Mr. Perrette's statement was substantively indistinct from the statement attributed to Mr. Zaslav in the text and, for the many reasons described *infra* in the Discussion section of this Opinion, that statement was neither false nor materially misleading.  Furthermore, by failing to attribute the statement to Mr. Perrette, and by making no allegations against Mr. Perrette in the FAC, Plaintiffs fail to present evidence from which the Court could find the requisite scienter.  Accordingly, the Court does not consider Mr. Perrette's statement further in this Opinion.

> *active negotiations with the league and under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them.*

(FAC ¶ 112).

*Fifth*, also during the May 9, 2024 earnings call, Mr. Zaslav responded to a question from an analyst, Steven Cahall:

> Steven Cahall – Thank you.  So David and Gunnar, with a continuous improvement mindset, it seems like you have some tools that could help reaccelerate EBITDA. *And then I think there's some concern about what you might be willing to do to match on the NBA rights.  So I'm just wondering if we can think about these things being tied together.  Do you think you can find enough cost improvement that strengthens your hand as you think about a more aggressive matching offer to retain some of those rights?*
>
> David Zaslav – *Thanks.  Look churn is the, you need to have a great, great product, you need to have great content.  But the churn is just a killer in this business. And so we have been hyper-focused on it and it's not one simple answer but the churn is down dramatically. And we measure it daily, weekly from when we launched this business.  It's not at our target because our target is that it should be extremely low in the -- with a two handle, that would be, you know, that's when your business starts to be really healthy, when you're below three.*
>
> *And so, JB, why don't you talk?  We have very specific initiatives on churn. Certainly, bundling is a big helper. A lot of these deals that we're talking about with players in Latin America and in Europe, where you're working with an existing distributor that you have a relationship with that's hard bundling in many cases with users have different characteristics that are quite attractive but we need to go at this as like an attack mode.*

(FAC ¶ 114).

*Sixth*, on May 22, 2024, Mr. Wiedenfels attended a conference and was asked about the NBA Rights:

11

> David Karnovsky – Got it.  With the NBA, I think many people in this room probably want me to ask you for an update.  I wouldn't expect you to break news, but maybe I can give you a follow-up to what you said on the earnings call around matching rights.  Would be interested to understand better how those work?  Is this entirely financial.  Are there considerations around packaging?  What can you say?
>
> Gunnar Wiedenfels – Well you wouldn't be surprised that I'm not going to be breaking news here.  *And look, this is still very much an ongoing negotiation.*  We've had a great partnership with the NBA. We value the product, and we[']re very hopeful that we're going to be able to find a solution here that's mutually beneficial to both sides.  *We do have a contractual matching, right?*
>
> *And that's an important part of our ongoing contractual relationship, but that's about as much as I want to say about the NBA.*

(FAC ¶ 118).

*Seventh*, Mr. Zaslav made the following statement at a May 30, 2024 conference:

> Laurent Yoon – All right.  So I would like to address one elephant in the room and turn to sports.  And just to kind of clear the table, no specific questions on the negotiation with the [NBA], none of that.
>
> But I'd like to kind of have a — take a slightly different angle to that.  So generally, the general view in the market, a lot of the questions I get or commentary I gets is that is WBD today, when it comes to NBA, is left with to auction.  And it's not a WBD issue, basically, all the players want the right.  You can pay up what seems to be an exorbitant amount, or you may — or give it up.  Those are sort of the — and both options don't see that appealing, right?
>
> The question I have is around what would WBD, or maybe (technical difficulty) specifically, what would it look like without the NBA rights?  Because —  and I don't mean that in a negative way because at the end of

12

the day, it's a capital allocation issue, right?  So if you can make the case that you could spend up money to generate return on something else, maybe that is compelling as well right?  So what would that look like?  What would be WBD and TNT look like without the NBA?

David Zaslav – Well first, we're — *we continue to talk to the NBA.  And our team does an extraordinary job on the NBA, [I]nside the NBA with Bar[kle]y and Sha[q] it's maybe the best sports television show.  I was just down in Atlanta.  We've got a great team down there, and we love our experience with the NBA.  But in general, we're a leader in sports around the world.  And if — we have the Olympics in Europe.  With leading — we have most of the football in the U.K. where TNT Sport, with a full buffet of content around the world. …*

Laurent Yoon – Okay.  So to summarize, even without — *whatever happens with the NBA, the value proposition of (technical difficulty) is a good destination for a (technical difficulty) content in each of the relevant of markets you play in?*

David Zaslav – *We feel very comfortable and we've been very strategically focused on making sure that we have a robust offering of sports for each our sports channels in the U.S. and around the world.*

(FAC ¶ 120).

Plaintiffs generally allege that each of these Matching Clause Statements was materially false and misleading because (i) WBD could not in fact match NBCUniversal's and Amazon's bids (so, for example, WBD was not engaging in "constructive negotiations"); (ii) WBD internally viewed the NBA Rights as a unique, irreplaceable asset; and (iii) losing the NBA Rights would significantly compromise WBD's revenue and goodwill, particularly in its Networks segment. (FAC ¶¶ 110, 113, 115, 119, 121).

## B.    Procedural Background

On November 25, 2024, Named Plaintiff Richard Collura initiated this action by filing a complaint.  (Dkt. #1).  On February 21, 2025, the Court appointed Mr. Yuson and Mr. Steinberg as Co-Lead Plaintiffs.  (February 21, 2025 Minute Entry; Dkt. #27 at 11; *see* FAC).  On May 7, 2025, Plaintiffs filed the FAC, which alleges two violations of the federal securities laws.  (FAC).  Count I alleges violations, by all Defendants, of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  (*Id.* ¶¶ 177-186).  Count II asserts, against Mr. Zaslav and Mr. Wiedenfels (together, the "Individual Defendants"), violations of Section 20(a) of the Exchange Act as control persons.  (*Id.* ¶¶ 187-192).

Defendants submitted their motion to dismiss and supporting papers on July 11, 2025.  (Dkt. #46-49).  Plaintiffs filed their opposition papers on August 25, 2025.  (Dkt. #51).  Defendants replied on September 24, 2025. (Dkt. #52).

## DISCUSSION

## A.    Applicable Law

On a Rule 12(b)(6) motion, the court "draw[s] all reasonable inferences in [a plaintiff's] favor, assume[s] all well-pleaded factual allegations to be true, and determine[s] whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir. 2009)); *see Ashcroft* v. *Iqbal,* 556 U.S. 662, 678-79 (2009).  A plaintiff is

14

entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). Nevertheless, the court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)). Indeed, plaintiffs must do more than provide a "formulaic recitation of the elements of a cause of action" — that is, their "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In addition, as relevant here, "[s]ecurities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Emps.' Ret. Sys. of Gov't of the V.I.* v. *Blanford*, 794 F.3d 297, 304 (2d Cir. 2015). "Prior to the enactment of the [Private Securities Litigation Reform Act of 1995 ('PSLRA'), 15 U.S.C. § 78u-4], the sufficiency of a complaint for securities fraud was governed only by [Federal] Rule [of Civil Procedure] 9." *Blanford*, 794 F.3d at 304. But "[t]he PSLRA builds on Rule 9's particularity requirement, dictating the pleading standard for claims brought under the Exchange Act." *Id.* Accordingly, a complaint alleging securities fraud must satisfy both Rule 9(b) and the PSLRA. *See ATSI Commc'ns, Inc.*, 493 F.3d at 99.

*First*, Rule 9(b) requires that "a party … state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "A securities fraud

15

complaint based on misstatements must [i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak* v. *Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). "While Rule 9(b) demands specificity as to the circumstances of an alleged fraud, it allows a plaintiff to 'allege[ ] generally' any requisite state of mind, *e.g.*, '[m]alice, intent, [or] knowledge[.]'" *Genesee Cnty. Emps.' Ret. Sys.* v. *DocGo Inc.*, 773 F. Supp. 3d 62, 78 (S.D.N.Y. 2025) (alterations in original) (quoting Fed. R. Civ. P. 9(b)).

*Second*, the PSLRA requires the plaintiff to "do more than say that [a defendant's] statements ... were false and misleading; [he] must demonstrate with specificity why and how that is so." *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In other words, the "plaintiff[ ] cannot rest on [his] say-so that these statements are fraudulent; [he] must explain why." *Id.* at 175. To do so, the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, where the plaintiff brings a Section 10(b) or Rule 10b-5 claim — for which the requisite state of mind is scienter, namely an "intent to deceive, manipulate, or defraud" — "[S]ection [78u-4(b)(2)(A)] of the PSLRA ... requires that a plaintiff's complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with [scienter].'"

16

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (internal quotation marks omitted) (first quoting *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007); and then quoting 15 U.S.C. § 78u-4(b)(2)(A)). "To qualify as 'strong' ... an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314; *accord Saraf* v. *Ebix, Inc.*, No. 23-1182-cv, 2024 WL 1298246, at *1 (2d Cir. Mar. 27, 2024) (summary order).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021). Beyond this narrow universe of materials, a court may also consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence" and disregard "allegations in a complaint that contradict or are inconsistent with judicially-noticed facts." *Becker* v. *Cephalon, Inc.*, No. 14 Civ. 3864 (NSR), 2015 WL 5472311, at *3, 5 (S.D.N.Y. Sept. 15, 2015) (internal quotation marks and citations omitted).

**B.    Analysis**

### 1.    Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  As relevant here, Section 10(b)'s implementing rule, Rule 10b-5, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).

"The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context,* would have misled a reasonable investor."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (internal quotation marks and citation omitted).  This rubric captures so-called half-truths, or "representations that state the truth only so far as it goes, while omitting critical qualifying information."  *Macquarie Infrastructure Corp.* v. *Moab Partners, L. P.*, 601 U.S. 257, 263 (2024) (internal quotation marks omitted) (quoting *Universal Health Servs., Inc.* v. *United States ex rel. Escobar*, 579 U.S. 176, 188 (2016)).

"To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: [i] a misstatement or omission of material fact; [ii] scienter; [iii] a connection with the purchase or sale of securities; [iv] reliance; [v] economic

loss; and [vi] loss causation." *Arkansas Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343, 351-52 (2d Cir. 2022).  Here, because the FAC fails to plead the first two elements, the Court finds that Count I fails to state a claim.

### a.    Plaintiffs Fail to Allege an Actionable Misstatement or Omission

The Court begins with the first element, a misstatement or omission of material fact.  A misstatement is actionable if it is material and false or misleading.  *Leadersel Innotech ESG* v. *Teladoc Health, Inc.*, No. 23-1112-cv, 2024 WL 4274362, at *2 (2d Cir. Sept. 24, 2024) (summary order) (citing *Singh* v. *Cigna Corp.*, 918 F.3d 57, 62-63 (2d Cir. 2019)).  "In order to adequately plead falsity, [Plaintiffs] must allege that the identified statements were either false at the time they were made or failed to contain other information that would have made them not misleading." *Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 577 (S.D.N.Y. 2014), *aff'd sub nom. In re Lululemon Sec. Litig.*, 604 F. App'x 62 (2d Cir. 2015) (summary order).  If "allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (internal quotation marks and citation omitted).

Further, "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174; *see also Novak*, 216 F.3d at 315 ("[S]tatements containing simple economic projections, expressions of optimism, and other puffery" like "rosy predictions" are "insufficient.").

19

"Statements are mere puffery, and hence non-actionable, when they are 'too general to cause a reasonable investor to rely upon them.'" *In re Checkpoint Therapeutics Sec. Litig.*, No. 24 Civ. 2613 (PAE), 2025 WL 1434400, at *14 (S.D.N.Y. May 19, 2025) (quoting *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).  Puffery includes, for example, statements about "continued progress," *In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069 (LGS), 2015 WL 5326166, at *9-10 (S.D.N.Y. Sept. 14, 2015) (internal quotation marks omitted); statements that a company's "business strategies would lead to continued prosperity," *Lasker* v. *N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (alteration adopted and internal quotation marks omitted); and statements that the company was "super pleased with the health systems partnerships we formed today" and "we're off to a strong start," *Helo* v. *Sema4 Holdings Corp.*, No. 22 Civ. 1131 (VDO), 2024 WL 3593677, at *9 (D. Conn. July 31, 2024) (internal quotation marks omitted); *see generally Checkpoint Therapeutics*, 2025 WL 1434400, at *14 (collecting these and other cases).

Here, to argue that Defendants' statements violated Section 10(b) and Rule 10b-5 thereunder, Plaintiffs group Defendants' statements into two categories — (i) statements allegedly downplaying the importance to WBD of the NBA Rights (the Importance Statements) and (ii) statements omitting that WBD knew it could not match rival bids (the Matching Clause Statements). (FAC ¶¶ 97-121; Pl. Opp. 9-23).  Plaintiffs technically allege both that Defendants' statements were false and that they were misleading, but the FAC

pays only lip service to falsity and instead primarily alleges that Defendants'
statements were misleading because they omitted critical information. (*See*
FAC ¶¶ 97-121). As explained below, however, all material facts were either
disclosed by Defendants or publicly available.

### i.      The Importance Statements

Turning first to the Importance Statements, the Court has already
explained that the second Importance Statement is not actionable. As a result,
only Mr. Zaslav's February 23, 2024 earnings call statement remains for
consideration. (*See* FAC ¶ 97). That statement was neither false nor materially
misleading.

As to falsity, the statement was true or, at worst, inactionable puffery. It
was true that WBD had a "40-year relationship with the NBA," and it was true
that WBD was "engaged in renewal discussions." (FAC ¶ 97). Mr. Zaslav also
described those discussions as "constructive and productive." (*Id.*). But such
remarks are not actionable: a defendant does not violate Section 10(b) or Rule
10b-5 by describing negotiations as constructive, even if those negotiations
later fail. *See Checkpoint Therapeutics*, 2025 WL 1434400, at *14 (collecting
cases); *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir.
2019) (summary order) (concluding that statements that defendants were
"actively engaged in good faith discussions" and were "excited to continue

productive discussions" that were "very early on" did not become misleading because those negotiations failed (internal quotation marks omitted)).[5]

Turning to whether this statement was materially misleading, the Court similarly concludes that it was not; Mr. Zaslav did not omit material information and, by extension, did not mislead reasonable investors. To the contrary, Defendants repeatedly communicated to the public the importance to WBD of the NBA Rights. For starters, Defendants did so formally in WBD's SEC filings. WBD's 2023 Form 10-K stated, "Failure to renew, renewal with less favorable terms, or termination of our content licenses and similar distribution agreements may cause a decline in our revenue." (Polkes Decl., Ex. 10 at 15). And the 10-K also stated, "We invest significant resources to acquire and maintain licenses to produce sports programming and there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed. We face significant competition to acquire and maintain licenses to sports programming[.]" (*Id.* at 16).

Further, WBD's first quarter 2024 Form 10-Q stated, "The Company will continue to monitor its reporting units for triggers that could impact the recoverability of goodwill. These triggers include, but are not limited to …

---

[5]    Plaintiffs recite another statement Mr. Zaslav made in November 2022 — "we don't have to have the NBA" — apparently in furtherance of their argument that Defendants downplayed the significance of the NBA Rights. (FAC ¶ 94). But this statement does not support a claim under Count I because it predates the Class Period. *See Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007) ("A defendant … is liable only for those statements made during the class period.").

sports rights renewals, including the NBA, associated with the Company's Networks and DTC reporting units[.]" (Polkes Decl., Ex. 11 at 10). And the 10-Q also stated, "[W]e face increased competition to license content from the NBA, which could result in significantly higher programming costs to us or a failure to maintain our license for NBA programming," and warned that failure to renew WBD's NBA Rights "could negatively affect our estimates of the fair value of our reporting units" and lead to "impairment charges related to goodwill and other intangible assets." (*Id.* at 43).

These disclosures in WBD's SEC filings adequately convey the significance of the NBA Rights to WBD. The disclosures explain that WBD "invest[s] significant resources" in acquiring and maintaining the Rights and acknowledged that failure to renew them, amidst fierce competition, could "negatively affect" WBD's "value" and lead to "impairment charges." These statements alone contradict Plaintiffs' allegations that Defendants failed to recognize the significance of the NBA Rights. *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d at 692 (If "allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true." (internal quotation marks and citation omitted)).

Further, the FAC itself cites statements Defendants made that repeatedly recognized the Rights' value. For example, Mr. Wiedenfels stated, "We've had a great partnership with the NBA. We value the product, and we[']re very hopeful that we're going to be able to find a solution here that's mutually beneficial to

both sides." (FAC ¶ 118). Similarly, Mr. Zaslav stated, "We've enjoyed a strong partnership with the NBA for almost four decades. We're in continuing conversations with them now and we're hopeful that we'll be able to reach an agreement that makes sense for both sides." (*Id.* ¶ 112). Mr. Zaslav also recognized that a WBD subsidiary's show, Inside the NBA, was "maybe the best sports television show" and that "we love our experience with the NBA." (*Id.* ¶ 120). Finally, Mr. Perrette, the speaker of the second Importance Statement, said, "we obviously acknowledge the enormous value, reach value, emotional value of these deals." (FAC ¶ 99).[6] To be sure, these statements are not as explicit in tying the NBA Rights to WBD's bottom line as WBD's SEC filings, but they are nonetheless additive. And because the Court assesses Defendants' liability by taking their "representations … together and in context," *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 250 (emphasis omitted), it finds that Defendants' Importance Statements did not mislead investors regarding the importance of the NBA Rights.

But even if Defendants had not conveyed the importance of the NBA Rights, public discourse — including widely disseminated media reports — made plain their importance. These reports would have been sufficient to counteract any misleading omissions made by Defendants. *See Barilli* v. *Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 254 (S.D.N.Y. 2019) ("A defendant has no duty to disclose information that is within the public domain through

---

[6]    Although the Court has found this statement does not support a claim under Count I, it is nevertheless a statement by a WBD employee included in the FAC that acknowledges the significance of the NBA Rights to the company.

24

publication in the news media."); *In re Progress Energy, Inc. Sec. Litig.*, 371 F.
Supp. 2d 548, 552-53 (S.D.N.Y. 2005) ("It is well-established law that the
securities laws do not require disclosure of information that is publicly
known[.]" (collecting cases)); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d
358, 377 (E.D.N.Y. 2003) ("[T]he securities laws require disclosure only of
'information that is not otherwise in the public domain[.]'" (emphasis omitted)
(quoting *Sailors* v. *N. States Power Co.*, 4 F.3d 610, 613 (8th Cir. 1993))).

The FAC itself proves the point by referencing a snippet of the extensive
public reporting on the NBA Rights and their importance to WBD.  Citing
analyses from Wells Fargo, the FAC alleges that "Analysts consistently
determined that the tangible impact of the NBA Rights to WBD's advertising
and carriage rates revenue for WBD's Networks segment approximated $1.8
billion per year."  (FAC ¶ 68).  The FAC also cites a *Wall Street Journal* article to
allege that "WBD depended on the NBA Rights not just for high … carriage fees
and linear advertising, but also for its new drivers of revenue."  (*Id.* ¶ 70).  In
these ways, the FAC recognizes the publicly known fact that the NBA Rights
were important to WBD.

In addition to the specific media coverage described in the FAC,
numerous news outlets reported during the Class Period on the importance of
the NBA Rights to WBD and the potential negative consequences of losing
those Rights.  (*E.g.*, Polkes Decl., Ex. 13 at 3 (reporting that "Wall Street views
NBA rights as necessary for WBD — not a luxury"); *id.*, Ex. 14 at 2 ("Industry
insiders have repeatedly underscored how important it is for … WBD to retain

25

the NBA broadcast rights."); *id.*, Ex. 17 at 2 (reporting that losing NBA Rights would be a "blow" to TNT cable network); *id.*, Ex. 19 at 1 (reporting that losing NBA Rights "could be devastating for WBD"); *see also* Def. Br. 15-16 (collecting additional public reporting)).

Plaintiffs argue that the Court should not consider these media reports not included in the FAC. (*See* Pl. Opp. 8 n.2). But "it is proper to take judicial notice of the fact that press coverage … contained certain information, without regard to the truth of [its] contents[.]" *Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (emphasis omitted) (collecting cases). The Court is mindful that it can "rely on such documents only for the fact that the statement[s] w[ere] made." *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 352. That is precisely the purpose for which the Court considers the reports, which confirm that statements opining on the importance of the NBA Rights to WBD were publicly available (indeed, widely disseminated) during the Class Period.

Resisting this conclusion, Plaintiffs cite WBD's $9.1 billion impairment charge as evidence of the NBA Rights' importance and Defendants' failure to disclose that importance. (*See* Pl. Opp. 15, 31).[7] But the impairment charge does not support such an argument. As just described, Defendants repeatedly made clear the importance of the NBA Rights — through SEC filings and public statements — and so too did media reporting. That WBD had to take such a large impairment charge was no doubt significant, but the fact and amount of

---

[7]    The Court accepts, solely for purposes of analysis, Plaintiffs' position that the impairment charge was largely, if not wholly, attributable to WBD's loss of the NBA Rights, a position Defendants contest. (*See, e.g.*, Def. Br. 17-18).

its imposition do not prove that Defendants' earlier statements regarding the Rights were misleading.  To the contrary, any reasonable investor knew that the NBA Rights mattered to WBD and would negatively affect its business if lost.  And Defendants warned investors of this risk, including the specific risk of an impairment charge.  (Polkes Decl., Ex. 11 at 43).  Accordingly, no reasonable investor could have been misled about the importance of the NBA Rights merely because Defendants did not precisely predict the $9.1 billion impairment charge that followed the loss of the Rights.

Finally, Plaintiffs argue that because Defendants disclosed some information, they had, and failed to discharge, a duty to tell the whole truth. (Pl. Opp. 10-13 (challenging Defendants' truth-on-the-market defense)).  In particular, Plaintiffs contend that by discussing the NBA Rights negotiations at all, Defendants undertook "a duty to tell the whole truth" (*id.* at 10 (quoting *Meyer* v. *Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014))), or, in other words, "to disclose information that would render [their] statements not misleading" (*id.* (quoting *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 332 (S.D.N.Y. 2014))).  Defendants fell short of this disclosure duty, Plaintiffs say, by omitting the facts "that losing the NBA Rights would significantly compromise WBD's revenue and goodwill; that the NBA Rights were crucial to WBD's high carriage rates, advertising revenue, and negotiating position with other sports leagues; and that, accordingly WBD internally viewed the NBA Rights as an irreplaceable asset." (Pl. Opp. 10 (internal quotation marks omitted) (citing FAC ¶¶ 97-100, 109-110, 112-115, 118-121)).

27

But Plaintiffs make too much of this disclosure principle.  It is true that once Defendants choose to speak, they must speak truthfully — and in that particular sense, they must tell the whole truth.  *Meyer*, 761 F.3d at 250-51.  But the principle does not require disclosure *ad infinitum*; it requires only the amount of disclosure necessary to make Defendants' statements not misleading given the circumstances.  *Id.* at 250 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).  Here, Defendants satisfied this principle.  They disclosed the importance of the NBA Rights in public statements and SEC filings.  To the extent those disclosures fell short (and the Court finds they did not), media reporting filled in the gaps.  The Importance Statements were therefore not misleading, and Defendants did not need to disclose more information about the importance of the NBA Rights.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.").

### ii.       The Matching Clause Statements

The Court turns next to the Matching Clause Statements.  Plaintiffs primarily allege that, in making these statements, Defendants misleadingly omitted that WBD would not and could not match the competing offers submitted by NBCUniversal and Amazon.  (*See* FAC ¶¶ 102-121).  Here, too, Plaintiffs fail to allege a claim for relief.

As an initial matter, like the Importance Statements, the Matching Clause statements were true — and Plaintiffs do not seriously contend

otherwise.  It was true that WBD and the NBA were actively negotiating.  (*See* FAC ¶¶ 109, 112, 118, 120 (discussing "constructive negotiations" and "continuing conversations")).  And it was true that WBD had a contractual entitlement to the Matching Clause.  (*See id.* ¶¶ 112, 118 (discussing "matching rights" and "contractual matching")).  So rather than questioning the existence of the Matching Clause, Plaintiffs instead challenge how Defendants characterized it.

In particular, Plaintiffs allege that the Matching Clause Statements were misleading because Defendants omitted material information that demonstrated that the Matching Clause provided Defendants "no protection" because (i) WBD could not match the terms offered by NBCUniversal and Amazon (such as cross-promotion with the NFL and commensurate internet streaming audience and infrastructure) and (ii) WBD was not in a financial position to match NBCUniversal's $2.45 billion per year offer.  (FAC ¶¶ 110, 113, 119, 121; *see also* Pl. Opp. 6).  Indeed, Plaintiffs allege that in May 2024, Defendants knew that the NBA Rights "were already lost" because WBD could not match the terms of NBCUniversal's and Amazon's offers.  (FAC ¶ 115).

To begin, these arguments fail to engage with the actual statements Defendants made.  As Plaintiffs would have it, Defendants said the Matching Clause *guaranteed* WBD the right to keep the NBA Rights.  (*See* FAC ¶¶ 113, 119, 121).  But that is not in fact what Defendants said.  Rather, a reasonable investor could only have interpreted Defendants' statements to convey that the Matching Clause guaranteed WBD the *opportunity* to continue to vie for the

29

NBA Rights after a competitor made a competing offer — not that WBD was guaranteed the Rights no matter what.  (*See* FAC ¶ 112 ("[W]e have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them." (emphasis omitted)); *id.* ¶ 118 ("We do have a contractual matching, right?  And that's an important part of our ongoing contractual relationship, but that's about as much as I want to say about the NBA." (emphasis omitted))).  What is more, Defendants did not and could not promise *ex ante* to match NBCUniversal's and Amazon's NFL cross-promotions or NBCUniversal's $2.45 million bid.  Again, Defendants only acknowledged that the Matching Clause existed and that it provided WBD the opportunity to counter a rival bid.  The Matching Clause Statements were thus both literally true and did not create a materially misleading impression by omitting information.  *See Macquarie Infrastructure Corp*, 601 U.S. at 263; *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 240. [8]

Plaintiffs contend otherwise:  They argue that Defendants knew WBD could not match NBCUniversal's and Amazon's bids and nevertheless made statements implying that it could.  (Pl. Opp. 18 (citing FAC ¶¶ 102-108, 116-117, 122-135)).  But Defendants made the Matching Clause Statements in

---

[8]    To the extent Plaintiffs argue in their opposition papers that Defendants' Matching Clause Statements were false or misleading because Defendants failed to disclose the precise text of the Matching Clause (*see* Pl. Opp. 1, 4, 17-19), those allegations fail because the FAC does not plead them.  *Fadem* v. *Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005) ("It is long standing precedent … that parties cannot amend their pleadings through issues raised solely in their briefs.").  Even if it had, failing to disclose the exact terms of the Matching Clause would not render Defendants' statements misleading because Defendants only stated that the right to match existed; Defendants did not guarantee that they would successfully match.

April and May, and the NBA did not reveal the exact terms of NBCUniversal's and Amazon's offers to WBD until July. (FAC ¶¶ 109, 112, 114, 118, 120; *see id.* ¶¶ 122-123). Quite obviously, therefore, Defendants could not have known in May that WBD would not reach a deal with the NBA or match competing offers in July. The law does not require Defendants to predict the future. *See Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud."); *Express Scripts*, 773 F. App'x at 15 (Because "Defendants 'need not be clairvoyant,' [a]llegations … 'that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.'" (quoting *Novak*, 216 F.3d at 309)).

Plaintiffs rejoin that the FAC does not fault Defendants for failing to predict the future, but rather for omitting "then-known and highly material risks when discussing the Matching Clause." (Pl. Opp. 18). But as to the particular issue of NFL cross-marketing, it was publicly available knowledge that competitors had NFL media rights and WBD did not, so Defendants are not to be faulted for failing to disclose this information preemptively before competing bids were submitted. *See Barilli*, 389 F. Supp. at 254; *In re Progress Energy*, 371 F. Supp. 2d at 552-53; *In re Keyspan Corp.*, 383 F. Supp. 2d at 377. Defendants likewise could not have known the exact number NBCUniversal would bid, and thus they could not have known that WBD would

31

fail to match it.[9]  More to the point, Defendants' statements did not guarantee that WBD would successfully match competing offers.  Nor did the statements misleadingly imply such a guarantee.  Defendants acknowledged only the Matching Clause's existence and then declined to say any more, citing the ongoing negotiations.  (FAC ¶¶ 112, 118).

Contemporaneous media reports similarly made clear that the Matching Clause was not a silver bullet.  (*See* Def. Br. 19 (citing Polkes Decl., Ex. 16 at 2 ("The new deals could include language and terms that would potentially make enforcing a matching-right clause challenging."); *id.*, Ex. 23 at 2 (noting that the NBA could "dispute the definition of 'match'"); FAC ¶ 103 (stating that "the deals offered by Amazon or NBCUniversal could contain terms that were difficult or impossible to match" (citing Polkes Decl., Ex. 16)).  That this information was publicly known only underscores that point that Defendants' Matching Clause Statements were not misleading.  *See Barilli*, 389 F. Supp. at 254; *In re Progress Energy*, 371 F. Supp. 2d at 552-53; *In re Keyspan Corp.*, 383 F. Supp. 2d at 377.

---

[9]    Plaintiffs argue that Defendants did in fact know NBCUniversal's exact number because news reports from late April announced it.  (Pl. Opp. 18-19 (citing FAC ¶¶ 103-105)).  These reports were speculative and came before the Matching Period, when Defendants were able to see for themselves the details of the rival bids.  But even assuming that the reports did put Defendants on notice of the terms of NBCUniversal's bid, Defendants did not make false or misleading statements after acquiring this knowledge.  Defendants stated only that WBD had a contractual Matching Right, and that WBD was "in continuing conversations" and "ongoing negotiation" with the NBA.  (FAC ¶¶ 112, 118).  Those statements were literally true.  Plaintiffs argue they were nevertheless misleading because they provided false hope of a successful matching bid.  But the statements do no such thing.  They do not guarantee a match; to the contrary, they hedge.  Indeed, Mr. Zaslav foreshadowed the possibility of failed negotiations.  He stated that although "we're hopeful that we'll be able to reach an agreement that makes sense for both sides," "[w]e've had a lot of time to prepare for this negotiation and we have strategies in place for the various potential outcomes."  (*Id.* ¶ 112).

Somewhat curiously, in debating whether the Matching Clause Statements violated Section 10(b) and Rule 10b-5, *both* sides invoke WBD's lawsuit against the NBA for failing to honor WBD's attempted matching offer. (Def. Br. 21; Pl. Opp. 22-23). Defendants cite the lawsuit to argue that WBD did in fact match Amazon's offer, and Plaintiffs point to the quick and modest settlement as evidence to the contrary. (Def. Br. 21; Pl. Opp. 22-23). The Court, however, does not find either line of argument persuasive. The Court does not understand WBD to have successfully matched the rival bids, and Plaintiffs have pleaded that it did not. Conversely, Defendants never claimed in the Matching Clause Statements to have submitted a successful matching offer. At this stage, the Court's task is to assess Defendants' contemporaneous statements. For the reasons just outlined, those statements were neither false nor misleading.[10]

### b.    Plaintiffs Fail to Plead Scienter

The Court turns next to the second element of a claim under Section 10(b) and Rule 10b-5, scienter, and concludes that the FAC does not adequately plead it. For this independent reason, the FAC fails to state a claim as to Count I.

Scienter is "an intent to 'deceive, manipulate, or defraud,'" or recklessness. *ECA*, 553 F.3d at 198 (quoting *Tellabs, Inc.*, 551 U.S. at 313). To

---

[10]    Plaintiffs' discussion in the FAC of information obtained from confidential witnesses warrants only a brief comment. The witnesses do not remedy the FAC's deficiencies because they provide only information that was publicly available or that, for the reasons described above, does not demonstrate that Defendants' statements were misleading. (*See* FAC ¶¶ 59-65, 70, 91-96).

adequately plead scienter, Plaintiffs must allege facts giving rise to a strong inference that either (i) "defendants had the motive and opportunity to commit fraud," or (ii) there is "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* "A complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

### i.          Plaintiffs Fail to Allege Motive and Opportunity

To plead motive and opportunity, Plaintiffs must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198 (internal quotation marks omitted) (quoting *Novak,* 216 F.3d at 307-08). "[T]he motive showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.* (internal quotation marks omitted) (quoting *Novak,* 216 F.3d at 308). That said, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). "Insufficient motives, therefore, "include [i] the desire for the corporation to appear profitable and [ii] the desire to keep stock prices high to increase officer compensation." *Id.*

34

Here, Plaintiffs advance a motive-and-opportunity theory of scienter only as to Mr. Wiedenfels. They allege that Mr. Wiedenfels sold WBD shares during the Class Period for about $971,614.35 after he had increased his holdings in WBD without a sale during the previous eleven and a half months. (FAC ¶¶ 166-167). But the Court finds these allegations insufficient to support a strong inference of Mr. Wiedenfels's scienter.

At base, Plaintiffs must establish that Mr. Wiedenfels's sales were unusual or suspicious. *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (quoting, among others, *Acito*, 47 F.3d at 54). "Whether trading was unusual or suspicious turns on factors including [i] the amount of net profits realized from the sales; [ii] the percentages of holdings sold; [iii] the change in volume of insider defendant's sales; [iv] the number of insider defendants[ ] selling; [v] whether sales occurred soon after statements defendants are alleged to know to be misleading; [vi] whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and [vii] whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001).

Plaintiffs focus on percentage and timing. (*See* FAC ¶¶ 166-167; Pl. Opp. 29-30). They assert in their opposition papers that Mr. Wiedenfels sold "approximately 9% of his total holdings." (Pl. Opp. 29). Plaintiffs do not explain how they calculated this percentage (*see id.* at 29-30), and Defendants offer competing percentages ranging from 0.7% to 3.2% depending on the date

35

of the trade (Def. Br. 27).  But even accepting Plaintiffs' higher number, the Court does not find the trading to be unusual or suspicious.  Indeed, courts in this Circuit have found that comparable percentages do not support an inference of scienter.  *Compare Acito*, 47 F.3d at 54 (concluding that trade was not unusual because it "represented less than 11% of holdings"), *and In re Piedmont Lithium Inc. Sec. Litig.*, 712 F. Supp. 3d 301, 312 (E.D.N.Y. 2024) (finding that sale of 13.19% of shares was a "small fraction" of total), *with In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 75 (holding that sale of 80% of holdings days after not selling in decades established scienter), *and City of Roseville Emps.' Ret. Sys.* v. *EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 420-22 (S.D.N.Y. 2011) (similar).

As for timing, three of the four alleged stock sales occurred in February and early March — before WBD entered the Exclusive Negotiation Period and before Plaintiffs allege that Defendants were on notice of NBCUniversal's and Amazon's rival bids.  (*See* FAC ¶¶ 109, 112, 114, 118, 120, 122-123, 166-167; Pl. Opp. 18-19 (citing FAC ¶¶ 103-105)).  All four trades occurred before the Matching Period.  (*See* FAC ¶¶ 123, 166-167).  The FAC is silent as to how the timing of these trades could therefore support an inference of scienter, and the Court finds that they do not.  (*See id.* ¶¶ 166-167).  The Court thus concludes that Mr. Wiedenfels's trading does not support a strong inference of scienter.

36

ii.        **Plaintiffs Fail to Present Strong Circumstantial Evidence That Defendants Acted with Conscious Misbehavior or Recklessness**

"If a plaintiff is unable to plead motive and opportunity, the plaintiff may allege scienter through strong circumstantial evidence of conscious misbehavior or recklessness, though such allegations must be 'correspondingly greater.'" *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, No. 17 Civ. 2169 (LAK), 2019 WL 1368787, at *15 (S.D.N.Y. Mar. 26, 2019) (emphasis omitted) (quoting *Lululemon Sec. Litig.,* 14 F. Supp. 3d at 573). Conscious misbehavior or recklessness involves "deliberate, illegal behavior, or highly unreasonable conduct that 'constituted an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Lululemon Sec. Litig.,* 14 F. Supp. 3d at 573). It is not enough to allege that Defendants should have known something; Plaintiffs must show a reckless disregard for facts at Defendants' disposal. *See id.*

Here, Plaintiffs advance three categories of circumstantial evidence to demonstrate Defendants' conscious misbehavior or recklessness. *First,* they argue that Defendants knowingly misled investors by downplaying the importance to WBD of the NBA Rights and concealing the Matching Clause's stringent language. (Pl. Opp. 27-28). This category entirely fails to persuade the Court. The Court has already catalogued a variety of reasons why these arguments fail to state claims for false or misleading statements under Section

37

10(b) and Rule 10b-5, and it incorporates those reasons here in finding that the arguments similarly do not support a strong inference of scienter.

*Second*, Plaintiffs contend that WBD's quick and modest resolution of its lawsuit against the NBA supports scienter because it shows that Defendants did not "genuinely or reasonably believe[e] that the Matching Clause entitled WBD to retain the NBA Rights." (Pl. Opp. 28).  It is true, as Plaintiffs argue, that courts have found "related litigations and settlements relevant to scienter." (*Id.* at 28-29 (citing *Rmed Int'l, Inc.* v. *Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL), 2002 WL 31780188, at *2 (S.D.N.Y. Dec. 11, 2002)).  But the Court has already explained why the Matching Clause Statements were not false or misleading:  Defendants never stated that the Matching Clause guaranteed WBD the right to keep the NBA Rights, only that it ensured WBD the chance to continue to vie for the Rights if a rival made a competing offer.  *A fortiori*, the Court cannot find that WBD's lawsuit against the NBA evinces a reckless disregard for the truth of Defendants' statements.  After all, the Matching Clause did exist and did grant WBD the opportunity to match a competing bid. So even if WBD's lawsuit to enforce that right was unsuccessful, the Court does not believe that the lawsuit or the settlement demonstrate "deliberate, illegal behavior, or highly unreasonable conduct that 'constituted an extreme departure from the standards of ordinary care[.]'" *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *15 (quoting *Lululemon Sec. Litig.*, 14 F. Supp. 3d at 573).  Put somewhat differently, the lawsuit and settlement do not

38

demonstrate scienter on their own, and they certainly do not when considered collectively with all the other facts of this case. *See Tellabs*, 551 U.S. at 323.

*Third* is a catch-all category of "additional" arguments for scienter, all of which fail. (Pl. Opp. 30-32). Plaintiffs suggest that the Individual Defendants' knowledge of the negotiations and the "high degree of specificity" with which they spoke about the negotiations show scienter. (*Id.* at 30). Relatedly, Plaintiffs assert that "the importance of the NBA Rights to WBD bolsters" this inference. (*Id.* at 31). But the Court fails to see how the Individual Defendants' knowledge of the negotiations, or of the importance of those negotiations, leads to such a finding. Mr. Zaslav and Mr. Wiedenfels were WBD's two top-ranking executives. They would not have been doing their jobs if they did not understand the details and the significance of the NBA Rights negotiations. Such knowledge does not demonstrate a reckless disregard for any facts, let alone an intent to deceive, manipulate, or defraud.

Plaintiffs also argue that because WBD's proposed matching offer substantially revised Amazon's competing bid, Defendants "knew or recklessly disregarded that WBD could not exercise the Matching Clause to retain the NBA Rights." (Pl. Opp. 31). But the Court has already explained why Defendants did not lie or deceive investors about the Matching Clause or WBD's ability to submit a matching bid. Further, engaging in competitive business negotiations by submitting an offer that attempts to replicate a rival bid does not show an intent to deceive, manipulate, or defraud investors.

39

Finally, Plaintiffs point to WBD's statements after disclosing the $9.1 billion impairment charge that the NBA Rights were a "unique asset that cannot be replaced" and that losing them would cause WBD "irreparable harm." (Pl. Opp. 31 (internal quotation marks omitted) (quoting FAC ¶¶ 136-141)). Plaintiffs say these statements contradict Mr. Zaslav's prior statement that "[we don't] have to have the NBA" and thus demonstrate scienter. (*Id.* (quoting FAC ¶¶ 94)). But as the Court has already explained, Defendants adequately disclosed the importance to WBD of the NBA Rights and the negative consequences that could result if WBD failed to renew those Rights. Indeed, WBD's SEC filings specifically warned of a potential impairment charge. (Polkes Decl., Ex. 11 at 43). So this argument does not support a strong inference of scienter either.

For all of these reasons, the Court finds that the FAC fails to allege scienter. Count I does not state a claim for this independent reason.

### 2.     Plaintiffs Fail to State a Claim Under Section 20(a)

Count II alleges that the Individual Defendants violated Section 20(a) of the Exchange Act as control persons. (FAC ¶¶ 187-192). To state a claim for control person liability under Section 20(a), "a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks and citation omitted). Because the FAC fails to plead a

primary violation under Section 10(b), Plaintiffs' Section 20(a) claim fails.  *See*
*Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011) (affirming
dismissal of Section 20(a) claim where plaintiff failed to allege a primary
violation).

### 3.    The Court Denies Plaintiffs Leave to Amend the FAC

Plaintiffs ask the Court to grant them leave to amend the FAC should the
Court find it deficient in any respect.  (Pl. Opp. 34).  The Court denies this
request.  Plaintiffs have already been given an opportunity to amend their
pleadings.  More pointedly, Plaintiffs "have failed to indicate in any way that
these defects can be cured by an amended complaint," *In re Progress Energy*,
371 F. Supp. 2d at 553, and the Court does not believe Plaintiffs can so cure
the FAC.

### 4.    Rule 11 Sanctions Are Not Warranted

Under the PSLRA, the Court is required to "include in the record specific
findings regarding compliance by each party and each attorney representing
any party with each requirement of Rule 11(b) of the Federal Rules of Civil
Procedure as to any complaint, responsive pleading, or dispositive motion."  15
U.S.C. § 78u-4(c)(1); *see also Rombach*, 355 F.3d at 178.  Because all legal
claims and defenses presented throughout this litigation were nonfrivolous
under existing law and all factual contentions had evidentiary support or were
reasonably based on belief or a lack of information, the Court finds that no
sanctions under Rule 11 are warranted.

41

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The Court dismisses Plaintiffs' claims with prejudice. The Clerk of Court is directed to amend the caption of the case and is further directed terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    March 30, 2026
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

42